**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WESTERNGECO, L.L.C. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. NO. 4:22-CV-03080 |
| | § | |
| MAGSEIS FF LLC, | § | |
| | § | |
| Defendant. | § | |

---

**NOTICE OF REMOVAL
EXHIBIT B**

---

**STATE COURT PLEADINGS**

Filed
8/5/2022 5:04 PM
**Beverley McGrew Walker**
District Clerk
Fort Bend County, Texas
Salena Jasso

CAUSE NO. <u>22-DCV-295787</u>

| | | |
|---|---|---|
| WESETERNGECO, L.L.C., | ) | IN THE DISTRICT COURT OF |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | FORT BEND COUNTY, TEXAS |
| | ) | |
| MAGSEIS FF LLC, | ) | Fort Bend County - 458th Judicial District Court |
| | ) | |
| Defendant. | ) | ___ JUDICIAL DISTRICT |

## <u>ORIGINAL PETITION</u>

Plaintiff WesternGeco L.L.C. ("WesternGeco" or "Plaintiff") files this Original Petition against Defendant Magseis FF LLC ("Magseis" or "Defendant") and respectfully shows as follows:

### I.       DISCOVERY CONTROL PLAN

1.      WesternGeco intends to conduct discovery under a Level 3 discovery control plan in accordance with Texas Rule of Civil Procedure 190.4.

### II.       PARTIES

2.      Plaintiff WesternGeco L.L.C is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 10001 Richmond Ave., Houston, TX 77042.

3.      Defendant Magseis FF LLC is a limited liability company organized and existing under the laws of the State of Delaware with offices at 9811 Katy Freeway, Suite 1100, Houston, Texas 77024.  Magseis may be served through its registered agent C T Corporation System at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

### III.       JURISDICTION AND VENUE

4.      This Court has jurisdiction over this lawsuit because the amount in controversy is within the jurisdictional limits of the Court.  WesternGeco seeks monetary relief over $1,000,000.

Copy from re:SearchTX

5.     This Court has personal jurisdiction over Magseis because Defendant continually conducts business in Texas, and the controversy at issue is related to Defendant's business in Texas. Tex. Civ. Prac. & Rem. Code § 17.042.

6.     Venue is appropriate in Fort Bend County, Texas, as it involves a major transaction and the parties agreed in writing via the March 31, 2022 Letter Agreement (the "Letter Agreement") (a copy of which is in Magseis' possession and which can be provided to the court for review in camera) that Fort Bend County would be the exclusive venue for disputes arising from the transaction.  All matters are to be tried by bench trial.  *See* Letter Agreement, Art. 12; TEX. CIV. PRAC. & REM. Code § 15.020(b).

## IV.     FACTUAL BACKGROUND

7.     WesternGeco is a leading provider of reservoir imaging, monitoring, and development services.  WesternGeco's world-class data library covers a wide range of basins throughout the globe.

8.     Magseis is a provider of, among other things, seismic acquisition and related services. Magseis professes to have "the largest and most advanced inventory of ocean bottom nodes (OBN) and source technology" making it "the recognized leader in OBN seismic."[1]  Among the OBN seismic technologies Magseis employs is ZXPLR technology, which Magseis touts as a "hybrid system" that allows for increased capacity in deepwater applications and greater safety and efficiency in shallow-water operations.[2]

9.     WesternGeco engages seismic acquisition providers, such as Magseis, to shoot and acquire seismic data from underwater regions in hopes of locating recoverable hydrocarbon reserves and other resources and/or opportunities.

---

[1] "About," https://magseisfairfield.com/about, accessed Aug. 4, 2022.
[2] "ZXPLR," https://magseisfairfield.com/zxplr, accessed Aug. 4, 2022.

2

Copy from re:SearchTX

### A. The Parties' Letter Agreement

10.     On March 31, 2022, WesternGeco entered into a Letter Agreement with Magseis, in which WesternGeco agreed to pay $4,000,000.00 in unowed compensation to Magseis in exchange for: (1) a priority right of first refusal for the services of Magseis' ZXPLR survey fleet and crew operating in the Gulf of Mexico (the "Contracted Fleet and Crew") and (2) for preferential, fixed pricing on WesternGeco's Engagement 3 and Engagement 4 surveys, if conducted within the time stated in the Letter Agreement.  *See* Letter Agreement, Art.'s 1-10.

### 1.   The Contracted Fleet and Crew

11.     The Contracted Fleet and Crew was selected for their recent experience on a previous engagement for WesternGeco (the Engagement 2 survey) in the Gulf of Mexico, and the right of first refusal for the Contracted Fleet and Crew was a material term of the Letter Agreement.

12.     Pursuant to the Letter Agreement, Magseis agreed to provide WesternGeco with weekly updates detailing Magseis's crew availability and crew schedule.  *See* Letter Agreement, Art. 6. Magseis agreed to inform WesternGeco within twenty-four (24) hours of executing the Letter Agreement of "any tenders/expressions of interest expected and/or received, and any offer made and or proposed prior to the Effective Date that could impact [the Contracted Fleet and Crew] availability."  *Id.*  Magseis agreed to provide "timelines and other relevant information including, but not limited to estimated contract award date, ***scheduling and any changes thereto***."  *Id.* (emphasis added).

13.     Magseis further agreed to provide WesternGeco with notice of any potential engagements of the Contracted Fleet and Crew within twenty-four (24) hours of "receipt and/or submission of any new and/or subsequent tenders/expressions of interest/LOI's/LOA's/agreements/etc. that might impact the [Contracted Fleet and Crew's] availability."  *See* Letter Agreement, Art. 7.

3

Copy from re:SearchTX

Magseis, again, agreed to provide WesternGeco "timelines and other relevant information including, but not limited to estimated contract award date, ***scheduling and any changes thereto***." *Id.* This information was meant to inform WesternGeco of potential, conflicting engagements and to allow time for WesternGeco to exercise its contractual right of first refusal.

14.     Once provided with notice of a potential engagement, WesternGeco was to have ten (10) business days to execute a written agreement with Magseis to secure the availability of the Contracted Fleet and Crew.[3]  *See* Letter Agreement, Art. 8.

2.  Fixed, Preferential Pricing

15.     In addition to the right of first refusal, WesternGeco paid for fixed, preferential pricing for its next two (2) engagements (Engagement 3 and Engagement 4), if conducted within the time stated in the Letter Agreement.  *See* Letter Agreement, Art. 2-5.  Specifically, Magseis agreed to waive the "Mobilisation fee" and "Demobilisation fee" for WesternGeco's next engagement.  *See* Letter Agreement, Art. 2.  This represented a substantial value and was an essential term of the Letter Agreement.

**B. Magseis Breaches the Letter Agreement by Failing to Provide Notice**

16.     On June 16, 2022, Magseis' Chief Sales Officer, Simon Hayter ("Hayter"), sent the following email to Gary Poole of WesternGeco:

---

[3] In the event that Magseis was unable to give WesternGeco 10 business days, Magseis agreed to provide WesternGeco with an alternate timeframe within 24 hours of receiving notice of a potential engagement.  Ex. 1, Art. 8.

4

Copy from re:SearchTX



**From:** Simon Hayter <simon.hayter@magseisfairfield.com>
**Sent:** 16 June 2022 20:48
**To:** Gary Poole <gpoole@slb.com>
**Cc:** Ibrahim Moussa <IMoussa@slb.com>; Carel Hooijkaas <Carel.Hooijkaas@magseisfairfield.com>; Tom Scoulios
<tom.scoulios@magseisfairfield.com>; Steve McIntosh <steve.mcintosh@magseisfairfield.com>
**Subject:** Z1 Availability etc.

Hi Gary

Following on from last week's update during EAGE.

This afternoon (16th June 2022) we received formal correspondence from an operator to use the Z1 XPLR crew for a campaign immediately after the current survey.

What is the official status of SLB's Engagement 3 project and the associated Letter of Authorisation & permit?

Let me also add that we have the 2nd XPLR crew running in the GoM plus a 3rd deepwater crew operating in Egypt. Both crews will finish their current campaigns in July/August.

We look forward to meeting at your convenience to discuss further.

With regards
Simon

**Simon Hayter**
*Chief Sales Officer*
+44 (0) 1444 892695 d
+44 (0) 7881 810459 c
magseis fairfield

17.    On June 21, 2022, Hayter sent a second email:



**From:** Simon Hayter <simon.hayter@magseisfairfield.com>
**Sent:** Tuesday, June 21, 2022 8:39 AM
**To:** Gary Poole <GPoole@slb.com>
**Cc:** Ibrahim Moussa <IMoussa@slb.com>; Carel Hooijkaas <Carel.Hooijkaas@magseisfairfield.com>; Tom Scoulios
<tom.scoulios@magseisfairfield.com>; Steve McIntosh <steve.mcintosh@magseisfairfield.com>
**Subject:** [Ext] RE: Z1 Availability etc.

Hi Gary

Things have progressed since we spoke on Friday. The company I referred to below has now provided signed documentation requesting the Z1 XPLR crew immediately following Mad Dog.

What is the official status of SLB's Engagement 3 project and the associated Letter of Authorisation & permit?

My comment below regarding the 2nd XPLR crew and the deepwater MASS crew still stands, although both crews have varying levels of interest.

With regard to the Z1 XPLR crew, we will continue to investigate the possibility of sliding a survey between Mad Dog and Company X, even though we have no unconditional award from SLB.

Regards
Simon

**Simon Hayter**
*Chief Sales Officer*
+44 (0) 1444 892695 d
+44 (0) 7881 810459 c
magseis fairfield

5

Copy from re:SearchTX

18.     Notably, neither email provided: (1) the contractually required, agreed-upon timeline information for the proposed, "Company X" engagement, including, but not limited to, the estimated contract award date or schedule for the Company X engagement.  Moreover, far from providing a deadline for WesternGeco to act, Magseis indicated that it could potentially perform both engagements by "sliding a survey" between its current engagement and the requested, Company X engagement.

19.     Despite its representations to WesternGeco, and despite never having served the required notice, Magseis committed the Contracted Fleet and Crew to the Company X engagement, denying WesternGeco its right of first refusal.

20.     WesternGeco notified Magseis of its defective performance and continued to negotiate in good faith in hopes of resolving the dispute.  Magseis' latest "solution" was to offer a different (piecemealed, technologically inferior and Gulf of Mexico inexperienced) fleet and crew at a rate approximately twelve million dollars ($12 million USD) higher than the Engagement 3 rate in the Letter Agreement (NOTE: delta may increase based on standby/downtime events that would have been avoided through use of the Contracted Fleet and Crew) —a rate that, among other things, inexplicably included Mobilisation and Demobilisation fees totaling over five million dollars ($5 million USD).  WesternGeco's only other option is to pay spot rates to hire a last-minute fleet and crew from another provider, which will likely cost WesternGeco at least twelve million dollars ($12 million USD) to sixteen million dollars ($16 million USD) more than the Engagement 3 rate promised by Magseis in the Letter Agreement. This will also, among other things, expose WesternGeco to downtime risk it would have mitigated through use of the Contracted Fleet and Crew it specifically bargained for.

6

Copy from re:SearchTX

21.     Thus, as a result of Magseis' breach, WesternGeco will, as it pertains to Engagement 3, be forced to forego its planned survey (an suffer associated consequences) or pay rates at least twelve million dollars ($12 million USD) to sixteen million dollars ($16 million USD) higher than the rates contained in the Letter Agreement, and suffer other business, operational and contractual related consequences that would have been avoided through use of the Contracted Fleet and Crew.

## V.     CAUSE OF ACTION

### Breach of Contract

22.     WesternGeco incorporates by reference the factual allegations set forth above.

23.     The Letter Agreement is a valid and enforceable contract.

24.     WesternGeco fully or substantially performed its contractual obligations under the Letter Agreement by paying Magseis four million dollars ($4 million USD) in unowed compensation.

25.     Pursuant to the Letter Agreement, Magseis agreed to provide written notice of any potential engagement and to allow WesternGeco to exercise its contractual right of first refusal.  As it pertains to Engagement 3, Magseis materially breached the Letter Agreement by failing to provide the required notice before accepting another contract of employment.

26.     This constitutes a material breach, as WesternGeco was not provided the benefit of the bargain for which it paid Magseis four million dollars ($4 million USD).

27.     Magseis's breach injured WesternGeco, which resulted in Engagement 3 related damages, including but not limited to WesternGeco's additional costs in securing alternative seismic acquisition services, which will result in at least twelve million dollars ($12 million USD) to sixteen million dollars ($16 million USD) in additional costs and other business, operational and contractual related consequences to WesternGeco.

7

## VI.    ATTORNEYS' FEES

28.    WesternGeco requests its costs, expenses, and reasonable and necessary attorneys' fees pursuant to Chapter 38.001 of the Texas Civil Practice and Remedies Code.   Additionally, WesternGeco requests its reasonable experts', attorneys' and collection agency fees and all court costs, fees and expenses pursuant to Section 12 of the Letter Agreement.

## VII.    CONDITIONS PRECEDENT

29.    All conditions precedent have been met prior to the filing of this action.  Specifically, Magseis has been notified of its defective performance.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff WesternGeco L.L.C respectfully asks that the Court enter a judgment:

a.   that Magseis breached the Letter Agreement;

b.   awarding damages to WesternGeco in an amount to be proven at trial;

c.   awarding WesternGeco its reasonable and necessary attorneys' fees, experts' fees, collection agency fees, and other/related fees, costs, and expenses;

d.   awarding pre-judgment and post-judgment interest to WesternGeco as may be allowed by law; and

e.   awarding such other further relief that the Court deem just, equitable, and proper.

Copy from re:SearchTX

Dated: August 5, 2022

Respectfully submitted,

**WINSTON & STRAWN, LLP**

*/s/ James H. Nye*
James H. Nye
Texas Bar No. 24056055
jnye@winston.com
800 Capitol Street, Suite 2400
Houston, Texas 77002
Tel. (713) 651-2600
Fax (713) 651-2700

**ATTORNEY FOR PLAINTIFF**
**WESTERNGECO L.L.C.**

9

Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nita Moore on behalf of James Nye
Bar No. 24056055
NiMoore@winston.com
Envelope ID: 67029956
Status as of 8/8/2022 9:01 AM CST
Associated Case Party: WesternGeco, L.L.C.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jim Nye | | jnye@winston.com | 8/5/2022 5:04:36 PM | SENT |

Copy from re:SearchTX



CT CORPORATION
**Service of Process Notification**
08/10/2022
CT Log Number 542090831

## Service of Process Transmittal Summary

**TO:**    Elloria Lindley
Magseis Ff LLC
9811 KATY FWY STE 1100
HOUSTON, TX 77024-1273

**RE:**    **Process Served in Texas**

**FOR:**   Magseis FF LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | WESETERNGECO, L.LC vs. MAGSEIS FF LLC |
| **CASE #:** | 22DCV295787 |
| **PROCESS SERVED ON:** | C T Corporation System, Dallas, TX |
| **DATE/METHOD OF SERVICE:** | By Process Server on 08/10/2022 at 14:33 |
| **JURISDICTION SERVED:** | Texas |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air , 1ZX212780110488664 |
| **REGISTERED AGENT CONTACT:** | C T Corporation System<br>1999 Bryan Street<br>Suite 900<br>Dallas, TX 75201<br>877-467-3525<br>SmallBusinessTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



## PROCESS SERVER DELIVERY DETAILS

**Date:**
**Server Name:**

Wed, Aug 10, 2022
DON ANDERSON

| Entity Served | MAGSEIS FF LLC |
|---|---|
| Case Number | 22-DCV-295787 |
| Jurisdiction | TX |

| Inserts |
|---|
| | | |



SERVICE FEE NOT COLLECTED
BY DISTRICT CLERK

**THE STATE OF TEXAS**

**CITATION**

TO:     **MAGSEIS FF LLC**
        **REGISTERED AGENT CT CORPORATION SYSTEM**
        **1999 BRYAN ST SUITE 900**
        **DALLAS TX  75201**

**NOTICE:**

You have been sued.  You may employ an attorney.  If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on Monday next following the expiration of twenty days after you were served this citation and **ORIGINAL PETITION** filed on **August 05, 2022,** a default judgment may be taken against you.  In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.

The case is presently pending before the **458TH JUDICIAL DISTRICT COURT** of Fort Bend County sitting in Richmond, Texas. It bears cause number **22-DCV-295787**  and is styled:

**WESETERNGECO, L.L.C. VS. MAGSEIS FF LLC**

The name and address of the attorney for **PLAINTIFF(S)** is:

**JAMES H. NYE**
**WINSTON & STRAWN LLP**
**800 CAPITOL STREET SUITE 2400**
**HOUSTON TX  77002**
**713-651-2600**

The nature of the demands of said **PLAINTIFF(S)** is shown by a true and correct copy of the **ORIGINAL PETITION** accompanying this citation and made a part hereof.

If this Citation is not served, it shall be returned unserved. Issued under my hand and seal of said Court, at Richmond, Texas, **on this the 9th day of August, 2022.**

                          **BEVERLEY MCGREW WALKER, DISTRICT CLERK**
                          **FORT BEND COUNTY, TEXAS**
                          Physical Address:
                          1422 Eugene Heimann Circle, Room 31004
                          Richmond, Texas 77469
                          Mailing Address:
                          301 Jackson Street, Room 101
                          Richmond, Texas 77469

                          By: _____
                          **Deputy District Clerk SHELBY TAYLOR**
                          **Telephone:** (281) 633-7613

22-DCV-295787
WeseternGeco, L.L.C. vs. Magseis FF LLC                    458th Judicial District Court

## OFFICER'S OR AUTHORIZED PERSON'S RETURN

Came to hand on the _____ day of _____, 20___, at _____ o'clock ___M.  Executed

at _____, within the County of _____

_____, at _____o'clock ___M. on the _____ day of _____,

20__, by delivering to the within named _____

_____, in person, a true copy of this citation together with the accompanying copy of the petition, having first

attached such copy of such petition to such copy of citation and endorsed on such copy of citation the date of

delivery.


Total fee for serving ___ citation at $80.00 each  $_____

_____
Name of Officer or Authorized Person

_____County, Texas

By:_____
                    Signature of Deputy or Authorized Person
*State day and hour and place of serving each person.

**COMPLETE IF YOU ARE A PERSON OTHER THAN A SHERIFF, CONSTABLE, OR CLERK OF THE COURT.**

In accordance with Rule 107:  The officer or authorized person who serves, or attempts to serve, a citation shall sign the return.  The signature is not required to be verified.  If the return is signed by a person other than a sheriff, constable, or the clerk of the court, the return shall be signed under penalty of perjury and contain the following statement:

"My name is _____,
                              (First, Middle, Last)

my date of birth is_____, and my address is _____
                                                                                            (Street, City, Zip)

_____."

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed in _____ County, State of _____, on the _____

day of _____.

_____
Declarant / Authorized Process Server

_____
(Id # & expiration of certification)

**ORIGINAL**

Citation issued to Magseis FF LLC  on 8/9/2022.

SERVICE FEE NOT COLLECTED
BY DISTRICT CLERK

THE STATE OF TEXAS

CITATION

TO:     MAGSEIS FF LLC
        REGISTERED AGENT CT CORPORATION SYSTEM
        1999 BRYAN ST SUITE 900
        DALLAS TX  75201

NOTICE:

You have been sued.  You may employ an attorney.  If you or your attorney do not file a written answer with the
clerk who issued this citation by 10:00 a.m. on Monday next following the expiration of twenty days after you were
served this citation and **ORIGINAL PETITION** filed on **August 05, 2022**, a default judgment may be taken against
you.  In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other
parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with
the clerk. Find out more at TexasLawHelp.org.

The case is presently pending before the **458TH JUDICIAL DISTRICT COURT** of Fort Bend County sitting in
Richmond, Texas. It bears cause number **22-DCV-295787**  and is styled:

**WESETERNGECO, L.L.C. VS. MAGSEIS FF LLC**

The name and address of the attorney for **PLAINTIFF(S)** is:

**JAMES H. NYE**
**WINSTON & STRAWN LLP**
**800 CAPITOL STREET SUITE 2400**
**HOUSTON TX  77002**
**713-651-2600**

The nature of the demands of said **PLAINTIFF(S)** is shown by a true and correct copy of the **ORIGINAL PETITION**
accompanying this citation and made a part hereof.

If this Citation is not served, it shall be returned unserved. Issued under my hand and seal of said Court, at
Richmond, Texas, **on this the 9th day of August, 2022.**

                              **BEVERLEY MCGREW WALKER, DISTRICT CLERK**
                              **FORT BEND COUNTY, TEXAS**
                              Physical Address:
                              1422 Eugene Heimann Circle, Room 31004
                              Richmond, Texas 77469
                              Mailing Address:
                              301 Jackson Street, Room 101
                              Richmond, Texas 77469

                              By: _____
                              **Deputy District Clerk** SHELBY TAYLOR
                              **Telephone:** (281) 633-7613

SERVICE

22-DCV-295787                              458th Judicial District Court
WeseternGeco, L.L.C. vs. Magseis FF LLC

## OFFICER'S OR AUTHORIZED PERSON'S RETURN

Came to hand on the _____ day of _____, 20__, at _____ o'clock ___M.  Executed

at _____, within the County of _____

_____, at _____o'clock ___M. on the _____ day of _____,

20__, by delivering to the within named _____

_____, in person, a true copy of this citation together with the accompanying copy of the petition, having first

attached such copy of such petition to such copy of citation and endorsed on such copy of citation the date of

delivery.

Total fee for serving ___ citation at $80.00 each  $_____

                        _____
                        Name of Officer or Authorized Person

                        _____County, Texas

                        By:_____
*State day and hour and place of serving each person.        Signature of Deputy or Authorized Person

__COMPLETE IF YOU ARE A PERSON OTHER THAN A SHERIFF, CONSTABLE, OR CLERK OF THE COURT.__
In accordance with Rule 107:  The officer or authorized person who serves, or attempts to serve, a citation shall sign the return.  The signature is
not required to be verified.  If the return is signed by a person other than a sheriff, constable, or the clerk of the court, the return shall be signed
under penalty of perjury and contain the following statement:

"My name is _____,
                        (First, Middle, Last)

my date of birth is_____, and my address is _____
                                                        (Street, City, Zip)

_____."

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed in _____ County, State of _____, on the _____

day of _____.

                        _____
                        Declarant / Authorized Process Server

                        _____
                        (Id # & expiration of certification)

**SERVICE**

Citation issued to Magseis FF LLC  on 8/9/2022.

Filed
9/6/2022 10:10 AM
**Beverley McGrew Walker**
District Clerk
Fort Bend County, Texas
Shelby Taylor

## NO. 22-DCV-295787

| | | |
|---|---|---|
| WESTERNGECO, L.L.C. | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | FORT BEND COUNTY, TEXAS |
| | § | |
| MAGSEIS FF LLC, | § | |
| | § | |
| Defendant. | § | 458TH JUDICIAL DSITRICT |

## MAGSEIS FF LLC'S ORIGINAL ANSWER TO
## WESTERNGECO, L.L.C.'S ORIGINAL PETITION

Defendant Magseis FF LLC files this Original Answer to Plaintiff WesternGeco L.L.C.'s Original Petition and respectfully shows as follows.

### GENERAL DENIAL

In accordance with the rights granted by Rule 92 of the Texas Rules of Civil Procedure, Defendant generally denies each and every material allegation contained in the Plaintiff's Original Petition and demands strict proof thereof by a preponderance of the evidence.

### THE CONTRACT

On April 7, 2021, Eastern Echo DMCC ("Schlumberger") and Magseis Fairfield ASA entered into a Global Agreement for Purchase of Services ("MSA"). See MSA attached as Exhibit A. The parties expressly agreed that the MSA would apply and serve as an umbrella agreement for the parties' relationship and the seismic work.

When Schlumberger wanted to obtain seismic information from the ocean bottom, it could choose to contact Magseis to provide an appropriate vessel, qualified crewmembers and seismic

technology for its information-gathering mission. Under the MSA, Schlumberger was required to submit a Service Order (Exhibit H to the MSA): a statement of work that specifically described the services to be performed, the pricing and commercial conditions, all of which was signed by the parties. Once agreed, the Service Order was a separate contract, and the MSA along with its Exhibits were included in and formed part of the Service Order.

In this case, WesternGeco, L.L.C. contacted Magseis FF LLC to provide its vessels, crewmembers and seismic technology to obtain valuable information from the bottom of the Gulf of Mexico for WesternGeco. The parties signed a Service Order – Ocean Bottom Node Seismic 3D Data Acquisition Engagement 2, GOM, USA – on April 13, 2021 (referred to as "Engagement 2 Service Order"). See Engagement 2 Service Order attached as Exhibit B. Engagement 2 Service Order expressly incorporates the MSA and any amendments, and WesternGeco's purchase of services under the Service Order "shall be subject to the terms of the [MSA]." Exhibit B, p.3.

On March 31, 2022, the parties created an addendum to Engagement 2 Service Order, through which WesternGeco paid Magseis $4 million for Engagement 2 cost overruns, and Magseis agreed to give information to WesternGeco relating to any tenders or expressions of interest from non-Schlumberger entities that might impact Magseis' Gulf of Mexico crew availability. See Letter Agreement for Engagement 2 Service Order attached as Exhibit C. Upon receipt of notice from Magseis, WesternGeco promised to submit and get a Magseis signature on a written agreement when it wanted to secure the next-available Gulf of Mexico seismic crew. Exhibit C, p. 2, ¶ 8. WesternGeco promised not to unreasonably withhold or delay its response to Magseis. *Id.*

<u>NOTICE TO WESTERNGECO</u>

On June 10, 2022, Magseis notified WesternGeco by email of a competitor's desire to use

the Z1 XPLR seismic crew on a Gulf of Mexico campaign immediately after the current survey ended in July/August 2022. On June 21, 2022, Magseis followed up and advised WesternGeco by email that the competitor had now submitted a written request for the Z1 XPLR seismic crew.

WesternGeco did not respond within 10 business days to either written notice from Magseis and did not comply with the Letter Agreement for Engagement 2 Service Order. Magseis performed all of its obligations under the Letter Agreement for Engagement 2 Service Order.

## AFFIRMATIVE DEFENSES

Defendant asserts that Plaintiff has not satisfied all conditions precedent.

Plaintiff's claims are barred, in whole or part, by waiver and estoppel.

Plaintiff is barred from recovery, in whole or part, because Plaintiff caused or contributed to its alleged damages.

Plaintiff's claims are barred, in whole or part, under the contract terms at issue.

Defendant reserves its right to amend its Answer to include additional affirmative defenses once it has had the opportunity to more closely investigate and evaluate the claims and allegations of the Plaintiff in this matter.

## PRAYER

Defendant Magseis FF LLC prays that Plaintiff WesternGeco L.L.C. take nothing, that Defendant be allowed to recover costs of suit, and for such other and further relief, at law or in equity, it which it may be justly entitled.

Respectfully submitted,

**KENNEDYS CMK, LLP**

CANDACE A. OURSO
State Bar No. 24008952
candace.ourso@kennedyslaw.com
CALLIE MURPHY
State Bar No. 24041546
callie.murphy@kennedyslaw.com
C. DOUGLAS WHEAT
State Bar No. 21246600
doug.wheat@kennedyslaw.com
848 Heights Boulevard
Houston, Texas 77007
T:  832.753.8062
F:  832.753.8079
***ATTORNEYS FOR DEFENDANT***
***MAGSEIS FF LLC***

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2022, a true and correct copy of the foregoing has been served on all known counsel of record, in accordance with the Texas Rules of Civil Procedure

CANDACE OURSO

# EXHIBIT A

**Magseis Fairfield - OBN Acquisition MSA 20210401**

**GLOBAL AGREEMENT FOR PURCHASE OF SERVICES**

**N°SLB--01/04/2021-MSFF/ASL431012**

**GLOBAL-Purchase of Services**

**Between**

**Eastern Echo DMCC**

**and**

**MAGSEIS FAIRFIELD ASA**

**For**

**MARINE SEISMIC OBN DATA ACQUISITION**

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 21E1D380-A995-4786-BD79-AD760008FEA0

Magseis Fairfield - OBN Acquisition MSA 20210401

**FORM OF AGREEMENT**

This Global Agreement for Purchase of Marine Seismic Data Acquisition Services is entered into as of this day 7th of April 2021 ("*Effective Date*") by and between:

(i)  **Eastern Echo DMCC,** a company incorporated under the laws of United Kingdom, having its registered address at Unit No: 296, DMCC Business Centre, Level No 5, Jewellery & Gemplex 2, Jumeirah Lake Towers, Dubai, United Arab Emirates, (referred to herein as "*Schlumberger*"); and

(ii)  **MAGSEIS FAIRFIELD ASA**, a company incorporated under the laws of Norway, having its registered address at  Strandveien 50, N-1366, Lysaker, Norway (referred to herein as "*Supplier*").

Schlumberger and Supplier are herein sometimes referred to individually as a "*Party*" and collectively as the "*Parties*".

**WHEREAS** Supplier is specialized in the provision of certain seismic data, and marine geological and seismic acquisition services (and represents that it has the required expertise, facilities, experience, and resources in respect thereof), and Schlumberger may from time to time purchase the same.

**NOW THEREFORE** Schlumberger and Supplier agree as follows:

1.  This Global Agreement for Purchase of Services consists of this document (also referred to as "*Form of Agreement*"), and the following attachments:
    - Exhibit A (*General Terms and Conditions for Purchase of Services*);
    - Exhibit B (*Special Terms and Conditions for Purchase of Services)*;
    - Exhibit C (*Description of Services)*;
    - Exhibit D *(Pricing)*;
    - Exhibit E (*Schlumberger's Quality, Health, Safety and Environment Policy)*;
    - Exhibit F *(Working Conditions Guidelines)*;
    - Exhibit G (*Access to Schlumberger Electronic Procurement Systems)*;
    - Exhibit H (*Form of Service Order/Local Agreement)*; and
    - Exhibit I (*Form of Variation Order*)

    made an integral part hereof, (collectively, the "*Agreement*"). The order of precedence between all the documents is set forth in Exhibit A.

2.  This Agreement will apply globally, as an umbrella agreement between the Parties and their Affiliates. Under this Agreement, Schlumberger or its Affiliates (as defined herein) may from time to time order certain services provided by Supplier or its Affiliates, and Supplier or its Affiliates may provide said services to Schlumberger or its Affiliates, subject to the terms and conditions hereof. Unless otherwise specified, references to Schlumberger or Supplier in this Agreement shall be deemed to include their respective Affiliates (as defined herein).

    Schlumberger hereby agrees that any of its Affiliates shall by executing an Order become a Party to and be bound by the terms of this Agreement for the purposes of that Order. Likewise, Supplier hereby agrees that any of its Affiliates shall by executing an Order become a Party to and be bound by the terms of this Agreement for the purposes of that Order. Each Party furthermore agrees that no termination rights shall arise in either party by virtue of any Affiliate of a party becoming a Party to this Agreement by executing an Order.

3.  The Agreement shall come into force on the Effective Date and shall remain in full force and effect for a period of three (3) years thereafter, unless earlier terminated under the provisions hereof, or extended.

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 21F1D380-A995-4786-BD79-AD760008FEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

**IN WITNESS WHEREOF**, the Parties have signed this Agreement in duplicate originals by their duly authorized representatives.

For Eastern Echo DM CC :

Signature: _____

Name: _____
Celia Rodrigues

Title: _____
Director

Date: _____
11-Apr-21

**For MAGSEIS FAIRFIELD ASA:**

Signature: _____

Name:  Carel Hooijkaas_____

Title:   Chief Executive Officer_____

Date: _____
8 April 2021

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

## EXHIBIT A –TERMS AND CONDITIONS FOR PURCHASE OF SERVICES

ARTICLE 1 – DEFINITIONS

For the purpose of this global Agreement, unless the context otherwise requires, the following words shall have the following meanings:

1.1   "*Affiliates*" means with respect to either Party, an entity that directly or indirectly through one or more intermediaries, controls or is controlled by that Party, or an entity that is controlled by the same entity that controls the Party. Control means having the right to decide, directly or indirectly, the manner of exercising more than fifty percent (50%) of the votes in a general meeting of an entity or more than fifty percent (50%) of the votes in a meeting of the executive body of an entity.

1.2   "*Applicable Laws*" means all laws, regulations, and requirements and orders of any properly constituted governmental authority or entity in force from time to time in the Country of Operations, the Supplier's country of incorporation or to which the Supplier is subject, and which are relevant to the performance of this Agreement and/or the Work and/or an Order.

1.3   "*Area of Operations*" means the area offshore the Country or Countries described in the Scope of Work of the Order and any other location where the Work under such Order is carried out as specified therein.

1.4   "*Change Order*" means an order to change the Work under the specific Order issued by Schlumberger under Article 20, and executed by the Parties in the form of Exhibit I attached hereto.

1.5   "*Change Order Request*" means a request to change the Work issued by Supplier under Article 20.

1.6   "*Claims*" means any claims, demands, causes of action, judgments, proceedings, liabilities, awards, damages, losses, civil fines, penalties, costs (including legal fees and costs) and expenses.

1.7   "*Commencement Date*" means the date, or date window, specified as such in the Order, on which date Supplier has completed Mobilization to the Area of Operations and the Equipment acquires the first seismic production recording, or seismic test recording, as part of the Work to be conducted by Supplier.

1.8   "*Completion Date*" means the date, or date window, specified as such in the Order, on which it is estimated Supplier has completed the Work in accordance with this Agreement and the respective Order.

1.9   "*Confidential Information*" means all information disclosed by the disclosing Party or its Affiliates to the receiving Party or its Affiliates or obtained by the receiving Party or its Affiliates from the disclosing Party or its Affiliates whether in tangible or intangible form and whether written, drawn, printed, kept on computer or in any other form which relates to the disclosing Party or its Affiliates' past, present, and future research, development, technical, or business activities. Confidential Information shall be deemed confidential and proprietary to the disclosing Party or its Affiliates and include: (i) Data and Deliverables, (ii) drilling, coring, logging, testing, surveying, geographical, seismic, and geological information, (iii) technological innovations and advancements, (iv) design and manufacturing methods for Equipment, (v) pricing information, (vi) information on contract structure, (vii) this Agreement or the content of any Order (whether accepted or not by Supplier), (viii) files, prints, reproductions, designs, drawings, specifications, and shop details, or (ix) technical information developed from inspection or testing of the disclosing Party or its Affiliates apparatus or equipment.

1.10  "*Consequential Loss*" means any: (a) loss of use, loss of profit, loss of business, business interruption, loss of bargain or opportunity; and (b) punitive, special, incidental, indirect or consequential damages or losses; sustained or incurred out of or in connection with this Agreement or any Order and whether or not foreseeable at the Effective Date of the Agreement or the Order.

1.11  "*Country*" or "*Country of Operations*" means the country in which the Area of Operations is situated.

1.12  "*Data*" means any geological or geophysical data or information of an area acquired by Supplier in the performance of the Work, regardless of the form or medium on which such data are recorded or stored and any reports related thereto all as specified in the Order.

1.13  "*Deliverables*" means the original field tapes and any other Data, reports, documents or media produced by Supplier as a result of the Work, as described in Article 9.5.

Schlumberger-Private

1.14 "**Demobilization**" means all activities to be carried out by Supplier after the Completion Date in order to allow the completion of the Work in accordance with the requirements of this Agreement and the Order.

1.15 "**Demobilization Date**" means the date, or date window as specified in the Order, in which the last element or component of Supplier, Supplier Group Equipment, and Supplier Personnel is expected to leave the Area of Operations and the last member of the Supplier's crew is expected to be discharged from the Order after the Completion Date.

1.16 "**Electronic Order**" means an Order sent automatically by a system such as SWPS or Oracle without human intervention after Order approval.

1.17 "**Force Majeure**" means an event which is unforeseeable, beyond the control of the Party affected, and cannot be remedied by the exercise of reasonable diligence, including acts of God, acts of civil or military authority, governmental orders, war, fire, explosion, labor unrest (except if limited to the Party affected), epidemic or pandemic (excluding COVID-19 and any of its variants)..

1.18 "**Indemnify**" means release, protect, defend, indemnify and hold harmless from and against any Claims of every kind and character.

1.19 "**Intellectual Property**" means any patent, copyright, proprietary right or confidential know-how, trademark, process, invention, and any other form of discovery (whether patented or patentable) made by any person or entity.

1.20 "**Liquidated Damages**" means an amount of money agreed by the Parties in the Order, as being a genuine pre-estimate of the loss (and not a penalty), which may be sustained and incurred by Schlumberger if Supplier fails to commence performance of the Work by the Commencement Date, and/or complete performance of the Work by the Completion Date as set out in the Order.

1.21 "**Mobilization**" means all activities to be carried out by Supplier before the Commencement Date in order to allow the beginning of the Work in accordance with the requirements of this Agreement and the Order, upon arrival at the Area of Operations.

1.22 "**Mobilization Date**" means the date or date window as specified in the Order, when Supplier, Supplier Group Equipment, and Supplier Personnel, fully conforming to the Order requirements, are expected to reach the Area of Operations having already been inspected.

1.23 "**Offshore Installation**" means: (i) a fixed permanent oil and gas platform; (ii) a floating, production, storage and off take vessel; (iii) a semi-submersible or jack-up drilling unit, (iv) a pipe lay vessel; (v) a well intervention vessel or any other vessel or installation, (vi) or other object connected to the seafloor or otherwise not readily removable.

1.24 "**Oracle**" means the electronic procurement tool used by Smith and M-I Swaco business units, which are Schlumberger wholly owned companies.

1.25 "**Order**" means an order issued by Schlumberger and accepted by Supplier as contemplated by Article 3.

1.26 "**Order Effective Date**" means the date stated in the preamble of an Order as being the date on which such Order becomes effective.

1.27 "**Party**" means either Schlumberger or Supplier and "**Parties**" means both of them, as the context so requires.

1.28 "**QHSE Policy**" means the health, safety, security and environmental policy and arrangements contained in Exhibit E.

1.29 "**Schlumberger**" means the Party designated as such in the preamble above and includes its successors or permitted assigns, and in respect of each Order, the Party named as such therein.

1.30 "**Schlumberger Group**" means Schlumberger, its parent, its Affiliates, its contractors (excluding Supplier and its subcontractors and vendors of any tier) and its and their respective employees, officers, directors, representatives, agents and invitees.

1.31 "**Schlumberger Personnel**" means the employees, agents, and/or representatives and invitees of Schlumberger, its contractors and subcontractors (excluding Supplier), joint venturers and the Affiliates of each of them engaged in the performance of the Work under the relevant Order.

1.32 "**Schlumberger Provided Data**" means all specifications, tapes, maps, survey designs, technical documents and other information, which are supplied by Schlumberger to Supplier for the performance of the Work or

Schlumberger-Private

DocuSign Envelope ID: 21F1D380-A995-4786-BD79-AD760008FEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

any part thereof.

1.33  "*Schlumberger Representative*" means the representative designated as such under Article 8.2.

1.34  "*Security*" means a condition that results from the establishment and maintenance of protective measures that ensure a state of inviolability from hostile acts or influences. These hostile acts or influences shall include, but not necessarily be limited to, any acts or actions of a civil or criminal nature such as terrorism, murder, assault, mugging, theft, blackmail, extortion, threats of any nature, car high-jacking, kidnapping, piracy, civil insurrection or civil war occurring in or in proximity to the Country of Operations/Area of Operations, and shall further include specific safety risks such as unexploded ordnance, chemical, biological or radioactive contamination.

1.35  "*Security Level Criteria*" means the security level and the associated physical security measures (including military or armed protection) as defined under Schlumberger's "SLB QHSE Standard 11 - Employee and Asset Security", or an alternative acceptable standard from Supplier as mutually agreed in writing by both Parties.

1.36  "*Service Order/Local Agreement*" (also equally referred to as "*Traditional Order*" or "*Order*") means any statement of work issued under this Agreement in substantially the form of Exhibit H attached hereto, signed by the Parties and describing the Services to be performed, the pricing and commercial conditions.

1.37  "*Subcontractor*" means a party to whom Supplier subcontracts any part of its obligations under this Agreement or the Order.

1.38  "*Supplier*" means the Party designated as such in the preamble above and includes its successors or permitted assigns, and in respect of each Order, the Party named as such therein.

1.39  "*Supplier Group*" means Supplier, its parent, its Affiliates, its Subcontractors and vendors of any tier, and its and their respective employees, officers, directors, representatives, agents and invitees.

1.40  "*Supplier Group Equipment*" or "*Equipment*" means the Vessel and seismic, navigation/positioning and all other equipment which is to be provided by Supplier in order for it to carry out its obligations under this Agreement including, but not limited to, those items as detailed in the Order.

1.41  "*Supplier Personnel*" means the employees, agents, and/or representatives and invitees of Supplier, its Subcontractors and vendors of any tier, joint venturers and participants and the Affiliates of each of them engaged in the performance of the Work under the relevant Order.

1.42  "*Supplier Representative*" means the representative designated as such under Article 8.1.

1.43  "*SWPS*" means the Schlumberger Web Procurement System, a system developed and implemented by Schlumberger as a procurement tool for the employees of Schlumberger and its Affiliates.

1.44  "*Third Party*" means any person or entity which is not a member of Schlumberger Group or Supplier Group.

1.45  "*Traditional Order*" means an Order which has not been sent in the manner described in Article 1.15 herein, (i) not automatically generated by one of the electronic procurement systems referenced in this Agreement, and usually (ii) executed by the Parties in the form of Exhibit H attached hereto (also known as a "*Service Order/Local Agreement*").

1.46  "*Vessel*" means the seismic vessel together with associated equipment, the description and specification of which are contained in the Order and/or any other vessel or vessels that may be required for the performance of the Work including any other vessel(s) supplied in substitution therefore. When preceded by the 'seismic' or 'survey', the word 'Vessel' shall specifically refer to the seismic data acquisition vessels.

1.47  "*Work*" means the acquisition of seismic Data and on board processing as described in an Order which is to be provided by Supplier or any one of its Affiliates under that Order, and all other obligations to be complied with by Supplier including such particulars and details not expressly defined but which are necessarily and customarily provided in the geophysical industry for the performance of obligations and liabilities as described herein and in the applicable Order.

ARTICLE 2 – PROVISION OF SERVICES TO SCHLUMBERGER AND ITS AFFILIATES

2.1  This Agreement is a global umbrella agreement which sets the terms and conditions under which Schlumberger may, from time to time, purchase from Supplier the Services described in Exhibit C and in accordance with Article 3, and Supplier may provide the same to Schlumberger.

2.3  Schlumberger shall under no circumstances incur any liability (including payment obligation) with respect to Services provided to its Affiliates under Orders entered into under this Agreement, and any implied

Schlumberger-Private

**Magseis Fairfield - OBN Acquisition MSA 20210401**

warranty, assurance or guarantee by Schlumberger of the performance by any of its Affiliates is hereby expressly excluded. When any Schlumberger Affiliate engages Supplier or an Affiliate of Supplier for the provision of Work under and Order, Supplier or Supplier's Affiliate shall only look to that Affiliate for the performance of its obligations under such Order, including any payment obligations.

2.2     Until an Order is executed by the Parties or any one of their Affiliates, neither Party shall have any obligation or liability to the other Party under this Agreement, except for the obligations set out in Articles [26, 30, 31, 33 and 34], which shall apply from the Effective Date hereof.

## ARTICLE 3 – ORDERS

3.1     To purchase Services, Schlumberger shall, each time it elects to do so, submit an Order.

3.2     Each Order shall set out the type, price and required date of performance of the Services, and other relevant information.

3.3     Supplier shall notify its acceptance or refusal of the Order within seven (7) working days of Order submission (unless a different period is stated in the Order).  Supplier's performance (in whole or in part) of the Services described in an Order shall constitute acceptance of such Order. Orders not accepted within such time frame shall be deemed rejected by Supplier and have no effect. Schlumberger may cancel any Order prior to its acceptance by Supplier.

3.4     Once accepted, an Order shall constitute a separate contract between the parties thereto. The terms of this Agreement and its Exhibits shall be included in and form part of such contract. The terms and conditions contained or referred to in this Agreement shall apply, regardless of whether the terms and conditions are referenced in the Order.

3.5     Schlumberger shall not be obligated to purchase and pay for any Services which have been included in an Order (i) not approved by the duly authorized representative of Schlumberger (with respect to Traditional Orders), or (ii) not submitted in accordance with the methods described in SWPS or Oracle (with respect to Electronic Orders).

## ARTICLE 4 – ORDER OF PREFERENCE; INTERPRETATION

4.1.    The various parts of this Agreement shall be read as one document, the contents of which, in the event of conflict or inconsistency, shall be given precedence in the following order listed in declining weight: (i) the Form of Agreement, (ii) Exhibit B, (iii) Exhibit A, and (iv) all other Exhibits listed in the Form of Agreement in declining weight. In case of conflict or inconsistency between an Order and the Agreement, the Agreement shall prevail. In case of conflict or inconsistency between the provisions of the Agreement (or those referred to in the Agreement) and any applicable laws or regulations, the provisions of the Agreement (or those referred to in the Agreement) shall, to the extent legally possible, prevail (and to the extent legally impossible, be amended accordingly), notwithstanding anything herein to the contrary.

4.2.    This Agreement replaces any Schlumberger Terms and Conditions for Purchase Orders which may be referred to on any Order. Furthermore, this Agreement applies in lieu of any terms or conditions (i) provided by Supplier during the performance of the Agreement (or of any Order), or (ii) contained or referred to in any form generally used by Supplier, or in any pre-contractual correspondence between the Parties applicable to the subject matter hereof, or (iii) implied by trade, custom, practice or course of dealing.

4.3.    References to occurrences *"under the Agreement"* (or such term with a similar meaning) shall be construed so as to include occurrences arising under any Order under this Agreement, notwithstanding anything herein to the contrary.

4.4.    The word "including" or "include" shall be deemed to be followed by the phrase "but not limited to". Reference to the masculine shall include the feminine genders and vice versa and reference to a gender shall be construed to include any other gender.

4.5.    References to Articles and Exhibits are to the articles and exhibits of this Agreement [and references to paragraphs are to paragraphs of the relevant Schedule]. The words "this Agreement", "herein", "hereof",

Schlumberger-Private

DocuSign Envelope ID: 2151D380-A985-47B6-BD79-AD760008EEA0

Magseis Fairfield - OBN Acquisition MSA 20210401

"hereby", "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular Article unless expressly so limited.

4.6.   Words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

## ARTICLE 5 – NON-EXCLUSIVE RELATIONSHIP BETWEEN THE PARTIES; NO COMMITMENT TO PURCHASE

5.1   The Parties expressly acknowledge and agree that their relationship under this Agreement shall be non-exclusive, and that each of them may, subject to their obligations pertaining to proprietary or confidential information or the like, enter into substantially similar agreements with other parties with respect to (i) services similar (or substantially similar) to the Services contemplated hereunder, or part thereof, or (ii) as applicable, the Services, or part thereof.

## ARTICLE 6 – SUPPLIER'S OBLIGATIONS, RESPONSIBILITIES AND UNDERTAKINGS

6.1   **Performance of Work**

(a)   **Equipment and Personnel.** In performing the Work, Supplier shall provide the Vessel and all management, supervision, personnel, materials, equipment, plant, consumables, facilities and all other things, whether of a temporary or permanent nature, so far as the necessity for providing the same is specified in the Order or can reasonably be inferred from the Work.

(b)   **Work Permits, Medical Care, Transportation, Lodging and Wages.** Supplier shall at its own cost perform or arrange for the performance of the following: (i) supply and management of Supplier Personnel including payment of salaries and wages, benefits, insurance and medical attention; (ii) fulfilment of immigration requirements including medical examinations, inoculations and personnel permits described in Article 7.1 or otherwise applicable; (iii) transportation of Supplier Personnel to and from the Area of Operations; and (iv) provision of food and accommodations for all Supplier Personnel onshore and on board the Vessel.

(c)   **Commencement Date and Work Progress**. Supplier shall use its best endeavors to commence the Work on the Commencement Date. Supplier shall, immediately upon becoming aware of any event which may cause any delay with regard to the Commencement Date, notify Schlumberger of such event and the assumed or estimated consequences thereof.

(d)   Supplier shall perform the Work on a twenty-four (24) hour per day basis, subject to the crew's safety which will be at the sole discretion of the Vessel's Master and as local legislation permits, if applicable. Supplier shall control the progress of the Work to ensure that the Work is completed by or around the estimated Completion Date.

(e)   Supplier shall, immediately upon becoming aware of the occurrence of any event or the possible imminent occurrence of any event which may cause any delay with regard to the contract schedule set out in the Order, notify Schlumberger of such occurrence or event and the assumed or estimated consequences thereof.

6.2   **Standard of Work**

(a)   Supplier shall undertake the Work:

(i)   strictly in accordance with this Agreement and the Order and in particular the scope, standards, operating procedures, timetable, technical specifications and reporting set out in this Agreement and/or the Order; and

(ii)   in compliance with Applicable Laws and sound oil and gas industry seismic acquisition or geophysical practices and with due regard to the protection of the environment; and

(iii)   in a good, efficient, safe and workmanlike manner using all due diligence, skill and care to be expected of a reputable contractor experienced in the types of seismic acquisition to be carried out under this Agreement and the Order.

Schlumberger-Private

Schlumberger-Private

**Magseis Fairfield - OBN Acquisition MSA 20210401**

(b) **Schlumberger Instructions.** Subject to its rights and responsibilities as an independent contractor under Article 28, Supplier shall comply with all instructions and directions issued by or on behalf of Schlumberger on matters relating to the Work.

(c) **Supplier Informed.** Supplier shall satisfy itself before executing each Order as to the extent and nature of the Work to be provided under it, including the materials, Equipment, consumables, personnel and facilities, general and local geographic, climatic, weather and cultural conditions, the sufficiency of the rates and prices, all Applicable Laws (including tax and environmental laws) and all other matters which could reasonably be expected to affect the performance of the Work. Any failure by Supplier to take account of matters that affect the Work will not relieve Supplier from its obligation to undertake the Work.

6.3 **Health, Safety and Environment**

(a) Supplier shall comply with the QHSE Policy (set out in Exhibit E), and shall maintain during the term of this Agreement, a clear and comprehensive health, safety, security and environmental policy and arrangements acceptable to Schlumberger, but always in compliance with Applicable Laws. Supplier shall provide Schlumberger with a copy of such policy and arrangements documenting that they comply with Applicable Laws upon request following execution of this Agreement or any Order and shall forthwith make and implement any reasonable changes thereto which Schlumberger may from time to time notify Supplier. The Parties may agree upon and conclude a bridging document to ensure harmonization between Supplier's QHSE policies and Schlumberger's QHSE policies applicable to the performance of the Work.

(b) Schlumberger may carry out ad hoc audits of Supplier's compliance with Article 6.2. Supplier shall forthwith rectify at its sole costs and risks any deficiencies which Schlumberger notify Supplier following any such audit.

(c) Supplier shall notify Schlumberger forthwith of any accidents, incidents or near misses resulting in personal injury to, or death of any person, or damage to any property arising out of or as a consequence of the Work, and shall promptly thereafter take all necessary remedial actions in respect of any such accident, incident or near miss and shall prepare such reports thereon as may be required by any Applicable Laws or as Schlumberger may require from time to time. Without relieving Supplier of its obligations hereunder, Supplier shall allow and co-operate with Schlumberger's own investigation into any accident, incident or near miss.

6.4 **Security**

(a) Prior beginning Work, the Parties shall perform a security assessment of the Area of Operations/Country of Operations, either as a desktop exercise or through a Schlumberger-approved security company or advisors, to certify that proper measures (including military or armed protection, if required) complying with the applicable Security Level Criteria have been or will be implemented by Supplier to ensure the security of the Vessels, crew, Supplier Personnel and any other personnel engaged in performing the Work in the Area of Operations/Country of Operations.

(b) If such assessment reveals that security is required for the performance of the Work, Supplier shall engage a Schlumberger-approved security provider and agree a security plan that complies with the Security Level Criteria. Supplier shall provide the final security plan to Schlumberger for approval prior to Supplier entering into any agreement with such Schlumberger-approved security services provider.

(c) The security arrangements specified by the security plan shall be put in place prior to commencing the Work specified in the Order. Security measures may include:

(i) guard/armed security for Vessels, Equipment, Personnel and materials for the duration of performance of the Work, provided always that proper security plans and rules of engagement are agreed to the mutual satisfaction of the Parties;

(ii) MEDI VAC transportation for Personnel (meeting OGP time guidelines put forward in document 317) to the closest location (to be agreed with Supplier Representative); and

(iii) air transportation for Personnel complying with Schlumberger's standards (helicopter or airplane) if required.

(d) All approved and properly documented costs incurred by Supplier to provide such security, shall be reimbursed by Schlumberger to Supplier at cost.

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

(e)     Schlumberger acknowledges that security levels in or near Areas of Operations may be dynamic and can be revised or reviewed as circumstances dictate, based on significant political events or any other events that change the overall security level during the performance of the Work. Any amendment to the security plan necessitated by such events shall be based on the Security Level Criteria reference document, or otherwise agreed by the Parties and the security provider.

(f)     If the Parties determine that security is required for the performance of Work under an Order, provision of the agreed Security Level Criteria by Supplier shall be a material term of such Order. If Schlumberger determines that Supplier is not implementing the agreed and approved minimum Security Level Criteria, Schlumberger may suspend the Work at no cost to Schlumberger until this is remedied. If such suspension period continues for more than ten (10) days, Schlumberger may terminate the Order in question under Article 17.4(f). Upon such termination, Supplier shall only be paid for Work performed up to the date of the notice of termination.

(g)     If an act of piracy is deemed higher than the security level criteria as stipulated within a project Service Order, then it may be deemed by the Parties as a Force Majeure event.

6.5     **Supplier's Representations.** Supplier represents and warrants that on the Effective Date and throughout the term of each Order:

(a)     (i) it has the experience and capability including sufficient and competent employees, supervisors and other Personnel and all necessary facilities and Equipment to perform the Work efficiently, safely and expeditiously; (ii) the Vessel's master, officers and crew are fully and properly qualified for the positions they hold and experienced in offshore operations and practices; and (iii) the Vessel is manned so as to ensure compliance with the appropriate manning regulations and the reasonable requirements of Schlumberger;

(b)     the Vessel will be, on the Commencement Date of and throughout the term of each Order, in all respects in a seaworthy condition appropriate for the Vessel's intended use, and the Vessel and all other items of Supplier Group Equipment have all certificates as may be required by Applicable Laws and all such certificates shall be maintained valid throughout the term of the Order;

(c)     (i) no other person or corporation has any known right, title or interest in or to the Vessel or any of its machinery or equipment, other than Supplier's voluntary mortgage of the Vessel and its machinery and equipment established prior to this Agreement, (ii) no involuntary lien, mortgage or encumbrance shall be placed upon the Vessel during the term of the respective Order; if an involuntary lien, mortgage or encumbrance is placed upon the Vessel or the Data during the term of the respective Order, Supplier shall immediately notify Schlumberger and ensure its immediate discharge; if the Vessel is prevented from working due to such lien, mortgage or encumbrance, Supplier shall immediately provide a substitute Vessel to undertake the Work, in in accordance with Article 10.4(d) of this Agreement;

(d)     the Vessel (i) is classed Lloyds 100A1; LMC; or equivalent classification within the International Association Classification Society (IACS) (ii) shall be fully maintained in class throughout the term of this Agreement or the Order, and (iii) shall fit the description set out in the Order; and

(e)     it shall comply with the Maritime Labor Convention 2006 and any subsequent amendment thereto, ("***MLC 2006***") and all and any relevant national laws of the Country of Operations or Home Country (as applicable) governing the working and living conditions of seafarers, which includes but is not limited to legislation implementing the MLC ("***National Seafarer's Law***"). For the purposes of this Article 6.5(e), "***Home Country***" means the country of residence of Supplier Personnel or Supplier.

6.6     **Schlumberger's Representations.** Schlumberger represents and warrants that:

(a)     it has the right or authorization granted by the government or any authority or entity representing the government of the Country of Operations or any third party having any rights, benefit or interest in and over the Area of Operations, to perform or to have performed the Work in or over the Area of Operations;

(b)     the performance of the Work by Supplier will not breach or violate the rights of any Third Party in and over the Area of Operations or the terms and conditions of any contract of which Schlumberger is a party to;

Schlumberger-Private

Schlumberger-Private

**Magseis Fairfield - OBN Acquisition MSA 20210401**

(c)     entering into this Agreement or any Order under this Agreement does not conflict or violate any term or condition of any agreement of which Schlumberger is a party to;

(d)     all authorizations, permits or licenses required to be obtained are obtained and remain valid and in force throughout the performance of the Work under the respective Order.

## ARTICLE 7 – LOCAL APPROVALS, PERMITS

7.1     **Supplier Approvals.** Supplier shall obtain at its own cost from the appropriate authorities all necessary consents, permits, authorizations and licenses required by Applicable Laws for the performance of the Work to be obtained by or in the name of Supplier, including where applicable: (a) those import and export approvals and other permits required to use the Vessel and other Supplier Group Equipment in the Area of Operations; and (b) all visas, passport, work permits, exit and re-entry permits and all other governmental authorizations or documentation required in connection with the entry, presence, employment and/or exit of Supplier Group Personnel into/in/from the Area of Operations. Schlumberger shall provide all reasonable assistance to enable Supplier to obtain same, but Schlumberger shall in no circumstances be responsible for any failure of Supplier to obtain any such permit or licenses or for any consequence of such failure.

7.2     **Schlumberger Approvals.** Schlumberger shall obtain at its own cost from the appropriate authorities all necessary consents, permits, authorizations and licenses required by Applicable Laws for the performance of the Work to be obtained by or in the name of Schlumberger, including where applicable all visas, passport, work permits, exit and re-entry permits and all other governmental authorizations or documentation required in connection with the entry, presence, employment and/or exit of Schlumberger Group Personnel into/in/from the Area of Operations. Supplier shall provide all reasonable assistance to enable Schlumberger to obtain same, but Supplier shall in no circumstances be responsible for any failure of Schlumberger to obtain any such permits, work visas or licenses or for any consequence of such failure.

7.3     **Mobilization.** Supplier shall not mobilize to or commence Work in the Area of Operations without obtaining the specific written approval to do so from Schlumberger and in accordance with the terms and conditions of the Order.

## ARTICLE 8 – APPOINTMENT OF REPRESENTATIVES

8.1     **Supplier Representative**

(a)     Prior to the Commencement Date of each order, Supplier shall designate an individual identified in that Order to be its representative on board the Vessel. Supplier's Representative shall be authorized by Supplier at all times during the term of the Order to direct and control Supplier's performance of the Work and to discuss and agree with Schlumberger Representative all matters which relate thereto. Supplier shall not remove or replace Supplier Representative without the prior written consent of Schlumberger, which shall not be unreasonably withheld or delayed. Supplier Representative shall liaise with Schlumberger Representative to ensure that the Work is satisfactorily performed in a safe and timely manner.

(b)     Supplier or Supplier Representative may nominate a deputy or replace Supplier Representative by giving written notice thereof to Schlumberger and Schlumberger Representative. Such deputy or replacement shall have the same powers and authority as Supplier Representative.

(c)     For the avoidance of doubt, it is expressly acknowledged that Supplier Representative shall not have authority to agree to any amendment or variation to any of the terms or provisions of this Agreement and/or any Order, or to waive any of the rights, duties or liabilities of the Parties, and no action of Supplier Representative shall have any such effect.

8.2     **Schlumberger Representative**

(a)     Schlumberger shall designate an individual identified in each Order to be its representative. Schlumberger Representative shall represent Schlumberger and liaise with Supplier Representative on all day to day matters relating to the performance of the Work under the Order. Schlumberger shall notify the name of Schlumberger Representative to Supplier not later than on the Commencement Date. Schlumberger may nominate a deputy or replace Schlumberger Representative by giving written notice thereof to Supplier and

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 2151D380-A995-4786-BD79-AD760008FEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

Supplier Representative. Such deputy or replacement shall have the same powers and authority as Schlumberger Representative.

(b) Schlumberger Representative will at all times be advised of the progress and performance of the Work in relation to the program, time schedule and specifications set out hereunder. If such program and specifications are not observed, Schlumberger's Representative is entitled to stop performance of the Work, at no cost to Schlumberger, until the deficiency is remedied. Schlumberger Representative shall have the right to receive on behalf of Schlumberger all reports furnished by Supplier and all other information and reports pertaining to operations performed under the relevant Order and shall be entitled at all times to witness and to check all measurements and tests conducted by Supplier and generally to inspect and monitor all operations performed under the relevant Service Order.

(c) The Schlumberger Representative shall not have authority to agree to any amendment or variation of this Agreement or any Order nor to waive any of the rights, duties or liabilities of the Parties and no action of Schlumberger Representative shall have any such effect. The presence of Schlumberger Representative in the Area of Operations shall not relieve Supplier from any of its obligations and liabilities under this Agreement and the applicable Order.

(d) Supplier shall provide board and lodging for Schlumberger Representatives and/or Schlumberger invitees on the Vessel at no additional cost to Schlumberger.

(f) Supplier shall establish, acquaint Schlumberger Representative with, and enforce its own safety rules and regulations for Supplier Personnel and any of its invitees in the performance of the Work.

8.3 **Representatives Required by Law.** If required by Applicable Laws, Supplier shall, always subject to space availability, have up to a maximum of two (2) representatives of the government or local content personnel of the Country of Operations on board the Vessel, provided always that such government representatives or local content personnel have undertaken the appropriate safety training and their safety certificates remain current for the duration of their stay on board the Vessel, and have a reasonable understanding of the English language. Supplier shall provide board and lodging for such representatives for the duration of their stay on the Vessel as required by the Applicable Laws. Without prejudice to the foregoing, Schlumberger shall be solely responsible for transport and travel arrangements for such representatives to and from the Area of Operations, and shall be responsible for ensuring that such representatives have current safety training certificates. The Parties agree such representatives shall only board and leave the Vessel at normal crew change of Supplier, except in the case of any emergency.

ARTICLE 9 – PROVISION OF INFORMATION

9.1 **Schlumberger Provided Information.** Schlumberger shall furnish Supplier, where necessary, with the following information at least fifteen (15) days prior to the Commencement Date: (a) charts or maps of suitable scale of the seismic acquisition area and Schlumberger's full fold sub-surface coverage line requirements; (b) a program map; and (c) a list of line-end coordinates. Supplier shall be responsible for verifying the accuracy and sufficiency of any such information provided by Schlumberger; Schlumberger shall not be responsible for the accuracy or sufficiency of such information and shall have no liability for any claim suffered or sustained by Supplier as a result of such information being inaccurate or erroneous. Supplier shall immediately notify Schlumberger on becoming aware of any error or inaccuracy in any of the information provided by Schlumberger under this Article 9.1 which may impact the results of the Work.

9.2 **Measurements and Records.** Supplier shall keep accurate measurements and records relating to the Work and shall prepare and send to Schlumberger the information specified in the Order in the formats and within the timescales specified in such Order. All operations logs and reports must be legible and correctly annotated in English. Supplier shall at all reasonable times permit Schlumberger, its authorized representatives and any invitees, to access and inspect the performance or results of the Work and of all measurements and tests made in connection with such part of the Work.

9.3 **Reporting to Authorities.** Supplier shall submit reports to relevant authorities at such times and frequency required by Applicable Laws. Copies of such reports shall simultaneously be submitted to Schlumberger.

9.4 **Communications**

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 2151D380-A985-47B6-BD79-AD760008FEA0

Magseis Fairfield - OBN Acquisition MSA 20210401

(a)   Throughout the performance of the Work there shall be continuous communication between the Parties which shall include:
  (i)    Initial project kick-off meeting;
  (ii)   Risk Assessment and QHSE Planning meetings;
  (iii)  Technical and Operational Planning meetings;
  (iv)  Mobilization/Start up meetings;
  (v)   Weekly meetings and teleconferences during survey operations;
  (vi)  Regular progress reporting;
  (vii) Demobilization meetings;
  (viii) Project Close-out Reviews.

(b)   **On Board**. Supplier shall provide adequate communications equipment facilities on board the Vessels, which shall include a working satellite-based communications system installation for voice, email and data transmission. The communications system shall be tested before Mobilization to ensure continuous, uninterrupted (24hr/7 day) connectivity. Supplier acknowledges that such communications equipment forms an integral part of the service provided and the Vessels shall not be accepted by Schlumberger as operational unless such systems are in full working order. Schlumberger Representative shall be provided a (24) twenty four hour access to a network connection (wired or Wi-Fi) that allows external internet and e-mail access at a reasonable bandwidth using their private laptops.

(c)   **Web Based Monitoring Systems**. Supplier shall provide to Schlumberger access to and shall maintain during the performance of the Work a web based operations monitoring, QC files and data transfer system that can be accessed from Schlumberger's offices. Real-time fleet tracking (including support vessels) shall be included and all Vessels tracks shall be maintained and transmitted to Schlumberger. Supplier shall provide adequate bandwidth for the type of Data to be transmitted. Supplier shall store the Data for web based monitoring systems on a secure server only externally accessible by individually controlled login IDs and passwords.

9.5   **Reporting and Final Deliverables**

(a)   **Daily Reports.** Daily operational information shall be provided to Schlumberger Representative, not later than three hours after the end of the reporting period.

(b)   Daily QHSE information shall consist of the previous twenty-four hours operations including:
  (i)    QHSE statistics;
  (ii)   Summary of QHSE activities;
  (iii)  Summary of any QHSE incidences;
  (iv)  Summary of marine mammal observations and interventions;
  (v)   Summary of environmental performance.

(c)   Details of daily operational information shall include:
  (i)    Daily and cumulative production statistics;
  (ii)   Daily and cumulative timing breakdown;
  (iii)  Diary of events;
  (iv)  Technical and operational performance;
  (v)   Technical and Operational problems;
  (vi)  Quality control observations;
  (vii) Navigation processing completed to date;
  (viii) Sea state and weather description;
  (ix)  Current status and twenty four-hour look–ahead plan;
  All items shall be agreed with Schlumberger Representative, any disputed times and/or production numbers pending acceptance must be clearly stated by Supplier on the daily report. Supplier shall provide the weekly and/or monthly operational reporting as stated in the Service Order.

(d)   **Weekly Reports.** Weekly summary reports shall be provided to Schlumberger Representative within twenty-four (24) hours of the end of the weekly reporting period, giving summary details of the previous seven (7) days operations. The reporting week shall be agreed with Schlumberger prior to the Commencement Date.

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 2151D380-A985-4786-BD79-AD760008FEA0

Magseis Fairfield - OBN Acquisition MSA 20210401

(e) **Monthly Reports**. Monthly summary reports shall be provided to Schlumberger Representative with twenty four (24) hours of the end of each calendar month giving the same summary details of the operations during the previous calendar month.

(f) **Final Deliverables**. On the Completion Date, Supplier shall provide at Supplier's sole costs and risks all Deliverables detailed in the Order hereto and ship all such Deliverables to the destinations indicated in the Order. All Deliverables shall be labelled as specified in the Order. Supplier shall provide a final operations report within thirty (30) days of the Completion Date. Unless otherwise agreed by the Parties in the applicable Order, final operations report shall contain:
(i) QHSE summary and incident reports including action item close-out confirmations;
(ii) Field acquisition techniques;
(iii) Streamer configuration and energy source description;
(iv) Recording system characteristics;
(v) Tabulation of data recorded;
(vi) Breakdown of time (in hours) by activity;
(vii) Resume of operations;
(viii) Summary of all measurements of temperature and salinity data acquired and calculations of water velocity;
(ix) Acquisition QC process and data examples;
(x) Onboard seismic processing flow, testing, execution and QC;
(xi) Any other factors which Supplier believes should be brought to the attention of Schlumberger;
(xii) Learning's and recommendations for future acquisition projects in the same area.

(g) **Navigation Processing Report.** The navigation and navigation processing report shall include:
(i) Details of equipment used for positioning;
(ii) Geodetic and projection parameters;
(iii) Satellite datum to local datum parameter shift constants;
(iv) Radio station co-ordinate locations;
(v) Calibration results and C-O's applied;
(vi) Location and offset diagrams for antennae, acoustic nodes, laser prisms (if applicable), compasses and active buoys;
(vii) Water depth processing.

(h) Each system at each node shall include:
(i) Differences between raw and processed data;
(ii) Range data C-O's (where "C" is the nominal range);
(iii) Standard deviation of the observed range;
(iv) Level of filtering and smoothing applied;
(v) De-spike filtering applied;
(vi) Methods used for network adjustments;
(vii) Primary/secondary systems comparison plots;
(viii) Range residual plots for each node;
(ix) Streamer rotations applied (magnitude, direction and method of application);
(x) Statement as to predicted precision and accuracy of results.

## ARTICLE 10 – SUPPLIER GROUP EQUIPMENT

10.1 **Condition and Maintenance.** Supplier shall ensure at its sole cost that all items of Supplier Group Equipment shall meet the stated specifications, be properly maintained and in good working order and repair so as to permit fully the safe, continuous and efficient performance of the Work throughout the term of each Order. Instrument tests and calibrations shall be performed in accordance with manufacturer's current specifications and/or Supplier's recommended procedures. In the latter case, Supplier shall submit its procedures to Schlumberger for approval. Supplier shall carry out and complete any necessary repairs or replacements to Supplier Group Equipment immediately and in such a manner as to prevent or minimize any adverse effects on the Work.

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

10.2 **Inspection.** Schlumberger shall have the right to inspect Supplier Group Equipment and all measurements and records relating thereto during Mobilization and any time thereafter (subject however to reasonable prior notice and without causing any undue disruption to the Work), to ensure that Supplier Group Equipment conforms to the requirements of this Agreement and the Order. Such inspection by Schlumberger shall not relieve Supplier from any of its obligations and liabilities under this Agreement and the Order. Supplier will immediately rectify at its sole cost any deficiencies in Supplier Group Equipment of which Supplier or any of Supplier Personnel are aware of, or which are notified to Supplier by Schlumberger following any inspection carried out under this Article 10.2. If any deficiencies are identified by Schlumberger or Supplier prior to mobilization of the Vessels, and such deficiencies prevent Supplier from performing its obligations under the Order, then Schlumberger shall have the right, at Supplier's sole cost, to delay the sailing of the Vessel to the Area of Operations until such deficiencies are rectified.

10.3 **Spares.** Without prejudice to its other obligations under this Article 10, Supplier shall provide, store and maintain at all times spare parts and operating supplies sufficient to ensure the safe, continuous and efficient operation of Supplier Group Equipment and performance of the Work. Supplier shall be responsible for arranging delivery of all spare parts and operating supplies from their point of origin to the Vessel. Critical spares specific to the Work as identified in the Order shall be maintained, and Schlumberger may audit such inventory. At a minimum, the following shall be maintained and kept on board:

(a) a comprehensive stock of operating supplies, spare parts and test equipment to perform continuous twenty four (24) hour operations in accordance with the manufacturer's recommendations and sufficient for the survey;

(b) information concerning all equipment, configuration and spares complement proposed for the survey, as detailed in the various sections of this Agreement or any Order, in time scales which are appropriate to the requirements;

A current inventory of spares shall be made available to Schlumberger prior to Mobilization and to Schlumberger Representative if requested.

10.4 **Vessel.** Supplier shall, before and at the commencement of the Work, exercise due diligence to ensure that (i) the Vessel is in every way fit for service in all weather and working conditions, (ii) fulfils all requirements set by Applicable Laws with its hull and machinery, and (iii) Equipment is in such a state as to obtain the most efficient working thereof. Supplier shall ensure that the Vessel's tanks containing bulk cargo, fuel and potable water are clean and free from contamination.

(a) If the Vessel or other item of Supplier Group Equipment becomes stranded, capsizes, sinks or becomes a wreck or obstruction to navigation, Supplier shall at its own expense promptly procure that the Vessel operator raise and remove the same or otherwise deal with the same in accordance with Applicable Laws.

(b) If Supplier fails or neglects to comply with the aforesaid obligation, Schlumberger may buoy and light the Vessel or any other item of Supplier Group Equipment which has become stranded, capsized, sunk or become a wreck or an obstruction to navigation and remove the same and Supplier shall reimburse all costs and expenses thereby incurred by Schlumberger.

(c) The fact that the Vessel or other item of Supplier Group Equipment is insured or has been declared an actual, constructive, compromised or arranged total loss, shall not relieve Supplier from any of its obligations and responsibilities under this Article 10.4.

(d) If Supplier requests or proposes to provide and Schlumberger accepts a substitute vessel from that originally named in the Order to be provided, such substitute vessel shall be of the same or higher specification as the Vessel or other vessel or vessels required for the performance of the Work and such substitute vessel shall be supplied at no additional cost to Schlumberger.

10.5 **Drydock.** Prior to entering into an Order, Supplier shall furnish Schlumberger with Supplier's proposed drydocking schedule for the Vessel.

10.6 **Chase Boats.** Unless otherwise provided for in the Order, Supplier shall provide chase boats in the Area of Operations for the purpose of clearing the area of Third Parties, including fishing or other vessels.

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 21F1D380-A985-47B6-BD79-AD760008EEA0

Magseis Fairfield - OBN Acquisition MSA 20210401

### ARTICLE 11 – ONBOARD ACCOMMODATION

Supplier shall provide accommodations and messing facilities for the number of individuals identified in each Order, including Schlumberger Representatives, government representatives (as provided in Article 8.3 above), and for such Third Parties as Schlumberger may require to be on-board the Vessel for the duration of the Work, subject to prior consultations with and the consent of Supplier, which consent shall not be unreasonably withheld. Unless otherwise agreed to in the Order, Supplier shall provide accommodations and messing facilities for Schlumberger Representatives and government representatives at no cost to Schlumberger. Supplier's provision of accommodation for Schlumberger Representatives and government representatives shall be subject to Vessel capacity restrictions and shall be agreed in the Service Order . Each Schlumberger Representative must be accommodated in single cabins if and as available. Each cabin shall have internet access and a desk. Supplier shall provide on board Schlumberger Representatives with adequate bench space per person in the instrument room and with suitable office equipment.

### ARTICLE 12 – SUPPLIER GROUP PERSONNEL

12.1    Supplier Personnel shall be suitable, competent, properly trained, qualified and experienced in all respects to properly perform the duties which will be assigned to them by Supplier in the conduct of the Work in a safe, timely and efficient manner. Supplier shall furnish Supplier Personnel in such numbers and classifications so as to allow the safe, continuous and efficient performance of the Work. Supplier Personnel designated as Key Personnel in the Order shall be fluent in the English language, both oral and written, and shall be capable of communicating effectively with all other Supplier Personnel and with Schlumberger Representative and any other Schlumberger Personnel as required. Key Personnel shall not be replaced without Schlumberger's prior written consent.

12.2    Supplier shall ensure that all Supplier Personnel assigned to the performance of the Work (or any part thereof) offshore have been passed as medically fit to work offshore. The minimum standards of medical fitness to be applied shall be those required by the Applicable Laws and those specified in Appendix A Attachment 1- OGP/IAGC Report No. 432 dated December 2009, Managing HSE in a geophysical Supplier. Any costs arising as a result of failure to comply with this Article 12.2, including unscheduled evacuation from the Vessel, shall be for Supplier's account.

12.3    Supplier shall maintain strict discipline and good order, including with respect to compliance with all Applicable Laws, among Supplier Personnel throughout the performance of the Work. Schlumberger may at any time object to and require Supplier to remove forthwith at its own cost and expense any Supplier Personnel who, in the reasonable opinion of Schlumberger, is or are not qualified to safely and efficiently carry out the duties assigned to them. Supplier shall Indemnify and hold Schlumberger against any and all Claims arising from the failure of Supplier Group to comply with any such Applicable Laws.

### ARTICLE 13 – TIME AND EXTENSION OF TIME

13.1    **Time.** Supplier shall comply in all respects with the timing requirements of any Order.

13.2    Schlumberger shall have the right to co-ordinate Supplier's performance of the Work with the work and requirements of others, without materially affecting Supplier's access to the Area of Operations. Supplier shall strictly comply with such scheduling and co-ordination. Schlumberger reserves the right and authority to reasonably schedule and reschedule the Work to effect overall completion of the Work, including the express right and authority to direct additional manpower, plant, equipment, goods or marine vessels for the performance of the Work reasonably necessary to accomplish Supplier's obligations hereunder, provided, however, that such reserved right and authority may be exercised only by the express direction in writing of Schlumberger under Article 20. Supplier shall promptly submit to Schlumberger such schedules and reports pertaining to Supplier's performance of the Work at the time and in the form required by Schlumberger and any required adjustments to the prices set out in the Order.

13.3    Except where there are specific schedules and/or dates provided elsewhere in this Agreement for Supplier to make submissions for approval, Supplier shall submit all matters requiring Schlumberger's approval with adequate timeliness so that Schlumberger clearly has reasonable time to review all such submissions and all accompanying support and/or justifications.

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 2151D380-A985-47B6-BD79-AD760008EEA0

Magseis Fairfield - OBN Acquisition MSA 20210401

13.4 **Extensions of Time.** Supplier shall, during the performance of the Work, use all reasonable endeavors to prevent, avoid, overcome or minimize any delay and shall take all reasonable measures at no expense to Schlumberger (except in cases of default or breach on the part of Schlumberger) to proceed with the timely completion of the Work. Supplier shall not be entitled to an extension of time for the completion of the Work unless Supplier shall have complied with this Article 13. Any extension of time to complete the Work shall be promptly and timely confirmed in writing by Schlumberger.

13.5 Upon any occurrence, including strikes or labor disputes, which will or may delay the progress of the Work, Supplier shall immediately give to Schlumberger Representative details of (i) the effect or anticipated effect on the progress of the Work, and (ii) such actions that Supplier intends to take to mitigate the effect of same, and provide Schlumberger with detailed particulars of any change to the Work which Supplier considers may entitle Supplier to an extension of time.

13.6 Should it appear to Schlumberger Representative at any time that the actual progress of the Work does not conform with the approved program set out in the Order, Schlumberger Representative can require Supplier to produce a revised program necessary to ensure completion of the Work within the agreed time or such extended time as may be agreed.

13.7 If (a) the Work is likely to be or has been delayed beyond the date or dates stated in the Order or beyond any extended time previously agreed, or (b) Schlumberger schedules or re-schedules the Work under Article 13.2 above, then Schlumberger may grant such extensions of time as the Parties agree are required to complete the Work. Such extensions and will be confirmed by the issuance of a Change Order by Schlumberger in accordance with Article 20, if the delay is due to (c) Force Majeure as provided for in Article 27; (d) any delay by Schlumberger in supplying materials, plant, equipment, drawings, information, approvals or any other matter specified in the Agreement; (e) any other act of prevention or breach by Schlumberger; or (f) mutual agreement of the Parties.

13.8 **Effects of Delay.** If the actual progress of the Work does not conform to the approved program set out in the Order because the Work is not being efficiently performed, Supplier shall take immediate measures to expedite the Work, by bringing in additional personnel, spare parts, equipment, Vessels or by other measures acceptable to Schlumberger. Such measures shall be at no cost to Schlumberger provided that such failure is attributable to Supplier.

ARTICLE 14– PRICES

14.1 Schlumberger shall pay Supplier the applicable prices set out in the applicable Service Order.

14.2 The prices include any applicable test performance and/or issue and filing of any required certificates. Schlumberger's access to and use of certificates and test results shall survive the expiry or termination of the Agreement.

14.3 Except as otherwise agreed in writing, prices are inclusive of all costs, charges, fees, costs of freight and insurance up to the point of delivery of the Equipment, as well as of all Supplier's costs and overheads in relation to the provision of the services, including direct labor costs, payroll burdens, taxes, social security contributions, disbursements, training, insurance and administrative costs and any costs incurred in procuring the Services from third party suppliers.

14.4 All invoices, worksheets, financial settlements and reports Supplier shall render to Schlumberger for Services performed shall properly reflect all activities and transactions undertaken for Schlumberger and Schlumberger may rely on such data as being complete and accurate and able to be used in any recording and reporting made by Schlumberger for whatever purpose.

14.5 Prices shall be valid for the duration of each Service Order.

14.6 Supplier acknowledges that the applicable prices shall be in line with the market rates.

ARTICLE 15– TAXES

15.1 Except as otherwise agreed by the Parties in writing, the prices set out in any Order shall include all applicable taxes, duties, and levies including those described in Articles 15.2, 15.3, 15.4, and 15.6, paid, payable, levied or assessed on Supplier or any of its employees, agents, Subcontractors and similar by the

Schlumberger-Private

Schlumberger-Private

**Magseis Fairfield - OBN Acquisition MSA 20210401**

relevant government, arising directly or indirectly from the performance of the services under this Agreement.

15.2    Supplier shall assume full and exclusive liability for the payment of all taxes (and associated penalties and interest) including, by way of illustration and not limitation, corporate tax, income tax, branch profit tax, capital gains tax, or franchise tax payable, levied, imposed, or assessed upon the revenue, profits, or assumed profits of Supplier arising directly or indirectly from the performance of this Agreement.

15.3    Supplier shall assume full and exclusive liability for the payment of all taxes (and associated penalties and interest), including, by way of illustration and not limitation, personal income tax, employment compensation insurance, old age benefits, welfare funds, pensions and annuities, national insurance contributions, social security benefits and disability insurance, and similar charges payable, levied or imposed on any of its employees, Subcontractors or agents and arising directly or indirectly from the performance of this Agreement.

15.4    Supplier shall assume full and exclusive liability for the payment of all taxes (and associated penalties and interest), including, by way of illustration and not limitation, sales and use tax, value-added tax, customs and import duties and levies and similar charges payable, levied or imposed on the procurement of goods or services by Supplier or any of its employees, Subcontractors or agents and arising directly or indirectly from the performance of this Agreement.

15.5    The prices are exclusive of Value Added Tax and/or Sales Tax. Notwithstanding Article 15.4, if applicable, Value Added Tax and/or Sales Tax will be added to Supplier's invoices and such invoices will be presented in accordance with applicable regulations with respect to Value Added Tax and/or Sales Tax.

15.6    Schlumberger may, without liability to Supplier, withhold any taxes or other government charges or levies from any payments which would otherwise be made by Schlumberger to Supplier to the extent that such withholding may be required by the existing or future legislation, orders, rules or directions of any competent taxing authority. Schlumberger shall provide a receipt in respect of any tax withheld. Where the requirements for any withholding are avoided by Supplier holding an appropriate valid exemption certificate it is the duty of Supplier to: (i) inform Schlumberger on a timely basis that such a certificate is held and to inform Schlumberger of any change to or cancellation of the certificate and; (ii) provide copies of the certificate or any other proper documentation evidencing the exemption or any further information that may be required to avoid such withholding. Failure on the part of Schlumberger to withhold or deduct any taxes from Supplier does not remove the liability for those taxes from being declared and paid by Supplier.

15.7    Supplier shall Indemnify Schlumberger against any and all liability to any competent authority resulting from Supplier's failure to (i) make timely payment of or pay any of the charges specified in Articles 15.2, 15.3, 15.4 or 15.6 above, including interest, penalties and any other liability arising from such failure, or (ii) comply with the reporting, filing or other procedural requirements with respect to their payment.

15.8    If Schlumberger receives a direct request from any governmental authority requesting information regarding Supplier, and upon written request by Schlumberger, Supplier shall provide evidence to confirm Supplier's compliance with governmental tax reporting and payment obligations.

ARTICLE 16— WARRANTIES

16.1    **Warranty Period**. Supplier warrants the Work against any omissions, failures, defects or otherwise unacceptable performance or results therefrom during the performance of the Order and for a period extending to twelve (12) months from the Completion Date. Supplier shall, at its own cost, risks and expense, correct any faults and deficiencies in the Work which may appear during this time.

The foregoing warranties and remedy are the only warranties and remedy that the Supplier shall provide to Schlumberger.

16.2    **Remedies.** Schlumberger's rights under this Article 16 shall be in addition to any other rights expressed in this Agreement or at law, including Schlumberger's rights of suspension and/or termination of an Order.

16.3    If Schlumberger believes that the Work is not in any way in accordance with the Order and this Agreement Schlumberger shall notify Supplier thereof before the expiry of the warranty period in Article 16.1,

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

specifying the portion of the Work which is unsatisfactory and not in compliance with the technical specifications of the Order. Schlumberger may in its sole discretion require Supplier to re-perform such Work. Such re-performance shall be as soon as Supplier has Vessel availability and at such time that is acceptable to Schlumberger. The remedy schedule shall take account of the urgency of such re-performance relative to Schlumberger's ongoing operational needs. The total cost and risk of re-performance shall be for Supplier's account.

16.4    Additionally, if, in Schlumberger's reasonable opinion, any line or part line shot is not in accordance with the technical specifications of an Order, Schlumberger may reject that part of the Work and if required by Schlumberger, Supplier will re-shoot the line or part line rejected, at Supplier's sole expense, provided Supplier has not, in accordance with Schlumberger's instructions, demobilized Supplier Group Equipment from the Area of Operations. If Supplier has demobilized Supplier Group Equipment, Supplier shall, as soon as Supplier has Vessel availability and at such time that is acceptable to Schlumberger, re-shoot, at Supplier's expense, the line or part line rejected within sixty (60) days of such Demobilization of Supplier Group Equipment or within such later period as agreed between the Parties.

16.5    If any lost, damaged or defective line or part-line of seismic is re-acquired, Supplier shall acquire the line or part line with sufficient overlap to provide a full fold tie on each end of the re-acquired line with the full fold point of each end of the previously acquired line. If Schlumberger agrees that any defective lines or part lines may be reasonably corrected through further processing or reprocessing of the defective line data, and upon Supplier accomplishing same at its cost and providing the further processed or reprocessed line Data to Schlumberger, Supplier's obligations hereunder shall be fulfilled and discharged in full.

16.6    If Supplier is unable or refuses to undertake or complete any re-performance which has been requested by Schlumberger under Article 16 within a reasonable time, Schlumberger may, without prejudice to any other rights and remedies which it may have under the Agreement or at law, undertake the re-performance itself or through a third party and, in either instance, recover from Supplier the reasonable, direct and documented costs incurred for such re-performance. Provided always that Supplier's liability under this Article 16.6 shall be limited to, and shall in no circumstances exceed, the pro-rata value of the re-performed Work, as provided in the relevant Order.

16.7    If any part of the Work is re-performed, rectified or replaced by Supplier under this Article 16, the warranty given in Article 16.1 shall also apply to that re-performed, rectified or replaced Work.

16.8    **Loss of Data.** Supplier shall be responsible for any damage to or loss of Data during the performance of the Work while such Data is in the possession, custody and control of Supplier Group. Supplier shall retain a duplicate set of all Data and ensure that a secondary tape is always available when a primary tape is being shipped to Schlumberger. If any such damage or loss occurs to the Data, Supplier shall, at Schlumberger's choice, either:

(a)     provide to Schlumberger at its own costs and expense and as the sole and exclusive remedy of Schlumberger in respect of same, a duplicate copy of the Data or a copy of processed Data corresponding to the original field tapes lost or damaged; or

(b)     re-perform, or have re-performed, at Supplier's sole expense that portion of the Work sufficient to reacquire the Data damaged or lost, such Data to be reacquired on a schedule to be agreed between the Parties, using a Vessel selected by Supplier and accepted by Schlumberger.

16.9    Supplier shall be responsible for the transportation of the Data to Schlumberger's nominated destination for processing as set out in the Order. Supplier shall, at its costs, carry and maintain insurance to cover the loss of or damage to Data, in any form or media, whilst in possession of common carriers during transportation.

16.10   Supplier shall ensure that any media, material or equipment supplied by any of its Subcontractors is of a durable or otherwise good quality. Any insufficiency in such media, material or equipment shall be the liability of Supplier.

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 2151D380-A995-47B6-BD79-AD760008EEA0

Magseis Fairfield - OBN Acquisition MSA 20210401

ARTICLE 17– TERMINATION AND SUSPENSION

17.1   **Termination of the Agreement**

(a)   Either Party may terminate this Agreement and/or any Order if the other Party or its parent company (i) becomes insolvent; (ii) passes a resolution for its voluntary liquidation or winding up or its assets become the subject of a voluntary or involuntary proceeding under Applicable Laws with respect to bankruptcy or debtor-relief; (iii) assigns all or substantially all of its assets for the benefit of creditors or has a receiver appointed by a court of competent jurisdiction; or (iv) if any activity occurs or proceeding is taken against the other Party or its parent company in any jurisdiction which has an effect equivalent to or similar to any of the events mentioned in (i), (ii) and (iii).

(b)   Schlumberger may terminate the Agreement and/or any Order forthwith by written notice to Supplier if, in Schlumberger's reasonable opinion, Supplier has repeatedly breached its obligations under this Agreement or an Order.

(c)   Schlumberger may terminate the Agreement and/or any Order at its convenience by giving Supplier sixty (60) days prior written notice.

(d)   If at the time of termination or expiry of the Agreement, any Order is being performed, said Order(s) shall either: (i) be completed (at the prices applicable on such date of termination or expiry) and the term of the Agreement shall be deemed extended accordingly; or (ii) terminate concurrently, and either of Articles 17.2 or 17.5 (whichever is applicable) shall apply.

17.2   **Termination of an Order without cause.** Schlumberger may terminate all or part of an Order for convenience at any time by giving Supplier not less than ten (10) days prior written notice. On a termination under this Article 17.2, Schlumberger shall pay (i) the early termination fee set out in the Service Order, and (ii) if the actual date of termination occurs after the Mobilization, the Mobilization and Demobilization fees, any fees and rates earned by Supplier for Work performed and reimbursable costs incurred up to the date of actual termination as well as reasonable third party costs properly incurred as a result of such termination.

17.3   **Termination of an Order for cause.** Schlumberger may terminate forthwith all or part of an Order for cause by giving Supplier written notice thereof. The termination notice shall specify the extent to which the performance of the Order is terminated, and the time at which such termination becomes effective. The causes giving rise to such a right of termination include:

(a)   **Loss of Vessel.** If the Vessel becomes a total loss (which term includes a constructive or compromised or arranged total loss), becomes stranded, capsizes, sinks or becomes a wreck or an obstruction to navigation or is seized or captured and Schlumberger considers that Supplier is unable to provide a substitute Vessel within a reasonable time.

(b)   **Prolonged technical breakdown.** If a breakdown of the Vessel or other item of Supplier Group Equipment results in Supplier's inability to perform its obligations under the Order for a period of fourteen (14) days or more.

(c)   **Safety**. If Supplier is not performing the Work in accordance with the QHSE requirements and procedures set out in Exhibit E hereof, and Supplier fails to rectify the default as soon as possible and in any event within ten (10) days of receipt of notice from Schlumberger.

(d)   **Business Conduct**. If Supplier breaches Article 34.

(f)   **Material breach without timely remedy**. If Supplier fails to perform its obligations under this Agreement or any Order in a diligent, skillful and workmanlike manner, or breaches any warranty given to Schlumberger or breaches its material obligations hereunder, and (i) fails to remedy the beach or failure to Schlumberger's satisfaction within a period of ten (10) working days from receipt of the notice from Schlumberger, or such breach or failure cannot be remedied; (ii) fails to commence to remedy the failure or breach within three (3) working days from receipt of notice from Schlumberger; or (iii) having commenced to remedy the failure or breach, fails to proceed diligently to complete the remedy;

(g)   **Prolonged Weather**. If a period of bad weather prevents Supplier from performing the Work or other obligations under the Order for a period of more than twenty (20) days within a period of thirty (30) consecutive days, Schlumberger may, at any time thereafter and whilst such bad weather is continuing,

Schlumberger-Private

unless the Parties agree otherwise, terminate the Order by giving notice in writing to Supplier with immediate effect, without any further liability to Supplier, except payment for Work performed up until the termination notice, including all fees, rates, reimbursable costs and expenses, accrued or owed to Supplier and Mobilization and Demobilization fees;

(h)     **Prolonged Force Majeure.** If the performance of the Work is suspended for more than twenty (20) days (whether or not consecutive) by reason of an event of Force Majeure, either Party may at any time thereafter, but whilst the Force Majeure event is continuing, terminate the affected Order by giving notice in writing to the other Party with immediate effect, without any further liability to the other Party, except payment by Schlumberger to Supplier for Work performed up until the termination notice, including all fees, rates, reimbursable costs and expenses accrued or owed to Supplier and Mobilization and Demobilization fees.

17.4    **Termination by Supplier.** Supplier may terminate all or part of an Order for any and all of the following reasons, by giving written notice thereof to Schlumberger: if Schlumberger is in breach of any material warranty given to Supplier under this Agreement or if Schlumberger is in breach of any of its material obligations hereunder and fails to rectify the breach within a period of thirty (30) days after notice is received from Supplier;

17.5    **Notice and effect of Order termination**

(a)     Upon receipt of the termination notice, Supplier shall immediately:

   (i)     stop the performance of the Work to the extent specified in the termination notice and forward to Schlumberger all Data and any other information acquired or created during the performance of the Work, including completed or uncompleted drawings, reports, Data and other documents and information;

   (ii)    provide Schlumberger full right of access to the Work, including to completed or uncompleted drawings, reports and other documents and information, in order to efficiently and effectively continue the Work or the relevant part of the Work;

   (iii)   assign to Schlumberger all or the relevant parts of the rights, titles and liabilities under a subcontract relating exclusively to the Work that Supplier may have acquired or entered into, to the extent permissible under the relevant subcontract;

(b)     If an Order is terminated under Article 17.3, Supplier shall be entitled to payment of all fees and reimbursable costs relating to Work properly performed prior to the event giving rise to the termination.

(c)     Upon the termination of an Order under Article 17.4, Schlumberger shall pay Supplier for the Work performed up to the termination notice, including all fees, rates, reimbursable costs and expenses, accrued or owed to Supplier and Mobilization and Demobilization fees.

17.6    **Suspension.** Schlumberger may suspend all or any portion of the Work at any time by giving Supplier at least ten (10) days prior written notice. During the suspension, Schlumberger shall pay Supplier at the suspension rates as set out in the applicable Order and any estimated Completion Date specified in the Order shall be automatically extended by a period at least equal to the period of suspension. Upon a suspension, the Parties shall meet no less than once a week to agree on a mutually acceptable course of action during the suspension. Schlumberger may, by further written notice, instruct Supplier to resume Work to the extent specified.

17.7    Upon termination of an Order, neither Party shall have any further liability nor obligation to the other under such Order, except as expressly provided for in Article 17.5 and/or in the Order and/or the Applicable Laws The rights and remedies of the Parties under this Article 17 are not exclusive, and apply in addition to any other rights and remedies available at law, in contract, in equity or otherwise. If either Party exercises its rights under this Article 17, under no circumstances shall it become liable for the Consequential Loss which may be sustained by the other Party or its Group as a result thereof. Termination of a specific Order shall not in any event invalidate or terminate any other Order entered into under this Agreement which shall remain valid and in force and effect.

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

ARTICLE 18– GENERAL PERFORMANCE OF THE AGREEMENT

18.1     The Parties shall, once a year (or other agreed frequency), meet to review the general performance of the Agreement and Orders, exchange and compare information, as appropriate, and determine action plans to settle issues, if any. Supplier shall, on a quarterly basis, provide Schlumberger with reports detailing the types and quantities of, and aggregate price for, the services purchased by Schlumberger during the just-completed quarter.

18.2     Supplier shall be bound by the Key Performance Indicators ("*KPIs*") agreed and set out in an Order, if any. The Parties shall continuously monitor and periodically evaluate the KPIs in order to ensure that Schlumberger's requirements are fully complied with. Supplier's failure to achieve the agreed KPIs shall require prompt remedial action, and improvement shall be monitored via Schlumberger´s Supplier Management Plan. As part of KPIs implementation, Supplier shall participate in Schlumberger business meetings and reviews, including but not limited to Quarterly Business Review.

18.3     Supplier shall, in relation to the performance of the Work, take diligent steps to protect the environment which includes proper management and disposal of all waste generated in the course of performing the Work (as applicable), in accordance with Applicable Laws and best industry practices. Supplier shall monitor its compliance with the foregoing.

18.4     Neither Party shall hire, solicit, or accept solicitation (either directly or indirectly) from, the employees of the other Party directly involved in the Agreement (or any Order), during the term hereof and for one (1) year thereafter, except as the Parties may agree on a case-by-case basis. The foregoing does not affect the ability of either Party to advertise to fill vacancies nor of a Party's employees to apply for a position within the other Party's organization.

18.5     Supplier shall co-operate with Schlumberger and Schlumberger's other suppliers and sub-suppliers in the performance of the Services and any work being carried out in conjunction with the Work.

ARTICLE 19– PAYMENT

19.1     Supplier's invoices shall cover Work performed during the preceding month (if any), and shall state the Order reference number. Supplier shall only submit one (1) invoice per month, unless otherwise agreed to in the Order. Payment shall be made by Schlumberger within (60) sixty days from Schlumberger's receipt of invoice, unless, (i) in Schlumberger's reasonable opinion, the Work and/or Equipment are defective, or fail to conform to the warranties or representations provided hereunder, or (ii) Schlumberger disputes the correctness of the invoice submitted, in which case the Parties shall use their best efforts to settle their dispute at the earliest, or (iii) otherwise agreed in the Service Order.

19.2     Schlumberger may (i) withhold payment in respect of any part of the price where the amount in question is the subject of any dispute or difference between the Parties, and/or (ii) set off any amount owed by Schlumberger to Supplier against any amount owed by Supplier to Schlumberger under this Agreement or any Order.

19.3     Payments made by Schlumberger shall not (i) constitute an acceptance of the Work provided under an Order, or (ii) be construed as a waiver of any rights Schlumberger may have hereunder for defective or non-conforming Work and/or Equipment, or for breach by Supplier of its obligations hereunder, or (iii) prejudice the rights of Schlumberger to question or dispute any portion of any invoice. Any payment withheld by Schlumberger shall be without prejudice to any other rights or remedies of Schlumberger under contract or at law. Furthermore, Schlumberger reserves the right to reject any invoice submitted more than six (6) months after the Completion Date.

19.4     Early payment discounts may be mutually agreed upon in an Order.

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

### ARTICLE 20– CHANGES TO ORDERS

20.1 **Written Change Order.** Changes to the Work may be identified and effected either by a Change Order issued by Schlumberger or a Change Order Request issued by Supplier and confirmed by a Change Order issued by Schlumberger. If the Parties reach an agreement on all matters pertaining to the Change Order, the Change Order shall be executed by the Parties. The Change Order once executed shall be deemed an amendment to the Work to be performed under the affected Order, and Supplier shall continue performing the Work under the applicable Order as amended by the Change Order.

20.2 **Change Order Administration**

(a) Changes shall be confirmed by the issuance of a Change Order by Schlumberger.

(b) On receipt of such Change Order executed by the Parties, Supplier shall perform the changes to the Work detailed therein forthwith. Supplier's compensation because of such change in the Work shall be agreed by the Parties and set out in the Change Order.

(c) Supplier shall not commence to implement a change to the Work until it has received a fully executed Change Order.

Supplier undertakes to use its best endeavors to furnish all additional resources as necessary to perform additional Work covered by any Change Order.

20.3 **Field Instructions.** Schlumberger Representative may issue a field instruction to confirm any action which Schlumberger requires to be taken by Supplier. If Supplier considers that the field instruction constitutes a change to the Work, Supplier shall notify Schlumberger and supply full reasons, impacts and costing associated with the compliance with the field instruction. Schlumberger shall review Supplier's notification and issue a Change Order as appropriate, under this Article 20.

20.4 **Subcontracts.** If Supplier is unable to or does not have the means to perform part of the Work covered by a Change Order, then Supplier shall notify Schlumberger promptly and in such event Schlumberger shall have the right to instruct Supplier to use a subcontractor nominated by Schlumberger to perform that part of the Work covered by a Change Order.

### ARTICLE 21 – TIMELY PERFORMANCE

21.1 Unless otherwise agreed by the Parties and specified in an Order, Supplier shall pay Liquidated Damages if, for reasons attributable to Supplier, Supplier fails to commence and/or complete performance of the Work or any part thereof in accordance with the time schedule or date windows set out in each Order. Notwithstanding the foregoing, in the event of delayed commencement of the Work, if Supplier completes performance of the Work by the Completion Date, no Liquidated Damages charges will be incurred by Supplier for delayed commencement of the Work.

21.2 The amount of the applicable Liquidated Damages (if any) shall be set out in an Order.

### ARTICLE 22 – LIENS

22.1 Supplier shall not claim and shall ensure that no member of Supplier Group shall claim any lien, charge or the like on or over the Work or on any property of Schlumberger Group, including, but not limited to field tapes, data and/or any other property of Schlumberger Group which is within the control or possession of Supplier Group or on or within the site where the Work is performed. Supplier shall Indemnify Schlumberger Group against any and all Claims with respect to liens, charges or other encumbrances in connection with or arising out of this Agreement.

22.2 Schlumberger shall have the right to withhold and/or set off or otherwise recover from Supplier such sum of money as will fully Indemnify Schlumberger Group against any lien, attachment, charge or Claim to which, if established, any member of Schlumberger Group or its property might be subjected, provided that such lien, attachment, charge or Claim arises in connection with this Agreement.

Schlumberger-Private

**Magseis Fairfield - OBN Acquisition MSA 20210401**

22.3    Before withholding any payment in accordance with Article 22.2, Schlumberger shall give to Supplier a reasonable opportunity to demonstrate that the purported lien, attachment, charge or Claim is either unenforceable or is covered by an enforceable policy of insurance, or Supplier disputes or is defending such Claim.

ARTICLE 23 – INTELLECTUAL PROPERTY

23.1    **Assets.** Supplier hereby acknowledges that any Schlumberger Provided Data, computer programs and/or equipment provided to Supplier are the sole and exclusive property of Schlumberger and/or its Affiliates. Supplier shall return to Schlumberger all such items and all copies thereof within thirty (30) days after termination or expiration of the Order or this Agreement.

23.2    **Existing Intellectual Property.** All Intellectual Property existing on the Effective Date of an Order and that is disclosed or made available by one Party to the other in connection therewith shall remain the exclusive property of the disclosing or developing Party.

23.3    **New Intellectual Property.**

(a)    For the purpose of clarity, "input" ("**Input**") as used in this Article 23.3 shall mean contributions to the conception of any creation, development or invention such that personnel making such contributions would qualify to be a named inventor on any related patent application or a creator on any related copyright.

(b)    Any Intellectual Property created or developed by Schlumberger outside of the scope of this Agreement and without the Input of Supplier Group shall remain the exclusive property of the Schlumberger Group.

(c)    Any Intellectual Property created or developed by Supplier outside of the scope of this Agreement and without the Input of Schlumberger Group shall remain the exclusive property of Supplier.

(d)    Any Intellectual Property created or developed by the Supplier with Input from Schlumberger Personnel during the course of and related to the Work shall vest in Supplier but Schlumberger Group shall have a non-exclusive, perpetual, royalty free license to use such Intellectual Property as Schlumberger sees fit in the conduct of its business from time to time.

23.4    **Data**

(a)    Notwithstanding Articles 23.3(b) and 23.3(c), any items prepared by Supplier for Schlumberger or acquired in connection with the performance and as part of the Work, including Data, Deliverables and any copyright vested therein, shall become the sole and exclusive property of Schlumberger upon acquisition or creation, and can be used by Schlumberger for any purpose whatsoever.

(b)    Data acquired under an Order will either be owned by Schlumberger, or subject to Applicable Laws of the Country of Operations, licensed to Schlumberger.

(c)    Supplier shall deliver the Data to Schlumberger at the intervals agreed upon in each Service Order, and Schlumberger shall enjoy the rights to possession and use of such Data

ARTICLE 24 – LIABILITIES AND INDEMNITIES

24.1    The indemnities given by Schlumberger to Supplier in this Agreement may be enforced by Supplier against Schlumberger for the benefit of Supplier Group. The indemnities given by Supplier to Schlumberger in this Agreement may be enforced by Schlumberger against Supplier for the benefit of Schlumberger Group.

24.2    Where in this Article 24 a Party gives an Indemnity:

(a)    Such Indemnity shall be full and primary notwithstanding the existence of any policy of insurance.

(b)    <u>Regardless of Cause</u>. SUBJECT TO ARTICLE **24.5**, SUCH INDEMNITY SHALL EXTEND, APPLY AND BE ENFORCEABLE REGARDLESS OF THE CAUSE OR CAUSES OF THE EVENT GIVING RISE TO THE CLAIM AND IN PARTICULAR BUT WITHOUT LIMITATION, SHALL EXTEND, APPLY AND BE ENFORCEABLE NOTWITHSTANDING THAT A CAUSE OR THE CAUSE MAY BE (I) THE NEGLIGENCE (WHETHER SOLE, CONTRIBUTORY OR GROSS), FAULT OR DEFAULT OF THE PARTY, PERSON OR BODY SO INDEMNIFIED, (II) THE BREACH OF CONTRACT (WHETHER BREACH OF CONDITION OR WARRANTY), REPUDIATION OF CONTRACT OR MISREPRESENTATION (WHETHER INNOCENT OR NEGLIGENT, BUT NOT FRAUDULENT) BY THE PARTY, PERSON OR BODY SO INDEMNIFIED, AND (III) ANY BREACH OF

Schlumberger-Private

DocuSign Envelope ID: 21F1D380-A995-47B6-BD79-AD760008FEA0

Magseis Fairfield - OBN Acquisition MSA 20210401

DUTY (STATUTORY OR OTHER AND WHETHER OR NOT INVOLVING FAULT) OR FAILURE TO COMPLY WITH APPLICABLE LAW ON THE PART OF THE PARTY, PERSON OR BODY SO INDEMNIFIED.

24.3 **Personal Injury**.

(a) SUPPLIER SHALL INDEMNIFY SCHLUMBERGER GROUP AGAINST ANY AND ALL CLAIMS ON ACCOUNT OF PERSONAL INJURY, ILLNESS OR DEATH OF ANY MEMBER OF SUPPLIER GROUP ARISING OUT OF OR IN CONNECTION WITH THE PERFORMANCE OF THIS AGREEMENT OR ANY ORDER.

(b) SCHLUMBERGER SHALL INDEMNIFY SUPPLIER GROUP AGAINST ANY AND ALL CLAIMS ON ACCOUNT OF PERSONAL INJURY, ILLNESS OR DEATH OF ANY MEMBER OF SCHLUMBERGER GROUP ARISING OUT OF OR IN CONNECTION WITH THE PERFORMANCE OF THIS AGREEMENT OR ANY ORDER.

24.4 **Property damage**.

(a) SUPPLIER SHALL INDEMNIFY SCHLUMBERGER GROUP AGAINST ANY AND ALL CLAIMS ON ACCOUNT OF DAMAGE TO OR LOSS OR DESTRUCTION OF PROPERTY OF ANY MEMBER OF SUPPLIER GROUP (INCLUDING PROPERTY RENTED OR LEASED BY SUPPLIER GROUP) ARISING OUT OF THE PERFORMANCE OR IN CONNECTION WITH OF THIS AGREEMENT OR ANY ORDER.

(b) SUBJECT TO ARTICLE 16.8, SCHLUMBERGER SHALL INDEMNIFY SUPPLIER GROUP AGAINST ANY AND ALL CLAIMS ON ACCOUNT OF DAMAGE TO OR LOSS OR DESTRUCTION OF ANY PROPERTY OF ANY MEMBER OF SCHLUMBERGER GROUP ARISING OUT OF OR IN CONNECTION WITH THE PERFORMANCE OF THIS AGREEMENT OR ANY ORDER.

24.5 **Third Parties.**

(a) Supplier shall Indemnify Schlumberger Group against any and all Claims arising out of death, illness, injury, or property loss or damage, loss, damage or cost sustained or incurred by a Third Party, as a result of or in connection with (i) the negligent acts or omissions of Supplier Group under the Agreement or any Order, or (ii) Supplier Group's breach of their obligations under the Agreement or any Order.

(b) Schlumberger shall Indemnify Supplier Group against any and all Claims arising out of death, illness, injury, or property loss or damage, loss, damage or cost sustained or incurred by a Third Party, as a result of or in connection with (i) the negligent acts or omissions of Schlumberger Group under the Agreement or any Order, or (ii) Schlumberger Group's breach of their obligations under the Agreement or any Order.

24.6 **Pollution**. Supplier shall Indemnify Schlumberger Group against any and all Claims on account of pollution or contamination from Equipment and materials owned, rented or leased by Supplier Group or under Supplier Group's control or other violations by Supplier Group of environmental Applicable Laws, including, but not limited to pollution or contamination resulting from spills or releases of hazardous substances, waste, fuels, lubricants, motor oils, paints, and garbage. Supplier shall at its sole costs and risks, control, remediate and remove such pollution or contamination.

24.7 **Intellectual Property**. Supplier shall Indemnify Schlumberger Group and its customers against any Claims they may suffer as a result of any allegation that Equipment and/or Services used in connection with the Work (and/or any Data resulting from such use) infringe any Third-Party Intellectual Property. If any Work or the use of Data resulting therefrom shall become or is likely to become the subject of an infringement Claim then, without prejudice to the above indemnity, Supplier shall also at Schlumberger's request either: (i) procure for Schlumberger the right to continue the use the infringing Intellectual Property; or (ii) replace or modify the same so that it becomes non-infringing (provided that the same level of functionality is maintained). Provided always that (i) in the event such Claims are received by Schlumberger, Schlumberger shall notify Supplier in writing of its receipt of the Claims within ten (10) days after its receipt of notice of such Claims, (provided that failure to give notice within such 10-day period shall relieve Supplier of its obligations under this Article only to the extent that Supplier was prejudiced by delay in the delivery of such notice), and (ii) Supplier is given complete control of the defence of such proceedings, provided further that (iii) any settlement or compromise agreed to by Supplier contains a full and unconditional release of Schlumberger, does not involve any admission of wrongdoing by Schlumberger, and does not require any payment or other performance by Schlumberger. Schlumberger may employ counsel, at its own expense, to assist it with respect to any such Claims. If, however, such counsel is necessary because Supplier does not assume control of the Claims, Supplier shall bear such expense.

Schlumberger-Private

**Magseis Fairfield - OBN Acquisition MSA 20210401**

24.8 **Consequential Loss**. Notwithstanding any other provision of this Agreement (other than Article 26.2 and 34 and any term in an Order relating to liquidated damages), neither Party shall be liable to the other Party or its respective Group for (and the Parties shall Indemnify each other against) any Consequential Loss sustained by the other Party or its Group.

24.9 **Compliance with Applicable Laws.** Supplier shall Indemnify Schlumberger Group against all fines, penalties or charges imposed, levied against or incurred by Schlumberger by reason of the failure or alleged failure of Supplier Group to comply with Applicable Laws arising out of or in connection with the performance of the Work under the Agreement or any Order.

24.10 **Salvage and General Average**. Notwithstanding Article 24.5, Supplier shall Indemnify, Schlumberger Group against any and all Claims in respect of injury, illness or death of any Third Party or loss of or damage to any property of a Third Party arising out of any salvage and rescue operations in connection with the performance of the Work under the Agreement or any Order.

24.11 **Notices**. If either Party becomes aware of any incident likely to give rise to Claims under this Article 24, it shall notify the other Party as soon as practicable and both Parties shall co-operate fully in investigating the incident.

## ARTICLE 25 –INSURANCE

25.1 **Schlumberger declarations.** Supplier shall promptly notify Schlumberger of any losses of Schlumberger's property in order to allow Schlumberger to file within any time limits an appropriate declaration of loss with customs, insurances or other relevant parties.

25.2 **Minimum insurances**. Without prejudice to Supplier's liabilities, indemnities and obligations under this Agreement, Supplier shall, throughout the term of each Order, carry and maintain at its cost (and shall ensure that its Subcontractors, if any, carry and maintain), insurance policies which shall include but shall not be limited to the types and minimum cover amounts set out in Article 25.7, or the equivalent thereof. Such insurances shall name Schlumberger Group as an additional insured under the P&I Club's standard "Protective Co-insurance Clause" or other similar cross liability provision, to the extent of the liabilities assumed by Supplier under the Agreement (except for Worker's Compensation and Professional Liability). Supplier shall Indemnify Schlumberger Group against any and all excesses, deductibles or franchises incorporated therein.

In the event that the Area of Operations in which Supplier is performing the Work is exposed or becomes exposed to war risks,  Schlumberger shall reimburse to Supplier any additional premiums required by Supplier's insurers, and the costs of any additional insurances that the Suppliers reasonably require in connection with war risks. Schlumberger shall not compensate or reimburse Supplier for any basic war risks cover.

25.3 Certificates of insurance. Supplier shall provide Schlumberger with certificates of insurance, endorsed by Supplier's insurers or brokers, within seven (7) days of the Effective Date of the Order, unless a current certificate has already been provided. Updated certificates will be provided on the renewal anniversary of all policies. Supplier shall give notice to Schlumberger immediately in the event of cancellation or material change affecting any insured party's interest in respect of the insurances set out in this Article 25.

25.4 **Cancellation or failure to maintain**. If: (i) any of Supplier Group's insurance policies are cancelled, (ii) Supplier and/or Supplier Group fail to carry out or maintain any insurance policy required in accordance with Article 25.7, or (iii), Supplier and/or Supplier Group fail to provide Schlumberger with any certificates of insurance as required in accordance with Article 25.3, Schlumberger may at its discretion purchase and maintain any such insurance or additional insurance as Schlumberger shall consider necessary in the circumstances, and Supplier shall promptly reimburse to Schlumberger (or Schlumberger may set off against Supplier's invoices) the full cost of any such insurance or additional insurance.

25.5 **Waivers of subrogation**. All insurance policies required under this Article 25 shall contain an agreement from the insurers to waive their rights of subrogation against Schlumberger Group.

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

25.6    **Priority of insurance.** Supplier Group insurance policies required under this Article 25 shall, to the extent that Supplier is liable hereunder, be primary to any other insurances effected by Schlumberger and which may overlap in quantum and/or terms and conditions*.*

25.7    **Supplier's minimum insurance.** The following are the minimum insurances required from Supplier Group under this Article 25 in respect of each Order:

(a)    Worker's Compensation and Employer's Liability in compliance with local statutory requirements;

(b)    General third-party insurance including pollution on a sudden and accidental basis with a combined bodily injury and property damage limit of not less than [10] million US Dollars ($[10],000,000) per occurrence or series of occurrences arising from the one event;

(c)    All Risks Hull and Machinery Insurance, on full conditions, including war risks and full collision liability, with a limit of not less than the full replacement value of the Vessel and other Supplier Group Equipment;

(d)    Protection and Indemnity cover (including cover for removal of wrecks and debris) in an amount sufficient to cover Supplier's liabilities under Articles 10 and 24;

(e)    Applicable insurance to cover the full value of Supplier's liability expressed in Article 16; and

(f)    Any other insurance required by Applicable Laws and/or identified in an Order.

(g)    For aircraft owned, operated, chartered, or brokered by or for a Party in connection with the Work, Supplier shall, at its expense, carry or require the owner or operator of such aircraft to carry and maintain throughout the duration of the Order: (i) All Risks Hull Insurance at agreed value including coverage for collision liability to the extent not covered by Article 25.7(c); and (ii) Aircraft Liability Insurance with a minimum limit of twenty million US Dollars ($20,000,000) per occurrence including coverage for bodily injury, death and property damage, passenger liability, and contractual liability for those liabilities assumed by Supplier.

ARTICLE 26 – CONFIDENTIALITY

26.1    Each Party acknowledges that during the performance of the Agreement and any Orders, it or its Affiliates will likely be exposed to Confidential Information belonging to the other Party.

26.2    Supplier shall (i) treat as secret and confidential, and (ii) not at any time during the Agreement term and for five (5) years thereafter, disclose, distribute, publish, copy, reproduce, sell, lend, manipulate or otherwise make use of (except for the purpose of performing this Agreement or an Order provided that the disclosure is made to Supplier Personnel on a need-to-know basis), or permit use to be made of, any Schlumberger Confidential Information, except with Schlumberger's express written consent.

26.3    Schlumberger shall (i) treat as secret and confidential, and (ii) not at any time during the Agreement term and for five (5) years thereafter, disclose, distribute, publish, copy, reproduce, sell, lend, manipulate or otherwise make use of (except for the purpose of performing this Agreement or an Order provided that the disclosure is made to Schlumberger Personnel on a need-to-know basis), or permit use to be made of, any Supplier Confidential Information, except with Supplier's express written consent.

26.4    The foregoing shall not apply to any Confidential Information that (i) can be shown by documentary evidence to have been previously known to the other Party at the time of disclosure, (ii) is independently developed by the other Party without breach of this Agreement, (iii) is lawfully obtained from a third party without restriction on use or disclosure, (iv) is or becomes part of the public domain through no fault of the other Party, or (v) is disclosed under any judicial or governmental requirement or order, provided that the disclosing Party takes reasonable steps to give the other Party sufficient prior notice in order to contest such requirement or order.

26.5    Each Party shall use the same degree of care to avoid unauthorized disclosure of the other Party's Confidential Information as it employs with respect to its own confidential/proprietary information of similar quality and nature, but employing no less than a reasonable standard of care.

26.6    Each Party acknowledges that the disclosure of Confidential Information made by the other Party does not grant the receiving Party any right other than the limited right to use such Confidential Information for the

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

performance of the Agreement or an Order (and nothing contained herein shall be construed as granting or conferring any rights to the disclosing Party's trademarks, inventions, copyrights, patents or the like).

26.7    Upon expiry or termination of this Agreement for whatever reason, the receiving Party shall return to the disclosing Party all Confidential Information and shall not be entitled to make or retain copies thereof, except as may be required to comply with Applicable Laws.

26.8    It is Schlumberger's policy not to publicly endorse other organizations through press releases or marketing materials. Supplier acknowledges and agrees that Supplier does not have the right (i) to advertise or publish the fact that Schlumberger has contracted with Supplier, (ii) to use Schlumberger's name or logo in any advertisement, publication, articles, brochure or website, videos, social media, presentations or other marketing material, (iii) to make any press releases, either directly or indirectly, that are endorsements or create marketing collateral involving Schlumberger; or (iv) to quote any Schlumberger employee in any press release, except if Schlumberger has given his prior written authorization to such press release.

## ARTICLE 27 – FORCE MAJEURE

27.1    Neither Schlumberger nor Supplier shall be responsible for any failure to fulfil any term or condition of this Agreement or any Order (other than in respect of payment of any sums due hereunder in respect of Work performed prior to a force majeure occurrence) if and to the extent that fulfilment has been delayed or temporarily prevented by Force Majeure, which has been notified in accordance with this Article 27.

27.2    Upon the occurrence of an event of Force Majeure, the Party that is or may be delayed in performing this Agreement or an Order shall notify the other Party without delay giving the full particulars thereof and shall use all reasonable endeavours to remedy the situation without delay.

27.3    The Force Majeure rate shall be stated in the Service Order.

27.4    If an event of Force Majeure continues for more than twenty (20) days, Schlumberger shall at its sole option either;

(a)    reimburse Supplier at the force majeure rate specified on the Order (if any) during the period of Force Majeure beyond such twenty (20) day period; or

(b)    terminate the applicable Order under Article 17.3(h).

## ARTICLE 28 – INDEPENDENT CONTRACTOR

Neither the Agreement nor any Order shall be construed as creating a joint-venture, partnership or the like between the Parties. Neither Party shall act or be deemed to act on behalf of the other Party, or have the right to bind the other Party. Each Party shall remain an independent entity, and act as an independent contractor. Each Party shall at all times during the performance of the Agreement or any Order under the Agreement be responsible for the payment of wages and benefits to, and as applicable, tax withholding from, its own employees. Without limiting the generality of the foregoing, the employees and Subcontractors engaged by Supplier for the performance of the Agreement, or an Order under the Agreement, shall be the direct employees and subcontractors of Supplier and Supplier shall remain solely responsible for all matters related to compliance with relevant employment laws.

## ARTICLE 29 – AUDIT

For a minimum of five (5) years (or longer if required by any Applicable Law), Supplier shall retain all records pertaining to information that are the subject matter of this Agreement. Schlumberger shall have the right, at any time up to five (5) years after completion, termination or cancellation of any Order under this Agreement, to audit Supplier's books, records and data in any form to verify compliance with the terms hereof (including Articles 30 and 34) and/or the correctness of any invoice submitted by Supplier. Said right shall be exercised solely for the purposes defined in this Article 29. If the audit reveals any amounts due to Schlumberger, such amounts must be paid by Supplier to Schlumberger within thirty (30) days of receipt of written notification.

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

**ARTICLE 30 –COMPLIANCE WITH LAWS**

30.1    Supplier undertakes to comply with and adhere to all Applicable Laws in connection with its performance of this Agreement or any Order, including those relating to health, safety, anti-corruption, and to trade and export control including as applicable, those of the United States and European Union. Supplier shall ensure that all necessary export information (e.g. applicable Export Commodity Classification Numbers, Harmonized Tariff Schedule Numbers per Product, and Country of Origin, including certificates of manufacture in accordance with the origin rules imposed by governmental authorities) is provided on all exports documentation as required by law. Supplier shall confer with Schlumberger to ascertain and confirm this information.

30.2    Supplier shall comply with the following when Schlumberger does not provide any instruction or information that is contrary to the same:

(a)    all applicable export and re-export control laws and regulations that pertain to any items, commodities, technology or software shipped or transferred by Supplier or its Subcontractors in connection or in association with their performance under this Agreement. Specifically, Supplier shall not -- directly or indirectly -- sell, provide, export, re-export, transfer, divert, loan, lease, consign, or otherwise release or dispose of any equipment, product, commodities, services, software, source code, or technology (including the "**Direct Product**" of such technology) (collectively and for the purpose of this Article 30.3 the "**Products**") received under this Agreement to or via any individual, entity, or destination, or for any use prohibited by the laws or regulations of any applicable jurisdiction without having obtained prior authorization from the competent governmental authorities as required by all such laws and regulations.

(b)    Schlumberger is responsible for providing Supplier with any license, permit or authorization required for items, commodities, technology or software shipped or transferred by Supplier in connection or association with their performance under this Agreement as required by any applicable export and/or re-export control laws and regulations. Supplier shall be responsible to ensure that such licenses, permits, and authorizations are included in the export/import documentation as necessary to comply with all applicable laws and regulations.

(c)    Upon request by Schlumberger, Supplier shall (i) provide information regarding those transactions which are the subject of this provision, and (ii) provide Schlumberger with a copy of all documents related to transactions which include products that require an export and/or re-export licenses for those items, commodities, technology, or software requiring export licenses in connection with Supplier's performance of this Agreement. Upon request by Schlumberger, Supplier shall further allow Schlumberger personnel reasonable access to information, materials and supporting records relating to compliance with this provision.

(d)    Supplier shall ensure that no item, commodity, technology or software will be shipped, either directly or indirectly, to any country or person or for any end-use that is prohibited under export regulations.

(e)    To the extent the laws or regulations applying to import or export of the commodities, which are the subject matter of the Agreement are amended, repealed or superseded, Schlumberger, at its sole option, shall establish new terms to this Article 30.3.

30.3    If Supplier Group's Equipment is eligible for preferential tax or tariff treatment (such as free trade or international agreement), Supplier shall provide Schlumberger with the documentation required to participate in the treatment.

**ARTICLE 31 –ASSIGNMENT AND SUBCONTRACTING**

31.1    Neither Party shall, without the prior written consent of the other Party, have the right to assign its rights and obligations under the Agreement or any Order pursuant the Agreement to any third party, and any purported assignment without such consent shall be null and void. However, Schlumberger shall have the right to assign, in whole or in part, its rights and obligations under the Agreement to any of its Affiliates, with notice to Supplier.

31.2    Supplier may not subcontract whole or part of its obligations under this Agreement or any Order under the Agreement without Schlumberger's prior written consent (which consent shall not be unreasonably

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 2151D380-A985-4786-BD79-AD760008EEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

withheld or delayed), and any purported subcontracting without such consent shall be null and void. Schlumberger's consent shall not relieve Supplier from its obligations under the Agreement or any Order under the Agreement, and Supplier shall be responsible for the performance, acts or omissions of its Subcontractors as if their performance, acts or omissions were its own performance, acts or omissions.

ARTICLE 32 - GOVERNING LAW AND DISPUTE RESOLUTION

32.1    This Agreement and any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the law of England and Wales.

32.2    Any dispute arising out of or in connection with this Agreement shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to this Article.

32.3    The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.  The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.  Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.  In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

ARTICLE 33 – NOTICES

33.1    Notices shall be sent by registered post or fax, or e-mail, or delivered in person, to the following address:

(a) If to Schlumberger:                           (b) If to Supplier:
C/O Schlumberger House                       Strandveien 50, N-1366, Lysaker, Norway
Gatwick Airport
West Sussex
RH6 0NZ
United Kingdom

**Attention: Steven Calthrop**                **Attention:  Simon Hayter**

Tel:  +44 1293 556415                            Tel:   +44 1444 892695 d
Mob:  +44 7717 346 417                          +44  7881 810459 c

e-mail:  scalthrop@slb.com                    e-mail: simon.hayter@magseisfairfield.com
                                                              With a copy to: Laila Myksvoll, General Counsel

with a copy to: General Counsel – WesternGeco
Schlumberger
62 Buckingham Gate
London SW1E 6AJ

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 215.D380-A995-47B6-BD79-AD760008FEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

33.2    Said notices shall be deemed received (i) upon delivery if hand delivered, (ii) upon delivery if sent by registered post, and (iii) upon recipient's confirmation of receipt if faxed. Notwithstanding the preceding, notices regarding the execution of an Order shall be as per the details agreed by the Parties in such Order.

### ARTICLE 34 – BUSINESS CONDUCT

34.1    For the purpose of this Article 34:

(a)    **"Anti-Corruption Compliance Due Diligence"** means a dedicated process to allow the identification and assessment of any warning flags concerning any contract. "Warning flags" are facts or circumstances which might cause a reasonable person to suspect that Supplier Group may have engaged or may engage in bribery. Warning flags will be deemed to exist whenever some fact or circumstance suggests that the particular relationship involves a likely risk of bribery. If a warning flag is identified, careful consideration must be given to the steps that should be taken to eliminate or mitigate the bribery risk that the particular relationship may present.

(b)    **"Anticorruption Laws"** means the UK Bribery Act 2010 (UKBA), the US Foreign Corrupt Practices Act 1977 (USFCPA) (as amended from time to time) and all other applicable national, regional, provincial, state, municipal or local laws and regulations that prohibit bribing, or providing of unlawful improper payments in any form including facilitation payments or other benefits to Government Officials or any other Persons.

(c)    **"Close Family Member"** means the Government Official's spouse or partner, the Government Official's and spouse's or partner grandparents, parents, siblings, children, nieces, nephews, aunts, uncles and first cousins; the spouse of any of these people; and any other individuals who share the same household with the Government Official.

(d)    **"Facilitation Payment"** means the giving of anything of value to speed up an on-going process and/or routine government action (for example, customs inspections, visa processing, and certain permits/licenses). These routine actions would be ordinarily and commonly performed by the Government Official, and would be nondiscretionary, that is, for something to which the payer is already legitimately entitled.

(e)    **"Government Official"** means (i) any director, officer or employee of any Public Body including (1) employees paid full time or part time, (2) consultants and contractors of any government department or agency whether executive, legislative or judicial branches of government at all levels from national, state, local or town level; (ii) all employees of national oil companies and national services companies; (iii) any person acting in an official capacity for or on its behalf; (iv) any officer or employee or candidate of any political party or faction; (v) anyone otherwise holding a legislative, administrative or judicial position at any Public Body; or (vi) any director, officer or employee of any public international organization (e.g. The United Nations or World Bank). Government Official also includes immediate Close Family Members of anyone described above.

(f)    **"Improper Payment"** means the offer, promise, authorization, request, acceptance or agreement, whether directly or indirectly, to give or receive anything of value (whether nominal or otherwise) including Facilitation Payments, in order to (i) improperly influence someone's judgment about Schlumberger products or services or those of another company; (ii) improperly gain advantage when selling Schlumberger goods and services, conducting business transactions, or representing Schlumberger interests; or (iii) influence the use of discretionary authority by any Government Official or Persons.

(g)    **"Key Employees"** means any of Supplier's officers, managers, directors and employees responsible for directly providing services or works to Schlumberger under this Agreement.

(h)    **"Persons or Person"** means any corporation (including corporate body in any form), partnership (limited or unlimited), trust, instrumentality, unincorporated venture or association and individual.

(i)    **"Public Body"** means any central or local government, or any ministry, department, agency, organ or instrumentality of state, or entity owned or controlled by, a government or state (e.g. a National Oil Company).

(j)    **"Supplier/Supplier Group"** means (i) officers and employees of Supplier; and (ii) parent, Affiliates, contractors, subcontractors, agents, consultants, invitees (including its officers and its employees) of any tier, whether contracted directly or indirectly.

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

34.2. For the purpose of this Agreement, Supplier agrees and undertakes that all works provided and transactions executed under this Agreement will comply with Anticorruption Laws. To ensure compliance with Anticorruption Laws Supplier shall maintain and enforce its own internal rules that are in compliance with this Article 34.

34.3. The Parties agree with respect to this Agreement that Anticorruption Laws and this Article 34 shall apply to Supplier and Supplier Group irrespective of whether Supplier and Supplier Group are subject to Anticorruption Laws.

34.4. Supplier represents and warrants that it has complied with this Article 34 and with Anticorruption Laws for the purpose of securing, performing, maintaining and extending this Agreement whether directly or indirectly and that this award, appointment, maintenance and/or extension was expressly made on the basis that this Article 34 and Anticorruption Laws have not and will not be breached.

34.5. Supplier shall not under any circumstances whatsoever (i) offer, promise or make any gift, payment, loan, reward, inducement, benefit or other advantage to any of Schlumberger's directors, officers, employees or agents, that is above a nominal value of Two Hundred US Dollars ($200.00) or equivalent in local currency; or in any manner that is deemed excessive or extravagant; or (ii) in the case of an event (including sporting or other entertainment events), where Supplier does not attend.

34.6. Schlumberger expressly prohibits the making, offering, promising, receiving and/or authorizing Improper Payments to any Government Official or Person. Supplier warrants and undertakes that it has not and will not make, offer, promise, receive or authorize any Improper Payment whether directly, indirectly or through any Person or entity to influence an act of a Government Official, Public Body and/or Person or to obtain, maintain, retain business or gain an improper advantage from a Government Official and/or Person. For the avoidance of doubt, Improper Payment shall include but shall not be limited to the offer, promise, payment of available funds, favor, gifts, entertainment, excessive promotional activities, investment opportunities, in-kind contribution, stocks, options, contracts, or a promise that has a value or can be exchanged for a value and/or benefit and also the creation of a favorable or easier working condition whether in the present or in the future.

34.7. Supplier also warrants and represents, having made reasonable enquiries, that neither Supplier nor Supplier Group:

(a) has been convicted of any offence involving bribery, corruption, fraud, dishonesty or breach of trade control regulations;

(b) has been or is the subject of any investigation, inquiry or enforcement proceedings by any governmental, administrative or regulatory body regarding any offence or alleged offence involving bribery, corruption, fraud, dishonesty or breach of trade control regulation;

(c) has been or is listed by any government agency or development bank as being debarred, suspended, proposed for suspension or debarment, or otherwise ineligible for participation in procurement programs or contracts run or offered by such agency or development bank;

(d) unless disclosed in writing to Schlumberger, no Government Official or Close Family Member (i) owns or possesses, directly or indirectly, shares or any other beneficial interest in Supplier and/or Supplier Group (other than through ownership of publicly traded securities that is not sufficient to constitute a controlling interest), or is a director, agent, consultant or representative of Supplier and/or Supplier Group or have a direct or indirect interest in Supplier and/or Supplier Group or this Agreement and (ii) has an active political role in the countries where the Agreement will be performed.

34.8. Supplier shall cause and ensures that:

(a) any payment or advantage made or given to anyone on behalf of or for the benefit of Schlumberger, is properly and accurately recorded in Supplier's books and records, including its amount, purpose and receipt, which records shall be maintained with supporting documentation for the duration of the applicable status of limitation period. It is strictly prohibited for Supplier to keep inaccurate or false records, for example misstatement of payment amounts, disguise of the purpose of the payment, creation of payment recipients, or forgery or cover-up of payment authorization;

(b) the key terms of this Article 34 are included in the contract between Supplier and Supplier Group ("**Relevant Terms**"). Supplier shall be responsible for the observance and performance of the Relevant

Schlumberger-Private

DocuSign Envelope ID: 2151D380-A985-47B6-BD79-AD760008FEA0

Terms by Supplier Group and shall be directly liable to Schlumberger for any breach of any of the Relevant Terms;

(d)   all Key Employees are trained periodically on Anticorruption Laws and training records are maintained for a period of five (5) years.

34.9.   Supplier shall apply a risk assessment methodology that it deems adequate and perform Anti-corruption Compliance Due Diligence on Supplier Group, as indicated by such risk assessment methodology. Schlumberger reserves the right: (i) to request the list of Supplier Group's members who were not subject to Anti-corruption Compliance Due Diligence, (ii) to request proof of and/or documentation relating to such due diligence and, where necessary; (iii) to reject or request replacement of non-complying Supplier Group members.

34.10.   Supplier shall immediately notify Schlumberger in writing if, at any time during the term of this Agreement, its circumstances, knowledge or awareness changes such that:

(a)   it is not able to comply with this Article 34 or is aware of or suspecting that there has been a potential or actual breach of this Article 34 and Anticorruption Laws by Supplier Group;

(b)   is aware of or is suspecting that a Government Official or Close Family Member (i) owns or acquires, directly or indirectly, shares or any other beneficial interest in Supplier and which ownership is sufficient to create a controlling interest, or (ii) is or becomes a director, officer or individually an agent of Supplier;

(c)   it has or is actively involved in a political role in the countries where the Agreement is performed; or it becomes a shareholder or an employee of a current client of Schlumberger (including a Public Body or National Oil Company);

(d)   it receives any request or demand for any undue financial or other advantage of any kind in connection with the performance of this Agreement;

(e)   it receives any requests or solicitations by Schlumberger employee for gifts, entertainments or other personal advantages (financial or otherwise) from Supplier or Supplier Group; and/or

(f)   it has been convicted or may potentially be convicted or is the subject of any investigation, inquiry or enforcement proceedings by any governmental, administrative or regulatory body regarding any offence or alleged offence involving bribery, corruption, fraud, dishonesty or breach of trade control regulations; or has been or is listed by any government agency or development bank as being debarred, suspended, proposed for suspension or debarment, or otherwise ineligible for participation in procurement programs or contracts run or offered by such agency or development bank.

## ARTICLE 35 – PERSONAL DATA

35.1   **Definitions**

In this Article 35.1:

(a)   **Controller**, **Data Subject**, **Personal Data**, **Processor** and **processing** shall have the respective meanings given to them in applicable Data Protection Laws from time to time (and related expressions, including **process**, **processing**, **processed**, and **processes** shall be construed accordingly) and **international organisation** and **Personal Data Breach** shall have the respective meanings given to them in the GDPR;

(b)   **Data Protection Laws** means any applicable law relating to the processing, privacy and use of Personal Data, as applicable to either party or the Services, including:

(a)   the Directive 95/46/EC (Data Protection Directive) and/or Data Protection Act 1998 or the GDPR;

(b)   any laws which implement any such laws;

(c)   any laws that replace, extend, re-enact, consolidate or amend any of the foregoing; and

(d)   all guidance, guidelines, codes of practice and codes of conduct issued by any relevant supervisory authority relating to such Data Protection Laws (in each case whether or not legally binding);

(c)   **GDPR** means the General Data Protection Regulation (EU) 2016/679;

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

(d)     **Protected Data** means Personal Data received from or on behalf of Schlumberger, or otherwise obtained in connection with the performance of the Supplier's obligations under this Agreement;

(e)     **Sub-Processor** means any agent, subcontractor or other third party engaged by the Supplier (or by any other Sub-Processor) for carrying out any processing activities in respect of the Protected Data; and

(f)     **supervisory authority** means any regulator, authority or body responsible for administering Data Protection Laws.

35.2    **Compliance with Data Protection Laws**

The Parties agree that Schlumberger is a Controller and that the Supplier is a Processor for the purposes of processing Protected Data pursuant to this Agreement. The Supplier shall, and shall ensure its Sub-Processors and each of the Supplier Personnel shall, at all times comply with all Data Protection Laws in connection with the processing of Protected Data and the provision of the Services. Nothing in this Agreement relieves the Supplier of any responsibilities or liabilities under Data Protection Laws.

35.2    The Supplier shall indemnify and keep indemnified Schlumberger Group against:

(g)     all losses, claims, damages, liabilities, fines, interest, penalties, costs, charges, sanctions, expenses, compensation paid to Data Subjects (including compensation to protect goodwill and ex gratia payments), demands and legal and other professional costs (and in each case whether or not arising from any investigation by, or imposed by, a supervisory authority) arising out of or in connection with any breach by the Supplier of its obligations under this Article 35; and

(h)     all amounts paid or payable by Schlumberger to a third party which would not have been paid or payable if the Supplier's breach of this Article 35 had not occurred.

35.3    **Instructions**

The Supplier shall only process (and shall ensure Supplier Personnel only process) the Protected Data in accordance with **Error! Reference source not found.**, this Agreement and Schlumberger's written i nstructions from time to time except where otherwise required by applicable law (and in such a case shall inform Schlumberger of that legal requirement before processing, unless applicable law prevents it doing so on important grounds of public interest). The Supplier shall immediately inform Schlumberger if any instruction relating to the Protected Data infringes or may infringe any Data Protection Law.

35.3    **Security**

The Supplier shall at all times implement and maintain appropriate technical and organisational measures to protect Protected Data against accidental, unauthorised or unlawful destruction, loss, alteration, disclosure or access. Such technical and organisational measures shall be, taking into account the state of the art, the costs of implementation and the nature, scope, context and purposes of the processing of the Protected Data to be carried out under or in connection with this Agreement, as well as the risks of varying likelihood and severity for the rights and freedoms of natural persons and the risks that are presented by the processing, especially from accidental or unlawful destruction, loss, alteration, unauthorised disclosure of, or access to the Protected Data transmitted, stored or otherwise processed, the Supplier shall implement appropriate technical and organisational security measures appropriate to the risk, including as appropriate those matters mentioned in Articles 32(a) to 32(d) (inclusive) of the GDPR.

35.4    **Sub-processing and personnel.** The Supplier shall:

(i)     not permit any processing of Protected Data by any agent, subcontractor or other third party (except its own employees that are subject to an enforceable obligation of confidence with regards to the Protected Data) without the prior specific written authorisation of that Sub-Processor by Schlumberger and only then subject to such conditions as Schlumberger may require;

(j)     ensure that access to Protected Data is limited to the authorised persons who need access to it to supply the Services;

Magseis Fairfield - OBN Acquisition MSA 20210401

(k)    prior to the relevant Sub-Processor carrying out any processing activities in respect of the Protected Data, appoint each Sub-Processor under a binding written contract containing the same obligations as under this Article 35 in respect of Protected Data that is enforceable by the Supplier and ensure each such Sub-Processor complies with all such obligations;

(l)    remain fully liable to Schlumberger under this Agreement for all the acts and omissions of each Sub-Processor and each of the Supplier Personnel as if they were its own; and

(m)    ensure that all persons authorised by the Supplier or any Sub-Processor to process Protected Data are reliable and:

(a)    adequately trained on compliance with this clause **Error! Reference source not found.** as a pplicable to the processing;

(b)    informed of the confidential nature of the Protected Data and that they must not disclose Protected Data;

(c)    subject to a binding and enforceable written contractual obligation to keep the Protected Data confidential; and

(d)    provide relevant details and a copy of each agreement with a Sub-Processor to Schlumberger on request.

35.5    **Assistance.** The Supplier shall (at its own cost and expense):

(a)    promptly provide such information and assistance (including by taking all appropriate technical and organisational measures) as Schlumberger may require in relation to the fulfilment of Schlumberger's obligations to respond to requests for exercising the Data Subjects' rights under Chapter III of the GDPR (and any similar obligations under applicable Data Protection Laws); and

(b)    provide such information, co-operation and other assistance to Schlumberger as Schlumberger reasonably requires (taking into account the nature of processing and the information available to the Supplier) to ensure compliance with Schlumberger's obligations under Data Protection Laws, including with respect to:

(i)    security of processing;

(ii)    data protection impact assessments (as such term is defined in Data Protection Laws);

(iii)    prior consultation with a supervisory authority regarding high risk processing; and

(iv)    any remedial action and/or notifications to be taken in response to any Personal Data Breach and/or any complaint or request relating to either party's obligations under Data Protection Laws relevant to this Agreement, including (subject in each case to Schlumberger's prior written authorisation) regarding any notification of the Personal Data Breach to supervisory authorities and/or communication to any affected Data Subjects; and

(c)    record and refer all requests and communications received from Data Subjects or any supervisory authority to Schlumberger which relate (or which may relate) to any Protected Data promptly (and in any event within three days of receipt) and shall not respond to any without Schlumberger's express written approval and strictly in accordance with Schlumberger's instructions unless and to the extent required by law.

35.6    **International transfers**

The Supplier shall not process and/or transfer, or otherwise directly or indirectly disclose, any Protected Data in or to countries outside the [*United Kingdom*] or to any international organisation without the prior written consent of Schlumberger (which may be refused or granted subject to such conditions as Schlumberger deems necessary).

35.7    **Records and audit**

The Supplier shall (and shall ensure all Sub-Processors shall) promptly make available to Schlumberger (at the Supplier's cost) such information as is reasonably required to demonstrate the Supplier's and Schlumberger's compliance with their respective obligations under this clause **Error! Reference source not f**

Schlumberger-Private

ound. and the Data Protection Laws, and allow for, permit and contribute to audits, including inspections, by Schlumberger (or another auditor mandated by Schlumberger) for this purpose at Schlumberger's request from time to time. The Supplier shall provide (or procure) access to all relevant premises, systems, personnel and records during normal business hours for the purposes of each such audit or inspection upon reasonable prior notice (not being more than [*two*] Business Days) and provide and procure all further reasonable co-operation, access and assistance in relation to any such audit or inspection.

35.8    **Breach.** The Supplier shall promptly (and in any event within 24 hours):

(d)    notify Schlumberger if it (or any of its Sub-Processors or the Supplier Personnel) suspects or becomes aware of any suspected, actual or threatened occurrence of any Personal Data Breach in respect of any Protected Data; and

(e)    provide all information as Schlumberger requires to report the circumstances referred to in Article 35.8(a) above to a supervisory authority and to notify affected Data Subjects under Data Protection Laws.

35.9    **Deletion/return.** The Supplier shall (and shall ensure that each of the Sub-Processors and Supplier Personnel shall) without delay (and in any event within 3 days), at Schlumberger's written request, either securely delete or securely return all the Protected Data to Schlumberger in such form as Schlumberger reasonably requests after the earlier of:

(f)    the end of the provision of the relevant Services related to processing of such Protected Data; or

(g)    once processing by the Supplier of any Protected Data is no longer required for the purpose of the Supplier's performance of its relevant obligations under this Agreement,

and securely delete existing copies (except to the extent that storage of any such data is required by applicable law and, if so, the Supplier shall inform Schlumberger of any such requirement).

35.10    This Article 35 shall survive termination or expiry of this Agreement for any reason.

### ARTICLE 36 – EXCLUSION ZONE

Schlumberger agrees that Supplier Group shall not, during and for performance of the Work in the Area of Operations, be required to enter into or operate within a five hundred meters (500m) radius of any Offshore Installation ("*Exclusion Zone*"). If Supplier Group enters an Exclusion Zone without specific written instructions from Schlumberger, then notwithstanding any other term of this Agreement, the Order or under the Applicable Law, Supplier shall be liable for and shall Indemnify Schlumberger Group against any and all Claims in respect of damage to or loss of (including pollution or contamination arising therefrom and including cost of control, removal and/or clean up) such Offshore Installation, to the extent caused by Supplier Group.

### ARTICLE 37 – MARINE MAMMAL PROTECTION; THIRD PARTY ACTIONS

37.1    Schlumberger shall use its best endeavors to provide Supplier prior to the Commencement with information related to local marine mammal protection regulations reasonably necessary to enable Supplier to understand and comply with such regulations. The foregoing shall in no way affect Supplier's obligation under Article 6.2(c) herein. If the performance of the Work is delayed or prevented by compliance with any Applicable Laws relating to marine mammal protection, Supplier shall, if agreed by the Parties in the Order, be paid a standby rate. If the performance of the Work is delayed or prevented by compliance with any Applicable Laws relating to marine mammal protection for a continuous period of ten (10) days or more, Schlumberger may terminate the Order under Article 17.3(h).

37.2    Supplier may from time to time be prevented from fulfilling its obligations under an Order by reasons of certain Third Party direct action groups including, environmental lobbyists (the "*Action Groups*"). If the performance of the Work is delayed or prevented as a result of an Action Group, Supplier Group shall notify Schlumberger immediately and the Parties will discuss and implement measures to bring the delay or stoppage to an end or to find a solution by which the Work may be performed despite the activities of such Action Groups. Where applicable, Supplier Group's performance will be suspended for the period that the activities of the Action Groups continue and Supplier will be granted a reasonable extension of time for the performance of the Work, and in any event no less than the period of delay or stoppage. Supplier shall, if

agreed by the Parties in the Order, be paid a standby rate during the suspension. If the delay or stoppage continues for more than twenty (20) days then Schlumberger may terminate the Order under Article 17.3(h).

## ARTICLE 38 – SALVAGE AND SHIPS DOCUMENTS

38.1    Supplier may use the Vessel to assist ships in distress and to divert for the purpose of saving life. Schlumberger shall not be responsible for any damage or loss which may arise as a result of or in connection with any such salvage or assistance. If within its control, Supplier shall arrange that all salvage assistance shall be on the terms of Lloyds open form "No Cure - No Pay". Except for the purpose of saving life, the Vessel shall not engage upon any salvage operation without the prior consent of Schlumberger.

38.2    Supplier waives all its rights to any salvage award payable should the Vessel (including the Master, officers and crew) provide any salvage service in respect of any vessel, cargo or wreck owned wholly or partially by Schlumberger or in respect of the lives of any persons being a member of Schlumberger Group. Supplier shall be remunerated at the Standby Rate as defined in the Order during the performance of any such salvage or attempted salvage of Schlumberger Group property or Schlumberger Group Personnel.

38.3    Supplier shall ensure that a full set of ship's certificates are kept on board the Vessel at all times and same shall be made available for inspection as required by Schlumberger. Supplier shall ensure that the Vessel Master keeps a full and correct log of the voyages in the English language; same shall be open to Schlumberger or its agents as required, and Supplier shall furnish to Schlumberger or its agents a true copy of the Vessel's log books as well as properly completed loading and discharging port sheets and voyage reports for each voyage, and such other similar documents as Schlumberger may require.

## ARTICLE 39 – GENERAL LIMITATION OF LIABILITY

39.1    Supplier's total aggregate liability to Schlumberger under this Agreement and under any applicable Order, whether under contract, tort, breach of statutory duty or otherwise, whether in a single event or a series of events, and without prejudice to any other limitation rights which Supplier may have under any Applicable Laws, shall be limited to one hundred and ten percent (110%) of the total estimated price of the Work as provided in each Order, and Supplier's costs in Article 16.6 related to re-performance will accrue against the liability cap.

For the avoidance of doubt, estimated amounts under one or more Orders will not be accumulated to determine Supplier's total aggregate liability; total aggregate liability will be determined separately for each Order.

39.2    Supplier's liability will not be limited by this Article with respect to any liability Supplier may have to Schlumberger under Article 15 - Taxes, Article 23 - Intellectual Property, Article 24 – Liabilities and Indemnities, Article 25 – Insurance, Article 26 – Confidentiality, Article 30 – Compliance with Laws, and Article 34 – Business Conduct.

## ARTICLE 40 – GENERAL LEGAL PROVISIONS

40.1    None of the provisions of this Agreement or any rights, benefits or remedies of a Party shall be considered waived by that Party unless such waiver is given in writing by the respective Party. Such waiver shall not be deemed a waiver of any subsequent breach or default. No such waiver shall be a waiver of any past or future default, breach or modification of any of the terms, provisions, conditions or covenants of this Agreement unless expressly set forth in such waiver, nor shall any failure, delay or omission on the part of a Party in exercising or availing itself of its rights hereunder constitute a waiver of such right or of that or any other right or remedy, nor shall it prevent or restrict any further exercise of that or any other right or remedy. No single or partial exercise of any right or remedy provided under this Agreement or by law shall prevent or restrict the further exercise of that or any other right or remedy.

40.2    The Parties intend that no provision of this Agreement shall by virtue of the Contracts (Rights of Third Parties) Act 1999 confer any benefit on, nor be enforceable by, a Third Party.

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

40.3    This Agreement and any terms and conditions referred to herein constitute the entire agreement between the Parties with respect to the subject matter hereof, and prevails over all prior communications, representations and agreements, whether oral or written, with respect to the subject matter. This Article 38.3 are not intended nor exclude any liability for fraud or fraudulent misrepresentation.

40.4    This Agreement may only be modified or amended by a separate written agreement, signed by both Parties, which specifically states it modifies or amends this Agreement and identifies the provisions so modified or amended.

40.5    The provisions of the Agreement which by their nature are intended to survive the termination or expiry of the Agreement (including warranty, indemnity/liability, intellectual property and confidentiality provisions) shall remain in full force and effect after the termination or expiry.

40.6    The Agreement shall be considered for all purposes as prepared through the joint efforts of the Parties and shall not be construed against one Party or the other as a result of the preparation, submission, negotiation, or drafting hereof. Captions and headings are for convenience of identification purposes only and do not form part of this Agreement. If this Agreement is translated, this original English version shall prevail.

40.7    Should any provision of this Agreement, or any portion thereof, be unenforceable or conflict with any governing country, state, province or local laws, then the validity of the remaining provisions, and portions thereof, shall not be affected by such unenforceability or conflict and this Agreement shall be construed as if such provision, or portion thereof, was not contained herein.

40.8    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 21F1D390-A995-4786-BD79-AD760008FEA0

Magseis Fairfield - OBN Acquisition MSA 20210401

### EXHIBIT B – SPECIAL TERMS AND CONDITIONS FOR PURCHASE OF SERVICES

This Exhibit B together with any Annexures sets out the Special Terms and Conditions applicable to Marine Seismic Data Acquisition Services. All capitalized terms used in this Exhibit B that are not expressly defined herein shall have the meaning ascribed to such terms as set out in Exhibit A.

**"Not Applicable"**

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 21F1D380-A995-47B6-BD79-AD760008FEA0

Magseis Fairfield - OBN Acquisition MSA 20210401

**EXHIBIT C – DESCRIPTION OF SERVICES**

1.    **General**
1.1  **General work standards**
The work shall meet the standards and specifications and be carried out in accordance with the procedures set out in this CONTRACT.

The CONTRACTOR shall have documented procedures for demonstrating that the work meets CONTRACTOR's stated and published standards. On request, CONTRACTOR shall provide COMPANY with these documented procedures.

The CONTRACTOR shall be responsible for demonstrating to the COMPANY ONBOARD REPRESENTATIVE that the ork meets CONTRACTOR's standards and specifications, and COMPANY's standards and specifications as outlined in this CONTRACT. Failure to do so will result in reacquiring of data at the CONTRACTOR's expense.

At any time, the COMPANY ONBOARD REPRESENTATIVE shall have the right of access to all technical logs relating to the operations and their quality control except to the CONTRACTOR's internal reports.

On request, CONTRACTOR shall make available to COMPANY the manufacturers' specifications of EQUIPMENT to be used, as well as a comprehensive description of the external header information produced by the acquisition instrument.

Key components of CONTRACTOR'S EQUIPMENT (e.g. guns, gun controller, ocean bottom receivers, recording instrument, navigation equipment etc. and the associated software) shall not be changed to a different system (different manufacturer or model) during the course of THE WORK unless approved by COMPANY

1.2  **Failure to meet specifications**
All EQUIPMENT shall at all times meet CONTRACTOR's stated or published standards, manufacturer's published specifications and COMPANY's standards and specifications as outlined in this CONTRACT. Work shall not start on any line if any one or more of these specifications is not met. All specifications shall apply throughout the seismic acquisition.

In the event that CONTRACTOR considers that any EQUIPMENT to be used does not meet or may not meet such standards and specifications, CONTRACTOR shall notify COMPANY ONBOARD REPRESENTATIVE.
If any of the specifications are not being met during the course of a line, then the CONTRACTOR may be allowed to continue the line, but all subsequent data shall be rejected, until such time that all specifications are proven to be met. In such cases, the acquisition of the re-shoot shall be subject to the re-shooting and run-in specifications as defined below and shall be at CONTRACTOR's account.

At any time, the COMPANY ONBOARD REPRESENTATIVE can decide to accept data which does not meet the specifications defined herein or a manufacturer's specification, but this will only be done after consultation with COMPANY.

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 21F1D380-A985-47B6-BD79-AD760008EEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

After the award of the work, any relaxation or other modification to any CONTRACTOR's or manufacturer's specification or to any COMPANY specification as outlined in this CONTRACT shall be at the sole discretion of COMPANY

**1.3   Re-shooting of source lines**

Minimum line length shall be 2000m

**1.4   Steering / Bin Coverage (3D)**

The following applies to the various receiver modes:

| | |
|---|---|
| **OBN**<br><br>**Tethered nodes** | The receivers should be deployed with a maximum radial deviation from the pre-plot of 5 m + 5% of water depth for 90% of the receiver line. Deviations up to 10% of water depth or 20m, whichever is the greater, for not more than 10% of the receiver line will be tolerated |
| **OBN**<br><br>**ROV nodes** | The receivers should be deployed with a maximum radial deviation from the pre-plot of 5 m for 90% of the receiver line. Deviations up to 10m for not more than 10% of the receiver line will be tolerated |
| **OBN**<br><br>**Free-fall nodes** | The receivers should be deployed with a maximum radial deviation from the pre-plot will be a percentage of water depth.<br>The actual percentage to be used with be defined in the ==service order== |

Max deviation off-line of centre of any source shall be 10 m for 90% of the line. Deviations up to 20m for not more than 10% of the source line will be tolerated.

The above criteria do not apply where lines have to be deviated due to the presence of infrastructure or seabed obstructions.
The final coverage shall be approved by COMPANY prior to survey completion.
On request, fold maps for each offset group using final co-ordinates allowing single bin resolution, shall be made available to COMPANY and/or to the COMPANY ONBOARD REPRESENTATIVE. After survey completion, all coverage displays shall be delivered in electronic form to COMPANY within five days of retrieval of the last node.
CONTRACTOR's binning system shall be capable of calculating and displaying flexible bin plots. Such shall be produced at the request of the COMPANY ONBOARD REPRESENTATIVE only.

The final coverage shall be approved by COMPANY prior to survey completion.

**1.5   Numbering Conventions**

Shot point & Line Numbering will be agreed in the ==Service order==

**1.5.1   Navigation NASUSB disk Labelling**

All navigation CD's or DVD's shall be named PPPPPPUXXX, where
- PPPPPP:     COMPANY project number (e.g. 11099)
- U:   'P' = OGP P1 format or UKOOA P1 format
- 'R' = OGP P2 format
- XXX:           Sequential NASUSB disk number (001-999)

COMPANY requires one (1) copy of each navigation NAS disk drive to be prepared on board. NASNASUSB should be labelled per instructions above.  If replacement is required due to loss or damage, it will be labelled per instructions above.

Schlumberger-Private

CONTRACTOR is responsible to secure an archive of the data for a period of Twelve (12) months from data delivery. Archive to be sufficient to allow for regeneration of products if deliverables are damaged or lost.

## 2.    Seismic Acquisition System and Ocean Bottom Receivers
## 2.1  Seismic Acquisition System

Any acquisition system may be proposed provided this system has been formally approved by COMPANY. Acceptance of any unaccepted instrument shall be at the sole discretion of COMPANY.

COMPANY reserves the right to perform an in-depth system evaluation in case COMPANY has not worked before with the offered seismic acquisition system, or in case such acquisition system has recently undergone significant changes.

For the purpose of this Section VII, a "Receiver Station" shall mean a single 4C Ocean Bottom Node (OBN). The system shall have the flexibility and channel capacity to handle the agreed acquisition configuration mentioned in the SCOPE OF WORK, AREA OF OPERATIONS, unless specifically agreed otherwise.

Once data is harvested from the retrieved nodes contractor shall make digital and online QC displays available to the onboard Company representative

The seismic data will be written to SEGD or SEGY format with all the required acquisition meta data, including orientation, position and timing information, written to the seismic header.

Any identified anomalies which are not within expected node specifications will be corrected for or the node will be considered out of specification. Any system delays will be clearly detailed in the acquisition reports.

No low-cut filter shall be set other than default instrument filters. COMPANY shall advise CONTRACTOR on the high-cut filter to be used, which shall be selected from the filters available for the instrument type.

## 2.2  Ocean Bottom Nodes (OBN)
### 2.2.1    Polarity Specification

Polarity for multi-component data 4C shall be as recommended in CREWES Research Report – Volume 12 (2000)  - by Brown, Stewart, Gaiser and Lawton, unless specifically agreed otherwise between COMPANY and CONTRACTOR. This report can be downloaded from the internet. The polarity standards are based on the SEG specifications. In particular, a compression at the hydrophone shall be recorded as a negative number on NAS disk drive and produce a downward displacement of the monitor. Prior to commencement of SURVEY OPERATIONS, the polarity of the receivers shall be verified with factory test results. This procedure shall be repeated each time a receiver is repaired or replaced before SURVEY OPERATIONS are resumed.

### 2.2.2    OBN clock Drift Specification

Each autonomous node with a thermally stabilized clock, or with a Chip Scale Atomic Clock (CSAC) is to be synchronized to the reference GPS clock immediately prior to deployment, and calibrated post recovery with the amount of clock drift reported. Clock drift correction is acceptable provided the residual error is less than one sample interval drift during a single deployment period of the node, and the error between the OBN clock and the reference clock after recovery does not exceed manufacturers specification.

Schlumberger-Private

Schlumberger-Private

**Magseis Fairfield - OBN Acquisition MSA 20210401**

**2.2.3    Receiver Location Requirements**

CONTRACTOR will use best efforts to correctly position the receivers in such a way that they are located at the preplotted receiver locations. It is recognised that this may not always be practical in all cases due to a variety of circumstances which may be out of the CONTRACTOR's control.
No receivers are to be deployed within the pipeline/umbilicals owner defined exclusion zone without explicit approval from COMPANY, and at any locations specifically excluded by COMPANY. If a receiver cannot be positioned correctly due to seafloor obstacles, it should be positioned as near as possible to the pre-planned location, such to be agreed upon between CONTRACTOR and COMPANY ON-SITE REPRESENTATIVE.

**3.    Data Acceptance**

**3.1  Definitions**
**3.1.1    Failed Node Definition**

**OBN Unit Channels – One or more channels exhibiting any of the following will be classed as an OBN Unit Failure:**
- Sensor instrument is out of manufacturer's specification
- Digital recorder is out of manufacturer's specification
- Output is zero, intermittent or ± 6 dB different from neighbouring OBN Stations.
- Output is distorted or has a phase shift of ± 0.5 ms
- Electronic leakage visible in the 3-70 Hz band
- Internally generated noise
- Ambiguity in channel numbering or switched channels
- Reversed polarity

**OBN Unit Recording - Data not recovered to disk for any of the following reasons will be classed as an OBN Unit Failure, including but not limited to:**
- Node not recovered from seabed
- Data not recorded
- Data not downloaded
- Data corrupted
- Data not processed and QC'ed

**Definition of OBN Unit Failure - Data on a particular OBN unit affected by any of the following shall be classed as an OBN Unit Failure:**
- OBN Unit is outside of position tolerance
- Exceeds clock tolerance
- 1 or more channels fail
- Recording failure
- No or incomplete data QC
- Data not passed by on board QC processors
- Node fails self-tests
- No or incomplete navigation position data
- No or incomplete log information
- No or incomplete GPS timing logged
- Continuous data set not combed to extract shot record traces
- Loss of data for whatever reason
- OBN Unit previously deployed, recovered and marked as an OBN Unit Failure which is redeployed before being tested and investigated on deck.
  All nodes classed as OBN Unit Failure must be flagged and removed from the equipment pool to undergo further investigation on deck, with all testing and changes logged and documented in writing, and may not be re-deployed unless approved by Company Representative

Schlumberger-Private

### 3.1.2  Field Recording Failure Definition for OBN Operations

A Field Recording Failure shall refer to:

a) any individual source line in which the active spread, as defined by the survey design, has more than (10%) Ten percent Failed Nodes

b) The number of Failed Nodes within a radius defined by COMPANY in SCOPE OF WORK, AREA OF OPERATIONS exceeding the maximum allowable number of Failed Nodes defined by COMPANY.

## 3.2  Acceptance Criteria

### 3.2.1  Allowable OBN Failures

a) A maximum of 2% of node station locations with 'bad data' are accepted in the final dataset.

b) The number of Failed Nodes (ref. Sub-article 3.1.1), i.e. nodes with 'bad data', within a radius defined by COMPANY in SCOPE OF WORK, AREA OF OPERATIONS shall not exceed the maximum allowable number of Failed Nodes defined by COMPANY.

c) Nodes considered as being defective during QC runs will be replaced at the earliest opportunity. Node replacement by the RECEIVER UNIT will be planned to cause minimal impact to the survey,

### 3.2.2  Acceptance of OBN Data

An On-board QC Processing system is included in the basic work to be delivered as part of the Agreement. It should be fit for normal state of the art QC processing and should be properly manned by professional operators.

The system should comprise an appropriate Software package, and should at least be powerful enough to process the acquired data (considering "normal" production) in a way appropriate for modern on-board QC processing, keeping pace with the data acquisition for e.g. at least a processing sequence (with appropriate output) as follows (or an equally heavy processing sequence):

Seismic processing through vector rotation is completed on the Node Handling Vessels by the Offshore Processing Team.  This process is performed throughout node retrieval.

See QC processing workflow on section 6.1.1

## 4.  NAS disk driveNAS disk driveNAS disk drive**Seismic Source**
## 4.1  General

The source shall be an array of Bolt, Bolt Long Life, Sleeve, or Sodera-G low-pressure airguns. CONTRACTOR shall endeavour to maintain all spare guns in or for the array at all times. Gun mask data and actual gun timing accuracy shall be recorded in the seismic trace headers and/or the navigation data. For multiple source arrays, an accurate and independent method of recording which array fired at each shot point shall be used.

### 4.2  Drop-out Specifications

Dropout specifications shall be clarified prior to MOBILISATION. Unless agreed otherwise by COMPANY, these shall be based on signatures modelled using GUNDALF (developed by Oakwood Computing Associates Ltd). Specifications and dropout criteria are referenced to the response of a DFS-V recording system with an Out-128 Hz 72 dB/octave bandwidth.

Dropout criteria used are:

a) The average deviation in the 10 to 70 Hz band-width from the spectrum of the full array shall not exceed ± 1.5 dB;

Schlumberger-Private

DocuSign Envelope ID: 21F1D380-A985-47B6-BD79-AD760008EEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

b)  The maximum deviation from the spectrum of the full array shall not exceed ± 3 dB anywhere in the 10 to 70 Hz bandwidth.

### 4.3  Near field Hydrophone

Each airgun sub-array shall be equipped with appropriately sited near field hydrophones to enable accurate verification of the near field signature of the air guns. Prior to the start of any line, a minimum of one hydrophone is required to be operational per gun position. However, once started, a line may be completed with defective hydrophones at the discretion of Company's onboard representative.  The near field signatures shall be recorded on a shot by shot basis to magnetic media or Hard Disk Drive (HDD).

a)  The ability to produce computed source far-field signatures from the near field signatures on a shot-        to-shot basis will be defined in the project service order.

b)  The auxiliary traces corresponding to the near-field hydrophones of the source array(s) shooting or non-shooting shall be recorded on NAS disk drives or USB in SEG-Y format, Raw SEGD near-field hydrophone data will be supplied on NAS disk drives or USB in tar format.  This will include the near-field hydrophone data recorded in both arrays for every shot, with a maximum sampling of 0.5 ms with an agreed record length.

### 4.4  Far-field Source Signature

### 4.5  Depth

Each airgun sub-array shall have at least two (2) functioning depth indicators. The accuracy of these indicators shall be no less than 0.30 m, not including the effect of atmospheric pressure changes. Depth indicators shall be verified at the start of the work, when replaced and whenever significant repairs are made to the sub-array, unless unusual atmospheric pressures preclude an accurate verification.

The source shall be considered outside specification if,;

a)  the measured depth of the array is outside ± 0.5 m of the specified depth; or

b)  any of the depth sensors indicates that any of the individual airguns is outside ± 1.0 meters of the specified depth.

For each individual shot, the depth of each individual sensor shall be recorded in the external header. CONTRACTOR's EQUIPMENT should be capable of producing screen  plots of all observed depths.

### 4.6  Configuration

Each Sub-array will be equipped with 2 positioning sensor units. Sub-array separations shall be measured using at least one positioning sensor unit per sub- array.

a)  Average String separation for a line – nominal +/- 2m

b)  Maximum String separation for a line – nominal +/- 4m

If, however, local currents/tides show a bias in a particular acquisition direction, then these tolerances may be reviewed by CONTRACTOR and the onboard COMPANY Representative.

### 4.7  Air Pressure

For each shot, the pressure of each sub-array shall be measured by at least one separate transducer, one of which shall be positioned at the far end of the sub-array furthest from the vessel.

▪  Maximum error:              + 5% of the nominal pressure

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

- 10 km average error:          2.5% to +5% of the nominal pressure

## 4.8  Gun Timing
- Gun timing error (warning)> +/- 1.0 ms
- Gun timing error (edit)> +/- 1.5 ms

## 4.9  Misfires
A misfire is defined as any condition resulting in an unusable record or no record at all. In addition a misfire has occurred if any of the following conditions arise:
- Air pressure does not meet performance specification
- Loss of time zero
- No gyro information
- No navigation data recorded (or incomplete record)
- No shot fired
- Recording instruments do not meet performance specification
- Array geometry and separations do not meet performance specification – that relate to individual array separation and alignment
- Source depth does not meet performance specification
- Source parameters and performance do not meet performance specification
- Source positioning does not meet performance specification
- NFH does not meet performance specification
- Source timing and/or synchronization does not meet performance specification
- Source volume does not meet performance specification
- Total failure of source depth indicator on any one source
- Vessel primary positioning does not meet performance specification
- Auto-fires on any gun of the array
- Wrong dither table applied
- No dither applied

**Misfire tolerance:**
- No more than 3 consecutive shots per array
- 5 misfires in any 10 consecutive records
- 6 misfires in any 80 consecutive records
- 5.0% for a line or line segment
- 1.0% for the survey

**Reshoot overlap:**          10 shot points on any given array
**Bubble period test:**          Period bubble test on all guns is done at source mobilization. It will be repeated for each gun replacement, NFH sensor replacement.
**Scenarios of Any One Source VESSEL Experiences out of specification (i.e. in excess of CONTRACT specifications for number of shots affected):**

| Position or Timing of Any Source Not Recorded or Cannot be Resolved | All Vessels re-shoot |
|---|---|
| Auto-fires (no position or timing by definition) | All vessels re-shoot |
| Low Pressure Air | Only the out-of-spec vessel re-shoot |
| Individual Gun Timing Errors | Only the out-of-spec vessel re-shoot |
| Air Leak | Only the out-of-spec vessel re-shoot |
| Source Positioning/ Location Error | All vessels re-shoot |
| Source Geometry | Only the out-of-spec vessel re-shoot |
| Guns do not fire on this VESSEL | Only the out-of-spec vessel re-shoot |

Schlumberger-Private

Schlumberger-Private

**Magseis Fairfield - OBN Acquisition MSA 20210401**

**5.    Recording Media NAS disk drive and Documentation**
**5.1 Recording Media NAS Media NAS disk drive**
**5.1.1    General**
　　　All seismic data shall be recorded on NAS disk drive.  COMPANY and CONTRACTOR shall agree on
　　　acceptable NAS media NAS disk drive media brands prior to MOBILISATION.

　　　All data shall be recorded in a suitable SEG-Y format. The revision shall be agreed by CONTRACTOR
　　　and COMPANY prior to the award of work. On request, CONTRACTOR shall make available to
　　　COMPANY a full description of the CONTRACTOR's implementation of this NAS disk drive format.


**5.1.2    Recording Media NAS disk drive Labels**
　　　Recording Media NAS disk drive labels shall be used, which as a minimum contain the following
　　　information in a readable form: As specified in the ==Service Order==

**5.1.3    Recording NAS Media NAS disk drive Transmittal Procedures**
　　　At the earliest opportunity, or as requested by COMPANY, CONTRACTOR shall ship the first copy of
　　　NAS disk drives to processing centre NAS data archiving facility designated by COMPANY.

　　　CONTRACTOR may assume the first copy of a NAS disk drive has been read successfully, if within
　　　two full months after the NAS disk drive has been delivered at the designated processing centre,
　　　COMPANY has not notified CONTRACTOR that a duplicate NAS disk drive is needed or may be
　　　needed.
　　　CONTRACTOR shall remain responsible and accountable for safeguarding NAS an archive of the
　　　data for a period of 12 months from data delivery.  Archive to be sufficient to allow for
　　　regeneration of products if deliverables are damaged or lost.
　　　The shipment will be tracked using a suitable method. An electronic and paper copy of a NAS disk
　　　drive transmittal form shall accompany all NAS disk drive shipments. The electronic copy shall
　　　consist of a Microsoft© Excel spreadsheet, with one row for each NAS disk drive. All information
　　　required on the NAS disk drive label shall also be required on the transmittal form, with a separate
　　　column for each item. One column shall contain the NAS disk drive identifier number. A further
　　　electronic copy of the transmittal shall be sent by e-mail to COMPANY at the time of the data
　　　shipment.
　　　Disk drives containing only rejected lines or line segments shall be marked 'DNP' or 'Do Not
　　　Process'. Unless specified differently, DNP NAS disk drives shall be sent to the designated
　　　processing Centre or to the designated storage CONTRACTOR. However, DNP NAS disk drives
　　　should be clearly marked on the paper and electronic transmittal forms.

**5.2  Source vessel line logs**
　　　All source vessel line logs shall be electronically generated. Source vessel line logs should, as a
　　　minimum, contain the following information:
　　　(a)　　CONTRACTOR and vessel name
　　　(b)　　COMPANY project number and line number
　　　(c)　　Sequence number
　　　(d)　　Line heading
　　　(e)　　Date
　　　(f)　　Disk drive number(s) and corresponding NAS disk drive-identifier
　　　(g)　　Shot point or node number and file numbers (if applicable)
　　　(h)　　GPS time of acquisition

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 2151D380-A985-4786-BD79-AD760008FEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

     (i)       An indication of misfires, stating the reason

     (j)       Any change in the bad traces in the configuration

     (k)      Weather and sea state at start of line

     (l)       Any change in recording parameters where applicable

## 5.3  Source Vessel Line Information Sheets

A line status summary log shall be kept in a spreadsheet format as approved by the COMPANY ONBOARD REPRESENTATIVE. If so requested by the COMPANY ONBOARD REPRESENTATIVE, a paper copy of this log, signed as approved by the Party Chief and the COMPANY ONBOARD REPRESENTATIVE, shall accompany each and every NAS disk drive consignment of seismic and/or navigation data. Alternatively, an electronic copy of the line status summary log can be sent on diskette or via E-mail to COMPANY.

This log is to include, as a minimum:

    a)      Line name

    b)      Sequence number

    c)      Date of acquisition

    d)      Line direction

    e)      First good shot point

    f)      Last good shot point

    g)      Status

## 6.    Onboard Processing

## 6.1  QC Processing

Section 6.1.1 subject to modification in the Service order

### 6.1.1    On Board OBN QC Processing

On-board QC of data recorded by autonomous nodes takes place as follows, unless COMPANY specifies otherwise.

To ensure the quality and integrity of the acquired data all data are to be run through a QC processing sequence. All recorded data will be checked, and the quality control is performed on continuous data and data from extracted shots. For every node, CONTRACTOR shall produce a comprehensive report containing all QC displays relevant for common receiver QC.

Any further investigations other than the QC steps described below must be documented separately by CONTRACTOR and provided to COMPANY with the QC log and clearly cross referenced.

The following QC processing steps are performed for every individual autonomous node, unless COMPANY specifies otherwise:

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401



*Figure 1 – Magseis Fairfield Node Data QC Sequence*

**Raw Field Data through Navigation Merge**

- **Field Data Read/Internal Reformat:** Raw field data is output in either shot sliced or continuous records from the recorder system and read back by the processing team.
  - Source Navigation Merge – The verified shot table from the recorder is utilized to create the preliminary processing shot database.  The receiver deployment table from the recorder is utilized to create the preliminary processing receiver database.  Both tables are merged with raw field data.
- **Preliminary QC:** Sequence is meant to verify recording coverage and prevent redeployment of nodes with recording issues.  The QCs will center on amplitude, frequency, and orientation sensors.
  - Orientation Analysis – Analysis identifies any anomalies in the orientation sensor readings including movement and sensor malfunctions.
  - Amplitude Analysis – Analysis confirms data coverage.  RMS amplitude maps analyzed to identify amplitude anomalies, data coverage, sensor malfunctions, high amplitude noise, large timing issues, node movement, coupling, etc.
  - Frequency Analysis – Analysis confirms hydrophone and geophone function and coupling, and to evaluate noise and signal characteristics.
  - Receiver Gathers QC – Receiver gathers are displayed for each recording component type. Data is displayed as wiggle trace.
- **Secondary QC:** Sequence is meant to refine shot and receiver positioning, and clock drift corrections for each node unit.  Note that positioning and clock timing are interrelated and must be solved together in iterative steps.
  - Shot Positioning Analysis – Depending on array design and towing depth, deviations may be visible in the defined GPS vs first break source positioning.  A correction is calculated through various shot inline shift scans and the average correction applied to all production sources. Preliminary analysis of the shot positions is performed during in the First Line QC and followed up in production.  Updated positions saved into shot database to be applied to final navigation merged dataset.
  - Receiver Positioning Analysis – Refines receiver positions using first break pick analysis.  Receiver depths are determined from the pressure sensors on the ROV during node deployment.  Receiver position scan uses constant velocity function.  Updated positions saved into receiver database are applied to final navigation merged dataset.  Combined with orientation sensors, node movement can also be verified and solved.
  - Clock Timing Analysis – Analysis to model clock drift correction and identify potential clock timing issues.  Clock timing analysis will also address clock discontinuities.  All updates are

Schlumberger-Private

DocuSign Envelope ID: 2151D380-A985-47B6-BD79-AD760008FEA0

Magseis Fairfield - OBN Acquisition MSA 20210401

saved into receiver database and noted in processing log.  Corrections to be applied to final navigation merged dataset.

- **Final QC:** Sequence confirms node orientation and if needed refines geophone rotation.
  - o Node Leveling Analysis – Raw data amplitude analysis performed to determine if refinement of the Yaw sensor is needed.  If needed, refinement values will be saved to the trace headers and residual rotation will be performed.
  - o Node Rotation – Geophones are pre-rotated by the recorder system upon download, if residual rotation is recommended from the node leveling analysis, it will be applied in this stage.  Orientation of horizontal geophone 1 to inline survey direction.  Updated orientation values saved in output SEG-Y trace headers.
- **Auxiliary Files:** These files and reports are attached to the data deliverables to allow for archival of all observations made during processing and data acquisition including lessons learned.
  - o Updated Shot and Receiver Databases - Databases of corrections applied to shots and receivers are generated for deliverables.
  - o Receiver Station Log - A log (Excel Receiver Station Log) is generated listing all receiver stations and observations made.
  - o Final Processing Report - A final report (PDF Onboard Processing Final Report) is generated at project closeout, this is typically merged with the Survey Acquisition Final Report.
  - o Receiver QC Images or Station Reports - Throughout processing of the data, QC images and notes are collected regarding anomalies, special corrections, or suggested DNPs.
- **Navigation Merged Rotated Output:**
  - o Navigation Merged SEG-Y - Navigation merged, rotated datasets are output as deliverable.  A SEG-Y media log is generated to track shipped datasets.  Delivery of SEG-Y data is as dictated in Scope of Work.
  - o Original versions of all deliverables will be shipped with auxiliary data to the client or client's processing center at first availability.
  - o Archive version of all deliverables will be kept offshore until all copy versions and original versions have been confirmed by clients.  Once confirmed, or depending upon contract requirements, these will then be purged.

## 6.2  Availability of QC Products

### Timing of QC Products

CONTRACTOR shall as a matter of routine make products available to the COMPANY SITE REPRESENTATIVE within thirty-six (36) hours of completion of each sequence, for transmission to COMPANY via a high-speed data link, if required.

### Format of QC Products

Products shall be provided in SEG-Y format. Furthermore, all aforementioned products shall be made available via a secured shared drive at a suitable scale, if so requested by the COMPANY SITE REPRESENTATIVE.

### Transmission by High-speed Data Link

All products shall be provided on a media that allows for said transmission via a high-speed data link. CONTRACTOR shall provide all necessary assistance to the COMPANY SITE REPRESENTATIVE in the provision of data suitable for transmission via a high-speed data link. For the purpose of data transmission, CONTRACTOR shall provide seismic data compression software onboard the vessel and corresponding data decompression software in COMPANY's offices.

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

**7.  Seismic Acquisition Deliverables**
**7.1  Deliverables for OBN Data**

**Deliverable Description**

- Node Seismic field data
- Continuous, raw field data.
- Recording trace length as ==per Service Order==, 2 millisecond sample rate.
- Output format standard SEG-Y onto NAS disk drive
- Clock correction not applied to traces
- Correction time logged in headers
- Geophone rotation to target azimuth, as listed in Service Order
- Nodes to be categorized as PRIME or INFILL. PRIME nodes to be on separate NAS disk drive than INFILL nodes.

**NavMerge 4C**
- Shot slicing from continuous
- Nav merge using the final shot and receiver tables.
- Use the shot and receiver flags from the tables.
- Recording trace length as ==per Service Order==, 2 millisecond sample rate.
- Output format standard SEG-Y onto NAS disk drive
- Clock correction to be applied to traces
- Correction time logged in headers
- Geophone rotation to target azimuth, as listed in Service Order
- Nodes to be categorized as PRIME or INFILL. PRIME nodes to be on separate NASNAS disk drive than INFILL nodes.

**Shot Table - ASCII tabulated file with the following information**
- exact shot time, to microsecond accuracy
- shot coordinates (X,Y, and Z)
- an identifier for the type of shot
- lead in, ramp up, kill, production, mitigation/turning
- If we can get different flags for why a shot was killed that would be even better
- source vessel
- array number
- sail line number
- line sequence number
- shot point number
- Dither value applied
- water depth at shot
- shot point index
- counter of how many times a given line/point has been occupied
- line type
- production, test, which test
- acquisition line name
- this will match the line names used in the P1/11, P2/11, P1/90 files
- Vessel speed
- Vessel direction/heading (in degrees relative to North)
- Array pressure
- Barometric pressure
Delivered data maybe in multiple ASCII tables

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 2151D380-A985-47B6-BD79-AD760008EEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

Schlumberger-Private

**Node table – ASCII tabulated file with the following information**
- REC_ID:  Node unit identification based on a concatenation of receiver line and station
- NODE_ID:  Unique identifier of node unit.  Consistent throughout surveys.
- DEPLOY:  Similar to Receiver Point Index.  Typically set to 1.  If node experiences movement, the value will increment for each individual receiver XY solution.
- RPRE_X:  Receiver pre-plot X coordinate
- RPRE_Y:  Receiver pre-plot Y coordinate
- REC_X:  Receiver X coordinate
- REC_Y:  Receiver Y coordinate
- REC_Z:  Receiver depth
- TIMECORR:  Applied timing bulk correction in milliseconds
- QDRIFT:  Applied quadratic drift correction coefficient in milliseconds
- LDRIFT:  Applied linear drift correction coefficient in milliseconds (Typically the field measured drift in milliseconds)
- TRMPITCH: Orientation Sensor, Pitch Value – Trimmed Mean
- TRMROLL: Orientation Sensor, Roll Value – Trimmed Mean
- TRMYAW: Orientation Sensor, Yaw Value – Trimmed Mean
- PITCHFIN: Orientation Sensor, Pitch Value – Final Applied
- ROLLFIN: Orientation Sensor, Roll Value – Final Applied
- YAWFIN: Orientation Sensor, Yaw Value – Final Applied
- TOTDAYS: Total amount in days the node recorded data.
- INFILL: To identify the regular node deployments and high density node stations. 0 for prime, 1 for infill.

**Receiver Station Report**
- Summary Information for Receiver
  - Deployment Status
  - Clock Status
  - Orientation Status
  - Onboard Processing Notes
- ROV Images
  - Pre-Deployment Image
  - Deployment Image
  - Retrieval Image
- Movement Maps
  - Pitch Receiver Line Map
  - Roll Receiver Line Map
  - Yaw Receiver Line Map
- Amplitude Map Displays
  - Hydrophone Full Trace RMS Amplitude Map
  - Horizontal 1 Geophone Full Trace RMS Amplitude Map
  - Horizontal 2 Geophone Full Trace RMS Amplitude Map
  - Vertical Geophone Full Trace RMS Amplitude Map
  - Hydrophone Direct Arrival Window Trace RMS Amplitude Map
  - Horizontal 1 Geophone Direct Arrival Window RMS Amplitude Map
  - Horizontal 2 Geophone Direct Arrival Window RMS Amplitude Map
  - Vertical Geophone Direct Arrival Window RMS Amplitude Map
- Receiver Gather - Nearest Inline
  - Hydrophone Receiver Gather - Nearest Inline
  - Horizontal 1 Geophone Receiver Gather - Nearest Inline
  - Horizontal 2 Geophone Receiver Gather - Nearest Inline
  - Vertical Geophone Receiver Gather - Nearest Inline

Schlumberger-Private

DocuSign Envelope ID: 21F1D380-A995-47B6-BD79-AD760008FEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

- Receiver Gather - Nearest Crossline
  - Hydrophone Receiver Gather - Nearest Crossline
  - Horizontal 1 Geophone Receiver Gather - Nearest Crossline
  - Horizontal 2 Geophone Receiver Gather - Nearest Crossline
  - Vertical Geophone Receiver Gather - Nearest Crossline
- Stacked Spectra QC
- Clock Timing QC
- Receiver Position QC
- Rotate QC

**Near Field Hydrophone & Far field signature**
- Navigation Merged Nearfield Hydrophone data (to include updated positions from P1/11)
- Recording trace length 1 seconds, 0.25 millisecond sample rate.
- Output format SEG-Y

**Source Line Logs**
- Navigation line log
- Navigation EOL report
- Gun EOL report

**Navigation Files**
- P1/11
- P2/11
- P6/11

**PIES**
- Deployment picture
- Deployment position
- Deployment date / time
- Recovery picture
- Recovery date / time
- Raw logging file
- Barometric pressure measurements
- Sampled at minimum every 30 minutes

**PTC / SVP**
- Deployment position
- Deployment date / time
- Raw logging file

**Daily report**
- Production from each vessel
- HSE stats from each vessel
- Each ROV and HSL

**7.2 Deliverables for OBN Data**

| Data Deliverables | Frequency | Format | Media |
|---|---|---|---|
| Continuous Node Data NAS disk drive | Per node | SEGY | NAS DisNAS |
| NavMerged Node Data | Per node | SEGY | NAS |
| Data Deliverables | Frequency | Format | Media |
| Raw Nav Data | End of Survey | P2/11 | USB |

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

| Bathymetry | End of Survey | P1/11 E-Record, DXF Map | USB |
| Final Nav Data | End of Survey | P1/11 | USB |

All QC deliverables shall be provided in the format stated in the table below, unless specified otherwise

| QC Deliverables | Frequency | Format | Media |
|---|---|---|---|
| Final Report | End of Survey | Softcopy | USB |
| Navigation Logs | End of Survey | XLS,PDF | USB |
| Acquisition grid including full-fold perimeter | End of Survey | P6/11 | USB |
| TS dips (temp & salinity data) 2 copies | End of Survey | CSV, XLSX | USB |
| Near field data package | acquisition sequence | SEGY | USB |
| Final Acquisition Logs | acquisition sequence | XLS | USB |
| Table of Contents (TOC) Files – NAS or USB drive content listing | per drive | ASCII | USB/NAS |
| NAS | | | |
| Node Data – Continuous SEGY Logs | Per shipment | CSV | USB/NAS |
| Node Data – NavMerged SEGY Logs | Per shipment | XLS | USB/NAS |
| NFH Data – NavMerged SEGY Logs | Per shipment | XLS | USB |
| Receiver Station Reports (refer to section 7.1 Receiver Station Reports) | Per node | PDF | NAS |
| Receiver Station Log | Per shipment | EXCEL | NAS |
| Field Shot Database | Per shipment | TEXT | NAS |
| Field Receiver Database | Per shipment | TEXT | NAS |
| OBP Media Description Document | Per shipment | PDF | NAS |
| 2D Brute Stack (P,Z) | Per receiver line | SEG-Y | NAS |

## 7.3 Data

DATA listed above will be available for shipment to COMPANY as described. CONTRACTOR shall arrange for at least one DATA drop per period as described in Service Order, unless agreed otherwise with COMPANY. DATA shall be supplied to the destination indicated on the PURCHASE ORDER within one week of the DATA being landed at an agreed port.

Transmittals will be provided and shall be copied to COMPANY for:

- Shipments to COMPANY or storage contractor,
- Shipment to CONTRACTOR,
- Shipment to processing contractor.

CONTRACTOR shall supply an end-of-job report within 2 months after completion of SURVEY OPERATIONS. Table of contents for the end-of-job report will be supplied to CONTRACTOR prior to the start of SURVEY OPERATIONS.

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 21F1D380-A995-4786-BD79-AD760008FEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

## 8.    Positioning

### 8.1    Equipment and Configuration

The CONTRACTOR shall supply, maintain and operate as a minimum a Primary and Secondary DGNSS based positioning system for all vessels and a complete source and node positioning system capable of continuous operation and with a sufficient level of redundancy to enable gross error detection/removal. The Secondary system shall in its functional elements, including the source of differential corrections, be as independent as possible from the Primary positioning system.

First Break Picking methods shall be used for computing final positions. USBL will be used as initial positioning during node deployment.

Relative GPS (RGPS) systems shall be used to establish the centre of source(s).

Each individual source string shall be equipped with two positioning sensor units to allow for sub array separation monitoring. Unavailability of individual sub-array separation for certain lines because of failure of individual positioning sensors may not deem the line unacceptable under the conditions that the CONTRACTOR is making every effort to fix the failed positioning sensor(s) and historical data proves the sub-array separation to be stable. At least one sub-array shall have two (2) functioning rGPS units to allow for the calculation of array orientation.

Sufficient redundancy shall be included in the integrated design of these systems to allow limited failure of equipment without severely affecting the positioning accuracy. Observation redundancy shall be at least 30% in all networks.

A precision dual frequency echo sounder with hull-mounted transducer is required for observations of water depth on all vessels.

The type and deployment of all positioning system(s) shall be subject to the prior approval of COMPANY. CONTRACTOR shall operate all positioning systems and adopt a processing/QC methodology in accordance with best surveying practices.

### 8.2    Verifications

Vessel draught shall be verified whenever possible and at port calls as a minimum.

If utilized in navigation data processing, gyro compass shall be verified on-line using a suitable on-line verification system (e.g. DGPS baseline or GPS Attitude Determination System).

Speed of sound measurements (TS-DIPS) to verify/calibrate acoustics and echo sounder observations shall be conducted at regular intervals as agreed between CONTRACTOR and COMPANY prior to commencing the SURVEY. These will be within 24 hours of the first shot and then on a weekly basis thereafter and no more than 14 days apart. TS-DIP system must have a valid manufacturer's calibration certificate.

### 8.3    Positioning Processing and QC

The calculation of source and receiver station co-ordinates shall include full statistical analysis, including outlier detection and calculation of reliability measures, using the redundancy in the navigation data available.

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

All positioning processing and post-processing shall be completed on board. THE CONTRACTOR will be expected to demonstrate within 24 hours of acquisition to the COMPANY ONBOARD REPRESENTATIVE that the required accuracy has been met and that all post processing has been finalized.

All final/provisional positioning data and a daily log of all relevant positioning information shall be made available to COMPANY ONBOARD REPRESENTATIVE on request.

## 8.4   Positioning Tolerances

Unless otherwise specified by COMPANY, the precision of positions, expressed in the semi major axis of the (two (2) sigma) standard error ellipse, shall be:

| Vessel reference point | < 2.5 metres |
|---|---|
| Seismic receiver on Sea Floor | +/- 5 metres |
| Relative GNSS units on sources | < 3 metres |

In the calculation of these quality indicators, the unit variance shall not be significantly different from Unity-1 (F-test accepted) for the particular shot. Alternatively, the quality indicators can be scaled with the calculated (a posteriori) unit variance for the particular shot or scaled with a calculated unit variance averaged over a number of consecutive shots.

CONTRACTOR shall not start a line when this accuracy cannot be met. CONTRACTOR shall reject (part of) a line when the positioning tolerances are exceeded for more than 8 consecutive shots or for more than 5% out of any 200 adjacent shots. If the tolerances are exceeded for more than 5% out of any 200 adjacent shots, shots shall be rejected consecutively until the tolerance criterion is met for any 200 consecutive accepted shots.

## 8.5   Reporting / Deliverables

Prior to mobilization of the SURVEY, the CONTRACTOR shall present for agreement of COMPANY and for reference by the COMPANY ONBOARD REPRESENTATIVE a documented strategy to achieve the required positioning accuracy. The plan shall as a minimum comprise of:
- description of equipment
- computation methodology and relevant parameters,
- calibration and QC procedures,
- equipment spares levels
- verification method of stochastic and functional model,
- observation redundancy levels,
- acceptance criteria,
- methods to assess network reliability

After mobilization, the positioning strategy document shall be updated with actual equipment to be used and serial numbers, offset diagrams giving relevant offset measurements from the applicable reference point(s) and calibration/verification results.
After having received SURVEY details, CONTRACTOR shall submit pre-plot maps and listings to COMPANY for approval within 5 working days.

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 21F1D380-A995-47B6-BD79-AD760008FEA0

Magseis Fairfield - OBN Acquisition MSA 20210401

After SURVEY completion, within 4 weeks, the CONTRACTOR shall prepare a navigation report comprising all relevant information on on-line performance, verifications, navigation processing and deliverables.

Raw navigation data shall be delivered on USBin OGP P2/11 format. DGPS raw data shall be logged when requested by COMPANY.

Final positioning data shall be delivered on USB in OGP P1/11 and or Shell Processing Support (SPS) format or as specified in the Service Order

COMPANY shall advice CONTRACTOR of  USB medium and destination for raw and final navigation data.

When requested by COMPANY, the pre-survey plan shall be provided with sample OGP P1, P2 and P6 ASCII data files, prepared by the vessel acquiring the project.

Water depth observations shall be corrected for tide and vessel draught (reduced to MSL) and be delivered on  USBin SPS or P1 format within 4 weeks of SURVEY completion

## 8.6  Coordinate System Definition

COMPANY will provide CONTRACTOR with the coordinate system parameters relevant to the SURVEY. These shall be reflected in the pre-plot maps and listings to be approved by COMPANY before commencement of the SURVEY.

Schlumberger-Private

Schlumberger-Private

**Magseis Fairfield - OBN Acquisition MSA 20210401**

**EXHIBIT D – PRICING**

**As Per Individual Order**

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

**EXHIBIT E – SCHLUMBERGER'S QUALITY, HEALTH, SAFETY AND ENVIRONMENT STANDARDS**

**General**

Quality, Health, Safety and Environmental ("***QHSE***") considerations shall be an integral part of the Work and shall be performed in a proper, systematic way based on established standards and safety objectives. Supplier shall implement an QHSE management system, documented in an QHSE program, defining organization, responsibilities and the QHSE activities, as referenced in the Agreement, and this Exhibit E. Supplier shall abide by all applicable industry standards as documented by IOGPIOGP (International Association of Oil and Gas Producers and IAGC (International Association of Geophysical Contractors) Quality, Health, Safety and Environmental protection and of those more specifically outlined in the HSE documentation below.

**Risk Management**

Supplier shall establish a risk management system containing a risk register of the most critical areas related to the execution of the Work. The register shall be updated every month and be reviewed at the status meetings. The entries on the list shall be ranked based on importance (probability and consequences) and the ten most critical items shall be highlighted and given special attention.

**Safety Management System**

Supplier shall have a Safety Management System (SMS) in place which includes all elements of the International Safety Management Code (ISM) and International Ship and Port Facility Security Code (ISPS) codes. . Supplier shall, at no additional cost to Schlumberger, comply with all applicable safety legislation and regulations, the IOGPIOGP Guideline and IAGC Safety Manual, and Schlumberger QHSE Requirements herein. Supplier shall also work in compliance with Schlumberger's Policies, the key ones of which are listed below and should be displayed prominently on board:

- Schlumberger QHSE Policy
- Schlumberger Substance Abuse Policy
- Schlumberger Sexual Harassment Policy
-

In addition, unless otherwise specified in the Order, Supplier shall comply with Schlumberger's standards and procedures, the key ones of which are summarized herein. Supplier and Supplier Personnel (including crew personnel) on board the Vessel shall participate in the preparation and maintenance of Schlumberger's Site Specific Management Plan (SSMP). The SSMP shall contain the following details, all of which must be kept up to date.

(i)     Supplier's Representative;
(ii)    Designated Person (as required by ISM Code);
(iii)   Supplier's Emergency contact numbers; and
(iv)    Supplier's media specialist.

**Reporting and Monitoring Requirements**

In addition to any reporting requirements set forth in Article 9 Exhibit A, or specified in the Order, Supplier shall ensure that the following reports are made available to Schlumberger:

- Crew List – to be updated after any change of crew
- Risk Identification Reports and Incident Reports - reporting any incident involving Supplier Personnel, Schlumberger Personnel, or any Third Party's, personnel, plant or equipment, immediately to Schlumberger irrespective of whether injury or damage resulted. Supplier shall investigate all incidents, take appropriate action and maintain a summary report of all incidents
- Maintenance Reports - maintenance performed on safety equipment and other equipment critical to the safe operation of the Vessel shall be made available as performed (in compliance with appropriate vessel classification society) regulations and requirements and good marine practice) and on request.

Unless otherwise specified in the Order, or otherwise agreed in writing, all reports shall be sent to Schlumberger's Representative.

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

**Critical Operations**

The following operations are to be considered critical operations:

(i)     Personnel transfers;
(ii)    Offshore refueling;
(iii)   Offshore re-supply;
(iv)    Close pass of oilfield infrastructure or other vessels;
(v)     Towing (emergency tow of in-field vessels and/or seismic equipment);
(vi)    Recovery or deployment of seismic equipment.

For critical operations, detailed procedures, and where appropriate checklists, must be in place prior to the operation. Toolbox meetings shall also take place before any such operations.

**Management of Change**

In order to comply with Schlumberger's Standard 10 "Management of Change" standard (available upon request), Supplier shall ensure that any deviations from normal procedure, or from contracted service, is risk assessed and any new controls agreed prior to implementation. Should an exemption be necessary, it shall be submitted for approval by Schlumberger's Representative.

**Preventive Maintenance System**

Supplier shall operate with a Preventative Maintenance approach and monitor an inventory of spare parts. This inventory shall be maintained, using an adequate ordering system, at an appropriate level in accordance with (i) the remoteness of Schlumberger's operations, (ii) the failure history of applicable parts, and (iii) scheduled maintenance intervals, in order to minimize technical downtime. Supplier shall inform Schlumberger's Representative of any significant equipment failures or reduced performance that may affect productivity and/or Schlumberger's operation.

**Life Saving Equipment and Arrangements**

The Vessel shall be appropriately equipped for its class with lifesaving equipment complying with and in accordance with the 1974 International Convention for the Safety of Life at Sea (SOLAS; including all amendments), or local coastguard minimum requirements where applicable. All safety equipment must be strategically positioned around the vessel and be readily accessible by the entire crew. Locations of such equipment shall be clearly marked. All persons shall have a basic knowledge of how to operate the equipment and the procedures to be followed in the event of emergencies.

| | |
|---|---|
| **Life Jackets\*** <br> \* IOGP Guidelines state vessels should have 100% of life jackets on board. | 100%, readily accessible, donning instructions displayed |
| **Survival Suits** | 100% (including passengers) where operational conditions demand. The full cost of all survival suits will be for the account of Schlumberger. |
| **Life Buoys** | As per Class but as minimum lifebuoys will be fitted on both sides, stowed ready for rapid deployment. At least one life buoy on each side shall have a self-igniting light and floating lifeline. Clear of all obstructions and maintained in good order. |
| **Life rafts** | As per Class but as a minimum one life raft with capacity for 100% of crew and capable of being launched from either side. At least 2 life rafts preferred. |
| **Fire Detection System** | Yes. As a minimum accommodation, galley and machinery spaces |
| **Emergency fire plan** | Yes. Supplier to amend Fire Plan to cover Schlumberger's equipment, if applicable |

Schlumberger-Private

DocuSign Envelope ID: 2151D380-A995-4786-BD79-AD760008FEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

| Fire Extinguishing Equipment | As per Class requirements. Provision must be made for adequate fire extinguishers to cover the seismic working areas. |
|---|---|
| First Aid/Medical Equipment | As per Class requirements but as a minimum there will be First Aid kits in the bridge, galley and machinery areas. First Aid boxes and eye wash stations shall be of a size and composition suitable for the number of persons on board. An up-dated list of the first aid box's contents should always be enclosed. First Aid Boxes and Eye Wash Stations are to be checked (and recorded) on a weekly basis and replenished if necessary. At a minimum, the first aid kit should include the following items, kept in a portable waterproof container.<br>• 4 x triangular bandages<br>• 6 x medium sterile bandages with un-medicated dressings<br>• 2 x large sterile bandages with un-medicated dressings<br>• 2 x extra-large un-medicated dressings<br>• 6 medium safety pins, stainless<br>• 20 assorted elastic adhesive dressings medicated<br>• 2 x sterile eye pads with attachment<br>• 2 x packages containing sterile gauze swabs<br>• 5 pairs large size disposable latex-free examination gloves<br>• sterile eye wash in eye wash bottle. |
| Pyrotechnics | As per Flag State requirements. |
| Exercises and Drills | The following drills shall be conducted at the specified periods and all of them documented.<br>• Abandon Ship should be at least twice per month and within 24hrs of crew changes.<br>• Fire Drills should be conducted at least twice a month. Where applicable the fireman's outfit and SCBA (Self Contained Breathing Apparatus) shall be used and ensuring that only the specified cylinder for training is used.<br>• Man Overboard (MOB) should be once a month. The drill plan (schedule) is to be posted on the bridge. |

**Lifting Arrangements**

Supplier shall comply with Schlumberger's Standard 13 Mechanical Lifting standard, the key requirements of which are summarized below.

| Cranes & Winches | Certified every 5 years, inspected by competent person annually |
|---|---|
| Lifting register | A register of all lifting equipment must be maintained, with each item tagged and the date of use recorded. |
| SWL | Clearly marked on all lifting points, beams and pad-eyes |
| Slings | Fiber slings shall not be in use for more than 12 months |
| Towing winches | Certified every 5 years, inspected by competent person annually |
| Safety harness points | Pad eyes and Sala Blocks |

**Energy Systems**

Supplier shall comply with Schlumberger's Standard 14 Pressure and Permit To Work (PTW) standards, the key requirements of which are summarized below.

| HP Air | Certified every 5 years, hydrostatically tested to 1.5 times operating pressure. This shall include all parts of the system from compressor to gun umbilical. |
|---|---|

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

| PTW and LoTo | Supplier will ensure that the vessel operates a Permit to Work (PTW) and LoTo (Lock out tag out) in keeping with good industry practice to cover the following tasks: Hot work, Confined space entry, Working at heights, Hull penetrating, Energy isolation (Electrical, Air, Hydraulic). Permits shall be approved by the Officer of Watch |
|---|---|

**General Safety Requirements**

| Safety Zones | Vessel shall have clearly defined safety zones posted, with the PPE requirement defined, marked or posted. Lifejackets and/or safety lines shall be required on any deck areas where barriers are less than 915mm high. Barriers can be a combination of bulwarks and guard rails/wires |
|---|---|
| Personal Protective Equipment (PPE) | Supplier shall provide all its personnel with PPE (certified to international standards i.e. ANSI, CE) and maintained in good condition. It shall be worn on all relevant occasions as indicated by notices, instructions and good practice. As a minimum this will include coveralls, hard hats, safety glasses and safety shoes, and where applicable, leather palm gloves |
| Workvests/PFDs | Where a personal flotation device (PFD) is required for safe working then the minimum buoyancy provided shall be 150 Newtons. Inflatable devices are preferred for ease of use. |
| Safety Harness | These shall be approved to International Standards; with suitably positioned and certified attachment points provided for personnel working in areas where there is danger of falling overboard or from height. |
| Boarding Zone | The vessel should have a dedicated boarding zone suitable for personnel transfers from small boats if used during the survey. |
| Flammable Storage Cabinet (Paint locker) | Paints and hazardous material shall be stored in separate metal lockers, with dedicated Fire Fighting system, and MSDS available at each storage location. |
| Gas Storage | Proper storage of Oxygen & acetylene shall be provided if used on board. All hoses must be checked for signs of wearing and replaced if necessary |
| Plant, Tools and Equipment | Supplier shall ensure that all plants, tools and equipment are maintained in an operable condition and that the users of the plant, tools and equipment are trained, experienced and where necessary, licensed and certified. |

**Housekeeping and Crew Welfare**

| Housekeeping | Good housekeeping shall be maintained continuously. Access ways and emergency exits shall be kept clear of all obstructions. Deck areas and walkways shall be treated with non-slip surfacing. |
|---|---|
| Accommodation | Accommodation shall be provided with suitable toilet, washing and shower facilities, together with clean bed linen and towels (to be changed at mutually agreed intervals). At no time shall the vessel accommodate more personnel that it is certified to or carries safety equipment for. |
| Drinking Water | Sufficient supply of fresh water (preferably with UV or similar UV treatment) for the full crew complement including Schlumberger's personnel, for the agreed endurance of the vessel. |
| Sewage Treatment | Vessel shall have a sewage treatment plant installed, approved by class, and in good working condition. |
| Smoking policy | Please refer to the Order. |

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 21F1D380-A995-47B6-BD79-AD760008FEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

| Noise levels | The vessel will be made available by the Supplier for noise testing, monitoring and evaluation, after which Schlumberger will have the option to accept the noise levels of the ship and deems the noise level of the ship to be satisfactory to Schlumberger. Schlumberger may, however, request additional testing, monitoring, modification and investment in additional sound-proofing or other forms of noise reduction, compensation for which will be addressed in the Order. Ear protectors should be used in any area where noise exceeds 85dB. |
|---|---|

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

**Crew Requirements**

The Captain, Officers and Crew of the Vessel(s) shall all have valid licenses, as required by the size and class of the vessel. The following table describes minimum training requirements to comply with industry guidelines, and Schlumberger's standards. This may be above minimum flag state requirements.

| Certification | |
|---|---|
| **Personnel Safety and Social Responsibilities, STCW Ref A-VI/1-4** | Required by all crew, validity 5 years as per STCW |
| **Personal Survival techniques, STCW RefA-VI/1-1** | |
| **Fire Prevention and Fire Fighting, STCWRefA-VI/1** | |
| **Elementary First Aid, STCW Ref A-VI/1-3** | |
| **Advanced fire fighting** | Captain, Deck and Engine Officers |
| **Medical First Aid** | Engineers and Deck officers |
| **Medical Care** | Captain and Chief Officer. Supplier (i) shall always comply with this requirement when required to do so by the SOLAS requirements of the country issuing the individuals navigation license, and otherwise (ii) shall use its best endeavors to comply with this requirement. |
| **FRB** | a)       As per MSFF sub contractor HSE requirement |
| **HLO** | At least one on board, if Helideck, validity 3 years |
| **HLO Team Member** | At least 2 (not inc HLO) |
| **HUET** | Required if crew expected to transfer by helicopter. Validity 4 years |
| **DP 2 Certified by Nautical Institute or equal - (IMCA guidelines ) for DP vessels only** | All Officers of the Watch. |
| **Medical – Screening** | Required, max 2 years validity |
| **Medical - Food Handler** | Required, max 1 year validity |
| **Vaccinations** | Mandatory Vaccinations: Tetanus, Polio, Yellow Fever, Hepatitis A&B, Typhoid vaccinations shall be obtained by all Supplier's Personnel and maintained valid and current at all times. Other Vaccinations Meningitis A&C, Rabies, Japanese Encephalitis, Tuberculosis, Cholera, Diphtheria, Tick Borne Encephalitis vaccinations shall be obtained (in consultation with a medical advisor) for areas within the area of operations that have been identified as a specific risk. |
| **Crane Driving** | At least 2 on board crew certified as Crane Operators (equivalent to lifting level 2 of Schlumberger's Mechanical Lifting standard). |
| **Rigging & Slinging** | Crew who assist in Crane operations shall be trained to a level equivalent to lifting level 1 of Schlumberger's Mechanical Lifting standard). |
| **Language Proficiency** | Unless, otherwise specified in this Agreement, English speaking Captain and Officer of the Watch. |
| **Swimming proficiency** | As a minimum, all crew must be confident in the water whilst wearing a lifejacket |

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

| Internet and Email Use | Supplier shall ensure use is in accordance with Schlumberger's Information Security User Standard. |
|---|---|

All training and/or certification costs set out above shall be provided by Supplier at no additional cost to Schlumberger

**Work Arrangements**
During the Work, Supplier shall ensure that crew work hours, periods offshore and minimum rest periods ashore are monitored. Work hours on board shall comply with the requirements of STCW95 and International Labor Organization (ILO). Captains, Deck and Engineering officers shall work a maximum of three months on board, and shall have a minimum of one month continuous break before returning to the vessel. Remaining crew shall work a maximum six months on board and minimum one month continuous break ashore., and Supplier shall aim for crew stability and a good handover period for Key staff (i.e. Captain, Chief Engineer etc.). Supplier shall liaise with Schlumberger's Representative to ensure that travel costs are purchased at the most competitive prices.

**Environment**
Supplier shall comply with applicable provisions of Schlumberger's Environmental Standard, the key provisions of which are summarized below. As part of the start up meeting , Supplier's crew shall be made aware of the importance in which Schlumberger holds environmental stewardship. Schlumberger's standard states that "All sites shall manage their operations in a continual improvement manner in order to protect the environment, prevent pollution, minimize environmental impact, and comply with environmental laws and regulatory requirements where we operate, and Schlumberger environmental requirements".

**Oil Spill Prevention**
Supplier shall have a spill response plan which covers shore based assistance in event of a spill, and which is approved by the relevant administration. Where such a response plan is not a requirement by relevant authorities, Supplier shall, as a minimum, have sufficient clean up equipment on board in case of any accidental spills. The spill response plan shall cover and include Schlumberger's equipment where applicable. Bunker points shall be fitted with save-alls, dry-break connectors, and appropriate spills kits shall be available.

**Waste Management**
Supplier will have a Waste Management Plan in accordance with MARPOL and local regulations.

**Discharges to sea**
All Vessels shall comply with local regulations regarding discharge of black and grey water to sea. As a minimum, no black water discharges shall take place in port or within close coastal regions.

**Asbestos**
Vessels shall either be certified as asbestos free, or there shall be an approved asbestos management plan in place.

**Halon or other CFCs**
Vessels shall not have Halon or other CFCs in portable or installed fire extinguishers.

**Interaction with Marine Fauna**
Supplier's crew will not engage in fishing or interference with marine fauna**. References:**
a)      IOGPIOGP Guidelines: Available from the International Association of Oil and Gas Producers - atwww.ogp.org.uk
b)      IAGC Safety Manual: Available from the International Association of Geophysical Contractors at www.iagc.org/default.asp
c)      Schlumberger's policies, standards and manuals.

**Security and protection**
Security shall be managed by Supplier in accordance with Article 6.4 of Exhibit A hereof, as dictated by the Security Level Criteria determinable by Schlumberger's Standard 11 (available upon request) or otherwise acceptable alternative noted in the Order. If a Third Party provides Security for the performance of the Work such Third Party shall be a Schlumberger-approved security provider as specified in Article 6.4 of Exhibit A. Security, as described

Schlumberger-Private

DocuSign Envelope ID: 21F1D380-A995-47B6-BD79-AD760008FEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

under Article 6.4 of Exhibit A, must be provided from the beginning of Mobilization until the end of Demobilization by Supplier or as agreed between the Parties and set out in the respective security plan, protecting people and Vessels from third parties attack. All Vessels and personnel related to the provision of security for the performance of the Work under the relevant Order (Private and Government) and its maintenance shall be provided by Supplier as well as all costs involved in the maintenance of them, subject always to the terms and conditions of the Agreement and the relevant Order.

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

## EXHIBIT F – WORKING CONDITIONS GUIDELINES

Schlumberger has determined requirements for the suppliers it engages, with a view to establishing a relationship, which promotes responsible social, environmental and economic practices, in a collaborative manner. Hence, supplier is to comply with the following labor and working conditions guidelines. Where a supplier is unable to meet the requirements of this Exhibit F, an interface or bridging document shall be developed with a mutually agreed remedial work plan to provide measures to address the deficiencies, the progress of said measures may be monitored by Schlumberger or its representative. Schlumberger's preference is for suppliers who can demonstrate a commitment to:

- Implementing risk-based due diligence processes to gauge actual or potential adverse impacts associated with labor and working conditions
- Establishing similar guidelines for their own suppliers associated with labor and working conditions.

- At a minimum all suppliers are required to comply with the laws, rules and regulations of the countries in which they operate. In addition, where Industry guidelines exist and are higher than local law requires, they should be adhered to. Supplier's compliance with this Exhibit F does not relieve the supplier from its obligation to comply with Exhibit E.

### ARTICLE 1 – LABOR

1.1   **Freely Chosen Employment.** All work is to be voluntary and workers are to be free to leave upon reasonable notice. Use of forced, bonded, indentured or involuntary prison labor is prohibited. Workers must not be required to hand over passports or work permits as a condition of employment.

1.2   **Child Labor.** Use of child labor is strictly prohibited – child labor includes any person under the age for completing compulsory education, or under the minimum age for employment in the country, whichever is greatest. Legitimate workplace apprenticeship programs are supported. Workers under the age of eighteen (18) must not be required to perform hazardous work. The educational needs of such workers are to be taken into account when determining working hours.

1.3   **Discrimination.** Supplier is to provide workplaces that are free of harassment and unlawful discrimination. Supplier must not engage in discrimination based on race, color, gender, age, sexual orientation, ethnicity, disability, religion, union membership or marital status in hiring and employment practices such as promotions, rewards and access to training.

1.4   **Harsh or Inhumane Treatment.** Harsh and inhumane treatment, including any sexual harassment, sexual abuse, corporal punishment, mental or physical coercion or verbal abuse of workers is strictly prohibited, as is any threat of such treatment.

1.5   **Minimum Wages.** Compensation paid to workers must comply with all applicable wage laws, including those relating to minimum wages, overtime hours and legally mandated benefits. Any disciplinary wage deductions are to conform to local law. The basis on which workers are being paid is to be clearly conveyed to them in a timely manner.

1.6   **Working Hours.** Worker fatigue is linked to increased accidents, illness, lowered productivity and increased turnover. Workers must therefore not be required to work more than the maximum set by local law, including overtime hours. Workers are to be allowed at least one day of rest per week. In addition where workers are contracted to spend long periods of time away from their home country, consideration is to be taken of their needs to remain in contact with their families and they are to be allowed to return home at least one time per year.

1.7   **Freedom of Association.** Workers are to be allowed the right to freely associate in accordance with local laws. Workers are to be able to communicate openly with their management regarding working conditions without fear of reprisal, intimidation or harassment.

1.8   **Grievances.** Suppliers are expected to provide a grievance mechanism for workers to raise workplace concerns.

### ARTICLE 2 – WORKPLACE HEALTH AND SAFETY

The following requirements are specific to suppliers operating in workplace locations and/or conducting activities under the operational control of their own organization:

2.1   **Machine Safeguarding.**  Physical guards, interlocks and barriers are to be provided and properly maintained for machinery used by workers.

2.2   **Industrial Hygiene**. Worker exposure to chemical, biological and physical agents is to be identified, evaluated, and controlled. When hazards cannot be adequately controlled by engineering and administrative means, workers are to be provided with appropriate personal protective equipment.

2.3   **Safety**. Worker exposure to workplace safety hazards (e.g., electrical and other energy sources, fire, vehicles, slips, trips and fall hazards) are to be controlled through proper design, engineering and administrative controls, preventative maintenance and safe work procedures (including lockout/tagout). Where hazards cannot be adequately controlled by these means, workers are to be provided with appropriate personal protective equipment.

2.4   **Emergency Preparedness and Response.**  Emergency situations and events are to be identified and assessed, and their impact minimized by implementing emergency plans and response procedures, including: emergency reporting, worker notification and evacuation procedures, worker training and drills, appropriate fire detection and suppression equipment, adequate exit facilities and recovery plans.

2.5   **Occupational Injury and Illness.** Procedures and systems are to be in place to manage, track and report occupational injury and illness, including provisions to: a) encourage worker reporting; b) classify and record injury and illness cases; c) provide necessary medical treatment; d) investigate cases and implement corrective actions to eliminate their causes; and d) facilitate return of workers to work.

2.6   **Physically Demanding Work.**  Worker exposure to physically demanding tasks, including manual material handling and heavy lifting, prolonged standing and highly repetitive or forceful assembly tasks is to be identified, evaluated and controlled.

2.7   **Dormitory and Canteen.**  Workers are to be provided with clean toilet facilities, access to potable water and sanitary food preparation and storage facilities. Worker dormitories provided by their employer or a labor agent appointed by the employer shall be clean, safe, have necessary emergency exits and provide adequate heat, light and ventilation together with reasonable personal space.

### ARTICLE 3 – SECURITY

Suppliers under Schlumberger operational control shall intend to implement for their respective activities and at their respective locations the protection measures against potential threats to the personnel working in such locations and the physical assets located therein. Such measures shall be the most appropriate in the circumstances and consistent with applicable laws and the following international standards:

a)   The Universal Declaration of Human Rights of the United Nations (UN)
b)   The Voluntary Principles on Security and Human Rights
c)   The UN code of conduct for Law Enforcement Officials, and
d)   The UN Principles on the use of force and firearms.

Schlumberger-Private

**Magseis Fairfield - OBN Acquisition MSA 20210401**

Schlumberger's preference is for suppliers' security personnel to receive training to intervene in actual and potential security situations appropriately and always act in a manner consistent with a respect for the human rights of workers, communities, as well as other stakeholders.

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

## EXHIBIT G –ACCESS TO SCHLUMBERGER ELECTRONIC PROCUREMENT SYSTEMS

This Exhibit G apply to the Parties when an Order is sent automatically through any Schlumberger electronic procurement systems and/or when Supplier is given access to Schlumberger networks, computer systems, software and/or data (herein collectively referred to as "**Systems**"). All capitalized terms used in this Exhibit G that are not expressly defined herein shall have the meaning ascribed to such terms as set out in Exhibit A.

1.      For the purpose of this Exhibit G, any information of Schlumberger, which is made available to Supplier is regarded by Schlumberger and shall be deemed Confidential Information and shall be subject to Exhibit A on confidentiality.

2.      Schlumberger grants Supplier access to certain Schlumberger Systems and Confidential Information to Supplier and its employees under the terms and conditions of this Exhibit G. Supplier and its employees will access and use Systems and Confidential Information solely for legitimate business purposes in furtherance of Supplier's business relationship with Schlumberger or its Affiliates. Supplier shall be liable for the actions or omissions of its employees in accessing and using the Systems and Confidential Information.

3.      Supplier shall take all necessary actions to prevent improper (i) access to the Systems, (ii) use of the Systems or Confidential Information, or (iii) dissemination or publication of Confidential Information to unauthorized third parties by Supplier and its employees or subcontractors. Upon receiving initial training from Schlumberger as applicable, Supplier shall provide further training to Supplier's employees accessing the Systems in order to facilitate compliance with this Exhibit G.

4.      Supplier's access to the Systems as well as utilization of access codes, passwords and access procedures may be denied, changed or terminated at any time by Schlumberger without cause or liability to Supplier, at Schlumberger's sole discretion. Upon termination of the Agreement or any Order under the Agreement, Supplier will cease all attempts to access the Systems.

5.      Except for information owned by Supplier prior to input into the Systems, all information including data created, stored or contained in the Systems, including messages (herein referred to as "**Information**"), is the property of Schlumberger. Supplier hereby assigns, to the extent it has the right to do so, all of its interests in, the rights and title to Schlumberger's Information. Schlumberger reserves the right to access and disclose all information and data, whether or not owned by Supplier, that Schlumberger, or third parties sent through or stored in the Systems.

6.      No rights, ownership, or licenses to any copyrights, patents, trade secrets, or other intellectual property rights are granted hereunder. In no event will Supplier copy, download, modify, reverse engineer, decompile, disassemble or create derivative works of any Schlumberger data or software programs, or third-party software programs licensed to Schlumberger except with the prior written consent of Schlumberger.

7.      Except as specifically provided for in the Agreement, Schlumberger is not responsible for content, protection, or privacy of any information held by Supplier or transferred or accessed through the Systems.

8.      For the purpose of this Exhibit G, the term "**Computer Virus**" shall mean and include but not be limited to any undocumented or hidden functionality or performance capability contained in software or data which is designed to destroy, corrupt, or facilitate the theft of data or software or disable or lock software or a computer system or any undocumented and unauthorized method for gaining access electronically to Schlumberger Systems. Supplier shall be liable for all damage to or loss of computer files or programs, disruption of use of all or any part of Schlumberger Systems, or other loss or damage to Schlumberger which results in whole or part, directly or indirectly, from the introduction by Supplier's actions of a Computer Virus into Schlumberger Systems.

9.      Supplier shall, to the extent permitted by law, Indemnify Schlumberger against all Claims, (copyright infringements), to the extent arising out of any negligence, willful misconduct, breach of this Exhibit G or violation of law by Supplier in its use of the Systems or Confidential Information.

10.     Schlumberger will not be responsible for any Consequential Loss sustained by Supplier and arising in connection with this Exhibit G. Schlumberger will not be liable to Supplier for any loss or corruption of Supplier's data stored in or transmitted through the Systems, incorrect results obtained by using the Systems, interruption of access or use of the Systems for whatever reason, access of any Supplier data by third parties, or toll fraud in accessing or using the Systems.

Schlumberger-Private

**Magseis Fairfield - OBN Acquisition MSA 20210401**

### EXHIBIT H – FORM OF SERVICE ORDER/LOCAL AGREEMENT

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

SERVICE ORDER/LOCAL AGREEMENT

N°[Supplier]-[Regional or Local]-Purchase of Services-mm_dd_yy

Between

SCHLUMBERGER [...]

and

[...]

for

[...]

Schlumberger-Private

DocuSign Envelope ID: 2151D380-A995-47B6-BD79-AD760008EEA0

Magseis Fairfield - OBN Acquisition MSA 20210401

This Service Order/Local Agreement ("**Order**") is entered into on this [**…**] day of [**…**], 201[**…**] (the "***Effective Date***"), by and between:

(i)      Schlumberger [**Insert entity**] a company incorporated under the laws of [**…**], having its registered address at [**…**], [**_OR_**] having its place of business at [**…**], ("***Schlumberger***"), and

(ii)     [**Insert Supplier's entity**], a company incorporated under the laws of [**…**], having its registered address at [**…**], ("***Supplier***").

WHEREAS Schlumberger [***Insert entity as shown in the principal or global Agreement***] and [***Insert Supplier's entity as shown in the principal or global Agreement***] have entered into a Global Agreement/an agreement for the purchase of Services referenced N°[**…**], effective [**…**], (the "***Agreement***")..

WHEREAS the Parties to this Order are Affiliates of **Schlumberger** [***Insert entity as shown in the principal or global Agreement***] and [***Insert Supplier's entity as shown in the principal or global Agreement***], and

WHEREAS Schlumberger wishes to contract with Supplier for the provision of Services, and Supplier is willing to perform the Services under this Order;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

### ARTICLE 1 – TERMS AND CONDITIONS

The terms and conditions of the Agreement and any amendments thereto, are hereby incorporated by reference and the purchase of Services hereunder shall be subject to the terms of the Agreement. In all respects this Order shall be treated as a separate contract entered into pursuant and subject to the terms of the Agreement. The provisions contained herein are limited exclusively for the sole purpose of this Order, and shall not be considered as an amendment, modification, alteration, revision, change, correction or consideration of any means and for any reason to the Agreement.

All capitalized terms not defined in this Order shall have the meanings ascribed to them in the Agreement.

### ARTICLE 2 – SCOPE OF WORK

The objective of this Order is to confirm the scope of Supplier's work and the compensation for this project.

2.1      **Project name**

[**to be inserted or marked "N/A"**]

2.2      **Description of the Work**

Under Article 1.46 - Exhibit A of the Agreement, the Work consists of the following: [**to be inserted or marked "As per Article 1.47 - Exhibit A of the Agreement"**]

2.3      **Order Effective Date**

Under Article 1.25 - Exhibit A of the Agreement, the Order Effective Date is: [**to be inserted**]

2.4      **Area of Operations**

Under Article 1.3 - Exhibit A of the Agreement, the Area of Operations for the performance of this Order is [**to be inserted**] [**Insert Map of Area of Operations of Service Order and Company's Permit**]

**SURVEY LINE COORDINATES**
[**Geodetic survey information of Service Order**]

[**Insert Survey Line Coordinates of Service Order**]

The following acquisition parameters shall be used for the Work:

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

| NAS disk drive media | NAS Disk Drive |
|---|---|
| Record length (sec. TWT) | sec |
| Sample rate | 2msec |
| Low-cut filter | Hz @ dB/oct |
| High-cut filter | Hz @  dB/oct |
| | |
| **Source** | |
| Number of source arrays | |
| Source type | |
| Source array volume | cu in |
| Source array pressure | psi |
| Source array depth | metres |
| Shot-point interval | m |
| | |
| **Receivers** | |
| Number of streamers | |
| Number of channels per streamer | |
| Streamer depth | |
| Group interval | m |
| Streamer length | m active |
| | |
| **Positioning** | |
| Nominal inline offset | m |
| Streamer separation | |
| Survey | |
| Vessel | M/V |
| Full Fold L km size (2D) or Full Fold Square Kilometers (3D) | |
| Date of acquisition | |
| Field NAS disk drive format (up to date SEG industry standard, i.e. SEG-D 8036 or 8058) | |

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 2151D380-A995-4786-BD70-AD760008FEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

2.5     **Commencement Date**

Under Article 1.7 - Exhibit A of the Agreement, the Commencement Date is: **[to be inserted]**

2.6     **Completion Date**

Under Article 1.8 - Exhibit A of the Agreement, the Completion Date is **[to be inserted]**

2.7     **Mobilization Date**

Under Article 1.21 - Exhibit A of the Agreement, the Mobilization Date is **[to be inserted]**

2.8     **Demobilization Date**

Under Article 1.15 - Exhibit A of the Agreement, the Demobilization Date is **[to be inserted]**

2.9     **Description of the Vessel**

Under Article 1.45 - Exhibit A of the Agreement, the Vessel is **[to be inserted]**

2.10     **Supplier Equipment**

Under Article 1.39 - Exhibit A of the Agreement, Supplier Equipment required for the Work shall be as follows: **[to be inserted]**

2.11     **Supplier Personnel**

(a) Under Article 1.40 - Exhibit A of the Agreement, Supplier Personnel required for the Work shall be as follows: **[to be inserted]**

(b) Under Article 12.1 - Exhibit A of the Agreement, Key Personnel shall be as follows: **[to be inserted]**

2.12     **Schlumberger's Representative**

Under Article 8.2 - Exhibit A of the Agreement, Schlumberger's Representative for the performance of this Order is **[to be inserted]**.

2.13     **Supplier's Representative**

Under Article 8.1 - Exhibit A of the Agreement, Schlumberger's Representative for the performance of this Order is **[to be inserted]**.

2.14     **On board Accommodation**

Under Article 11 - Exhibit A of the Agreement, Supplier shall provide on board accommodation as follows: **[to be inserted or marked "As per Article 11 - Exhibit A pf the Agreement"]**

2.1.5     Vessel, Personnel and Supplier Equipment details as per details provided by Supplier under Exhibit , attached hereto, and forming an integral part of this Order.

### ARTICLE 3 – TECHNICAL SPECIFICATIONS

3.1     **Survey Deliverables**

(a) Under Article 9.5 - Exhibit A of the Agreement, Supplier shall provide the following deliverable as part of the Work: **[to be inserted or marked "As per Article 9.5 - Exhibit A of the Agreement"]**

(b) Under Article 9.5(f) - Exhibit A of the Agreement, all deliverables shall be labelled as followed and shipped to the following address: **[to be inserted]**.

3.2     **Critical spare parts**

Under Article 10.3 - Exhibit A of the Agreement, Supplier shall maintain an inventory if critical spare parts as follows: **[to be inserted or marked "N/A"]**

3.3     **Reporting requirements**

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 2151D380-A985-47B6-BD79-AD760008FEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

Under Article 9.5 - Exhibit A of the Agreement, Supplier's reporting requirements shall be as follows: **[to be inserted or marked "As per Article 9.5 - Exhibit A of the Agreement"]**

3.4     **Security Level Criteria**

Under Article 1.34 - Exhibit A of the Agreement, the Security Level Criteria required for the performance of the Work shall be as follows: **[to be inserted]**

3.5     **Other technical specifications**

**[to be inserted or marked "N/A"]**

## Article 4 – Key Performance Indicators

Under Article 18.2 - Exhibit A of the Agreement, the Parties have agreed to the following KPIs:**[to be inserted or marked "N/A"]**

## Article 5 – Pricing

5.1     Supplier's compensation for the project will as **per Exhibit B, attached hereto and forming an integral part of this Order.**

5.2     Under Article 17.6 - Exhibit A of the Agreement, the Parties agree to the following Suspension Rate: **[to be inserted or marked "N/A"]**

5.3     Under Article 17.2 - Exhibit A of the Agreement, the Parties agree to the following Early Termination Fee: **[to be inserted or marked "N/A"]**

5.4     In addition to such compensation, Supplier may also bill S

S

Schlumberger for necessary economy travel and reasonable expenses related to the performance of the Work requested, to the extent substantiated by all relevant documentation.

## Article 6 – Invoicing

Under Article 19 - Exhibit A of the Agreement, Supplier's invoice must contain the following information:

Location: _____
Contact Person: _____
Legal Entity: _____
Accounting Unit (AU): _____
Activity Code (AC): _____
Date effective: _____

If the above information is not displayed on the invoice, payment will be delayed as invoice will be returned to you.

Invoices must be forwarded to the following address:

_____
_____
_____

## Article 7 – Notices

Under Article 33.2 - Exhibit A of the Agreement, any notice that is to be given by one Party to the other under this Order will be given in writing and delivered as follows:

**For Schlumberger**
[…]
[…]
To the attention of: […]

Schlumberger-Private

DocuSign Envelope ID: 21F1D380-A995-47B6-BD79-AD760008FEA0

Magseis Fairfield - OBN Acquisition MSA 20210401

**For Supplier**
[...]
[...]
To the attention of: [...]

ARTICLE 8 – SPECIAL CONDITIONS

8.1     Under Article 21 - Exhibit A of the Agreement, the Parties agree to the following liquidated damages: **[to be inserted or marked "N/A"]**

8.2     Under Article 25.7(f) - Exhibit A of the Agreement, Supplier's shall carry out and maintain at its own costs, the following additional insurance: **[to be inserted or marked "N/A"]**

8.2     Under Article 35.2 - Exhibit A of the Agreement, the Parties agree to the following allocation of liabilities and indemnities for Claims in respect of loss of or damage to Offshore Installations, arising as a result of Supplier Group entering into the Exclusion Zone upon specific instruction from Schlumberger: **[to be inserted or marked "N/A"]**

8.2     Under Article 36.1 - Exhibit A of the Agreement, Supplier's shall be paid the following standby rate if the Work is delayed or suspended as a result of compliance with Applicable laws related to Marine Mammal protection: **[to be inserted or marked "N/A"]**

8.3     Under Article 36.2 - Exhibit A of the Agreement, Supplier's shall be paid the following standby rate if the Work is delayed or suspended as a result of an Action Group: **[to be inserted or marked "N/A"]**

ARTICLE 9 – LOCAL CONDITIONS

**[to be inserted as appropriate or marked "N/A"]**

**EXECUTED AS AN AGREEMENT BY THE DULY AUTHORIZED REPRESENTATIVES OF THE PARTIES**

For **SCHLUMBERGER [ENTITY]:**                    For **SUPPLIER [ENTITY]:**

Signature: _____      Signature: _____

Name: _____      Name: _____

Title: _____      Title: _____

Date: _____      Date: _____

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

**Exhibit A**
**SUPPLIER's VESSEL, PERSONNEL AND EQUIPMENT**

| | |
|---|---|
| Supplier Name | |
| Supplier Representatives (Name, contacts) | |
| Vessel Crew Model (Maritime)* | |
| Vessel Crew Model (Seismic)* | |
| Vessel Crew Rotation | |

## Primary Vessel Specifications

**Main Particulars**

| | |
|---|---|
| Vessel  Name | |
| Call Sign | |
| International Maritime Org. (IMO) No. | |
| Owner | |
| Previous Name, (if any) | |
| Flag State & Port of Registry | |
| Date of Build | |
| Yard Built | |
| Date Converted / Upgraded | |
| Yard Converted / Upgraded | |
| Classification Society and Class Notations | |
| International Safety Management (ISM) Code Compliance | |
| Safe Manning Certificate (Minimum) | |
| Classification renewals schedule (details of all dates of upcoming surveys) | |

**Principal Particulars**

| | |
|---|---|
| Gross Tonnage | |
| Net Tonnage | |
| Length Over All (LOA) | |
| Breadth | |
| Draft | |
| Air Draft (to highest antenna) | |
| Helicopter Deck Rating | |
| Helicopter Deck Diameter (D-Value) | |

**Capacities and Endurances**

| | |
|---|---|
| Pulling Capacity, 5 knots | |
| Fuel Capacity,  All Tanks Topped | |
| Fuel, Useful for 100 % Consumption | |
| Fuel Type | |
| Speed, Transit, Max, in calm sea | |

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 21F1D3B0-A985-4786-BD70-AD760008EEA0

Magseis Fairfield - OBN Acquisition MSA 20210401

| | |
|---|---|
| Endurance of Fuel, during survey | |
| Method of refuelling | |
| Safety Equipment Certificate (no. persons) | |
| Additional Notes: | |
| | |

**Bridge Navigation Equipment**

| | |
|---|---|
| Radars | |
| VDR / S-VDR | |
| ECDIS | |
| Gyro Compass | |
| Auto Pilot | |
| GPS Receiver | |
| Echo Sounder | |
| Navtex Receiver | |
| UPS, Power Supply to all GMDSS equipment | |

**Communication Equipment, Compliant With GMDSS Requirements**

| | |
|---|---|
| Vessel / Air Craft Radio | |
| Helicopter Beacon | |
| Automatic Identification System (AIS) | |
| Transmitter / Receiver, Main (MF, VHF/ DSC) | |
| Radios, VHF, GMDSS, | |
| Radio, VHF, Portable | |
| Radios, UHF, Fixed | |
| Radios, UHF, Portable | |
| Emergency Radio Beacon (EPIRB) | |
| Radar Transponder | |
| Long Range Identification Transmitter | |
| Ship Security Alert System (SSAS) | |

**Satellite Communications**

| | |
|---|---|
| MMSI Number: | |
| Accounting Authority Code (AAIC) | |
| Inmarsat Type A | |
| Inmarsat Type B | |
| Inmarsat Type C | |
| Inmarsat Fleet 77 | |
| V-Sat | |
| Iridium Phone (Ast Airtime) | |
| Telefax Machine | |
| Internal E-Mail & PC Network | |
| E-Mail Address To Vessel | |

**Safety Equipment Crew**

Schlumberger-Private

Schlumberger-Private

Magseis Fairfield - OBN Acquisition MSA 20210401

| Lifeboat Type / Capacity/ No. of Boats | |
| --- | --- |
| Engine, Lifeboat | |
| Life Raft Type /Capacity | |
| Number of Life Rafts | |
| Life Jackets No. | |
| Survival Suits, Thermo Insulated | |
| Working Suits, Thermo Insulated | |
| Man Overboard Boat (FRB) Type | |
| Max Speed of Boat (FRB) | |
| Work Boat(s) Type, model | |
| Additional Notes: | |
| | |

## Accommodation

| Crew Accommodation, No of Bunks | |
| --- | --- |
| Client Cabins, Single Berth | |
| Office, equipment (for Client) | |

## Seismic Equipment Specifications

### Main Particulars

| Streamer Type | |
| --- | --- |
| Tow Points | |
| No of Sub Arrays | |

### Energy Systems

| Gun Controller Hardware (Model & Manufacturer) | |
| --- | --- |
| Gun Controller Software (Type & Version) | |
| Guns (Manufacturer, Type & Capacities) | |
| Gun Cable Type | |
| Diameter of Air Hose | |
| Gun cable length | |
| Nominal Source Pressure | |
| Timing Resolution | |
| Total Compressor Capacity | |
| Compressors (Manufacturer & Capacity) | |
| Near Field Phone (Manufacturer & Type) | |
| Far Field Phone (Manufacturer & Type) | |
| Depth Indicators | |

### Streamer & Recording Systems

| Streamer (Manufacturer & Type) | |
| --- | --- |
| Streamer Deflector Type | |
| Streamer Capacity (Max onboard) | |

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 21F1D3B0-A985-4786-BD70-AD760008FEA0

Magseis Fairfield - OBN Acquisition MSA 20210401

| | |
|---|---|
| Streamer Control Device (Manufacturer & Type) | |
| Recording System Hardware (Model & Manufacturer) | |
| Recording System Software (Type & Version) | |
| Recording System Format | |
| Recording System Media | |

**Navigation Systems**

| | |
|---|---|
| Source Positioning System (Manufacturer & Type) | |
| Global Positioning System (GPS) Receivers (Manufacturer & Type) | |
| DGPS QC System (Manufacturer & Type) | |
| Tail Buoy (Manufacturer & Type) | |
| Tail Buoy Positioning (Manufacturer & Type) | |
| Ultra-Short Baseline (USBL) Acoustic Positioning System (Manufacturer & Type) | |
| Acoustic Positioning System (Manufacturer & Type) | |
| Current Profiler (Manufacturer, Type & Frequency) | |
| Temperature/Salinity Dip Profiler (Manufacturer & Type) | |
| Recording System Format (Nav) | |
| Recording System Media (Nav) | |

**Onboard Seismic Quality Control**

| | |
|---|---|
| System | |
| Software | |
| Hardware | |
| Additional Notes | |

**Onboard Seismic Processing**

| | |
|---|---|
| System | |
| Software | |
| Hardware | |
| Additional Notes | |

**Supplier Chase boats**

| | |
|---|---|
| Vessel Name | |
| Date Built | |
| Length Overall | |
| Class | |

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 21F1D3B0-A985-4786-BD70-AD760008EEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

| | |
|---|---|
| Bollard Pull | |
| Propulsion systems | |
| Endurance | |
| Min Speed maintaining manoeuvrability | |
| Max Speed | |
| Refuel method | |
| No of crew | |
| Crew change schedule | |
| Radar | |
| Navigation System | |
| VHF Radios (no. and type) | |
| Current Meter | |

**Supplier Supply vessels )**

| | |
|---|---|
| Vessel Name | |
| Date Built | |
| Length Overall | |
| Class | |
| Bollard Pull | |
| Propulsion systems | |
| Endurance | |
| Min Speed maintaining manoeuvrability | |
| Max Speed | |
| Fuel delivery capacity | |
| Fuel transfer rate | |
| No of crew | |
| Crew change schedule | |
| No of passenger berths | |
| Radars | |
| Navigation System | |
| VHF Radios (no. and type) | |
| Current Meter | |

Schlumberger-Private

Schlumberger-Private

DocuSign Envelope ID: 21F1D3B0-A985-4786-BD70-AD760008EEA0

**Magseis Fairfield - OBN Acquisition MSA 20210401**

**EXHIBIT I - FORM OF VARIATION ORDER / CHANGE ORDER**

Variation No. [enter sequential number]    Dated: [enter effective date]

This Variation is issued under the Order N°[…], effective […], entered into by and between **[enter Schlumberger's legal entity]** ("*Schlumberger*") and **[enter Supplier's legal entity]** ( "*Supplier*"), for work on the **[enter Vessel name]**.

The Parties wish to modify the Order as follows:

1.      Work to be performed or deleted:

[**Enter relevant details or mark "Not Applicable"**]


2.      Price:

[**Enter relevant details or mark "Not Applicable"**]

3.      Detailed schedule for the performance:

[**Enter relevant details or mark "Not Applicable"**]


4.      Delivery Date

[**One of the following statements regarding Delivery Date should be included – delete whichever is not applicable**]

The Survey Schedule specified in the Order shall not be modified due to this Variation

[**OR**]

The Survey Schedule specified in the Order shall be amended and the new date for the final deliverables shall be [**enter new final deliverable date**].

Except as varied herein all other terms and conditions of the Order shall remain unaltered and in full force and effect.


For **SCHLUMBERGER [ENTITY]:**                    For SUPPLIER **[ENTITY]:**

Signature: _____      Signature: _____

Name: _____      Name: _____

Title: _____      Title: _____

Date: _____      Date: _____

Schlumberger-Private

Schlumberger-Private

# EXHIBIT B

**EXHIBIT H – FORM OF SERVICE ORDER**

**SERVICE ORDER**

**Between**

**WESTERNGECO L.L.C.**

**and**

**MAGSEIS FF L.L.C.**

**for**

**OCEAN BOTTOM NODE SEISMIC 3D DATA ACQUISITION**

**ENGAGEMENT 2, GOM, USA**

This Service Order (hereinafter referred to as the "*Order*") is entered into on this 13th day of April 2021 (hereinafter referred to as the "*Effective Date*"), by and between:

(i)        **WESTERNGECO LLC.:** a company incorporated under the laws of the United States of America having its registered address at P.O. Box 2469, 10001 Richmond Avenue, Houston, 77252, Texas, USA (hereinafter referred to as "*Company*"), and

(ii)        **MAGSEIS FF LLC:** a company incorporated under the laws of the United States of America having its registered address at 9811 Katy Freeway, Suite 1100, Houston, Texas 77024 USA (hereinafter referred to as the "*Supplier*").

WHEREAS Eastern Echo DMCC**,** and **MAGSEIS FF LLC**, have entered into a Global Agreement for the purchase of Services referenced Marine Acquisition MSA SLB **N°SLB--01/04/2021-MSFF/ASL431012** effective the 7th day of April 2021, (hereinafter referred to as the "*Agreement*").

WHEREAS Company wishes to contract with Supplier for the provision of Services, and Supplier is willing to perform the Services pursuant to the terms and conditions set forth in this Service Order and considering it as an Exhibit H of the Agreement mentioned above;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

## ARTICLE 1 – TERMS AND CONDITIONS

The terms and conditions of the Agreement and any amendments thereto, are hereby incorporated by reference and the purchase of Services hereunder shall be subject to the terms of the Agreement.  In all respects this Order shall be treated as a separate contract entered into pursuant and subject to the terms of the Agreement.  The provisions contained herein are limited exclusively for the sole purpose of this Order, and shall not be considered as an amendment, modification, alteration, revision, change, correction or consideration of any means and for any reason to the Agreement.

All capitalized terms not defined in this Order shall have the meanings as described to them in the Agreement.

Pursuant to Article 17.3 – Termination for cause

In the event that the Supplier is unable to start the Work within sixty (60) days from the Commencement Date, then the Company shall have the option to terminate the Service Order with cause and then no termination fee or compensation shall be due and / or payable to the Supplier. Provided that this clause shall not apply if Supplier's inability to commence the Work is due to a Force Majeure event, or events that are the responsibility of Company, principally the delivery of required permits or authorizations.

Pursuant to Article 21.1 of the Agreement, both Parties agree that any delay of thirty (30) days or greater in the commencement of the Work is subject to Liquidated Damages in an amount no greater than the Mobilization Fee of One Million, Five Hundred Thousand US Dollars (US$1,500,000.00). Provided that this clause shall not apply if Supplier's delay in commencement of the Work is caused by Force Majeure events, or events that are the responsibility of Company, principally the delivery of required permits or authorizations.

 *In the event Supplier delivers the project data to Company no later than **15 December 2021**, Company shall credit Supplier back the Mobilization fee in full.*

Pursuant to Article 26 of the Agreement, both Parties agree that no information concerning this Service Order shall be released to the Public by Supplier without Company's prior approval and written consent.

Any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with this Service Order or its subject matter or formation shall be governed by and construed in accordance with the general maritime laws of the United States of America, or, if there is no applicable general maritime law, then the laws of the State of Texas.

### ARTICLE 2 – SCOPE OF WORK

The objective of this Order is to confirm the scope of Supplier's work and the compensation for this project.

2.1    **Project name**

Engagement 2 WG MC 3D OBN,

2.2    **Description of the Work**

Pursuant to Article 1.47 - Exhibit A of the Agreement, the Work consists of the following:

Company are contracting Supplier under this Order to acquire a 3D OBN seismic survey in the Gulf of Mexico, USA, with the acquisition of Seismic Data and on-board QC processing as required in line with the survey deliverables under Article 3.1 and Key Performance Indicators under Article 4 together with the scope of Work as per below.

| Survey type | OBN |
|---|---|
| Technique | ROV Nodes |
| **Nodes** | |
| Sample Rate | 2 ms |
| Low Cut Filter | Out |
| Spacing | 1200m Receiver line interval x 1200m Receiver point interval |
| OBN Record Length | Continuous recording, can be blocked at any length |
| **Source** | |
| Number of sources | 3   (flip-flop-flap) |
| Source array separation | 100m for triple source |
| Source Sail Line spacing | 300m for triple source sail lines |
| Shot interval | Triple source at 16.6667m dithered, giving a 100m x 50 m source grid . |
| Minimum Maximum source offset (X-line) | 30km |
| Minimum Maximum source offset (Inline) | Unlimited |
| Operating Air Pressure | 2000 PSI |

| Individual source array volume | 5200 cubic inches |
|---|---|
| **Number of Sub Arrays per Source** | 2 sub arrays for triple source |
| **Source Depth** | 10 m |

The Work shall consist of approximately 3724km$^2$ of OBN receiver coverage, 160 OCS blocks.

2.3     **Order Effective Date**

Pursuant to Article 1.26 - Exhibit A of the Agreement, the Order Effective Date is: April 13th 2021**.**

2.4     **Area of Operations**

Pursuant to Article 1.3 - Exhibit A of the Agreement, the Area of Operations for the performance of this Order is as detailed (map, coordinate listing) below and shall be extended by such a distance as may be necessary for seismic vessel navigation (including shooting during the line changes) during the conduct of the Work. The Area of Operations is shown below.

Engagement 2 is located approximately 215km South-southwest of Port Fourchon, Louisiana, USA.



Above map showing geographical location



Above map shows main pipeline systems crossing the survey. The map also shows oilfield platform infrastructure. Node area denoted in blue and source area denoted in red.

Water depths are in the range 800m to 1650m.

The full-fold area is approximately 3724km$^2$

Receiver area co-ordinates:

| Easting | Northing |
|---|---|
| 639707.09 | 3029811.14 |
| 646944.48 | 3022554.37 |
| 666256.38 | 3022554.59 |
| 682019.06 | 3008073.89 |
| 706101.63 | 3008071.78 |
| 706093.21 | 3004743.66 |
| 716462.19 | 3004814.45 |
| 724197.79 | 3011600.02 |
| 724192.53 | 3016253.08 |

7

| | |
|---|---|
| 755572.47 | 3041866.42 |
| 755584.93 | 3053938.31 |
| 728938.58 | 3053938.31 |
| 728938.58 | 3061195.99 |
| 724200.12 | 3060362.66 |
| 720076.15 | 3056325.95 |
| 708700.1 | 3056374.67 |
| 708748.29 | 3041895.93 |
| 680677.12 | 3041895.83 |
| 676072.79 | 3046648.62 |
| 661443.22 | 3046574.36 |
| 656616.3 | 3051400.61 |
| 656610.72 | 3053967.72 |
| 642115.87 | 3053967.72 |
| 639687.02 | 3049216.96 |

2.5 **Commencement Date**

Pursuant to Article 1.7 – Exhibit A of the Agreement, the Commencement Date is:  **28 July, 2021**

2.6 **Completion Date**

Pursuant to Article 1.8 – Exhibit A of the Agreement, the Completion Date is: **26 November, 2021**

2.7 **Mobilization Date**

Pursuant to Article 1.21 – Exhibit A of the agreement, the Mobilization on Date is: **19 July, 2021**

2.8 **Demobilization Date**

Pursuant to Article 1.15 - Exhibit A of the Agreement, the Demobilization Date is: **29 November, 2021**

**All dates above ( 2.5-2.8) are linked to an execution date of the 13th APRIL 2021. Any delays in the receipt of this executed agreement will cause the stated dates to extend the equivalent amount to that of the delay.**

2.9 **Description of the Vessels**

Pursuant to Article 1.46 - Exhibit A of the Agreement, the seismic Vessels are:

Rem Saltire
Artemis Odyssey
Artemis Arctic
7-Oceans

Further details are provided in Annex A.

2.10            **Supplier Equipment**

Pursuant to Article 1.40 - of the Agreement, Supplier Equipment required for the Work shall be as follows:
Attached to this Order marked as "Annex A" and forming an integral part of this Order.

2.11            **Supplier Personnel**

Pursuant to Article 12.1 - Exhibit A of the Agreement, Key Personnel are included in Annex A.

2.12            **Company Representative**

Pursuant to Article 8.2 - Exhibit A of the Agreement, Company Representative for the performance of this Order
will be a consultant appointed by Company, the details of the individual shall be notified to Supplier prior to the
Commencement Date.

2.13            **Supplier's Representative**

Pursuant to Article 8.1 - Exhibit A of the Agreement, Supplier's Representative for the performance of this Order,
the details of the individual shall be notified to Company prior to the Commencement Date.

2.14            **Onboard Accommodation**

Pursuant to Article 11 - Exhibit A of the Agreement, Supplier shall provide onboard accommodation as per Article
11 – Exhibit A of the Agreement on each recording Vessel.

2.15            **Fisheries Liaison**

Not Applicable

2.16            **Marine traffic**

All marine traffic and local maritime management shall be managed by supplier.

2.17            **Permits and Authorizations**

Pursuant to paragraph 4 of Article 1.1 - Exhibit C of the Agreement, Company shall be responsible for the BOEM
permit

Supplier shall be responsible for all vessel-specific and vessel-related permits and authorizations.

**ARTICLE 3 – SURVEY REQUIREMENTS**

3.1      **Survey Deliverables**

Under Article 9.5 - Exhibit A of the Agreement, Supplier shall provide the following Deliverables as part of the
Work:

3.1.1    **Reporting and Final Deliverables**

(a)      **Daily Reports.** Daily operational information shall be provided to Company Representative, not later than
twenty-four (24) hours after the end of the reporting period.

(b)      Daily QHSE information shall consist of the previous twenty-four hours operations including:
QHSE statistics;

Summary of QHSE activities;

Summary of any QHSE incidences;
Summary of marine mammal observations and interventions;
Summary of environmental performance.

(c)      Details of daily operational information shall include:

Daily and cumulative production statistics;
Daily and cumulative timing breakdown;
Diary of events;
Technical and operational performance;
Technical and Operational problems;
Quality control observations;
Navigation processing completed to date;
Sea state and weather description;
Status and twenty-four-hour look–ahead plan;


All items shall be agreed with Company Representative, any disputed times and/or production numbers pending acceptance must be clearly stated by Supplier on the daily report. Supplier shall provide the weekly and/or monthly operational reporting as stated in the Order.

(d)      **Weekly Reports.** Weekly summary reports shall be provided to Company Representative within twenty-four (24) hours of the end of the weekly reporting period, giving summary details of the previous seven (7) days operations. The reporting week shall be agreed with Company prior to the Commencement Date.

Also, P190 files containing all shot records will be delivered to Company on each Monday morning. The P190 files should contain all shots where the airgun source was discharged, i.e. production, ramp-up, test, scratched, etc. This is to facilitate the reporting of shots fired to BOEM for permit compliance.

(e)      **Monthly Reports**. Monthly summary reports shall be provided to Company Representative within forty-eight (48) hours of the end of each calendar month giving the same summary details of the operations during the previous calendar month.

(f)      **Quarterly Report.**          Not Applicable

(g)      **Final Deliverables**. On the Completion Date, Supplier shall provide at Supplier's sole costs and risks all Deliverables detailed in the Order hereto and ship all such Deliverables to the destinations indicated in the Order. All Deliverables shall be labelled as specified in the Order. Supplier shall provide a final operations report within thirty (30) days of the Completion Date. Unless otherwise agreed by the Parties in the applicable Order, final operations report shall contain:

QHSE summary and incident reports including action item close-out confirmations;
Field acquisition techniques;
Spread configuration and energy source description;
Recording system characteristics;
Tabulation of data recorded;
Breakdown of time (in hours) by activity;
Resume of operations;
Summary of all measurements of temperature and salinity data acquired and calculations of water velocity;
Acquisition QC process and data examples;
Onboard seismic processing flow, testing, execution and QC;
Any other factors which Supplier believes should be brought to the attention of Company;
Learnings and recommendations for future acquisition projects in the same area.


(h)      **Navigation Processing Section of Final Acquisition Report** shall include:

Details of equipment used for positioning;

Geodetic and projection parameters used;
Satellite datum to local datum parameter shift constants (if applicable);
Calibration results and C-O's applied;
Location and offset diagrams for vessel antennae and source rGPS unit positions;
Water depth processing.

**Summary of key deliverables from OBN data. Details in Exhibit C section 7**

The 3592 cartridges will be written out in 3592-E07 4TB format.

| One (1) copy of all deliverables will be required and shall be sent to WesternGeco Houston Data Management Department<br>**Product** | Format | Media | **Quantity (if appropriate)** |
|---|---|---|---|
| Daily and weekly reports | PDF | Email FTP | |
| Seismic raw gathers – Continuous Field Data | SEG-Y | NAS | 1 x NAS |
| Seismic navigation merge gathers – Shot Sliced Data (40 seconds record length.) | SEG-Y | NAS | 1 x NAS |
| Seismic field tape & box listing showing, as a minimum:<br><br>Tape Number<br>Survey Name<br>Line Number<br>Shot point Range<br>Data type<br>Box Number | ASCII | USB | With every shipment as appropriate. |
| WG DMS GAT file for every seismic data shipment | Excel file | Email/NAS or USB | With every shipment as appropriate. |
| Raw navigation data | IOGP (P2/11) | USB | 2 |
| Navigation data | (P6/11) | USB | 2 |
| Final processed navigation data<br><br>P1's - All positions referenced to the time of source firing including any dither (S, V, Z, T records) | SPS<br>IOGP (P1/11)<br>P1/90 | USB<br>USB<br>USB | 2 |
| Monthly and daily tests | PDF | USB, FTP | 2 |
| Configuration reports (Recording, Timing, Source report) | PDF | USB, FTP | 2 |
| Recording instrument filters | ASCII | USB, FTP | 2 |
| Instrument filter coefficients | ASCII | USB, FTP | 2 |
| The near-field hydrophone data recorded in both arrays for every shot (non-firing source too), 0.5 ms | SEG-Y | USB | 2 |

11

| | | | |
|---|---|---|---|
| sampling for 12 s.  No filters applied (anti-alias high cut is ok) | | | |
| Estimated far field signature for every shot. To be further discussed during Project Planning Phase. | SEG-Y / ASCII | USB, FTP | 2 |
| Modelled far field Signature for source used | ASCII | USB, FTP | 2 |
| Bathymetry data and tidal variation data | ASCII | USB, FTP | 2 |
| CTD (TS) data and report including calculations | ASCII and Excel | USB, FTP | 2 |
| Acoustic Doppler Current Profiler (ADCP) data | ASCII | USB, FTP | 2 |
| Pressure Inverted Echo Sounder data (PIES) | .CSV | USB, FTP | 2 |
| Sound Velocity Profile (SVP) | .CSV | USB, FTP | 2 |
| Barometric Pressure (Daily Log) | Excel | USB, FTP | 2 |
| Onboard QC products | GIF, PNG, JPEG or similar | NAS, FTP | 2 |
| Source Vessel positions for survey duration | ASCII | USB, FTP | 2 |
| Final acquisition report including annexes | PDF e-copy, MS Word | USB, FTP | 2 |

Deliverable Support files, one (1) copy:
Raw Gun data
Shot Table – Example will be provided
Node Table – Example will be provided
Video Files from ROV
Node QC Report – Example will be provided
        Pre-Deployment, Deployment and Recovery images
A record of the node type being used and marking each node, xls spreadsheet
Information on the node location (Is it being tracked during deployment using Sonardyne USBLs at each node and/or has there been an update of the location from direct arrivals after retrieval?)
Clock drift (documented and a record of its application to the input data)
Node orientation measurements (trimmed mean measurement from the nodes plus a description of any rotation being applied to the data)

Backup/ Archive Copies of seismic data should be retained on the crew for duration of 12 months from final delivery.

Under Article 9.5(f) – Exhibit A of the Agreement, all deliverables shall be labelled as followed and shipped to the following addresses:

| | |
|---|---|
| WesternGeco | |
| Data Shipping Department | |
| 10001 Richmond Avenue | |
| Houston, TX 77042 | |
| Attn: Tape Library Supervisor Lisa Simpson-Pervis | |
| Email: Lsimpson1@slb.com | |

3.2              **Critical spare parts**

Under Article 10.3 - Exhibit A of the Agreement, Supplier shall maintain an inventory of critical spare parts.

3.3              **Reporting requirements**

As per Article 9.5 – Exhibit A of the Agreement and Article 3.1.1

3.4              **Security Level Criteria**

Not Applicable

          **Other technical specifications**

          **Line and Shot Numbering**

The line prefix for the survey is EGN2. This prefix can be omitted for line names in the P190 format if it is included in the P190 headers.

# Source Line Naming Convention

File Name: LLLLXSSSS

**Variable Description**

LLLL      Line Name.

X          Attempt or index. It is a single character that is normally a digit. Letters should only be used in ramp up and non-production line changes.

1 = Prime

2 = Reshoot/Continuation

3 = Reshoot/Continuation

etc.

Only ramp-up lines and line changes can present a letter.

R = Ramp-up line

L = Line change

SSSS      Sequence number. Sequence number ranges are assigned to source vessels for identification.

**Line**

**Change**

# Receiver Line Naming Convention

File Name: LLLLSSSS

LLLL      Line Name

SSSS      Station Number

**Numbers**

**Vessel Purpose Comment**

**Shot point Numbering**

Shot point numbers shall increment heading northwards and decrement when heading southwards.

Decrementing shot point numbers shall be used for sailing in opposite direction.

**Note that the line and shot numbers tie with the Engagement-1 survey.**

**Onboard QC Processing**



*Figure 1 – Magseis Fairfield Node Data QC Sequence*

**Raw Field Data through Navigation Merge**

QC process is performed throughout node retrieval.

**Field Data Read/Internal Reformat:** Raw field data is output in either shot sliced or continuous records from the recorder system and read back by the processing team.

*Source Navigation Merge* – The verified shot table from the recorder is utilized to create the preliminary processing shot database. The receiver deployment table from the recorder is utilized to create the preliminary processing receiver database. Both tables are merged with raw field data.

**Preliminary QC:** Sequence is meant to verify recording coverage and prevent redeployment of nodes with recording issues. The QCs will center on amplitude, frequency, and orientation sensors.

*Orientation Analysis* – Analysis identifies any anomalies in the orientation sensor readings including movement and sensor malfunctions.

*Amplitude Analysis* – Analysis confirms data coverage. RMS amplitude maps analyzed to identify amplitude anomalies, data coverage, sensor malfunctions, high amplitude noise, large timing issues, node movement, coupling, etc.

*Frequency Analysis* – Analysis confirms hydrophone and geophone function and coupling, and to evaluate noise and signal characteristics.

14

*Receiver Gathers QC* – Receiver gathers are displayed for each recording component type.  Data is displayed as wiggle trace.

**Secondary QC:** Sequence is meant to refine shot and receiver positioning, and clock drift corrections for each node unit.  Note that positioning and clock timing are interrelated and must be solved together in iterative steps.

*Shot Positioning Analysis* – Depending on array design and towing depth, deviations may be visible in the defined GPS vs first break source positioning.  A correction is calculated through various shot inline shift scans and the average correction applied to all production sources.  Preliminary analysis of the shot positions is performed during in the First Line QC and followed up in production.  Updated positions saved into shot database to be applied to final navigation merged dataset.

*Receiver Positioning Analysis* – Refines receiver positions using first break pick analysis.  Receiver depths are determined from the pressure sensors on the ROV during node deployment.  Receiver position scan uses constant velocity function.  Updated positions saved into receiver database are applied to final navigation merged dataset.  Combined with orientation sensors, node movement can also be verified and solved.

*Clock Timing Analysis* – Analysis to model clock drift correction and identify potential clock timing issues.  Clock timing analysis will also address clock discontinuities.  All updates are saved into receiver database and noted in processing log.  Corrections to be applied to final navigation merged dataset.

**Final QC:** Sequence confirms node orientation and if needed refines geophone rotation.

*Node Leveling Analysis* – Raw data amplitude analysis performed to determine if refinement of the Yaw sensor is needed.  If needed, refinement values will be saved to the trace headers and residual rotation will be performed.

*Node Rotation* – Geophones are prerotated by the recorder system upon download, if residual rotation is recommended from the node leveling analysis, it will be applied in this stage.  Orientation of horizontal geophone 1 to inline survey direction.  Updated orientation values saved in output SEG-Y trace headers.

**Auxiliary Files:** These files and reports are attached to the data deliverables to allow for archival of all observations made during processing and data acquisition including lessons learned.

*Updated Shot and Receiver Databases* - Databases of corrections applied to shots and receivers are generated for deliverables.

*Receiver Station Log* -  A log (*Excel Receiver Station Log*) is generated listing all receiver stations and observations made.

*Final Processing Report* - A final report (*PDF Onboard Processing Final Report*) is generated at project closeout, this is typically merged with the Survey Acquisition Final Report.

*Receiver QC Images or Station Reports* - Throughout processing of the data, QC images and notes are collected regarding anomalies, special corrections, or suggested DNPs.

**Navigation Merged Rotated Output:**

*Navigation Merged SEG-Y* - Navigation merged, rotated datasets are output as deliverable.  A SEG-Y media log is generated to track shipped datasets.  Delivery of SEG-Y data is as dictated in Scope of Work.

Original versions of all deliverables will be shipped with auxiliary data to the client or client's processing center at first availability.

Archive version of all deliverables will be kept offshore until all copy versions and original versions have been confirmed by clients.  Once confirmed, or depending upon contract requirements, these will then be purged.

**First Line QC**

During the First Line QC, the processing team will perform the following analysis beyond the scope of the navigation merged workflow:

PreAmp Gain Analysis – Verifying the maximum recorded amplitudes for the nodes and projecting for shallowest survey area to determine appropriate preamplifier setting.

First Break vs Acoustic Positioning Comparisons – Comparing first break refined positioning versus the USBL acoustic positions.

First Break vs Acoustic Shot Positioning Comparison – Comparing first break refined positioning versus the USBL acoustic positions for the shots.  Specifically targeting the potential shot inline shifts associated with RGPS displacement.  In process map, listed as shot inline shift analysis.

Source Vessel Amplitude Comparisons (if multivessel) – Comparing both source vessels and multi array amplitude and signature outputs.

SEGY data verification – Verifying SEGY data and header content for production sequence.
FLQC Processing Report – incorporated into the mobilization report, this will outline the results of the above analysis and any recommendations for shot position corrections, preamplifier gain settings while noting any anomalies.

**ARTICLE 4 – KEY PERFORMANCE INDICATORS**

Under Article 18.2 - Exhibit A of the Agreement, the Parties have agreed to the following KPIs:

Compliance with QHSE plan, no injuries and fully compliant reporting.
First Shot acquisition date/delivery date on schedule
Last Shot acquisition date/delivery date on schedule
Intermediate data deliveries 1/3 weeks minimum, once first batch of nodes are picked up and data harvested.
Adherence to Operations and Simops procedures

**ARTICLE 5 – PRICING**

5.1     Supplier's compensation for the project will be as **per Exhibit D below, attached hereto and forming an integral part of this Order.**

5.2       Not Applicable

5.3     Under Article 17.2 – Exhibit A of the Agreement, the Parties agree that this Article 17.2 shall be reworded to the following: Termination of an Order without cause. Schlumberger may terminate all or part of an Order for convenience at any time by giving at least ten (10) days prior written notice to Supplier. Parties agree that the early termination fee table shall be applied in the event of termination of the order without cause.

| | |
|---|---|
| Termination between 61 and 90 Days before the Mobilization Date | 20% of Estimated Service Order Value |
| Termination between 31 and 60 Days before the Mobilisation Date | 40% of Estimated Service Order Value |
| Termination between 11 and 30 Days before the Mobilisation Date | 70% of Estimated Service Order Value |
| Termination within 10 Days of the Mobilisation Date | 80% of Estimated Service Order Value. If alternative work is found for the crew within this time the payment will be prorated. |
| Termination after Mobilization Date | 100% of Estimated Remaining Service Order Value. If alternative work is found for the vessel within this time the payment will be prorated |

5.4     Pursuant to Article 17.6 Suspension, the Suspension rate in this Service Order shall be 70% of the Standby Rate.

Pursuant to Article 27 Force Majeure, the Force Majeure rate in this Service Order shall be 70% of the Standby Rate.

5.5     All expenses incurred by Supplier for logistic activities in the mobilization, crew change and demobilization of Company Representatives; i.e. in terms of getting the Company Representatives from the agreed airport in US Gulf of Mexico to the Supplier's OBN crew offshore US Gulf of Mexico shall be incurred by the Supplier.

5.6     Parties agree that in the event the Supplier subcontracts or requests a Third-Party to provide services as part of the Work under the Agreement and/or this Order, all Subcontractor or Third-Party costs that are in addition to costs already agreed shall be incurred by the Supplier.


ARTICLE 6 – INVOICING

Under Article 19 - Exhibit A of the Agreement, a detailed process for the submission of invoices will be provided, an outline of which is provided below.

For this Service Order a proforma invoice covering the progress of the operation may be issued every 30 days, the payment terms are thirty 30 days from Schlumberger receiving the invoice with the correct PO number. A separate mobilization proforma invoice may be issued after the completion of the first acceptable source line.


**Draft Invoice Approval**:

Send the draft invoice along with the supporting documents to the Company Project Manager by email; invoices will be reviewed, approved or rejected within (7) seven business days.  Once approved, the Supplier will be sent a copy of the invoice-specific Purchase Order (PO) and the Company Project Manager will notify the Supplier of the Goods Receipt (GR) number, both of which are required for submission on the final invoice.

The PO number and the GR number must be included on all invoices.


**Invoice Submission:**

Submit electronic invoices along with supporting documents, a copy of the PO and GR number to My Supplier Portal: https://slb.mysupplierportal.com

Each invoice should contain the following information:

Co Code:      1531-WesternGeco LLC
AU:             7416119
AC:              To be created
PO:             Xxxxx

**Review the status of invoices on My Supplier Portal (All Suppliers):**

To view the status of your invoice, visit the online portal at https://slb.mysupplierportal.com.
Please note it may take up to 7 business days for invoice to be visible on the portal.
Please contact My Supplier Portal Helpdesk for any queries at:

+1 703 404 9996 (English);
+35 314 078 748 (Spanish, Portuguese);
slb.finance@accenture.com  (For Queries Only; Do NOT submit invoices to this email address).


ARTICLE 7 – NOTICES

Under Article 33.2 - Exhibit A of the Agreement, any notice that is to be given by one Party to the other under this Order will be given in writing and delivered as follows:

**For WesternGeco LLC.**
10001 Richmond Ave.
Houston
TX 77042
USA

Office: +1 713 689 6547
Mobile: +1 8328358537
Email: [GPoole@slb.com](GPoole@slb.com)

To the attention of: **Gary Poole**

**For Magseis FF LLC**
9811 Katy Freeway, Suite 1100
Houston, Texas 77024
USA

Office:  +1 281 275 7613
Mobile:  +1 832 344 6061
Email:  [steve.mcintosh@magseisfairfield.com](steve.mcintosh@magseisfairfield.com)

To the attention of:  **Steve McIntosh**

18

**ARTICLE 8 – SPECIAL CONDITIONS**

8.1     Pursuant to Article 24 - Exhibit A of the Agreement, the liabilities and indemnities clause shall be as follows:

Supplier shall be fully responsible, at its sole cost and expense, for all inspection, repair, maintenance and replacement of its equipment and all the necessary spare parts for its equipment as required in accordance with good oil field practices and, for proper storage and security of its equipment at all times during the term of this Service Order or any extensions thereafter. Supplier shall keep the equipment at all times in a good operating condition. Supplier shall provide, upon request, pertinent details of Quality Assurance and Quality Control procedures (QA / QC).

Supplier shall pay all costs to repair or replace its equipment and to remedy any damage caused by normal wear and tear or negligent handling, misuse or loss of equipment.

8.2     Pursuant to Article 25.7 (c) - Exhibit A of the Agreement, the insurance clause, the following should be added:

Supplier shall procure that the Vessel operator takes a Full form Hull and machinery insurance including any equipment and supplies on board, in an amount equal to the replacement value of each vessel and equipment used in connection with this Service Order. Coverage shall be written on a form acceptable to Company (the American institute hull clause form or equivalent). Company shall confirm acceptance in writing prior to Mobilization.

In the event the aforementioned insurance is not purchased, and Supplier elects to be self-insured, Company shall have the same rights and protection which would have been provided if the insurance were in force and the policy endorsed with a waiver of subrogation in favor of Company.

8.3     Pursuant to Article 25.7 (c) - Exhibit A of the Agreement, the insurance clause, the following should be added:

The Protection and indemnity insurance (P&I) or marine liability insurance shall be provided for each vessel used in connection with this contract with a limit equal to the value insured under "Worker's Compensation and Employer's Liability in compliance with local statutory requirements" above or five million US Dollars ($ 5,000,000.00) whichever is greater.

Coverage shall be written on a form acceptable to Company (and shall include but not be limited to, crew liability, third party liability, bodily injury, and property damage liability including collision/towers liability and contractual liability as applicable). Company shall confirm acceptance in writing prior to Mobilization.

8.4     Under Article 25.7(f) – Exhibit A of the Agreement, upon execution of this Order Supplier shall provide copies of Vessel insurance certificates.

**ARTICLE 9 – LOCAL CONDITIONS**

Supplier will provide a minimum of 1 support vessel for the duration of the project.
Company will provide as a minimum the following personnel:
Node Handling ROV vessel - One (1) lead QC and one (1) lead HSE advisor
Source Vessel 1— One (1) QC/HSE advisor, 3 Pam Operators and 3 x PSO's.
Source Vessel 2— One (1) QC/HSE advisor, 3 Pam Operators and 3 x PSO's.
Supplier will provide a minimum of 8 PIES (Pressure Inverted Echo Sounder), to be deployed in the receiver area.
Company will provide locations for the PIES units.
Speed of sound velocity profiles, full water column, using a reusable probe on a grid to be agreed with Company
Minimum 1 measurement per week temporal sampling.

Supplier will be required to subscribe to a suitable weather forecasting service, in particular to monitor and plan for weather events.

Company will provide a copy of the permit to Supplier.  Supplier is expected to read the permit and comply with all permit stipulations.

Nodes cannot be placed within an archaeological zone. A list of archaeological zones will be supplied by Company.

Any nodes that cannot be deployed in their pre-planned position should be deployed in the nearest available position.

A minimum 2000m crossline separation will be maintained between the two source vessels.

EXECUTED AS AN AGREEMENT BY THE DULY AUTHORIZED REPRESENTATIVES OF THE PARTIES

For **Company [WESTERNGECO LLC ]**

For Supplier [MAGSEIS FF LLC]

Signature: _____

Signature: _____

Name:   Will Gowans

Name: Tom S. Scoulios

THOMAS E. SCOULIOS

Title:   Vice President

Title: Chief Operating Officer

Date:   April 22, 2021

Date: 13 APRIL, 2021

21

**EXHIBIT C – DESCRIPTION OF SERVICES AND TECHNICAL SPECIFICATIONS FOR OBN**

Pursuant to the provisions in the Article 2.1 of the Exhibit A of the Agreement, Parties agree that the EXHIBIT C of the Agreement shall be supplemented with the following Exhibit C (OBN) of the Service Order called "Description of Services and Technical Specifications."

**SURVEY objectives**

| | |
|---|---|
| Main Target | Miocene and Wilcox reservoirs in structural and combination traps, primarily 3-way closures against salt or salt welds |
| Main target lithology | Deep water (turbidite) sandstone - channel and lobe facies |
| Main Target Depth | 20k-35k feet (6-11 km) |
| Main Target Two-Way Time | 4.5 - 7 seconds |
| Main Target Maximum Dip | 30-45 degrees; imaging of very steep dips (70+ degrees) important in some structures |
| Expected bandwidth at objectives | 15-25 Hz |

**SURVEY geodesy**

For all geodetical definitions and parameters, reference is made to the Official Geodetic System for the SURVEY, provided hereafter:

| | |
|---|---|
| Coordinate system | WGS 84 / UTM zone 15N |
| Geodesy EPSG code (4 to 5 numbers) | 32615 (See EPSG CRS report below) |



**International Association of Oil and Gas Producers**

EPSG geodetic parameters

data set version        9.8.6

## Detailed Report on Projected Coordinate Reference Systems

*Search Criteria:*   32615



International Association of Oil & Gas Producers

---

**# 1**       *Code:* 32615      *Name:* **WGS 84 / UTM zone 15N**

| *Base GeogCRS:* | WGS 84 |
| *Geodetic Datum:* | World Geodetic System 1984 |
| *Ellipsoid:* | WGS 84 |

*Semi-major axis (a) =*   6378137       metre

*Inverse flattening (1/f) =* 298.257223563

| *Prime Meridian:* | Greenwich |
| *Datum origin:* | Defined through a consistent set of station coordinates. These have changed with time: by 0.7m on 1994-06-29 (G730), a further 0.2m on 1997-01-29 (G873),  0.06m on 2002-01-20 (G1150), 0.2m on 2012-02-08 (G1674) and 0.02m on 2013-10-16 (G1762). |
| *Datum remarks:* | EPSG::6326 has been the then current realization. No distinction is made between the original and subsequent (G730, G873, G1150, G1674 and G1762) WGS 84 frames. Since 1997, WGS 84 has been maintained within 10cm of the then current ITRF. |
| *CRS scope:* | Large and medium scale topographic mapping and engineering survey. |
| *CRS remarks:* | |

*CS axes:*

| Order | Axis Name | Abbr | Axis Units | Orientation |
|---|---|---|---|---|
| 1 | Easting | E | metre | east |
| 2 | Northing | N | metre | north |

*CS remarks:*   Used in projected and engineering coordinate reference systems.

*Map Projection:*   UTM zone 15N

*Projection Method:* Transverse Mercator

| Parameter Name | Parameter Value | | | | Unit of Measure |
|---|---|---|---|---|---|
| Latitude of natural origin | 0 ° | 0 ' | 0 " | N | |
| Longitude of natural origin | 93 ° | 0 ' | 0 " | W | |
| Scale factor at natural origin | 0.9996 | | | | unity |
| False easting | 500000 | | | | metre |
| False northing | 0 | | | | metre |

*Projection remarks:*

*CRS info. source:*                        *Data source:* OGP    *Revision date:* 02-Jun-95    *Change id:*

*CRS area of use:*    Between 96°W and 90°W, northern hemisphere between equator and 84°N, onshore and offshore. Canada - Manitoba; Nunavut; Ontario. Ecuador -Galapagos.

**Parameters**

**Acquisition Geometry**

| | |
|---|---|
| Acquisition Technique | Ocean Bottom Node |
| Node deployment type | (Deep Water) ROV Nodes |
| Geometry type | Parallel shot and receiver lines |
| Orientation of receiver lines | North-South (0/180 degrees) |
| Orientation of source lines | North=South (0/180 degrees) |
| Distance between receiver lines | 1200m |
| Distance between nodes along a receiver line | 1200m |
| Shot line separation | 100m |
| Distance between shots on any given shot line | 50m |
| Number of unique node locations in survey | 2,585 |
| Number of source locations in the survey | 2,072,377 |
| Number of receiver lines | 96 |
| Number of shot lines | 1520 |
| Natural Inline bin cell size | 50m |
| Natural Crossline bin cell size | 50m |
| Nominal fold (/25m bin cell) | TBD |
| Min Max crossline offset | 30km |
| Min Max inline offset | 30km |

**Survey Dimensions**

| | |
|---|---|
| Receiver area | 3724 sqkm |
| Source area | 10,376 sqkm |
| Full Fold area | 3724sqkm |

**Ocean Bottom Node specification**

| | |
|---|---|
| Number of nodes used in survey | 2585 |
| Node Type | ZXPLR |
| Number of sensors | 4 (1 x hydrophone, 3 x geophones) |
| Geophone orientations | 1 vertical, 2 x horizontal |
| Node battery life | 90 days |
| Node failure rate | Less than 2% |
| Allowable Node Failure Radial distance | No more than two adjacent nodes may fail. |
| Sample rate | 2ms |
| High Cut Filter | System dependent |
| Low Cut Filter | 0 Hz (Or system minimum) |
| Record length | Continuous record length |
| Node Specifications | See attached Magseis Fairfield document |

**Source specification**

| | |
|---|---|
| Source type | Airgun |
| Manufacturer | Bolt |
| Gun type | Bolt long-life |
| Gun volume | 5200 cuin |

24

| Minimum pressure | 2000psi |
|---|---|
| Number of sub-arrays | 2 |
| Source depth | 10m |
| Near Field Hydrophones | To be recorded on every shot for active and passive arrays for all arrays for every shot.<br>See Exhibit C - 4.3 for detail |
| Far Field Signatures | Generate shot-by-shot far-field signatures |
| Array Geometry | Include in SEG-D headers of NFH |
| Gun controller | TBC |

**Shooting vessels**

| Number of shooting vessels | 2 |
|---|---|
| Simultaneous shooting | No |
| Synchronized shooting | No |
| Minimum distance between vessels | 2,000m |
| Number of sources per vessel | 3 (triple source) |
| Sail line interval | 300m |
| Average shooting speed | 4.3knots or greater |
| Average turn time | 42 mins |
| Distance between successive shots | 16.6667m |
| Approximate time between successive shots | 7.0 secs + dither |
| Dither time between successive shots | Max +/- 1 sec |

**Navigation & Positioning systems**

| Primary vessel positioning | GNSS |
|---|---|
| Navigation software system | 4D Nav (NHV Vessel) / Gator (Source Vessel) |
| Acoustic positioning | HiPAP 501 |
| RGPS | SeaMap 4DX |
| STD/CTD,PIES | Valeport SVX2 (ROV and HSL) / Sonardyne PIES |

**Node QC**

| Item | Quantity | Comments |
|---|---|---|
| Processing Software | --- | Seispace Interface, WKG Processing Software<br><br>Initially developed from a Landmark ProMAX platform, this software has been expanded to include node specific processes and to improve data management.  A fully functional processing system allows for queuing, job replication, and processing through migration.  Offshore processing systems are utilizing the WKG Light version running with a SeisSpace user interface.<br><br>WKG Light processing software includes, but is not limited to, the following processes:<br><br>SEG-Y Input/ Output<br>Fairfield Receiver Gather Input/Output<br>Nearfield Hydrophone Input<br>Shot Slicing from Continuous<br>Processed Navigation Import |

|  |  | Geophone Rotation<br>FK and FX Spectrum<br>Time Variant Filtering<br>Amplitude Measurements / Compensation<br>Despike / Noise Attenuation Tools<br>CMP/CDP Stacking<br>Pre- / Post- Stack Migration |
|---|---|---|
| Processing Workstations | 2 or more | Dell T5500 series or equivalent.<br>Dual 24 inch monitors |
| Processing Data Storage | 400TB | Panasas ActiveStor or equivalent. |
| Processing Servers | 120 Cores | Dell r620 or r720 processing servers.  Torque or PBS Queueing for efficiency. |
| Processing Network Switch | 10 Gigabit | SFP+ connections for quick transfer |
| Data Output Methods | NAS OR 3592 Tape | Network Attached Systems (NAS) drive capable data transfers.<br><br>110TB NAS storage size.<br>10 Gbit ethernet connections<br>Raid 6<br>Transfer in All-Weather Casing<br><br>3592 Tape Drive<br><br>TS1140 Generation (e07)<br>JC Cartridge, 4TB capacity<br>Tape Copy system onboard. |

**Source Data QC**

| Item | Quantity | Comments |
|---|---|---|
| Processing Software | --- | Seispace Interface, WKG Processing Software<br><br>Initially developed from a Landmark ProMAX platform, this software has been expanded to include node specific processes and to improve data management.  A fully functional processing system allows for queuing, job replication, and processing through migration.  Offshore processing systems are utilizing the WKG Light version running with a SeisSpace user interface.<br><br>WKG Light processing software includes, but is not limited to, the following processes:<br><br>SEG-Y Input/ Output<br>Fairfield Receiver Gather Input/Output<br>Nearfield Hydrophone Input<br>Shot Slicing from Continuous<br>Processed Navigation Import<br>Geophone Rotation<br>FK and FX Spectrum<br>Time Variant Filtering<br>Amplitude Measurments / Compensation<br>Despike / Noise Attenuation Tools<br>CMP/CDP Stacking<br>Pre- / Post- Stack Migration |
| Processing Workstations | 1 or more | Dell T5500 series or equivalent.<br>Dual 24 inch monitors<br>8TB internal storage |

**EXHIBIT D – PRICING**

The Parties agree to the following:

MOBILISATION AND DEMOBILISATION

The Mobilization and Demobilization fees shall cover all expenses incurred by the Supplier in the Mobilization and Demobilization of the survey Vessels, personnel and Equipment required to perform the Work.

**Pursuant to Article 1.21 of the Agreement, the Parties agree to the following:**

"Mobilization" shall consist of planning and preparation of all activities as required to conduct the Work, preparation of program maps and pre-plots as specified by Company, port call and client meeting in a port to be determined operationally prior to mobilization, equipment audits and tests and calibrations as specified in port and on location, transit from the Port of Mobilization to the Area of Operations, deployment, node gain tests, long offset node tests, configuration and balancing of the equipment to specifications and commencement of recording of data according to specifications and approved by Company Representative. Mobilization is deemed complete when the first source is completed within the Technical Specifications.

**Pursuant to Article 1.14 of the Agreement, the Parties agree to the following:**

"Demobilization" means the recovery of all equipment and completion of all activities immediately following the last record, transit to the port of Demobilization and post-survey calibrations and checks (if required) and off-loading equipment and recorded data in order to allow the completion of the Work in accordance with the requirements of this Agreement and the Order.

***Exhibit D of the Agreement shall be deleted in its entirety and replaced with the following:***

Overlaps caused by Supplier's equipment deficiencies or negligence will be to Supplier's account.

Supplier will be remunerated based on the turnkey AUR (area under receiver) square-kilometer rate.

**Turnkey Receiver Area Sq.-km Rate**

The turnkey receiver area sq-km rate shall apply for every 'area under receiver' sq km acquired in accordance with the Technical Specifications outlined in **Exhibit C— TECHNICAL SPECIFICATIONS**. Every event, including weather, fishing, and any other oil field activities, external, technical and any other downtime is accountable to Supplier, including vessel importation.

**Turnkey Standby Rate**

The turnkey standby rate, set out in SCHEDULE OF RATES AND PRICES to this Exhibit D, shall apply only to events that are the responsibility of WesternGeco, principally the delivery of required permits or authorizations, or shall apply during the period from first to last shot point when Supplier's equipment is fully operational and is able to perform the Work but is prevented from doing by any of the following events:

Standby due to:

time spent performing tasks requested by WesternGeco but outside of normal survey operations including, but not limited to:

testing requested by WesternGeco
unscheduled port calls for data drops
WesternGeco personnel changes
waiting on WesternGeco provided goods, permits or services

## SUPPORT VESSEL(S)

Supplier shall provide sufficient auxiliary vessels to perform support and guard duties, in support of the Work.

The Support Vessels as described in ANNEX A - Supplier's VESSEL, PERSONNEL AND Equipment are included within Supplier's rates, inclusive of any and all personnel, Equipment, consumables and spares including fuel.

## REIMBURSABLE COSTS

Supplier shall pass on to WesternGeco reimbursable charges for any additional equipment or services requested and agreed by WesternGeco in writing at cost plus a 5% handling fee for any third-party invoice.

For the avoidance of doubt, any costs associated with Data shipment to WesternGeco's Houston Hub Computer operations center shall be included in the rates.

Any additional reimbursable items and/or services must be requested in writing by WesternGeco and Supplier shall in turn immediately confirm in writing all such costs to WesternGeco.

**TABLE 1: SCHEDULE OF RATES AND PRICES**

This Schedule of Rates is US $ Dollars and includes **all** taxes and duties.

**OBN SURVEY**

| | |
|---|---|
| 1 | Service:  Engagement 2 Sparse OBN (1200m x 1200m spaced nodes), 1 x Node (2x ROV) vessel with 2x source vessels each with triple source, 100 m apart.  Src grid 50 m inline by 100 m x-line. 18 Km Source Halo. 30 Km min/max offset. |

| Location: Green Canyon, GOM, USA |
|---|

| Bidder's Name: Magseis Fairfield |
|---|
| Survey Vessel(s): REM Saltire, Artemis Odyssey, Artemis Arctic, 7 - Oceans |

| Please provide est. date to arrive in survey area and commence deploying nodes: | |
|---|---|

| | Renumeration Option A - Full Turnkey<br>Including ALL TAXES | Payment Type | Quantity (if applicable) | Rate | Amount | Currency |
|---|---|---|---|---|---|---|
| 1 | Mobilisation | | 1 | $ 1,520,201 | $ 1,520,201 | $USD |
| 2 | Demobilisation | Lump Sum | 1 | $ 928,300 | $ 928,300 | $USD |
| 3 | Turnkey Receiver Area Square Kilometre Rate | Receiver Area Square Kilometre | 3,724 | $ 11,248 | $ 41,932,544 | $USD |
| | Stand-by Rate (chargeable) | Per Day | -0.0 | 339,130 | | |
| 4 | Total Est. Acquisition Cost | | | | $ 44,381,045 | $USD |
| 5 | Estimated Survey duration from Commencement of first node being deployed to the last node being retrieved. | | | | 135 | Days |

30



*__The above estimate includes 5% for weather downtime and can be a variable when calculating the overall project timeline.__*

**COVID Cost estimate for WG Green Canyon**

| Personnel Provider | No. On-signers | Labor and T&E Total cost /day | No. Days Quarantine | Total COVID Cost / crew change | No. Crew Changes | Total Project COVID Cost |
|---|---|---|---|---|---|---|
| MSFF, Seismic Contractors (Atlas, Nautech, CSS, RMI), REM Saltire, Artemis Odyssey , Artemis Arctic, Oceaneering and Navigation | 132 | $ 90,200 | **4** | $ 360,800 | 4 | $ 1,443,200 |

Upon the request of WesternGeco, Supplier will provide documentation of a COVID-19 quarantine per person per day rate, as evidence of the extra activities undertaken by Supplier during Project start up, subsequent crew changes and any other such appropriate events, during these COVID-19 period.

.

**ANNEX A – Supplier's Vessel, Personnel and Equipment**

| Supplier Name | See attached spec sheets. |
|---|---|
| Supplier Representatives (Name, contacts) | |
| Vessel Crew Model (Maritime)* | |
| Vessel Crew Model (Seismic)* | |
| Vessel Crew Rotation | |

Seismic Specifications

| Vessel Type | Quantity | Comments |
|---|---|---|
| Seismic Source | Arctic/Odyssey | See attached Spec sheets |
| Seismic Node Handler | Saltire | See attached Spec sheets |
| Chase/Guard | 7 Oceans | See attached Spec sheets |

| Item | Quantity | Comments |
|---|---|---|
| ZXPLR Nodes | 3,000 | |
| Tape Drives (3592) | | |
| Node Handling Systems | 2x ROV | |
| | | |
| **OBN Source System** | | |
| RGPS System | 4DX | |
| Airguns | 5200ci | |
| Compressors | | |
| Barrovanes | C680/4000 | |
| Airgun Umbilicals | 550m | 6 Active and 1 Spare per vessel. |
| Source Controller | Smart Source | Teledyne Smart Source |
| | | |
| **Navigation System** | | |
| INS System | | |
| | | |
| USBL (Node Vessel) | | |
| Gyro Compass | iXblue    Octans Gyro/MRU | |
| GNSS Systems (Primary) | Veripos LD5 GPS system | |
| GNSS Systems (Secondary) | Veripos LD5 GPS system | |
| Sound velocity probe | Valeport SVX2 | |
| | | |
| **Navigation and QC systems** | | |
| (To be provided by Supplier) | 4DNav | |

**Supplier Key Personnel**

Minimum seismic personnel:

| | Onshore | Source Vessels | | Node Vessels |
|---|---|---|---|---|
| | | Vessel S1 | Vessel S2 | Vessel N1 |
| Operations Manager* | 1 | | | |
| Project Manager* | 1 | | | |
| HSE Advisor | 1 | 1 | 1 | 1 |
| Fleet Coordinator/Simops* | | | | 1 |
| Party Chief | | 1 | 1 | 1 |
| Chief Geophysicist | | | | |
| Geophysicist – OBP | 1 | | | 3 |
| Node Field Service Tech | 1 | | | |
| Chief Technician | | | | 1 |
| Shift Leader Technician | | | | 2 |
| Operator Node Technician | | | | 2 |
| Node Back Deck Mechanic | | | | 2 |
| Node Technician | | | | 2 |
| Chief Navigator | | 1 | 1 | 1 |
| Shift Leader  Navigator | | 2 | 2 | 2 |
| Navigator | | 2 | 2 | 2 |
| Senior Source Mechanic | | 1 | 1 | |
| Source Mechanic | | 4 | 4 | |
| **Total** | 5 | 12 | 12 | 20 |
| | | | | |

* Denotes Senior Supervisory Personnel

**Company Key Personnel**

| | Onshore | Source Vessels | | Node Vessel |
| --- | --- | --- | --- | --- |
| | | Vessel S1 | Vessel S2 | Vessel N1 |
| WG Operations Manager* | 1 | | | |
| WG MC Project Manager* | 1 | | | |
| Lead QC* | | | | 1 |
| Lead HSE Advisor | | | | 1 |
| QC / HSE advisor | | 1 | 1 | |
| PSO | | 3 | 3 | |
| PAM Operator ## | | 4 (3) | 4 (3) | |

\* Denotes Senior Supervisory Personnel
\#\# Denotes 3 of the PAM's may perform their duties onshore due to satellite communications.


The above table represents an indicative position; but changes may be made if agreed between WG & Supplier senior personnel.





# VESSEL SPECIFICATION

# REM SALTIRE



REM SALTIRE

## CONTACT DETAILS (NUMBERS ETC)

| | |
|---|---|
| Call sign | 5BYV4 |
| IMO Number | 9377016 |
| V-Sat | +47 23 67 62 47 |
| V-Sat | +47 23 67 62 49 |
| V-Sat | +47 22 40 64 42 |
| Sat-C | 4 209 254 15 |
| Client phone 1 | +47 23 67 77 06 |
| E-mail Master | captain@saltire.remoffshore.no |
| E-mail C/O | choff@saltire.remoffshore.no |
| E-mail Bridge | bridge@saltire.remoffshore.no |
| E-mail C/E | chiefeng@saltire.remoffshore.no |
| E-mail C/S | steward@saltire.remoffshore.no |

## VESSEL MAIN PARTICULARS

| | |
|---|---|
| Vessel design | SkipsTeknisk ST-327-L |
| Vessel name | Rem Saltire |
| Manager (DOC holder) | Rem Maritime AS, Mjølstadnesveien 24, 6092 Fosnavåg, Norway. |
| Owner | E. Forland AS |
| Vessel type | Multi-Purpose Offshore Vessel (MPOV) |
| Class definition | DNV A1 ICE-C SF COMF-V(3)C(3) HELDK-SH, E0 DYNPOS-AUTR CLEAN DK(+) TMON |
| Vessel built/ Delivered | 25. June 2008 |
| Yard | Bergen Yards BMV AS / Stocznia Gdansk S.A. |
| Yard no | 161 |
| Port of registry | Limassol |
| Flag state | Cyprus |
| Safe manning | 13 |
| Next dry docking | Q2/2023 |

## PRINCIPAL DIMENSIONS

| | |
|---|---|
| LPP - Length betw. PerPendiculars (m) | 100,2 m |
| Breadth mld (m) | 24,0 m |

| | |
|---|---|
| Depth mld to main deck | 9,6 m |
| Min. draft | 4,145 m (lightship) |
| Summer draft | 7,5 m (max) |
| Air draft - Water line to vessel top-point (m) | 38,4 at 6,0 m draught |
| Deadweight (DWT) | 6 687 T |
| Lightship | 5 832,9 T |
| Gross tonnage (GT) | 9 603 T |
| Net tonnage (NT) | 2 881 T |

## PERFORMANCE (VESSEL SPEED - FAIR WEATHER)

| | |
|---|---|
| Max speed (Sea trials) | 16 knots |
| Full (Service) speed | 14 knots |
| Economical speed | 12 knots |

## PROPULSION / MAIN ENGINES

| | |
|---|---|
| Diesel engine output (each unit & total) | 4x 3 937 kW. Total 15 748 kW |
| Generator output (each unit & total) | 4x Marelli generators 16 800 kVA, 60 Hz |
| Propeller (no. & diameter) | 2x C/P. Diameter 4,2 m. |
| Drive type (shaft or diesel-electric) | 2x diesel-electric 4 200 kW each. Total  8 400 kW |
| Fuel type (MGO/HFO/Others) | MDO |

## THRUSTERS / PROPELLERS (NO. & TYPE)

| | |
|---|---|
| Bow thruster | 2x 2 000 kW Brunvoll tunnel variable pitch |
| Azimuth thruster | 1x 1 400 kW Brunvoll retractable azimuth |
| Stem thrusters | 2x 1 400 kW Brunvoll tunnel Variable pitch |

## GENERATORS (MAIN & AUX/ EM)

| | |
|---|---|
| Main generators (no. & type) | 4x Marelli generators |
| EM generator (no. & type) | 1x Mitsubishi/Stamford, 685 kVA |
| EM generator (no. & capacity) | 1x 595 kW, 690V 60 Hz |

## FUEL CONSUMPTION IN FAIR WEATHER (M3/DAY)

| | |
|---|---|
| Transit - Full (Service) speed | 25 m3/d |
| Transit - Economic speed | 19,0 m3/d |
| DP/ Maneuvering - Average conditions (weather & sea state dependent) | 10,0-15,0 m3/d |

| | |
|---|---|
| Port stay | 4,0 m3/d |

## CARGO DECK DIMENSIONS AND CAPACITIES

| | |
|---|---|
| Deck space | 1000 m2 |
| Usable deck space | 960 m2 available timbered |
| Deck space (wooden) | 960 m2 |
| Deck lenght | Total 46,8 m. Timbered 46,1 m. |
| Deck breadth | Total 24 m. Timbered 23,1 m. |
| Deck strength | 10 T/m2 |
| Deck cargo capacity (tonnes) | Max 2 260 T in max in-depth condition |
| Removeable cargo rail (placing & length) | 6 sections, stb, port and aft. |

## AVAILABLE POWER SUPPLY ON DECK

| | |
|---|---|
| Air outlets (no. & locations) | 2x 1/2" couplings at ROV hangar and by crane pedestal. |
| ROV power outlets (no. & type) | 2 x 440V, from transformer T21 & T22 |
| ROV power outlet capacity (V & amps) | 440V, 400kVA, 500A |
| Deck Utility / Electrical switchboard (type & capacity) | 440V/220V/110V |

## TANK CAPACITIES (OVERVIEW)

| | |
|---|---|
| Fuel oil (m3) | 2 680.6 m3 |
| Ballast water (m3) | 2 318 m3 |
| Lube oil (m3) | 166,7 m3 |
| Fresh (potable) water (m3) | 696 m3 |
| Hydraulic oil (m3) | 26,8 m3 |
| Waste oil holding tank (m3) | 13 m3 |
| Bilge - Oily bilge water (m3) | 32 m3 |
| Special products | Sewage treatment 18.5 m3/day |
| Sludge - Oil residue (m3) | 32 m3 |

## FW SYSTEM (POTABLE WATER)

| | |
|---|---|
| FW tanks (no. & capacity) | 6 Tk, Total 696 m3 |
| FW pumps (no. type & capacity) | 2x 6,2 m3/h |

## FUEL OIL SYSTEM

| | |
|---|---|
| FO tank (no. & capacity) | 22 Tk. Total 2 680.6 m3 |

| FO pump (no. type & capacity) | 2x Screw pump, 49,7 m3/h |

## SLUDGE TANKS DESCRIPTION

| Number of sludge tanks | 1, 401 PS |
| Number of sludge tanks | Sludge tk 401 PS  max cap 31,5 m3 |
| Sludge Pump (no. & capacity) | Diaphragm pump HUSKY 2150 Max fluid working pressure 8 Bar Air operating range 1,4-8 Bar Max free-flow delivery 568 l/min |

## ROLL REDUCTION SYSTEM

| Roll reduction system (no. & type) | Passive |
| Roll reduction system (no. & type) | 1 |

## ANTI HEELING SYSTEM

| Anti heeling system - Tank (no. & capacity) | 2 x 251.3 m3. Tank 710PS & 710SB |
| Anti heeling system - Pump (no. & capacity) | 1 x 1 900 m3/h |

## FW PRODUCTION - POTABLE WATER (EVAPORATOR)

| Evaporator (no. & type) | 2 x Alfa Laval |
| Evaporator capacity | 2 x 15 m3 / 24h |

## INCINERATOR DESCRIPTION

| Incinerator type | Kai Lindegård SH-20-SM/SR |

## TUGGER / CAPSTAN

| Capstan type | C-8 |
| Capstan capacity | Pull 80 kN |
| Capstan hoisting speed | Quick |

## WINDLASS / ANCHOR WINCH

| Type | Hydraulic |
| Anchor type | Type M Short Version 2x 5 610 kg |
| Anchor chain stb (length & diameter) | 1 x 324m, 1x 297m Ø54mm K3 |
| Anchor chain port (length & diameter) | 1 x 324m, 1x 297m Ø54mm K3 |

## RIG CHAIN LOCKERS

| Chain lockers numbers & m3 | 2 x 10 m3 |

| | |
|---|---|
| Capacity 76mm chain | N/A |
| Capacity 84mm chain | N/A |
| Capacity 110mm chain | N/A |

## DYNAMIC POSITION (DP) SYSTEM

| | |
|---|---|
| DP Class definition | DYNPOS-AUTR, DP2 |
| DP Class definition | Kongsberg K-pos DP 22, DP 2 |
| DGPS - Differential Global Satellite Positioning (no. & type) | DGNSS 1: Seatex, DPS i4, DGNSS 2: Seatex, DPS i4, DGNSS 3: Seatex, Seapath 380- R2, |
| Diff correction | AHRS (MGC) |
| HPR - Hydroacoustic position reference (no. & type) | 2x Seatex, HIPAP 501 |
| HPR - Hydroacoustic position reference (no. & type) | 1x Client HIPAP Pole |
| Fan beam (laser) | 1 x MDL Mk 4 fanbeam |
| Taut wire | N/A |
| Transponders | 4 pcs |
| Original FMEA | 23.03.2018 by Boatlabs |
| ERN - Environmental Regularity No (Open/ Closed bus) | 99,99,99,68 |

## JOYSTICK

| | |
|---|---|
| Type | Konsberg joystick system |
| Connections points (no. & location) | Aft, stb and port bridgewing |

## NAVIGATION EQUIPMENT (NO. & TYPE)

| | |
|---|---|
| X-band Radar | 1 x Furuno FAR 2827 |
| S-band Radar | 1 x Furuno FAR 2837S |
| Electronic chart system | 2 x Furuno Techdis T-2136 |
| Autopilot | 1 x Robertson AP9 Mk3 |
| GPS | 2 x Furuno GP 150 |
| Echosounder | 1 x Simrad Echo Sounder |
| Std Compass | 1 x Magnetic Compass Nor T17 |
| Gyro compass | 3 x SG Brown Meridian Surveyor |
| Wind gauge | 2 x Gill Ultrasonic |
| Speed log (no. & type) | 1 x 2 axis Furuno DS 80, Doppler log |
| AIS - Automatic Identification System (no. & type) | 1x Furuno FA-150 |

## COMMUNICATION EQUIPMENT (NO. & TYPE)

| | |
|---|---|
| MF/HF - Medium / High frequency (no. & type) | 1 x Furuno FS 2570 |
| MF/HF DSC | 1 x Furuno FS 2570 |
| VHF - Very High Frequency (no. & type) | 2 x Furuno VHF, 4 x Sailor VHF |
| VHD DSC | 2 x Furuno VHF DSC |
| EPIRB - Emergency Position Indicating RadioBeacon (no. & type) | 1 x Jotron 40S, 1 x Jotron 60S |
| Inmarsat C (no. & type) | 2 x Furuno Felcom 15 |
| Portable VHF | 3 x Jotron TR 20, 2 x Motorola GP 340 |
| Portable UHF - Ultra High Frequency (no. & type) | 10 x Motorola GP 40 |
| Helicopter radio | 1 x Jotron TR710D 3 x Dittel FSG 5 |

## ACCOMMODATION CAPACITIES

| | |
|---|---|
| Total number of bunks | 105 pers in 68 cabins + hospital, 77 beds for charterers |
| Crew single cabins | 37 |
| Crew double cabins | 34 |
| Mess room / Recreation rooms | 3x (1 mess room & 2 lounges) |
| Lounges (no. & description) | 2 |
| Gymnasium (no. & description) | 1x spinning, sauna, stretch & weight area |
| Hospital (no. & description) | 1 medical treatment room & bathroom at 6 deck |
| Offices (no. & description) | 10 at several decks |
| Conference rooms (no. & description) | 1 at 5 deck |
| Auditorium | 1x auditorium / cinema - 54 seats |

## GALLEY (FOOD STORAGE SPACES)

| | |
|---|---|
| Freezer (no, space in m3 & temperature) | 2, one fish & one meat at -30C |
| Cooler (no, space in m3 & temperature) | 2, vegetables +8C, dairy +4C on 4th deck |
| Dry provision room (no & space in m3) | 1x dry provision at 4th deck |

## LIFE-SAVING APPLIANCE (LSA)

| | |
|---|---|
| MOB boat (no. type & capacity) | Monohull waterjet 170 kW. 15 persons |
| Lifeboat (no. type & capacity) | Eide Monohull, 105 pax |
| Liferafts (no. type & capacity) | 6 x 35 pax Viking Float-free |

| Lifejackets (no. & type) | 110x seamaster, adult and child |
|---|---|
| Survival suits (no. & type) | 109x Helly Hansen Nordic N6 |
| MOB-boat suits (no. & type) | 6x Helly Hansen |

## FIRE-FIGHTING (FIFI) INSTALLATION

| Type | Flexifog & CO2 |
|---|---|
| Fire Fighting class | SOLAS |
| FIFI Capacity | 2360 L/min |
| Throw height / length | 22 m |
| Monitor count | 2 x monitors at helideck |
| Foam system Capacity | 1000 - 1200 L |

## MOONPOOL DESCRIPTIONS

| Moonpool 1 (dimension, location & type) | 7,2m x 7,2m = 14 m2 aft of the ROV hangar area |
|---|---|

## HELICOPTER DECK DESCRIPTION

| Helicopter deck -Type / Location | 22,2 m, 12,8 T |
|---|---|
| Helicopter deck - Approvals | DNV / CAA |
| Helicopter deck - Capacity in tonnes | 12,8 T |
| Diameter (D-value) | 22.2m |
| Dimensioned for helicopter type | Sikorsky S61 / S92 |

## ROV EQUIPMENT

| ROV hangar | 1x hangar with ROV doors S&P sides for launch |
|---|---|
| Size of ROV hangar (m2) | 288 m2, including ROV store and ROV workshop |
| ROV (no. & type) | 2x Fugro FCV3000 150HP |
| ROV systems (no. & type) | 1x AHC LARS |

## SHIP CRANES (EXCEPT OFFSHORE CRANE) DESCRIPTION

| Port crane (capacity & type) | Provision crane on 5th deck |
|---|---|
| Provision crane (capacity & type) | 10T Hydramarin  HMC 1800 LKO 100-15 |

## OFFSHORE (MAIN) CRANE DESCRIPTION

| Offshore crane - Type (capacity & type) | Hydramarine HMC 3568 LKO 250-35 AHC |
|---|---|

| SWL - Safe Working Load | 150T at 10m, 25T at 35m radius |
| Wire (type & dimension) | Flexpack anti rotate 1960 grade |
| Wire length (main & aux) | 3 042 m (August 2017) |
| Tugger winch (no. & SWL) | 2 x 4 T swl |
| SWL lift internal on deck (harbour) | 150 T |
| SWL External deck/sea (subsea lift) | 150 T |
| SWL External deck-sea Active Heave Compensation (AHC) lift | 150 T |
| Personnel crane lift capacity | 15 T |

## OFFSHORE CRANE II DESCRIPTION

| Offshore crane - Type (capacity & type) | Hydramarine hydraulic knuckleboom crane with cordless radio remote |
| Offshore crane - Type (capacity & type) | Hydramarine hydraulic knuckleboom crane with cordless radio remote |
| SWL - Safe Working Load | 10 T |
| Wire (type & dimension) | 1 960 galv Ø26 mm, 2,9 kg/m |
| Wire length (main & aux) | 1 000 m |
| SWL Lift internal on deck (harbour) | 10 T |
| SWL External deck-sea lift (subsea lift) | 10 T |
| SWL External deck-sea Active Heave Compensation (AHC) lift | 10 T |
| Personnel crane lift capacity | N/A |



"Details believed to be correct and given in good faith, but without guarantee"





# MV Artemis Arctic
## MULTIPURPOSE SEISMIC VESSEL

| | |
|---|---|
| Source vessel | 6 String dual source. |
| 2D Acquisition | 1 x 12000 meter streamer. |
| 3D Acquisition | 6-8 Streamers. |

Principal dimensions:

| | |
|---|---|
| Length | 74.40 m |
| Beam | 17.96 m |
| Max. draught | 8.49 m |



A WESTCON COMPANY

# MV Artemis Arctic



## ARTEMIS ARCTIC – SHORT OUTLINE

| | |
|---|---|
| Operation: | 20/30 |
| Owner: | Artemis Shipping AS |
| Registered: | BERGEN |
| Flag: | NIS |
| Call Sign: | LJZK3 |
| IMO Number: | 9207510 |
| Class: | DNV 1A1 HELDK TMON |
| Class Notification: | |
| DNV Number: | 20369 |
| Built: | 1999 at Myklebust Norway |

## PARTICULARS

| | |
|---|---|
| L.O.A. | 74,4m |
| Breadth: | 17,96m |
| Max mid draft: | |
| Draught, loaded: | 8,49m (max) |
| GRT: | 3947 |
| NRT: | 1188 |
| Max speed: | 12,5 |
| Economic speed: | 11,5 |

## TANK CAPACITY

| | |
|---|---|
| Fuel: | 830 m³ |
| Fuel cons.: | 25m³ |
| Lub.oil: | 65 m³ |
| Fresh water: | 122m³ |
| Sludge: | 20m³ |
| Sewage/Grey water: | 25 m³ |
| Dirty oil | 13m³ |
| Ballast Water: | 307m³ |

## MACHINERY

| | |
|---|---|
| Gearbox | Wartsila SCV85-P560 |
| Propulsion | Wartsila 9L32, 4300 kw |
| Rudder | Ulstein HLR 2330 |
| Steering gear | Ulstein Tenfjord 12M260 |
| Bow thruster | Rolls Royce 375 TV, 1020 Kw |
| | BrunvollFU-45-LTC-1375, 350 kW |
| Azimuth thruster | RollsRoyce TCNS 73/50 - 180. 1100 Kw |
| Main engine monitoring | |
| | Wartsila |
| Electrical power | 1 x Cummings 1620 kW |
| | 2 x Cummings 1290 kW |
| Emergency generator | Scania 275 kw at 1800 RPM, 450 volts |
| Clean power | 3980 kw from Generators sets / 2000 kw from Shaft generator |

## BRIDGE EQUIPEMENT

| | |
|---|---|
| DP System: | |
| Manouver stat. Bridge: | |
| Auto Pilot | Anschutz Pilotstar D |
| Differential GPS (GNSS) | |
| Radar no. 1 | Furuno S-Band FAR-2137S |
| Radar no. 2 | Furuno X-Band FR-2117 |
| Radar no. 3 | Furuno X-Band FR-2117 |
| Gyro no. 1 | Sperry Marine Navigat X MK1 |
| Gyro no. 2 | Sperry Marine Navigat X MK2 |
| VHF direction finder | |
| Wind sensor | Malling-Delf |
| Navigation echo sounder | |
| | Skipper GDS 101 |
| Electronic chart | 2X TECDIC Furuno |
| Navtex | Furuno NX-700 |

OCTOBER - 2018

## SEISMIC EQUIPMENT

| | |
|---|---|
| Compressors | 3 x LMF 51s / 138 - 207 - E50 |
| HPR | Sonardyne |
| Seismic Echo Sounder | Navisound 600 |
| Source | Sergei G Gun 1 / Bolt Gun 1900 |
| Strings | Max. 6 |
| Guns pr. string | Max. 12 |
| Press. Transd. AG | 1 per string |
| Depth Transd. AG | 2 per string |
| Near field ph. AG | One per gun position |
| Umbilicals | Seaproof Solution |
| Tow system | BARO Flex. 18" floats |
| Deflectors | BARO 8, BARO 3 |
| Source contr. Seamap | Gunlink 2000 |
| Max. channels | 256 |
| Array posit. Seamap | 4DX |
| Recording Sercel | Seal 408 |
| Channels Max. | 8000 |
| Aux. channels | 48 |
| Sample rate | 0.25 - 4 ms |
| Streamer Sercel | SSAS solid streamer |
| Sect. length | 150 m |
| Group length | 12.5 m |
| Streamer depth control | ION 5011 Digibird w/compass |
| Controller Digicourse | System -3 PCS |
| Streamer recov. | ION SRD-500S |
| Tailbuoy pos. Seamap | Buoylink EX |
| INS System | GATOR |

| | |
|---|---|
| DGPS | Fugro dual Starfix G4 and Starfix XP2 |
| Binning syst. ION | Reflex |
| Nav. porocessing ION | Sprint |

## CRANE

| | |
|---|---|
| Deck Crane: | Starboard foldable crane, Heila Gru, HLM 170-4S, SWL 3300 kg at 4,65 m range and 300 kg at 12,99 m Hidrofersa, GH 06/14, SWL: 6,3 tons Aukra Maritime, ABAS KOE60-EH-8,5/5,2-12M-6T-RF, Marking: 6T SWL 1,7m - 12m |
| FRC-Davit: | Aukra Maritime, AM-HRT-3200, Safe working load: 3200 kg |
| WB-Davit: | AM-HRT-10000 safe working load, 10 ton |

## SAFETY EQUIPMENT

| | |
|---|---|
| Lifeboat / MOB boat | 1 x FRC |
| Inflatable life rafts | 6 x Viking x 25 persons |
| | 1 x Viking x 6 persons |
| Survival suits | 56 pcs |
| Life jackets | 103 x Adult / 8 x Children |
| Life rings | 14 pcs |
| Smoke hoods | 53 pcs |
| Emergency radios | 3 x Tron TR20 |
| Emergency beacons | 1 x Tron 40S MKII |
| | 1 x Trons/GPS |
| Radar transponders | 2 x Tron SART |
| Fire detection system | ELTEK Detection System |
| Fire pumps | 2 x GS Fire Pump |
| | 1 x Emergency Fire Pump |
| | 1 x Helideck Fire Pump |
| Fire suits | 7 pairs |
| Halon systems | - |
| CO2 systems | Engine room , Emergency Generator Galley |
| Hi-Fog system | Main Engine, Aux. Engines, Boiler, Purifiers, Incinerator |
| Foam deluge systems | 1 x Helideck |

## HELI DECK

| | |
|---|---|
| Helicopter type | Super Puma Max |
| Weight | 12 800 kg |
| Length Over all | 24 mtr |

## ACCOMMODATION

| | |
|---|---|
| Maritime | 18 |
| Seismic | 29 |
| Client | 2 |



## SEISMIC VESSEL OWNER & OPERATOR

- 1 OBS Vessel (autonomous)
- 1 Multipurpose Seismic Vessel
- 1 3D Vessels
- 1 2D Vessels

Maritim Managements group of companies are owners and operators of 4 seismic vessels and 1 fishing vessel. The group of companies are privately owned by Westcon Group (www.westcon.no), a major contractor in the maritime and offshore service industry in Norway.

## FOCUSED, EFFICIENT, TRANSPARENT

Contact : Managing Director Sigurd Rekkedal
Tlph: +47 70 11 39 20
Mobile: +47 91 86 93 09
sigurd@mmanagement.no





# MV Artemis Odyssey
## MULTIPURPOSE SEISMIC VESSEL

| Principal dimensions: | Length 72,80 meters |
|---|---|
| Beam: | 16,00 meters |
| Max. Draught: | 5,70 meters |



A WESTCON COMPANY

# MV Artemis Odyssey



## GENERAL INFORMATION

| | |
|---|---|
| Name | M/V Artemis Odyssey |
| Call sign | LNUT3 |
| Flag state/ Port of registry | Norway/ Aalesund |
| Vessel type | Seismic Research Vessel |
| Class | DNV +1A1, EO, HELDK, SF, DPS(2) |
| Yard number/ Yard | No. 136/ 2005 at Søviknes Verft AS |
| Upgrade | 2019 |
| MMSI no. | 257 692 000 |
| IMO no. | IMO 9335977 |
| DNV Id. no. | 26127 |
| Max. persons on board | 45 |
| 1P cabins | 11 |
| 2P cabins | 17 |

## MAIN DIMENSIONS

| | |
|---|---|
| Length overall | 72.80 m |
| Length between pp. | 64.20 m |
| Beam mld. | 16.00 m |
| Depth mld. main deck | 6.80 m |
| Depth loaded (summer) | 5.70 m |
| Air draft (to highest antenna) | 25.2 m (from draft 5.7 m) |
| Brt. tonnage | 3 658 t. |
| Net tonnage | 1 098 t. |
| Dead-weight: | 2 300 t. |

## CAPACITIES

| | |
|---|---|
| Marine diesel oil | 1 017.0 m³ |
| Fresh water | 424.5 m³ |
| Fresh water production capacity (Osmosis + Evaporation) | 15.0 m³/ 24h |
| Ballast water | 719.1 m³ |
| Water Ballast in Mud tanks | 561.0 m³ |
| Lubrication oil | 26.8 m³ |
| Drain/Sludge tanks | 15.6 m³ |
| Stop tank | 75.0 m³ |
| Sewage holding tks. | 100.0 m³ |

## PUMPS

| | |
|---|---|
| 2 x Fuel oil transfer pump | Kral 3 spindle screw pumps KFUG 275. 20 m³ / h – 2,0 bar. |
| 2 x Ballast pump | Speck 100/250 A1 Centrifugal pump 200 m³ / h – 2,0 bar. |
| 1 x Fresh water pump | Speck 100/250 A1 Centrifugal pump 200 m³ / h – 2,0 bar. |
| 2 x Bilge/ Fire | Seepex 70-6LBN eccentric screw pump 64/ 74 m³ / h – 6/3 bar. |
| 1 x Em.Fire | Speck 32/200 A1 Centrifugal pump 27 m³ / h – 6,0 bar. |
| 1 x Heli deck fire pump | Allweiler NAM 80-200 Centrifugal |

## OILY WATER SEPARATOR

| | |
|---|---|
| 1 x 5 ppm Oily Water Sep. | Wärstilä OWS 500 |

## SEWAGE TREATMENT PLANT

| | |
|---|---|
| 1 x | JETS |

## MAIN ENGINE/ GEAR

| | |
|---|---|
| 2 x Main Engine | MaK 8M25, 2 640kW @ 750 rpm |
| 2 x Reduction gear | Rolls-Royce Marine, 750 AGC-S-KP500ND |
| 2 x Propeller | KaMeWa Ulstein CCP, Ø 3300 mm, 4 blades, 170 rpm |

## AUX./ EMERGENCY ENGINES

| | |
|---|---|
| 2 x Auxiliary Engines | Nogva Scania, DI 12 62M (10-40), 320kW @ 1800 rpm |
| 1 x Emergency Engine | Nogva Deere 4045TFM50-G, 75kW @ 1800 rpm |

JUNE - 2019

## GENERATORS

| | |
|---|---|
| 2 x Shaft Generators | Marelli, MJBM 500 M, 2100KVA, 3 x 450V, 60Hz, 1800 rpm |
| 2 x Aux. Generators | Stamford HC, M43 4E1, 375KVA, 3 x 450V, 60Hz, 1800 rpm |
| 1 x Emergency Generator | Stamford UVM 224F, 87,5KVA, 3 x 450V, 60Hz, 1800 rpm |

## THRUSTERS

| | |
|---|---|
| 2 x Bow thrusters | Rolls-Royce, TT 1650 DPN CP, 700kW |
| 1 x Stern thrusters | Rolls-Royce, TT 1650 DPN CP, 700kW |

## STEERING GEAR/ RUDDERS

| | |
|---|---|
| 2 x Steering Gear | Rolls Royce, SR 622 for FCP |
| 2 x Rudder | Rolls Royce HLR-S 1750. |

## SPEED & CONSUMPTION

| | |
|---|---|
| Maximum | Approx. 14,6 knot/ 14,5 m³/ 24h |
| Economy | Approx. 13,0 knot/ 12,3 m³/ 24h |
| In harbour | < 1m³/ 24h |

## ANCHOR/ ANCHOR CHAIN

| | |
|---|---|
| 2 x Anchor | Spek, 2460kg |
| 2 x Anchor chain | Ø 38 mm, length 467.5 m, Grade K3 |

## HYDRAULIC EQUIPMENT

| | |
|---|---|
| 1 x Windlass | Rolls-Royce Marine A/S BMG 41036, 10,5 ton |
| 2 x Rope Reels | Rolls-Royce Marine A/S, ALM2205, 5 ton @ 1st layer |
| 2 x Capstan | Rolls-Royce Marine A/S, CM1206, 6 ton |
| 1 x Deck crane | Hydralift, HMC 1400 LK 50-15, SWL 5t @ 13m |
| 1 x MOB- davit | Hydralift, HMD A 32 Mk 3, SWL 2.95 t |

## LIFE-SAVING EQUIPMENT

| | |
|---|---|
| 1 x MOB/ Rescue - boat | MP 741Springer FRC, max 10 persons, 200hp |
| 6 x Life Rafts | 6 x 25 P |
| 50 x Survival Jackets | Seamaster 1983. |

## HELI DECK

| | |
|---|---|
| Helicopter type | Super Puma AS 332L2 |
| Weight | 9300 kg |
| Lenth over all | 19.5 m |

## NAUTICAL EQUIPMENT

| | |
|---|---|
| 1 x Radar 10 cm | Furuno S-band, FAR-2137, ARPA Radar |
| 1 x Radar 3 cm | Furuno X-band, FAR-2117, True Motion Radar |
| 1 x Electronic chart system | Tel-Chart |
| 3 x Gyrocompass | Anschütz STD. 22 G/GM |
| 1 x Auto pilot | Anschütz, Pilotstar D |
| 1 x Speed Log | Furuno Doppler Speed Log, DS-80 |
| 1 x Echo Sounder | Kongsberg EA600 38/200 |
| 1 x GPS | Furuno GP-90 |
| 2 x VHF | Furuno FM-8500 VHF simplex |
| 1 x VHF | Furuno FM-2721 VHF DSC simplex |
| 4 x UHF | Motorola portable, 6 channels |
| 1 x DP/ Joystick system | Kongsberg K-POS DP-21 |

## COMMUNICATION

| | |
|---|---|
| GMDSS-A3 | Furuno |
| Transmitter/Receiver MF/HF DSC | Furuno MF/HF SSB model FS-1570 |
| Emergency Radio Beacon | Jotron, Tron 40S EPIRB |
| 2 x Radartransponder | Jotron Tron Sart |
| 1 x UHF | Motorola GP 340 |
| 4 x portable UHF | Motorola GP 340 |
| Navtex receiver | Furuno NX 5000 |
| 1 x aircraft/ ship VHF | Icom VHF AM |
| 1 x portable aircraft/ ship VHF | Icom VHF AM |

## SEISMIC EQUIPMENT

| | |
|---|---|
| Compressors | 2 x LMF 4B - 1695 CFM, 1 x LMF 36 - 1271 CFM @ 2000 psi |
| Source type | G Gun II |
| Strings | Max. 6 |
| Guns pr. string | Max. 12 |
| Press. Transd. | AG, 1 per string |
| Depth transd. | AG, 3 pr. string |
| Near field ph. | AG, 6 pr. string |
| Umbilicals. | Seaproof Solution |
| Deflector. | BARO B |
| Source contr. | Seamap Gunlink 2k |
| Array posit. | Seamap Buoylink 4DX |
| INS System | ION Orca |
| GNSS | Fugro - dual STARFIX G4 and STARFIX XP2 |

## SHORE BASED MANAGEMENT STRUCTURE

| | |
|---|---|
| Owner | Maritim Research I AS |
| Management | Maritim Management AS |



## SEISMIC VESSEL OWNER & OPERATOR

Maritim Managements group of companies are owners and operators of
5 seismic vessels and 1 fishing vessel. The group of companies are privately
owned by Westcon Group [www.westcon.no], a major contractor in the maritime
and offshore service industry in Norway.

## FOCUSED, EFFICIENT, TRANSPARENT

Contact : Managing Director Sigurd Rekkedal
Tel:+47 70 11 39 20
Mobile: +47 91 86 93 09
sigurd@mmanagement.no



MARITIM MANAGEMENT AS · KEISER WILHELMS GATE 23, 6003 ÅLESUND · MARITIM-MANAGEMENT.NO · A WESTCON COMPANY



## Specifications
## Seismic Research Support Vessel
## "7-Oceans"



**Year of construction:** 2013
**Vessel Name:** 7-Oceans
**Owner:** Rederij Groen II BV
**Flag:** Panama
**IMO Number:** 9714173
**Call Sign:** HP 4534
**Class:** Lloyds Register, IACS
**Notation :** Q 100A1, Ice Class 1$^E$
                        UMS, LMC

**Dimensions:**
Lenght OA          : 35,00 Mtrs.
Lenght PP          : 29,10 Mtrs
Beam               : 8,70 Mtrs.
Draught            : 3.20 Mtrs.
Depth              : 4.25 Mtrs.
Design Speed       : 12 kts.
Gross Tonnage      : 338 Grt
Bollard Pull       : 15 Ton

**Generators:**
Caterpillar        : 3x C18 TA SCAC
                   : 465Kva@1800Rpm
                   : Insight monitoring

**Propulsion system:**
Propellers         : 2x Thruster 600 Bhp
Bow thruster       : 1x Veth VT-80 90 kW

**Anchor(s):**
Anchor             : 2x HHP 675 kg
Chain              : 357.5 mtr x 26 mm dia.

**Cranes:**
Deck Crane         : 1x 2t @ 10.5 Mtrs.

**Safety Equipment:**
Liferafts          : 4x 16 persons (SOLAS)
Fifi               : 2x General service pump
                     25 m³/h
                   : 1x Portable emergency fire
pump

**Communication Equipment:**
GMDSS A4           : 1x Sailor-6222
VHF Radio          : 1x Sailor-6222
                   : 1x Sailor-6248
Portable VHF       : 5x Jotron TR 20
Immarsat Sat-C     : 1x Sailor-6110
AIS                : 1x Furuno FA-150
EPIRB              : 1x Jotron Tron-40S MKII
Iridium            : Pilot open port
V-Sat              : Sailor 900 Hu-Band

**Navigation Equipment:**
Radar              : 2x Furuno FAR 2117
Mag. Compass       : 1x Cassens & Plath
Sat Compass        : 1x Furuno SC50
Auto Pilot         : 1x Simrad AP80
GPS Navigation     : 1x Furuno GP-150
                     1x Furuno GP-33
Echo Sounder       : 1x Furuno FE 700
Navtex             : 1x Furuno NX700B
Electronic Charts  : 1x Maris Dual Ecdis 900
Gyro Compass       : 1x Anschütz BST 2233

**Bunker/Towing/Storage capacity:**
Fuel Oil           : 150 m³
Fuel Transfer      : 4" TODO
Fresh Water        : 50 m³
F. W. Maker        : 5.3 m³/day

**Storage capacity:**
Cool Store         : 4,3 m³
Freeze Store       : 4,3 m³
Clear Deck         : 103.3 m²

**Accommodation (fully air conditioned):**
Total Capacity     : 16

**Special Features:**
Towing Hook        : 1x Mampeay 18/25 t
Bollard Pull Test  : 15 Ton



oceaneering.com

# Millennium® Plus

## Heavy work class ROV

The **Millennium®** Plus ROV is a side entry cage deployed, dual manipulator 220 hp heavy work class ROV.  The cage or Tether Management System (TMS) supplies an additional 110 hp and is capable of powering skids, and has thruster control and auto heading.



## FEATURES

**Fly-by-wire station keeping system**

**10,000 fsw / 3,000 msw depth rating (13,000 fsw / 4,000 msw optional)**

**220 hp**

Connecting What's Needed with What's Next™

## Specifications

| Vehicle Specifications | |
| --- | --- |
| Weight in air | 8,800 lb / 4,000 kg |
| Dimensions (LxWxH) | 10.8 x 5.5 x 6.3 ft / 3.3 x 1.7 x 1.9 m |
| Depth rating | 10,000 ft / 3,000 m (standard)<br>13,000 ft / 4,000 m (optional) |

| Vehicle Power and Performance | |
| --- | --- |
| Hydraulic power units | 2 x 110 hp(E) |
| Propulsion | 4 x vectored horizontal<br>4 X vertical |
| Thrust<br>Forward/reverse:<br>Lateral:<br>Vertical: | <br>2,000 lb / 900 kg<br>2,000 lb / 900 kg<br>2,080 lb / 950 kg |

| Vehicle Manipulators and Tooling | |
| --- | --- |
| Manipulators (2) | 5 or 7 function: rate, SC, or hybrid control |
| Hydraulic Tool Control | Multiple directional control valves with proportional pressure and flow control<br>Maximum 40 gal/min |

| Vehicle Cameras and Lighting | |
| --- | --- |
| Cameras | Standard definition (SD)<br>High definition (HD)<br>3D HD (optional) |
| Lighting | Up to 8 x 250 W (quartz halogen or high-intensity LED) |

| Vehicle Control and Navigation | |
| --- | --- |
| Automatic control | Fly-by-wire station keeping system<br>Auto heading/depth/altitude/pitch<br>Cruise control |
| Heading and altitude sensors | Survey-grade gyro<br>Backup flux gate compass |
| Depth sensor | High-resolution digiquartz<br>Backup analog depth sensor |
| Navigation sensor | Doppler velocity log |
| Obstacle avoidance sonar | Kongsberg 1071 or 1171<br>Tritech SeaKing |

| Vehicle Optional Power and Data Interfaces | |
| --- | --- |
| Data links | Multiple RS232 and RS485<br>Ethernet<br>Optical fiber |
| Power | 24 V DC and 110 V AC |

| Tether Management System (TMS) | |
| --- | --- |
| Type | Side entry cage or top-hat |
| Propulsion | 2 x horizontal (cage only) |
| Hydraulic power unit | 1 x 110 hp(E) |
| Electro-optical tether | 2,000 ft / 600 m (cage)<br>4,000 ft / 1,200 m (cage) optional<br>1,300 ft / 400 m (top-hat) |
| Cameras | 2 x charge-coupled device (CCD) |
| Lighting | 2 x 250 W (quartz halogen or high-intensity LED) |

| Launch and Recovery Systems (LARS) (choice of) |
| --- |
| Overboarding |
| A-frame w/ or w/o docking head |
| Heavy-weather overboarding system |
| Cursor |
| Winch |
| Heavy lift winch with conventional or OHRA level wind |

© 2017 Oceaneering International, Inc. All rights reserved.

oceaneering.com

OCEANEERING®

# EXHIBIT C



WesternGeco L.L.C.
10001 Richmond Avenue
Houston, Texas 77042
www.westerngeco.com

March 31st, 2022

Magseis FF L.L.C.
Attn: Simon Hayter
9811 Katy Freeway, Suite 1100
Houston, 77252
Email: simon.hayter@magseisfairfield.com

**RE: Letter Agreement between WesternGeco L.L.C. ("_WesternGeco_") and Magseis FF L.L.C. ("_MSFF_") for Engagement 2 WG MC 3D OBN ("_Engagement 2_") Additional (Unowed) Compensation to MSFF by WesternGeco and Commitment by MSFF to WesternGeco for Future Gulf of Mexico ("_GoM_") Ocean Bottom Node ("_OBN_") geophysical acquisition services (this "_Agreement_").**

On 13th, April 2021, WesternGeco executed a Service Order with MSFF to acquire the Engagement 2 seismic data survey in the United States GoM (the "_Service Order_"). As of 31st March 2022 (the "_Effective Date_"), MSFF requests, and WesternGeco agrees to make a one (1) time only payment of, USD $4,000,000.00 in additional (unowed) compensation to MSFF to cover MSFF cost overruns from Engagement 2 acquisition. In exchange for the aforementioned payment (which WesternGeco is not obligated to pay under the Service Order), MSFF agrees to the following with respect to future Sparse Node OBN surveys in the GoM utilizing ZXPLR nodes. The aforementioned payment is all-inclusive. No other payments, amounts or sums are due, owed or payable by WesternGeco.

<u>**Terms, Conditions and Services**</u>

1.  As of the Effective Date, MSFF has a deep water OBN crew utilizing ZXPLR nodes and two (2) triple source vessels available for WesternGeco in the August/September 2022 timeframe. MSFF is not in receipt of any tenders/expressions of interest/LOI's/LOA's/agreements /etc. for the same time slot.

2.  Based upon the 104 day survey rates (exclusive of weather standby, simops, sea/loop currents) quoted by MSFF to WesternGeco in February 2022, MSFF will provide WesternGeco with the following rates for the next pending WesternGeco OBN sparse node survey, notionally called Engagement 3 ("_Engagement 3_"):

    | | | |
    |---|---|---|
    | a. | Mobilisation fee: | N/A (waived for Engagement 3) |
    | b. | Demobilisation fee: | N/A (waived for Engagement 3) |
    | c. | Operational Day Rate: | USD 456,275 |
    | d. | Standby Day Rate: | USD 433,462 |
    | e. | Support vessel Day Rate: | USD 9,677 |
    | f. | Fuel price reference: | USD 2.95 / gallon (or $780 / m3) |

    The above quoted rates for Engagement 3 are firm and fixed, and not subject to adjustment (except as provided in Article 3 below). These rates apply to Engagement 3, to the extent commenced on or before December 31, 2023. MSFF shall not unreasonably delay commencement of Engagement 3 to obtain revised and/or other pricing.

    Source configuration and technical specifications for Engagement 3 will be mutually agreed and verified by both parties, prior to commencement.

3.  Should the estimated survey duration for Engagement 3 deviate by more than +/- five (5) days from 104 days, rates may be adjusted by MSFF in a reasonable manner and with the written agreement of WesternGeco, to account for such change of duration. The parties shall execute a mutually agreed service order (issued pursuant to the existing Global Agreement for Purchase of Services, dated April 7, 2021, between EasternEcho DMCC, an affiliate of WesternGeco, and Magseis Fairfield ASA, an affiliate of MSFF (the "_Master Service Agreement_"), to the extent possible), which shall include mutually agreed provisions for weather standby and fuel price escalation, prior to commencement.



4. For the following WesternGeco sparse OBN survey in the GoM, notionally called Engagement 4 ("*Engagement 4*") using the same crew and acquisition configuration, the following rates will apply:

   a. Mobilisation fee:          USD 3,046,978
   b. Demobilisation fee:        USD 2,273,931
   c. Operational Day Rate:      USD 474,166
   d. Standby Day Rate:          USD 450,458
   e. Support vessel Day Rate:   USD 9,677
   f. Fuel price reference:      USD 2.95 / gallon (or $780 / m3)

   The above quoted rates for Engagement 4 are firm and fixed, and not subject to adjustment (except as provided in Article 5 below). These rates apply to Engagement 4, to the extent it commences on or before December 31, 2023. MSFF shall not unreasonably delay commencement of future surveys to obtain revised and/or other pricing.

   Source configuration and technical specifications for Engagement 4 will be mutually agreed and verified by both parties, prior to commencement.

5. Should the estimated survey duration for Engagement 4 deviate by more than +/- five (5) days from 104 days, rates may be adjusted by MSFF in a reasonable manner and with the written agreement of WesternGeco, to account for such change of duration. The parties shall execute a mutually agreed service order (issued pursuant to the Master Service Agreement), which shall include mutually agreed provisions for weather standby and fuel price escalation, prior to commencement.

6. MSFF will provide WesternGeco with details of MSFF GoM crew availability and crew schedule on a weekly basis and additionally through meetings as required by WesternGeco. Without providing customer and/or project names (to protect client confidentiality), MSFF will within twenty-four (24) hours after executing this Agreement, inform WesternGeco of any tenders/expressions of interest expected and/or received, and any offers made and/or proposed prior to the Effective Date that could impact MSFF GoM crew availability. MSFF shall provide WesternGeco with timelines and other relevant information, including, but not limited to, estimated contract award date, scheduling and any changes thereto.

7. MSFF will notify WesternGeco within twenty-four (24) hours of MSFF's receipt and/or submission of any new and/or subsequent tenders/expressions of interest/LOI's/LOA's/agreements/etc. that might impact MSFF GoM crew availability. Without providing customer and/or project names (to protect client confidentiality), MSFF shall provide WesternGeco with timelines and other relevant information, including, but not limited to, estimated contract award date, scheduling and any changes thereto.

8. Upon receipt by WesternGeco of a notification from MSFF under Article 6 or Article 7 above, WesternGeco shall have ten (10) business days to execute a written agreement with MSFF and WesternGeco will secure the availability of the MSFF crew from the very next day that crew completes demobilising from its prior project. Should MSFF not be able to grant WesternGeco these ten (10) business days due to the terms of any existing and/or future tenders received by, or offers made or received by MSFF prior to or after the Effective Date, MSFF will, within twenty four (24) hours after receipt of such tenders and/or offers, provide WesternGeco with the tender and/or offer acceptance timeline and WesternGeco may formally execute a written agreement with MSFF in connection with that timeline, and by doing so WesternGeco will secure the availability of the MSFF crew from the very next day that crew completes demobilising from its prior project. To allow MSFF to respond to tenders and/or offers where WesternGeco elects not to move forward with a survey window, WesternGeco will not unreasonably withhold or delay its response to MSFF.

9. In the event that WesternGeco cannot commit to a notification provided by MSFF, all articles in the section headed Terms, Conditions and Services (excluding, for the avoidance of doubt, Article 10) of this Agreement will continue to apply until the time a service order is executed for both Engagement 3 and Engagement 4. For the avoidance of doubt, this Letter Agreement is not a promise, commitment, guarantee or assurance that MSFF will be engaged by WesternGeco to conduct Engagement 3 and/or Engagement 4.



10. Upon WesternGeco's receipt of MSFF's invoice by no later than April 14th, 2022, WesternGeco shall make payment to MSFF of USD $4,000,000.00 by April 30th, 2022.

11. This Agreement will commence on the Effective Date and remain in effect until December 31st, 2023 (the "*Term*").

12. This Agreement shall be governed, interpreted and enforced according to the laws of the state of Texas, without regard to conflict of law provisions that would require application of the substantive laws of another jurisdiction. Any claim to interpret or enforce this Agreement must be brought, solely and exclusively, before the state or federal courts in Fort Bend County, Texas and can only be tried by bench trial. Each party on a fully informed and knowing basis, waives all rights to a jury trial. The prevailing party in an action to enforce this Agreement will be entitled to recover its reasonable experts', attorneys' and collection agency fees and all court costs, fees and expenses.

13. This Agreement was jointly drafted by the parties. Rules of construction that interpret ambiguity against a party because of its participation in drafting are disregarded and will not apply.

14. This Agreement will expire if not accepted in the form of a duly executed copy returned to the undersigned WesternGeco representative by **5:00 PM CDT on Wednesday, April 6, 2022**. This Agreement may be rescinded by WesternGeco at any time prior to execution by both parties.

**For: Magseis FF L.L.C.**

Tom Scoulios
Chief Operating Officer
March 31, 2022

**For: WesternGeco L.L.C.**

Will Gowans
Vice President
March 31, 2022

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Candace Ourso on behalf of Candace  Ourso
Bar No. 24008952
candace.ourso@kennedyslaw.com
Envelope ID: 67997591
Status as of 9/7/2022 11:40 AM CST

Associated Case Party: WesternGeco, L.L.C.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jim Nye | | jnye@winston.com | 9/6/2022 5:39:28 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Candace Ourso on behalf of Candace  Ourso
Bar No. 24008952
candace.ourso@kennedyslaw.com
Envelope ID: 67997591
Status as of 9/7/2022 11:40 AM CST

Associated Case Party: Magseis FF LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Callie Elizabeth Murphy | 24041546 | callie.murphy@kennedyslaw.com | 9/6/2022 5:39:28 PM | SENT |
| Candace A. Ourso | 24008952 | Candace.Ourso@kennedyslaw.com | 9/6/2022 5:39:28 PM | SENT |
| Maria Rangel | | Maria.Rangel@kennedyslaw.com | 9/6/2022 5:39:28 PM | SENT |
| Doug Wheat | | Doug.Wheat@kennedyslaw.com | 9/6/2022 5:39:28 PM | SENT |
| Cortney Kaighen | | Cortney.Kaighen@kennedyslaw.com | 9/6/2022 5:39:28 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Candace Ourso on behalf of Candace  Ourso
Bar No. 24008952
candace.ourso@kennedyslaw.com
Envelope ID: 67997591
Status as of 9/7/2022 11:40 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| James Nye | 24056055 | jnye@winston.com | 9/6/2022 5:39:28 PM | SENT |
| Nita Moore | | nimoore@winston.com | 9/6/2022 5:39:28 PM | SENT |