United States District Court
Southern District of Texas
**ENTERED**
February 27, 2025
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

WESTERNGECO, L.L.C.,           §
                               §
          Plaintiff,           §
                               §
v.                             §   CIVIL ACTION NO. H-22-3080
                               §
MAGSEIS FF LLC,                §
                               §
          Defendant.           §

## MEMORANDUM OPINION AND ORDER

WesternGeco, L.L.C. ("WesternGeco") brought this breach-of-contract action against Magseis FF LLC ("Magseis").[1]  Pending before the court are Magseis FF LLC's Renewed Motion to Compel Foreign Arbitration and Dismiss Lawsuit ("Magseis's Renewed Motion to Compel") (Docket Entry No. 42) and Plaintiff WesternGeco L.L.C.'s Amended Motion for Preliminary Injunction ("WesternGeco's Amended Motion for Preliminary Injunction") (Docket Entry No. 44). The parties' agreements contain an arbitration clause and a forum selection clause that cannot be reconciled.  Resolving the parties' forum dispute depends on whether one agreement amends a prior agreement or is a separate, supplemental agreement.  Although both parties' positions find some support in the relevant contracts, the weight of the evidence suggests that the documents are separate

---

[1]Original Petition, Exhibit B to Notice of Removal, Docket Entry No. 1-2, p. 2.  All page numbers reference the pagination imprinted at the top of the page by the court's Electronic Case Filing system.

agreements.   For the reasons explained below, Magseis's Renewed Motion to Compel will be denied.   Because Magseis stipulates that it will not pursue parallel proceedings, WesternGeco's Amended Motion for Preliminary Injunction will be denied as moot.

## I.  **Factual and Procedural Background**

On April 7, 2021, WesternGeco's affiliate and Magseis's parent company entered into a Global Agreement for Purchase of Services N°SLB--01/04/2021-MSFF/ASL431012 (the "Global Agreement").[2]   The Global Agreement states in relevant part:

> WHEREAS Supplier [Defendant's parent] is specialized in the provision of certain seismic data, and marine geological and seismic acquisition services . . . and Schlumberger [Plaintiff's parent] may from time to time purchase the same.
>
> * * *
>
> 2.   This Agreement will apply globally, as an umbrella agreement between the Parties and their Affiliates. Under this Agreement Schlumberger or its Affiliates . . . may from time to time order certain services provided by Supplier or its Affiliates, and Supplier or its Affiliates may provide said services to Schlumberger or its Affiliates, subject to the terms and conditions hereof.[3]
>
> * * *
>
> ARTICLE 1 — DEFINITIONS
>
> * * *
>
> 1.4  **"Change Order"** means an order to change the Work under the specific Order issued by Schlumberger

---

[2]Global Agreement, Exhibit 1-1 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-2, pp. 2-3.

[3]Id. at 3.

under Article 20, and executed by the Parties in the form of Exhibit I attached hereto.

\* \* \*

1.25 **"Order"** means an order issued by Schlumberger and accepted by Supplier as contemplated by Article 3.

\* \* \*

1.36 **"Service Order/Local Agreement"** (also equally referred to as **"Traditional Order"** or **"Order"**) means any statement of work issued under this Agreement in substantially the form of Exhibit H attached hereto, signed by the Parties and describing the Services to be performed, the pricing and commercial conditions.[4]

\* \* \*

ARTICLE 2 — PROVISION OF SERVICES TO SCHLUMBERGER AND ITS AFFILIATES

2.1 This Agreement is a global umbrella agreement which sets the terms and conditions under which Schlumberger may, from time to time, purchase from Supplier the Services described in Exhibit C and in accordance with Article 3, and Supplier may provide the same to Schlumberger.

2.2 Until an Order is executed by the Parties or any one of their Affiliates, neither Party shall have any obligation or liability to the other Party under this Agreement . . .

ARTICLE 3 — ORDERS

3.1 To purchase Services, Schlumberger shall, each time it elects to do so, submit an Order.

3.2 Each Order shall set out the type, price and required date of performance of the Services, and other relevant information.

\* \* \* ¬

---

[4] Terms and Conditions for Purchase of Services, Exhibit A to Global Agreement, Exhibit 1-1 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-2, pp. 5-7.

3.4   Once accepted, an Order shall constitute a separate
      contract between the parties thereto.  The terms of
      this Agreement and its Exhibits shall be included
      in and form part of such contract.  The terms and
      conditions contained or referred to in this
      Agreement shall apply, regardless of whether the
      terms and conditions are referenced in the Order.

                        * * *

ARITCLE 4 — ORDER OF PREFERENCE; INTERPRETATION

4.1   The various parts of this Agreement shall be read
      as one document, the contents of which, in the
      event of conflict or inconsistency, shall be given
      precedence in the following order listed in
      declining weight:  (i) the Form of Agreement,
      (ii) Exhibit B, (iii) Exhibit A, and (iv) all other
      Exhibits listed in the Form of Agreement in
      declining weight.  In case of conflict or incon-
      sistency between an Order and the Agreement, the
      Agreement shall prevail. . . .

                        * * *

4.3   References to occurrences "*under the Agreement*" (or
      such term with a similar meaning) shall be
      construed so as to include occurrences arising under
      any Order under this Agreement, notwithstanding
      anything herein to the contrary.[5]

                        * * *

ARTICLE 14 — PRICES

14.1  Schlumberger shall pay Supplier the applicable
      prices set out in the applicable Service Order.

                        * * *

14.6  Supplier acknowledges that the applicable prices
      shall be in line with the market rates.[6]

* * *

---

[5] Id. at 7-8.

[6] Id. at 18.

-4-

ARTICLE 20 — CHANGES TO ORDERS

20.1 **Written Change Order.**  Changes to the Work may be identified and effected either by a Change Order issued by Schlumberger or a Change Order Request issued by Supplier and confirmed by a Change Order issued by Schlumberger.   If the Parties reach an agreement on all matters pertaining to the Change Order, the Change Order shall be executed by the Parties.   The Change Order once executed shall be deemed an amendment to the Work to be performed under the affected Order, and Supplier shall continue performing the Work under the applicable Order as amended by the Change Order.

20.2 **Change Order Administration**

(a)   Changes shall be confirmed by the issuance of a Change Order by Schlumberger.

(b)   On receipt of such Change Order executed by the Parties, Supplier shall perform the changes to the Work detailed therein forthwith.   Supplier's compensation because of such change in the Work shall be agreed by the Parties and set out in the Change Order.[7]

* * *

ARTICLE 32 — GOVERNING LAW AND DISPUTE RESOLUTION

32.1 This Agreement and any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the law of England and Wales.

32.2 Any dispute arising out of or in connection with this Agreement shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to this Article.

32.3 The artbitration shall be conducted in accordance with the London Maritime Arbitrators Association

_____

[7]Id. at 24.

-5-

> (LMAA) Terms current at the time when the
> arbitration proceedings are commenced. . . .[8]

\* \* \*

ARTICLE 40 — GENERAL LEGAL PROVISIONS

\* \* \*

40.3 This Agreement and any terms and conditions referred to herein constitute the entire agreement between the Parties with respect to the subject matter hereof, and prevails over all prior communications, representations and agreements, whether oral or written, with respect to the subject matter. . . .

40.4 This Agreement may only be modified or amended by a separate written agreement, signed by both Parties, which specifically states it modifies or amends this Agreement and identifies the provisions so modified or amended.[9]

Attached to the Global Agreement is Exhibit I — Form of Variation

Order/Change Order (the "Change Order Form"):

EXHIBIT I — FORM OF VARIATION ORDER/CHANGE ORDER

Variation No. [enter sequential number]   Dated: [enter effective date]

This Variation is issued under the Order N°[...], effective [...], entered into by and between [**enter Schlumberger's legal entity**] ("*Schlumberger*") and [**enter Supplier's legal entity**] ("*Supplier*"), for work on the [**enter Vessel name**].

The Parties wish to modify the Order as follows:

1.   <u>Work to be performed or deleted:</u>

[**Enter relevant details or mark "Not Applicable"**]

---

[8]<u>Id.</u> at 31.

[9]<u>Id.</u> at 38-39.

-6-

2.    Price:

[**Enter relevant details or mark "Not Applicable"**]

3.    Detailed Schedule for the performance:

[**Enter relevant details or mark "Not Applicable"**]

4.    Delivery Date

\* \* \*

Except as varied herein all other terms and conditions of the Order shall remain unaltered and in full force and effect.[10]

Effective April 13, 2021, the parties executed the Service Order Between WESTERNGECO L.L.C. and MAGSEIS FF L.L.C. for OCEAN BOTTOM NODE SEISMIC 3D DATA ACQUISITION ENGAGEMENT 2, GOM, USA ("Order 2").[11]   Order 2 states in relevant part:

WHEREAS Eastern Echo DMCC [Plaintiff's affiliate], and Magseis FF LLC, have entered into [the Global Agreement].

WHEREAS Company wishes to contract with Supplier for the provision of Services, and Supplier is willing to perform the Services pursuant to the terms and conditions set forth in this Service Order and considering it as an Exhibit H of the Agreement mentioned above;

\* \* \*

ARTICLE 1 — TERMS AND CONDITIONS

The terms and conditions of the [Global] Agreement and any amendments thereto, are hereby incorporated by reference and the purchase of Services hereunder shall be subject to the terms of the Agreement.  In all respects this Order shall be treated as a separate contract entered into pursuant and subject to the terms of the

_____

[10]Change Order Form, Exhibit I to Global Agreement, Exhibit 1-1 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-2, p. 83.

[11]Order 2, Exhibit 1-2 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-3, pp. 3-4.

[Global] Agreement.  The provisions contained herein are limited exclusively for the sole purpose of this Order, and shall not be considered as an amendment, modification, alteration, revision, change, correction or consideration of any means and for any reason to the [Global] Agreement.

\* \* \*

Any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with this Service Order or its subject matter or formation shall be governed by and construed in accordance with the general maritime laws of the United States of America, or, if there is no applicable general maritime law, then the laws of the State of Texas.

ARTICLE 2 — SCOPE OF WORK

The objective of this Order is to confirm the scope of Supplier's work and the compensation for this project

2.1  Project Name

    Engagement 2 WG MC 3D OBN,

\* \* \*

2.3  Order Effective Date

Pursuant to Article 1.26 — Exhibit A of the [Global] Agreement, the Order Effective Date is:  April 13th 2021.

\* \* \*

ARTICLE 5 — PRICING

5.1  Supplier's compensation for the project will be as per Exhibit D below, attached hereto and forming an integral part of this Order.[12]

Attached to the Engagement 2 Service Order is Exhibit D — Pricing,

including a price schedule:[13]

---

[12]Id. at 4-6, 17.

[13]Pricing, Exhibit D to Order 2, Exhibit 1-2 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-3, pp. 29, 31.

-8-

| Renumeration Option A - Full Turnkey Including ALL TAXES | Payment Type | Quantity (If applicable) | Rate | Amount | Currency |
|---|---|---|---|---|---|
| 1 | Mobilisation | | 1 | $ 1,520,201 | $ 1,520,201 | $USD |
| 2 | Demobilisation | Lump Sum | 1 | $ 928,300 | $ 928,300 | $USD |
| 3 | Turnkey Receiver Area Square Kilometre Rate | Receiver Area Square Kilometre | 3,724 | $ 11,248 | $ 41,932,544 | $USD |
| | Stand-by Rate (chargeable) | Per Day | -0.0 | 339,130 | | |
| 4 | Total Est. Acquisition Cost | | | | $ 44,381,045 | $USD |
| 5 | Estimated Survey duration from Commencement of first node being deployed to the last node being retrieved. | | | | 135 | Days |

In March of 2022 Magseis contacted WesternGeco to discuss cost
overruns by Magseis on Engagement 2.[14] Effective March 31, 2022,
the parties entered an agreement titled "Letter Agreement between
WesternGeco L.L.C ('WesternGeco') and Magseis FF L.L.C. ('MSFF')
for Engagement 2 WG MC 3D OBN ('Engagement 2') Additional (Unowed)
Compensation to MSFF by WesternGeco and Commitment by MSFF to
WesternGeco for Future Gulf of Mexico ('GoM') Ocean Bottom Node
('OBN') geophysical acquisition services" (the "Letter Agreement").[15]
The Letter Agreement states in relevant part:

> On 13th, April 2021, WesternGeco executed a Service Order
> with MSFF to acquire the Engagement 2 seismic data survey
> in the United States GoM (the "Service Order"). As of 31st
> March 2022 (the "Effective Date"), MSFF requests, and
> WesternGeco agrees to make a one (1) time only payment of,

---

[14]Declaration of Gary Poole ("Poole Decl."), Exhibit 2 to
WesternGeco's Amended Motion for Preliminary Injunction, Docket
Entry No. 44-2, p. 2 ¶ 5.

[15]Letter Agreement, Exhibit 1-3 to Magseis's Renewed Motion to
Compel, Docket Entry No. 42-4, p. 2.

USD $4,000,000.00 in additional (unowed) compensation to MSFF to cover MSFF cost overruns from Engagement 2 acquisition.  In exchange for the aforementioned payment (which WesternGeco is not obligated to pay under the Service Order), MSFF agrees to the following with respect to future Sparse Node OBN surveys in the GoM utilizing ZXPLR nodes. . . .

## Terms, Conditions and Services

1.  As of the Effective Date, MSFF has a deep water OBN crew  .  .  .  available for WesternGeco in the August/September 2022 timeframe.  MSFF is not in receipt  of  any  tenders/expressions  of interest/LOI's/LOA's/agreements/etc.  for  the  same time slot.

2.  Based upon the [] survey rates . . . quoted by MSFF to WesternGeco in February 2022, MSFF will provide WesternGeco with the following rates for the next pending  WesternGeco  OBN  sparse  node  survey, notionally called Engagement 3 []:

    a. Mobilisation fee:      N/A (waived for Engagement 3)
    b. Demobilisation fee:    N/A (waived for Engagement 3)
    c. Operational Day Rate:    USD 456,275
    d. Standby Day Rate:    USD 433,462

                        *  *  *

    The above quoted rates for Engagement 3 are firm and fixed, and not subject to adjustment . . .  These rates apply to Engagement 3, to the extent commenced on or before December 31, 2023. . . .

3.  .  .  . The parties shall execute a mutually agreed service order (issued pursuant to the existing [Global Agreement], to the extent possible), . . . prior to commencement.

4.  For the following WesternGeco sparse OBN survey in the GoM, notionally called Engagement 4 . . . the following rates will apply:

    a. Mobilisation fee:      USD 3,046,978
    b. Demobilisation fee:    USD 2,273,931
    c. Operational Day Rate:    USD 474,166
    d. Standby Day Rate:    USD 450,458

                        *  *  *

The above quoted rates for Engagement 4 are firm and fixed, and not subject to adjustment . . . These rates apply to Engagement 4, to the extent it commences on or before December 31, 2023. . . .

5.   . . . The parties shall execute a mutually agreed service order (issued pursuant to the [Global Agreement]) . . . prior to commencement.

6.   MSFF will provide WesternGeco with details of MSFF GoM crew availability and crew schedule on a weekly basis . . . MSFF will within twenty-four (24) hours after executing this Agreement, inform WesternGeco of any [existing offers from other customers] that could impact MSFF GoM crew availability. . . .

7.   MSFF will notify WesternGeco . . . of any new and/or subsequent [offers from other customers] . . . that might impact MSFF GoM crew availability. . . . MSFF shall provide WesternGeco with timelines and other relevant information, including, but not limited to, estimated contract award date, scheduling and any changes thereto.

8.   Upon receipt by WesternGeco of a notification from MSFF [regarding another customer's offer that could affect crew availability], WesternGeco shall have ten (10) business days to execute a written agreement with MSFF and WesternGeco will secure the availability of the MSFF crew . . .

9.   In the event that WesternGeco cannot commit to a notification provided by MSFF, all articles in the section headed Terms, Conditions and Services . . . of this Agreement will continue to apply until the time a service order is executed for both Engagement 3 and Engagement 4. For the avoidance of doubt, this Letter Agreement is not a promise . . . that MSFF will be engaged by WesternGeco to conduct Enagement 3 and/or Engagement 4.

10.  Upon WesternGeco's receipt of MSFF's invoice by no later than April 14th, 2022, WesternGeco shall make payment to MSFF of USD $4,000,000.00 by April 30th, 2022.

11.  This Agreement will commence on the Effective Date and remain in effect until December 31st, 2023 (the "Term").

-11-

> 12. This Agreement shall be governed, interpreted and enforced according to the laws of the state of Texas, without regard to conflict of law provisions that would require application of the substantive laws of another jurisdiction. <u>Any claim to interpret or enforce this Agreement must be brought, solely and exclusively, before the state or federal courts in Fort Bend County, Texas and can only by tried by bench trial.</u> Each party on a fully informed and knowing basis, waives all rights to a jury trial. The prevailing party in an action to enforce this Agreement will be entitled to recover its reasonable experts', attorneys' and collection agency fees and all court costs, fees and expenses.[16]

According to WesternGeco, Magseis committed the relevant Gulf of Mexico crew to another customer during the term of the Letter Agreement.[17] The parties dispute whether Magseis met its Letter Agreement obligation to provide adequate notice and first-refusal to WesternGeco.[18] WesternGeco alleges that it had to pay another company over $11 million more than the Letter Agreement's pricing for its desired survey.[19] WesternGeco filed this action alleging that Magseis breached the Letter Agreement.[20]

---

[16]Id. at 2-4.

[17]Original Petition ("Petition"), Exhibit B to Notice of Removal, Docket Entry No. 1-2, p. 7 ¶ 19.

[18]Id. at 8 ¶¶ 25-27; Maiseis FF LLC's Original Answer to WesternGeco, L.L.C.'s Original Petition ("Magseis's Answer"), Exhibit B to Notice of Removal, Docket Entry No. 1-2, pp. 19-20.

[19]Petition, Exhibit B to Notice of Removal, Docket Entry No. 1-2, p. 8 ¶ 27. In the Petition, WesternGeco alleged that it would have to pay $12-16 million more than the Letter Agreement pricing, and it now states that it did contract with another company for approximately $11.3 million greater than the Letter Agreement pricing. WesternGeco's Amended Motion for Preliminary Injunction, Docket Entry No. 44, p. 9.

[20]Petition, Exhibit B to Notice of Removal, Docket Entry No. 1-2, p. 8 ¶¶ 23-27.

On November 29, 2022, Magseis's attorneys notified WesternGeco that Magseis had initiated arbitration in London and appointed an arbitrator.[21] Magseis's attorneys requested that WesternGeco appoint an arbitrator or else Magseis's appointed arbitrator would act as sole arbitrator.[22]

WesternGeco asked this court to issue a preliminary injunction enjoining Magseis from pursuing arbitration in London, and Magseis asked this court to compel arbitration and to dismiss this action.[23] The motions were never fully briefed because the parties obtained a series of extensions to focus on settlement discussions, and the court denied both motions without prejudice to reinstatement. The parties now state that they have been unable to reach a settlement and will resume litigating. Magseis filed its Renewed Motion to Compel Arbitration on August 30, 2024, WesternGeco responded, and Magseis replied.[24] WesternGeco filed its Renewed Motion for

---

[21]Notice of Arbitration - Global Purchase of Services Agreement Dated 7 April 2021 ("Arbitration Notice"), Exhibit 1 to WesternGeco's Amended Motion for Preliminary Injunction, Docket Entry No. 44-1, p. 2.

[22]Id. at 3.

[23]Plaintiff WesternGeco L.L.C.'s Motion for Preliminary Injunction, Docket Entry No. 11; Magseis FF LLC's Motion to Compel Foreign Arbitration and Dismiss Lawsuit, Docket Entry No. 18.

[24]Magseis's Renewed Motion to Compel, Docket Entry No. 42; Plaintiff WesternGeco L.L.C.'s Response to Defendant's Motion to Compel Foreign Arbitration and Dismiss Lawsuit ("WesternGeco's MTC Response"), Docket Entry No. 47; Magseis FF LLC's Reply in Support of Its Renewed Motion to Compel Foreign Arbitration and Dismiss Lawsuit ("Magseis's MTC Reply"), Docket Entry No. 50.

Preliminary Injunction on September 3, 2024, and Magseis responded.[25]

## II.   **The Parties' Forum Dispute**

Magseis argues that this dispute falls within the scope of the Global Agreement's arbitration clause, that the arbitration clause trumps the Letter Agreement's forum selection clause, and that the court should therefore compel arbitration in London. WesternGeco argues that the Letter Agreement's forum selection clause supersedes the Global Agreement's arbitration clause in the event of any conflict and that the court should therefore enjoin Magseis from pursuing the London arbitration.

It appears undisputed that the parties are within the scope of affiliates subject to the Global Agreement. Neither party challenges the validity of the Global Agreement, Order 2, or the Letter Agreement. There is no dispute that WesternGeco's action falls within the scope of claims described by the Letter Agreement's forum selection clause. Finally, the Global Agreement's arbitration clause and the Letter Agreement's forum selection clause cannot both apply to WesternGeco's claim.

Section 32.2 of the Global Agreement requires arbitration of any claims "arising out of or in connection with" the Global

---

[25]WesternGeco's Renewed Motion for Preliminary Injunction, Docket Entry No. 44; MagSeis FF LLC's Amended Response to Plaintiff WesternGeco L.L.C.'s Amended Motion for Preliminary Injunction ("Magseis's MPI Response"), Docket Entry No. 48.

Agreement.[26]  Under § 4.3 of the Global Agreement, "[r]eferences to occurrences '*under the Agreement*' (or such term with a similar meaning) shall be construed so as to include occurrences arising under any Order under this Agreement[.]"[27]  Therefore, claims arising under "Orders" under the Global Agreement fall within the scope of the Global Agreement's arbitration clause.  Moreover, § 4.1 states that the Global Agreement prevails in the event of any conflict "between an Order and the [Global] Agreement[.]"[28] Therefore, if the Letter Agreement is either an Order or an amendment to an Order, then (1) it is within the scope of the Global Agreement's arbitration clause, and (2) the Global Agreement's arbitration clause displaces the Letter Agreement's forum selection clause.

Conversely, § 4.1 of the Global Agreement by its terms does not purport to resolve conflicts between the Global Agreement and subsequent contracts other than "Orders."[29]  Therefore, if the Letter Agreement is neither an Order nor an amendment to an Order, then the Letter Agreement's forum selection clause, being later-in-time, would supersede the Global Agreement's arbitration clause

---

[26]Terms and Conditions for Purchase of Services, Exhibit A to Global Agreement, Exhibit 1-1 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-2, p. 31.

[27]Id. at 8.

[28]Id.

[29]Id.

under background contract principles. Goldman, Sachs & Co. v. Golden Empire Schools Financing Authority, 764 F.3d 210, 215 (2d Cir. 2014) ("[A]n agreement to arbitrate is superseded by a later-executed agreement containing a forum selection clause if the clause 'specifically precludes' arbitration . . . but there is no requirement that the forum selection clause mention arbitration[.]"); see also Personal Security & Safety Systems Inc. v. Motorola Inc., 297 F.3d 388, 396 n.11 (5th Cir. 2002).

Resolving the parties' forum selection dispute therefore requires the court to determine whether the Letter Agreement was intended to be a separate Order under the Global Agreement, an amendment to an Order (Order 2 specifically), or neither. Magseis argues that the Letter Agreement is either an Order or an amendment to Order 2, and WesternGeco argues that it is neither.[30]

## III.   **Legal Standard**

### A.   **The Federal Arbitration Act**

The Federal Arbitration Act ("FAA") states that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "'places arbitration agreements on an equal footing with other contracts.'" Coinbase, Inc. v.

---

[30]Magseis argues, in the alternative, that background contract principles support reading the Global Agreement and Letter Agreement as a single contract. For the reasons explained in section IV.C. of this Memorandum Opinion and Order, the court is not persuaded.

Suski, 144 S. Ct. 1186, 1192 (2024) (quoting Rent-A-Center, West, Inc. v. Jackson, 130 S. Ct. 2772, 2776 (2010)). "The policy is to make 'arbitration agreements as enforceable as other contracts, but not more so.'" Morgan v. Sundance, Inc., 142 S. Ct. 1708, 1713 (2022) (quoting Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 87 S. Ct. 1801, 1806 (1967)).

"[A]n agreement to arbitrate is superseded by a later-executed agreement containing a forum selection clause if the clause 'specifically precludes' arbitration . . . but there is no requirement that the forum selection clause mention arbitration[.]" Goldman, Sachs & Co., 764 F.3d at 215.

## B.   Contracts and Modification

"In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). "We also give words their plain, common, or generally accepted meaning unless the contract shows that the parties used words in a technical or different sense." Plains Exploration & Production Co. v. Torch Energy Advisors Inc., 473 S.W.3d 296, 305 (Tex. 2015). "[C]ourts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." Coker, 650 S.W.2d at 393.

"Modification of a contract is some change in an original agreement that introduces a new or different element into the

details of the contract, but leaves its general purposes and effect undisturbed." _In re F.C. Holdings, Inc._, 349 S.W.3d 811, 815 (Tex. App.—Tyler 2011). "Whether a contract is modified depends on the parties' intentions[.]" _Hathaway v. General Mills, Inc._, 711 S.W.2d 227, 228–29 (Tex. 1986).

## IV.  **Analysis**

Magseis argues (1) that the Letter Agreement is an amendment of Order 2, (2) that the Letter Agreement is a separate Order, and (3) that, even if the Letter Agreement is neither, background contract principles favor reading the Letter Agreement and Global Agreement as a single instrument and enforcing its arbitration clause. WesternGeco argues that the Letter Agreement is neither an Order nor an amendment to an Order and that the Letter Agreement and Global Agreement should not be read as a single instrument.

### A.  **Whether the Letter Agreement is an Amendment to Order 2**

Magseis argues that "[t]he premise of the [Letter Agreement] was to vary the compensation payable to Magseis" under Order 2.[31] Magseis points to references in the Letter Agreement to Order 2, references in Magseis's $4,000,000 invoice to the Global Agreement and Order 2, and WesternGeco's invocation of Order 2 in its demand letter. Having carefully reviewed the three contracts, the court also finds relevant the Global Agreement's "umbrella" language.[32]

---

[31]Magseis's Renewed Motion to Compel, Docket Entry No. 42, p. 18.

[32]Terms and Conditions for Purchase of Services, Exhibit A to Global Agreement, Exhibit 1-1 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-2, p. 7 § 2.1.

WesternGeco argues that the Letter Agreement was a separate agreement in which WesternGeco paid $4,000,000 for first-refusal rights and preferential, fixed pricing for two future surveys. WesternGeco emphasizes that the Global Agreement provided a form for amending Orders, that the Letter Agreement had its own effective term, that Order 2 is only referenced in the Letter Agreement's preamble, and that the Letter Agreement does not reference any specific terms of Order 2.

The parties also argue for the application of various background rules for interpreting contracts and resolving ambiguity, which the court addresses below. The court then considers the competing evidence.

### 1.   The Letter Agreement's References to Order 2

The Letter Agreement's title uses the language "Engagement 2 WG MC 3D OBN . . . Additional (Unowed) Compensation[.]"[33]   The Letter Agreement states that the parties executed Order 2 on April 13, 2021, and then states that WesternGeco agrees to make a $4,000,000 payment "in additional (unowed) compensation to [Magseis] to cover [Magseis's] cost overruns from Engagement 2 acquisition."[34]

---

[33]Letter Agreement, Exhibit 1-3 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-4, p. 2. "Engagement 2 WG MC 3D OBN" is the project name for Order 2. Order 2, Exhibit 1-2 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-3, p. 5.

[34]Letter Agreement, Exhibit 1-3 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-4, p. 2.

-19-

The second reference appears to be a recital or preamble. <u>See</u>
<u>All Metals Fabricating, Inc. v. Ramer Concrete, Inc.</u>, 338 S.W.3d
557, 561 (Tex. App.—El Paso 2009) ("A recital is a formal statement
or setting forth of some matter of fact, in any deed or writing, in
order to explain the reasons upon which the transaction is
founded."). The reference is in the Letter Agreement's first
paragraph, which is unnumbered and separated from the rest of the
Letter Agreement by the heading "Terms, Conditions and
Services[.]"[35]

Titles and recitals are generally not legally operative but
may be used to interpret a contract. <u>Id.</u> ("Recitals are generally
not part of a contract unless the parties intended them to be . . .
The recitals may be looked to in determining the proper
construction of the contract and the parties['] intent.");
<u>Enterprise Leasing Co. of Houston v. Barrios</u>, 156 S.W.3d 547, 549
(Tex. 2004) ("Although we recognize that in certain cases, courts
may consider the title of a contract provision or section to
interpret a contract, 'the greater weight must be given to the
operative contractual clauses of the agreement.'").

The references to Order 2 could imply that the Letter
Agreement's terms and conditions were modifying or being added to
Order 2. Alternatively, the language could have been included to
document why the parties were entering an ad hoc arrangement with
unique types of commitments not contemplated by their Global

---

[35] <u>Id.</u>

Agreement.[36] If the parties intent in referencing Order 2 was to
signal an amendment, it would be surprising for them to do so only
in a preamble or title instead of the terms and conditions.
Moreover, given the sophistication of the parties, one would expect
a contractual amendment to use explicit amendatory language and to
single out specific terms or language in Order 2 that they intended
to displace or modify. The other agreements suggest that the
parties prefer explicit amendatory language and want to avoid
amendment by implication. For example, the Global Agreement states
that it "may only be modified . . . by a separate written agreement
. . . which specifically states it modifies or amends this
Agreement and identifies the provisions so modified or amended."[37]
The Change Order Form prefaces amendments by stating, "[t]he
Parties wish to modify the Order as follows[.]"[38]

_____

[36]WesternGeco was agreeing to pay $4 million that it was not
obligated to, and Magseis was granting first-refusal rights plus
fixed pricing — essentially an option contract — whereas the Global
Agreement envisioned the parties negotiating each Order at market
prices.

[37]Terms and Conditions for Purchase of Services, Exhibit A to
Global Agreement, Exhibit 1-1 to Magseis's Renewed Motion to
Compel, Docket Entry No. 42-2, p. 39 § 40.4.

[38]Change Order Form, Exhibit I to Global Ageeement, Exhibit 1-1
to Magseis's Renewed Motion to Compel, Docket Entry No. 42-2,
p. 83. The lack of explicit amendatory language or citations to
particular parts of Order 2 is significant in light of the Letter
Agreement's statement that "WesternGeco is not obligated to pay
[the $4 million payment] under" Order 2. Letter Agreement,
Exhibit 1-3 to Magseis's Renewed Motion to Compel, Docket Entry
No. 42-4, p. 2. The language casts doubt on Magseis's
interpretation. Because the parties explicitly cited Order 2 in
clarifying WesternGeco's lack of obligation, it seems unlikely that
(continued...)

### 2.    WesternGeco's Subsequent Actions

Magseis sent an invoice to WesternGeco for the $4,000,000 payment.[39] In a box titled "Project/Agreement," Magseis referenced "12101-1-SLB Engagement II - 1/02082022Q[.]"[40] In an untitled section below that the invoice lists the Global Agreement's contract number.[41]    In the payment's description field Magseis wrote "Additional compensation: Letter agreement between WesternGeco and Magseis Fairfield received on April 7th 2022[.]"[42] WesternGeco does not dispute that it paid the invoice.   Later, in its Final Notice of Defective Performance, WesternGeco stated that it was "in [the] process of obtaining quotes from other providers to perform Engagement 3, for use if the [same fleet and crew from Order 2] is not offered to WesternGeco on the terms stated in the Letter Agreement and on Engagement 2 Service Order terms."[43]

---

[38] (...continued)

the parties intended the new payment obligation to become part of Order 2 without explicitly saying so.   This distinction could be important.   In the event of a dispute over the Letter Agreement, it would be significant whether Magseis's contractual right to the payment rested only on its Letter Agreement performance as opposed to its past Order 2 performance.

[39] Invoice, Exhibit 1-6 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-7, p. 2.

[40] Id.

[41] Id.

[42] Id.

[43] Final Notice of Defective Performance, Exhibit 1-5 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-6, p. 13.

Although Magseis does not fully explain the significance of the text in the invoice's "Project/Agreement" box, it appears to reference Engagement 2.[44]  To the extent that the invoice connects the payment to Engagement 2, it supports Magseis's reading that the parties intended the Letter Agreement "to vary the compensation payable to Magseis for" Order 2.[45]  But the "[c]onduct of the parties which indicates the construction that the parties themselves placed on the contract" can only be considered to resolve ambiguity.  Consolidated Engineering Co. Inc. v. Southern Steel Co., 699 S.W.2d 188, 192-93 (Tex. 1985).

WesternGeco's Demand Letter is less clear.  It could be read as treating the Letter Agreement and Order 2 as constituting a single agreement.  But it could be read as a demand by WesternGeco that Magseis agree to provide Engagement 3 on terms modeled after Order 2.  The fact that the Demand Letter lists both "terms stated in the Letter Agreement" and "Engagement 2 Service Order terms" could indicate that WesternGeco considered them separate.[46]  Read

_____

[44]Invoice, Exhibit 1-6 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-7, p. 2.  Magseis offers no explanation of the numbers preceding or following "Engagement II."  Nor does Magseis address why the invoice, unlike the parties' other documents, states the engagement number in Roman numerals.  Nevertheless, WesternGeco does not appear to dispute that the quoted invoice text is a reference to Engagement 2.

[45]Magseis's Renewed Motion to Compel, Docket Entry No. 42, p. 18.

[46]Magseis's Renewed Motion to Compel, Docket Entry No. 42, p. 18.  The Demand Letter contains various other indications that
(continued...)

-23-

as a whole, the Demand Letter does not give the impression that
WesternGeco considered the Letter Agreement to be an amendment to
Order 2.

### 3.   The Change Order Form

Sections 20.1 and 20.2(b) of the Global Agreement state that
changes to the "Work" under an Order are to be made or confirmed by
a Change Order, which is also supposed to state the change in
Magseis's compensation for the revised work.[47]  According to the
definition in § 1.4 of the Global Agreement, Change Orders are to
be executed "in the form of Exhibit I attached hereto."[48]   The
Change Order Form (Exhibit I) identifies the Order to be changed,
states that "[t]he Parties wish to modify the Order," and includes
sections for changes to work, price, schedule, and delivery date,
but each can be marked "Not Applicable[.]"[49]

---

[46](...continued)
WesternGeco considered Order 2 and the Letter Agreement to be
separate contracts.   The Demand Letter states that Magseis
requested an "extra-contractual" payment, which WesternGeco
ultimately made to "keep[] Magseis as a financially viable
acquisition services provider in a three (3) provider market" and
"in exchange for preferential pricing and a right of first refusal"
for the same fleet from Order 2.  Id. at 4.

[47]Terms and Conditions for Purchase of Services, Exhibit A to
Global Agreement, Exhibit 1-1 to Magseis's Renewed Motion to
Compel, Docket Entry No. 42-2, p. 24.

[48]Id. at 5.

[49]Change Order Form, Exhibit I to Global Ageeement, Exhibit 1-1
to Magseis's Renewed Motion to Compel, Docket Entry No. 42-2,
p. 83.

It is not clear that the Change Order Form is intended as an
exclusive method for amending Orders.  Although the Change Order
Form contemplates price amendments, §§ 1.4, 20.1, and 20.2(b) only
appear to require that changes to an Order's work use the Form.
But even assuming without deciding that the Change Order Form is
not an exclusive means of amendment, the fact that the parties had
a standard form for amending Orders but did not use it for the
Letter Agreement is significant.  Absent some reason for not using
the Change Order Form, one would not expect the parties to draft an
Order amendment from scratch.  That the parties did not use the
Change Order Form suggests that they did not mean to change
Order 2.

### 4.   The Letter Agreement's Effective Term

Instead of modifying the effective term of Order 2 or
inserting a new one, the Letter Agreement states an effective term
that only purports to apply to the Letter Agreement itself.[50]  But
"[a] modification to a contract creates a new contract . . . [that]
includes the new, modified provisions and the unchanged old
provisions."  Wes-Tex Tank Rental, Inc. v. Pioneer Natural
Resources USA, Inc., 327 S.W.3d 316, 319 (Tex. App.—Eastland 2010).
The Letter Agreement does not clarify whether or how it affects the
term of Order 2's existing provisions.  This suggests that the
Letter Agreement was not intended as an amendment to Order 2.

---

[50]Letter Agreement, Exhibit 1-3 to Magseis's Renewed Motion to
Compel, Docket Entry No. 42-4, p. 4 ¶ 11.

5.    The Global Agreement's "Umbrella" Language

The Global Agreement describes itself as a "global umbrella agreement" that governs the purchase of Magseis's services by WesternGeco.[51]  This appears to be a general, prefatory statement and does not bar the parties from later deciding to enter other, separate agreements.  But the fact that the Global Agreement would no longer be fully global under WesternGeco's interpretation supports Magseis's position.

6.    Superfluous Language Under Magseis's Interpretation

Courts "must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003).[52] If the Letter Agreement was an amendment to Order 2, then any claim falling within the Letter Agreement's forum selection clause ("Any claim to interpret or enforce this [Letter] Agreement . . .")[53] would also fall within the Global Agreement's arbitration clause ("Any dispute arising out of or in connection with this [Global]

_____

[51]Terms and Conditions for Purchase of Services, Exhibit A to Global Agreement, Exhibit 1-1 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-2, p. 7 § 2.1.

[52]See also In re Davenport, 522 S.W.3d 452, 457 (Tex. 2017) ("The Court must read contractual provisions so none of the terms of the agreement are rendered meaningless or superfluous.").

[53]Letter Agreement, Exhibit 1-3 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-4, p. 4 ¶ 12.

-26-

Agreement . . .").[54]  Because the Global Agreement prevails to the extent it conflicts with Orders, the Letter Agreement's forum selection clause would have no effect.[55]  The fact that Magseis's position renders the forum selection clause meaningless supports WesternGeco's position.[56]

### 7.    The Federal Policy Favoring Arbitration

Magseis invokes the federal policy favoring arbitration.  The Fifth Circuit has held that this policy "requires the court to decide in favor of arbitration when 'the scope of an arbitration clause is fairly debatable or reasonably in doubt.'"  Downer v. Siegel, 489 F.3d 623, 626 (5th Cir. 2007).  The court concludes that this canon does not apply for two reasons.  First, the parties' dispute is not about the scope of the Global Agreement's arbitration clause.  It is about whether the Global Agreement's arbitration clause is superseded by the Letter Agreement's forum selection clause, which in turn depends on whether the Letter Agreement was an amendment to Order 2.[57]

---

[54]Terms and Conditions for Purchase of Services, Exhibit A to Global Agreement, Exhibit 1-1 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-2, p. 31 § 32.2.

[55]Conversely, if the Letter Agreement is separate, neither clause would be meaningless because the arbitration clause would still apply to any disputes outside the Letter Agreement.

[56]This interpretive canon is not an absolute rule.  The parties' Global Agreement itself, by stating an order of preference, contemplates the possibility that inconsistent terms might exist and that it may be necessary to displace some terms.

[57]Applying an arbitration-preferring interpretive rule in this context would lead to strange results.  The question of whether the (continued...)

-27-

Second, the Supreme Court has recently emphasized that "[t]he federal policy is about treating arbitration contracts like all others, not about fostering arbitration" and rejected a "special, arbitration-preferring" rule. Morgan v. Sundance, Inc., 142 S. Ct. 1708, 1713 (2022). Morgan concerned procedural rules that favored arbitration, but it is not clear whether arbitration-preferring interpretive rules can be reconciled with the Court's rationale, especially where the question is deciding whether an arbitration clause or an inconsistent forum selection clause controls. See id. ("The policy [favoring arbitration] . . . is merely an acknowledgment of the FAA's commitment . . . to place [arbitration] agreements upon the same footing as other contracts.") (internal quotation marks omitted).

### 8.  Resolving All Disputes in One Forum

Magseis cites an English opinion concerning an arbitration dispute that articulated this interpretive rule:

> [T]he construction of an arbitration clause should start from the assumption that the parties, as rational businessmen, are likely to have intended any dispute

---

[57](...continued)
Letter Agreement is an amendment to Order 2 could have consequences beyond the proper forum.   For example, because of the Global Agreement's order-of-preference term, resolving any other inconsistencies between the agreements could depend on whether the Letter Agreement is an amendment to Order 2.  Surely a court would not apply the policy favoring arbitration in resolving other inconsistencies just because the underlying question also bears on arbitration.  But that would mean that the question of whether the Letter Agreement is an amendment could change depending on whether the dispute is about arbitration or some other Global Agreement term.

arising out of the relationship into which they have entered . . . to be decided by the tribunal.

Fiona Trust and Holding v. Yuri Privalov and Others [2007] 4 All ER 951, ¶ 13. In a dispute about the scope of an arbitration clause, where the possibilities are arbitration or a default judicial forum, this argument might have some force. That was the nature of the dispute in Fiona Trust and Holding. But where one of the parties' agreements contains an arbitration clause and another contains an inconsistent forum selection clause, the court cannot infer that they intended a single forum to apply to all disputes. That would require the court to assume away one of the parties' agreed terms.

## 9. Weighing the Contractual Evidence

The Letter Agreement's lack of explicit amendatory language or references to specific parts of Order 2 undermine Magseis's arguments. The court also finds it significant that the Letter Agreement did not use the parties' existing form for amending Orders and that Magseis's interpretation would render the forum selection clause meaningless. Magseis's strongest evidence is the Letter Agreement's preamble and title references to Order 2 and WesternGeco's subsequent conduct. But this is the type of evidence that courts only consider to resolve ambiguities and, even to the extent there is ambiguity, this evidence does not outweigh WesternGeco's evidence. The court concludes that the parties did not intend the Letter Agreement to amend Order 2.

B.    **Whether the Letter Agreement is a Separate Order Under the Global Agreement**

As defined in § 1.25 of the Global Agreement, an Order "means an order issued by Schlumberger and accepted by Supplier as contemplated by Article 3."[58]   Article 3 states that "[t]o purchase Services, Schlumberger shall, each time it elects to do so, submit an Order" and that "[e]ach Order shall set out the type, price and required date of performance of the Services, and other relevant information."[59]

The Letter Agreement is not an offer or agreement by WesternGeco to "purchase Services[.]"[60]   It is payment for a right of first refusal and fixed pricing that would apply _if_ WesternGeco decided to purchase services.[61]   It therefore does not include the "required date of performance" or various "other relevant information," including the specific area to be surveyed.[62]   The court concludes that the Letter Agreement is not a separate Order under the Global Agreement.

---

[58]Terms and Conditions for Purchase of Services, Exhibit A to Global Agreement, Exhibit 1-1 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-2, p. 6 § 1.25.

[59]_Id._ at 8 §§ 3.1, 3.2.

[60]_Id._ § 3.1.

[61]Letter Agreement, Exhibit 1-3 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-4, p. 3 ¶ 9 ("For the avoidance of doubt, this Letter Agreement is not a promise, commitment, guarantee or assurance that MSFF will be engaged by WesternGeco to conduct Engagement 3 and/or Engagement 4.").

[62]Terms and Conditions for Purchase of Services, Exhibit A to Global Agreement, Exhibit 1-1 to Magseis's Renewed Motion to Compel, Docket Entry No. 42-2, p. 8 § 3.2.

C.    **Whether the Global Agreement and the Letter Agreement Should Be Construed as a Single Contract**

Magseis invokes "general contract principles" to argue that the court should construe the Global Agreement and Letter Agreement as a single contract and that, read as a single agreement, the Global Agreement's arbitration clause controls over the Letter Agreement's forum selection clause.[63]  The opinions cited by Magseis establish that multiple written agreements "may" me read together and that courts "may" construe the multiple agreements as a single contract "[i]n appropriate instances[.]"  Fort Worth Independent School District v. City of Fort Worth, 22 S.W.3d 831, 840 (Tex. 2000).  But Magseis presents no persuasive argument why this is an "appropriate instance" to do so.  Magseis does not explain why either agreement could not operate as intended if the agreements are read as two contracts.  Conversely, reading the agreements as one would result in a single contract containing an arbitration clause and an inconsistent forum selection clause.  The court concludes that the Global Agreement and Letter Agreement should not be construed as a single contract.[64]

_____

[63]Magseis's Renewed Motion to Compel, Docket Entry No. 42, pp. 20-21.

[64]It is not even clear that the Global Agreement's arbitration clause would prevail if the agreements were read as one.  The Global Agreement only specifies that it prevails to the extent it conflicts with Orders, which the Letter Agreement is not.  Although the Global Agreement states that it can only be amended explicitly, it is not clear that reading the two agreements as a unified contract means treating the Letter Agreement as an amendment.

## V.  Conclusion and Order

The court concludes that the Letter Agreement is neither an amendment to Order 2 nor a separate Order under the Global Agreement.  Moreover, the court concludes that the Global Agreement and Letter Agreement should not be construed as a single contract. Because the Letter Agreement's forum selection clause was later-in-time and precludes arbitration, it supersedes the Global Agreement's arbitration clause.  Goldman, Sachs & Co., 764 F.3d at 215.  Magseis FF LLC's Renewed Motion to Compel Foreign Arbitration and Dismiss Lawsuit (Docket Entry No. 42) is therefore **DENIED**. Magseis, in its MPI Response, stipulates that it is for this court (i.e., not for the arbitrator) to decide which contract controls the proper forum.[65]  It therefore appears that an injunction is not necessary.  Plaintiff WesternGeco L.L.C.'s Amended Motion for Preliminary Injunction (Docket Entry No. 44) is therefore **DENIED AS MOOT**.  Should Magseis renege on its agreement to not pursue parallel proceedings, WesternGeco may seek relief.

The parties are **ORDERED** to submit a proposed Amended Docket Control Order by March 12, 2025.  If the parties are not able to agree on a proposed Amended Docket Control Order, each party will file its own proposed Amended Docket Control Order with a short explanation why the court should enter it; and, if necessary, the

---

[65]Magseis's MPI Response, Docket Entry No. 48, p. 2.

court will conduct a hearing on March 14, 2025, at 2:00 p.m. in Courtroom 9B, 9th Floor, United States Courthouse, 515 Rusk Street, Houston, Texas 77002.

**SIGNED** at Houston, Texas, on this 27th day of February, 2025.

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE

-33-