United States District Court
Southern District of Texas
**ENTERED**
July 20, 2026
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WESTERNGECO, L.L.C., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-22-3080 |
| | § | |
| MAGSEIS FF LLC, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

This is a breach of contract action arising from Plaintiff, WesternGeco L.L.C.'s ("Plaintiff" or "WesternGeco") allegation that Defendant, Magseis FF LLC ("Defendant" or "MSFF") breached its obligation to provide WesternGeco adequate notice and right of first refusal ("ROFR") for use of a particular ocean fleet and crew (the "Z1 Crew") for a deep water seismic survey known as "Engagement 3" in the Gulf of Mexico ("GoM") in the fall of 2022, and potentially another survey known as "Engagement 4" in 2023. Pending before the court are Defendant Magseis FF LLC's Motion for Summary Judgment and Brief in Support ("MSFF's MSJ") (Docket Entry No. 63), and Plaintiff WesternGeco, L.L.C.'s Motion for Partial Summary Judgment and Brief in Support ("WesterGeco's MPSJ") (Docket Entry No. 72). Also pending are Plaintiff WesternGeco, L.L.C.'s Response in Opposition to Magseis LLC's Motion for Summary Judgment ("WesternGeco's Opposition to MSFF's MSJ")(Docket Entry No. 73); Defendant Magseis FF LLC's Opposition to Plaintiff WesternGeco, L.L.C.'s Motion for Partial Summary Judgment ("MSFF's Opposition to

WesternGeco's MPSJ")(Docket Entry No. 74);[1] Defendant Magseis FF LLC's Reply in Support of Its Motion for Summary Judgment ("MSFF's Reply") (Docket Entry No. 75);[2] and Plaintiff WesternGeco L.L.C.'s Reply in Support of Its Motion for Summary Judgment ("WesternGeco's Reply") (Docket Entry NO. 78).  For the reasons stated below, WesternGeco's MPSJ will be denied, MSFF's MSJ will be granted, and this action will be dismissed.

## I. Undisputed Facts

WesternGeco is a business unit of SLB, an oilfield service company formerly known as Schlumberger.  WesternGeco engages others to supply seismic data from underwater regions in hopes of locating recoverable hydrocarbon reserves and/or other opportunities.  MSFF provides maritime seismic acquisition services, including vessels and crews.  WesternGeco hires contractors like MSFF to provide vessels, crews, and equipment to acquire seismic data.

**A.    Engagement 2**

Effective April 13, 2021, Westerngeco and MSFF executed a Service Order ("Order 2") for a project titled "Engagement 2."[3]

---

[1]This instrument was also filed as Docket Entry No. 76.

[2]This instrument was also filed as Docket Entry No. 77.

[3]MSFF's MSJ, Docket Entry No. 63, p. 8; WesternGeco's MPSJ, Docket Entry No. 72, p.8.  See also Engagement 2 Service Order,
(continued...)

MSFF completed Engagement 2 using the Z1 crew.[4]  After Engagement 2, the Z1 crew was obligated to other work until the August-September 2022 timeframe.[5]

## B.    Letter Agreement

Because Engagement 2 suffered delays and cost overruns for which MSFF was contractually responsible, MSFF asked WesternGeco for additional compensation to cover costs that were beyond its control but were not WesternGeco's responsibility.[6]  Effective March 31, 2022, the parties entered an agreement  titled

> **Letter Agreement between WesternGeco L.L.C. ("WesternGeco") and Magseis FF L.L.C. ("MSFF") for Engagement 2 . . . Additional (Unowed) Compensation to MSFF by WesternGeco and Commitment by MSFF to WesternGeco for Future Gulf of Mexico ("GOM") Ocean Bottom Node ("OBN") geophysical acquisition services" ([Letter] "Agreement").[7]**

---

[3](...continued)
Exhibit A-2 to MSFF Appendix, pp. 89-144, Docket Entry No. 63-1, pp. 90-99, and Docket Entry No. 64, pp. 1-45. Page numbers for docket entries refer to the pagination inserted at the top of the page by the court's electronic filing system.

[4]MSFF's MSJ, Docket Entry No. 63, p. 8; WesternGeco's MPSJ, Docket Entry No. 72, p. 8.

[5]MSFF's MSJ, Docket Entry No. 63, p. 9.

[6]Id.; WesternGeco's MPSJ, Docket Entry No. 72, p. 9.

[7]Letter Agreement, p. 1, included in Exhibit B to Notice of Removal, Docket Entry No. 1-2, p. 161.

The Letter Agreement states in relevant part:

> On 13th, April 2021, WesternGeco executed a Service Order with MSFF to acquire the Engagement 2 seismic data survey in the United States GoM (the "<u>Service Order</u>").  As of 31st March 2022 (the "<u>Effective Date</u>"), MSFF requests, and WesternGeco agrees to make a one (1) time only payment of, USD $4,000,000.00 in additional (unowed) compensation to MSFF to cover MSFF cost overruns from Engagement 2 acquisition.  In exchange for the aforementioned payment (which WesternGeco is not obligated to pay under the Service Order), MSFF agrees to the following with respect to future . . . surveys in the GOM utilizing ZXPLR nodes . . .

> ### <u>Terms, Conditions and Services</u>
>
> 1.    As of the Effective Date, MSFF has a deep water OBN crew . . . available for WesternGeco in the August/September 2022 timeframe.  MSFF is not in receipt of any tenders/expressions of interest/ LOI's/LOA's/agreements/etc. for the same time slot.
>
> 2.    Based upon the [] survey rates . . . quoted by MSFF to WesterGeco in February 2022, MSFF will provide WesternGeco with the following rates for the next pending WesternGeco OBN sparse node survey, notionally called Engagement 3 [];
>
>    a. Mobilisation fee: N/A (waived for Engagement 3)
>    b. Demobilisation fee: N/A (waived for Engagement 3)
>    c. Operational Day Rate:    USD 456,275
>    d. Standby Day Rate:        USD 433,462
>
>    * * *
>
>    The above quoted rates for Engagement 3 are firm and fixed, and not subject to adjustment . . . These rates apply to Engagement 3, to the extent commenced on or before December 31, 2023. . .
>
> 3.    . . . The parties shall execute a mutually agreed service order . . . (to the extent possible), . . . prior to commencement.
>
> 4.    For the following WesternGeco sparse OBN survey in the GoM, notionally called Engagement 4 . . . the following rates will apply:

```
a.   Mobilisation fee:        USD 3,046,978
b.   Demobilisation fee:      USD 2,273,931
c.   Operational Day Rate:    USD   474,166
d.   Standby Day Rate:        USD   450,458
```

\* \* \*

The above quoted rates for Engagement 4 are firm and fixed, and not subject to adjustment . . . These rates apply to Engagement 4, to the extent it commences on or before December 31, 2023. . .

5.  . . . The parties shall execute a mutually agreed service order . . . prior to commencement.

6.  MSFF will notify WesternGeco with details of MSFF GoM crew availability and crew schedule on a weekly basis and additionally through meetings as required by WesternGeco. . . MSFF will within twenty-four (24) hours after executing this Agreement, inform WesternGeco of any [existing offers from other customers] that could impact MSFF GoM crew availability. . .

7.  MSFF will notify WesternGeco within twenty-four (24) hours of MSFF's receipt and/or submissions of any new and/or subsequent tenders/expressions of interest/LOI's/LOA's/agreements/etc. [offers from other customers] that might impact MSFF GoM crew availability. MSFF shall provide WesternGeco with timelines and other relevant information, including, but not limited to, estimated contract award date, scheduling and any changes thereto.

8.  Upon receipt by WesternGeco of a notification from MSFF under Article 6 or Article 7 above, WesternGeco shall have ten (10) business days to execute a written agreement with MSFF and WesternGeco will secure the availability of the MSFF crew from the very next day that crew completes demobilising from its prior project. Should MSFF not be able to grant WesternGeco these ten (10) business days due to the terms of any existing and/or future tenders received by, or offers made or received by MSFF prior to or after the Effective Date, MSFF will, within twenty-four (24) hours after receipt of such tenders and/or offers, provide WesternGeco with the tender and/or offer acceptance timeline and WesternGeco may

-5-

formally execute a written agreement with MSFF in connection with that timeline, and by doing so WesternGeco will secure the availability of the MSFF crew from the very next day that crew completes demoblising from its prior project.  To allow MSFF to respond to tenders and/or offers where WesternGeco elects not to move forward with a survey window, WesternGeco will not unreasonably withhold or delay its response to MSFF.

9.    In the event that WesternGeco cannot commit to a notification provided by MSFF, all articles in the section headed Terms, Conditions and Services . . . of this Agreement will continue to apply until the time a service order is executed for both Engagement 3 and Engagement 4.  For the avoidance of doubt, this Letter Agreement is not a promise . . . that MSFF will be engaged by WesternGeco to conduct Engagement 3 and/or Engagement 4.

10.   Upon WessternGeco's receipt of MSFF's invoice by no later than April 14th, 2022, WesternGeco shall make payment to MSFF of USD $4,000,000.00 by April 30th, 2022.

11.   This Agreement shall commence on the Effective Date and remain in effect until December 31st, 2023 (the "Term").

12.   This Agreement shall be governed, interpreted and enforced according to the laws of the state of Texas, without regard to conflict of law provisions that would require application of the substantive laws of another jurisdiction.  Any claim to interpret or enforce this Agreement must be brought, solely and exclusively, before the state or federal courts in Fort Bend County, Texas and can only be tried by bench trial.  Each party on a fully informed and knowing basis, waives all rights to a jury trial.  The prevailing party in an action to enforce this Agreement will be entitled to recover its reasonable experts', attorneys' and collection agency fees and all court costs, fees and expenses.[8]

---

[8] Id. at 4-6, Docket Entry No. 1-2, pp. 162-64.

-6-

## C.    Execution of the Letter Agreement

After executing the Letter Agreement WesternGeco timely paid the $4,000,000.00 unowed compensation to MSFF for cost overruns from Engagement 2,[9] and the parties met at least weekly to discuss crew availability as contemplated by Article 6.[10]  Following the weekly meetings, Gary Poole, WesternGeco's Multi-client New Ventures Lead,[11] sent emails summarizing GoM crew availability and interest from other companies to his superiors: Ibrahim Moussa, WesternGeco's President;[12] Will Gowans, WesternGeco's Vice-President (now President);[13] and Tristan Allen, WesternGeco's Global New Ventures Manager.[14]  Their counterparts at MSFF were Simon Hayter, MSFF's Chief Sales Officer,[15] and Carel Hooijkaas, MSFF's Chief Executive Officer.[16]

---

[9]WesternGeco's MPSJ, Docket Entry No. 72, p. 9.

[10]MSFF's MSJ, Docket Entry No. 63, pp. 9-10.  See also April 11-May 27, 2022, email chain, Exhibit D of MSFF Appendix, pp. 304-306, Docket Entry No. 65, pp. 5-7.

[11]MSFF's MSJ, Docket Entry No. 63, p. 11.

[12]Id. at 13.

[13]Id. at 11.

[14]Id. at 16.  See also June 9, 2022, email chain, Exhibit F of MSFF Appendix, pp. 322-23, Docket Entry No. 65, pp. 23-24.

[15]WesternGeco's MPSJ, Docket Entry No. 72, p. 16.

[16]Id. at 18.

On June 16, 2022, MSFF and an Exxon subsidiary — Esso Exploration and Production Guyana Limited — executed a Memorandum of Understanding ("MOU") obligating them to negotiate a work order for use of the Z1 crew on a project anticipated to commence in the September 2022 timeframe.[17]  The same day, MSFF's Hayter emailed WesternGeco's Poole on the subject "Z1 Availability etc." stating:

> This afternoon (16th June 2022) we received formal correspondence from an operator to use the Z1 XPLR crew for a campaign immediately after the current survey.
>
> What is the official status of SLB's Engagement 3 project and the associated Letter of Authorisation & permit?
>
> Let me also add that we have the 2nd XPLR crew running in the GoM plus a 3rd deepwater crew operating in Egypt. Both crews will finish their current campaigns in July/August.
>
> We look forward to meeting at your convenience to discuss further.[18]

Poole responded by asking "is the Z1 XPLR crew you mention here the 'Appomattox' or the 'Mad Dog' crew," to which Hayter replied, "It's the 'Mad Dog' crew."[19]

---

[17]MOU, Exhibit A-5 of MSFF Appendix, pp. 154-59, Docket Entry No. 64-1, pp. 6-11.  <u>See also</u> MSFF's MSJ, Docket Entry No. 63, p. 10 & n. 17 explaining that "Z1 is designated here by reference to the vessels REM Saltire and Sanco Spirit."

[18]June 16, 2022, email, Exhibit G of MSFF Appendix, p. 326, Docket Entry No. 65, p. 27.

[19]<u>Id.</u>

Poole forwarded Hayter's email to Gowans, and together with Gowans drafted the following email that Poole sent to Moussa and Allen:

> See below notification of crew utilization from MSFF relative to the crew that is intended for our Engagement 3 project.  Hayter indicates that an operator has provided MSFF with "formal correspondence" to use that crew on completion of their current BP work on the Atlantis and Mad Dog proprietary surveys, due to finish end of August (however, that is a single source vessel crew, so potentially higher mob/de-mob cost if they have to bring in a second source), or around the same time, their crew that's working in Egypt is available (even higher mob/de-mob into US GOM).
>
> Referencing our Agreement with MSFF, they have to notify us within 24 hours of MSFF's receipt of LOI/LOA.  It would appear that is what Hayter is doing in his email. We now have first right to that crew and up to 10 business days to execute an agreement with MSFF to use that crew, unless the terms of the LOI/LOA they received give them less than 10 days to respond, in which case we have the same time frame to work within.  MSFF are required to tell us what that timeframe is.
>
> I can have a call with Hayter tomorrow morning to understand the relevant timelines and request written confirmation of those.[20]

Although not included in the above quoted email to Moussa and Allen, the following references to the Letter Agreement were made in the color-coded draft for this email prepared by Poole and Gowans:[21]

---

[20]June 16, 2022, email, Exhibit G of MSFF Appendix, p. 325, Docket Entry No. 65, p. 26.

[21]MSFF MSJ, Docket Entry No. 63, p. 11 & n. 22 (citing color-coded email chain showing Gowans' revisions to Poole's draft, Exhibit H of MSFF Appendix, p. 329, Docket Entry No. 65, p. 30, and explaining that in the draft email, red typeface indicates text supplied by Gowans).  See also Oral and Video Deposition of William

(continued...)

> Referencing our Letter Agreement with MSFF, the below points are relevant .....
>
> Article 7: "MSFF will notify WG within 24 hours of MSFF's receipt of LOI/LOA etc". I assume Simon's notification is in accordance with this.
>
> Article 7: "MSFF will provide WG with timelines and other relevant info including estimated contract award date relative to any such LOI/LOA's received". We should ask MSFF for the LOI/LOA timelines and expected contract award date and timelines.
>
> Article 8: "Upon receipt of notification from MSFF (as per Article 7), WG shall have 10 business days to execute a written agreement with MSFF". WG should have 10 business days to secure the crew unless ......
> "Should MSFF not be able to grant WG 10 business days due to terms agreed prior to execution date of the WesternGeco Letter Agreement and/or future tenders, then MSFF shall provide WG with the acceptance timeline and WG can execute a written agreement within the same timeline". If the operator talking to [MSFF] is Equinor, Shell or BP there may be existing terms from before our agreement that mean [MSFF] don't have to give us a[s] much as 10 days to execute a contract with them. However, if it's new work, e.g. XOM Guyana, they should have to give us the full 10 business days. But they do have to tell us what that timeline is.[22]

On June 17, 2022, Poole spoke with Hayter and they each summarized their discussion in emails to their superiors. In an email to Allen and Gowans, Poole wrote in pertinent part:

> It appears it is Exxon who are trying to secure this crew from MSFF for a campaign in Guyana. MSFF have some sort of conditional letter of intent in their hands. They are unsure whether Exxon will realistically be in a position

---

[21](...continued)
Copeland Anderson Gowans ("Gowans Deposition"), pp. 67:25-68:3, Exhibit I of MSFF Appendix, p. 349, Docket Entry No. 65, p. 50 ("Q. All right. So, the words in red are authored by you in response to Mr. Poole's solicitation of input regarding his draft email, correct? A. That's correct.").

[22]June 16, 2022, email, Exhibit H of MSFF Appendix, p. 329, Docket Entry No. 65, p. 30.

> to commence work in the Aug/Sep timeframe, so there is possibly a window for us to start Engagement 3 acquisition at that time if Exxon are not ready.  MSFF are expecting to discuss with Exxon on Monday about what "it" is and when.[23]

In an email to Hooijkaas and others, Hayter wrote:

> Gary [Poole] called.  He's asking how long he has to make a call.  I told him we'd let SLB know on Monday as we need further information before giving a deadline.
> No details on "formal correspondence" was shared but Gary suspects this is Exxon Guyana.
>
> He has no insight as to whether SLB receives permit and LOA early next week.
>
> He feels that to this point, we have maintained dialogue and good transparency on a weekly basis, so he has no complaints.
>
> Let's revert after the Exxon mtg . . .[24]

On June 21, 2022, Hayter emailed Poole stating:

> Things have progressed since we spoke on Friday.  The company I referred to below has now provided signed documentation requesting the Z1 XPLR crew immediately following Mad Dog.
>
> What is the official status of SLB's Engagement 3 project and the associated Letter of Authorisation & permit?
>
> My comment below regarding the 2nd XPLR crew and the deepwater MASS crew still stands, although both crews have varying levels of interest.
>
> With regard to the Z1 XPLR crew, we will continue to investigate the possibility of sliding a survey between Mad Dog and Company X, even though we have no unconditional award from SLB.[25]

---

[23]June 17, 2022, email (RE: [Ext] Z1 Availability etc.), Exhibit J of MSFF Appendix, p. 397, Docket Entry No. 65, p. 98.

[24]June 17, 2022, email (FW: Z1 Availability etc.), Exhibit F of WesternGeco Appendix, p. 21, Docket Entry No. 72-1, p. 28.

[25]June 21, 2022, email (RE: Z1 Availability etc.), Exhibit A-6
(continued...)

On June 23, 2022, Hayter sent another email to Poole writing in pertinent part, "[a]s stated in my recent emails, paperwork has been received for the crew immediately following Mad Dog.  Can you shed any light on the SLB permit & LOA status?"[26]  Poole responded:

> Thanks for the update.  We're still focused on the ZXPLR crew and would like to get the Engagement 3 Work Order prepared (to include a mutually agreeable termination clause, so we can secure the crew unconditionally). . . I think it would be useful if we agree on a [maybe daily] meeting schedule so we can iron out a contract efficiently.[27]

On June 29, 2022, Poole met with Hayter and other MSFF personnel.  In pertinent part, Poole summarized the meeting in an email to Gowans and Allen, that was copied to Moussa, as follows:

- Hayter talked about Egypt "MASS" crew being available in our timeframe.  Different node technology, but previously used by Anadarko in GoM.

- Hayter said they are progressing towards a contract with Company X.  He said he is assuming they will not have a contract with us as it is nearly 10 business days since he let us know that they had paperwork from company X.  Lot's of chatter about when we get our LOA etc as we have heard before.  I see little in the way of intention to giving us any priority.

- I told Hayter that our intention was to be in a position to finalize a contract, which is why we were getting their cost estimates.

---

[25](...continued) of MSFF Appendix, p. 161, Docket Entry No. 64-1, p. 13.

[26]June 23, 2022, email (RE Engagement 3 price estimate), Exhibit P of MSFF Appendix, p. 525, Docket Entry No. 66, p. 26.

[27]Id.

- Company X are saying they are ready to start acquisition in September, MSFF are a bit less sure of X's readiness, but continuing to take them at their word.

- At the end, Hayter asked whether we could send them a draft Service Order.

Can discuss tomorrow.[28]

Allen responded almost immediately stating in pertinent part: "As expected, [Hayter] now stating 10 days is triggered and backdated to his first notification of receiving 'paperwork.'"[29]

On June 30, 2022, WesternGeco debated internally whether to ask MSFF for a "formal clock" on the 10-business day ROFR period. Poole exchanged text messages with Allen agreeing that they should ask MSFF for a "formal clock," but deferred the decision to Gowans.[30]  That evening Poole emailed Allen the following:

Sat down with [Gowans] and we decided that there's no point in [Moussa] talking to [Hooijkaas].  I will continue to push [Hayter] for cost numbers in the meantime.

If we ask him for a formal clock I imagine they will say it started 10 days ago.  If we don't ask, then there's still an argument to say we never had a formal notification.  There's no great option.[31]

---

[28]June 30, 2022, email (Magseis meeting today), Exhibit R of MSFF Appendix, p. 534, Docket Entry No. 66, p. 35.  The date of the email is June 30th instead of June 29th because it was sent just after midnight.

[29]Id.

[30]Poole-Allen June 30, 2022, text messages, Exhibit EE of MSFF Appendix, pp. 689-90, Docket Entry No. 67, pp. 90-91.

[31]June 30, 2022, email (MSFF end of day), Exhibit S of MSFF Appendix, p. 537, Docket Entry No. 66, p. 38.

Allen responded, "Ok thanks Gary.  Don't they need to provide evidence?  Or they can just verbally say clock started?  Surely we put something in [t]he agreement?"[32]

### D.   MSFF Withdraws the Z1 Crew from the Gulf of Mexico

On July 15, 2022, MSFF informed WesternGeco that the Z1 crew was leaving the GoM and was no longer available for Engagement 3.[33]

WesternGeco objected to MSFF's decision to withdraw the Z1 crew from the GoM and on July 16, 2022, Gowans sent Hayter a Notice of Defective Performance.[34]

On July 19, 2022, WesternGeco sent MSFF a draft Service Order for Engagement 3.[35]

On July 20, 2022, Hayter responded to WesternGeco's Notice of Defective Performance and draft Service Order in the following email to Gowans that was copied to Poole and Allen:

---

[32]July 1, 2022, email (Re: MSFF end of day), Exhibit S of MSFF Appendix, p. 537, Docket Entry No. 66, p. 38.

[33]MSFF's MSJ, Docket Entry No. 63, p. 18; WesternGeco's MPSJ, Docket Entry No. 72, p. 13.

[34]MSFF's MSJ, Docket Entry No. 63, pp. 18-19; WesternGeco's MPSJ, Docket Entry No. 72, p. 13.  See also July 16, 2022, email (Notice of Defective Performance), Exhibit A-8 of MSFF Appendix, pp. 166-68, Docket Entry No. 64-1, pp. 18-20.

[35]MSFF's MSJ, Docket Entry No. 63, p. 19.  See also July 19, 2022, email  (Service Order MSFF Engagement 3_OBN 19th July draft), Exhibit Z of MSFF Appendix, pp. 557-606, Docket Entry No. 66, pp. 58-100, and Docket Entry No. 67, pp. 1-7.

-14-

> We've been updating SLB with news on XPLR1 (and other
> crews) since we were required to.  In very pointed emails
> of 16th June, 21st June, and 23rd June informing SLB of
> the receipt of paperwork from Company X, we asked the
> question of how ready the Engagement 3 project was.
> Other than responses to acknowledge the updates we had
> given, not once did SLB answer the questions we asked
> about project readiness (required paperwork and permits
> etc.) or use the opportunity to send a service order
> draft.
>
> During a call on 15th July, we stated XPR1 was leaving
> the GoM and pointed SLB toward MASS3 as a suitable option
> to acquire Engagement 3 in 2022.  We again asked the
> question about Engagement 3 readiness with respect to
> receipt of LOA & permit but were refused an update.
> However, we stated we are now working on a timing/
> costing/logistics model for delivering a MASS III crew
> into GoM as soon as possible.
>
> Only yesterday (19th July) did we receive a draft service
> order from SLB to review, discuss and negotiate.  This
> could have been delivered to us as far back as April 2022
> since there are a lot of items that need addressing.
> Already at a glance we see a clause related to "capped
> termination fee due to lack of BOEM permit".  MSFF is not
> in a position to take risk on permits.  Not in the GoM or
> any other geography. . .[36]

MSFF and ExxonMobil did not finalize a contract for the Z1 crew

until August 16, 2022.[37]

On August 5, 2022, WesternGeco filed this action in state

court alleging that MSFF breached the Letter Agreement by

committing the Z1 crew to another customer without providing

WesternGeco the required notice and right of first refusal.[38]

---

[36]July 20, 2022, email (Re: Notice of Defective Performance),
Exhibit FF of MSFF Appendix, p. 692, Docket Entry No. 67, p. 93.

[37]WesternGeco's MPSJ, Docket Entry No. 72, p. 13.  See also
Seismic Order #A4016483, Exhibit E of WesternGeco Appendix, pp. 14-
16, Docket Entry No. 72-1, pp. 21-23.

[38]Original Petition ("Petition"), included in Exhibit B to
(continued...)

-15-

Alleging that it would have to pay another company more than the Letter Agreement's pricing for its desired survey, WesternGeco seeks monetary damages, fees, costs, expenses, and pre- and post-judgment interest.[39]

On September 9, 2022, MSFF answered WesternGeco's action by asserting in pertinent part that

> [o]n June 10, 2022, [MSFF] notified WesternGeco by email of a competitor's desire to use the Z1 XPLR seismic crew on a Gulf of Mexico campaign immediately after the current survey ended in July/August 2022.  On June 21, 2022 [MSFF] followed up and advised WesternGeco by email that the competitor had now submitted a written request for the Z1 XPLR seismic crew.
>
> WesternGeco did not respond within 10 business days to either written notice from [MSFF] and did not comply with the Letter Agreement for Engagement 2 Service Order.  [MSFF] performed all of its obligations under the Letter Agreement for Engagement 2 Service Order.[40]

On September 9, 2022, MSFF removed WesternGeco's action to this court.[41]

---

[38](...continued)
Notice of Removal, Docket Entry No. 1-2, pp. 5-8 ¶¶ 16-27.

[39]Id. at 9.  In the Petition, WesternGeco alleged that it would have to pay another company $12-16 million more than the Letter Agreement pricing, see id. at 8 ¶ 27, but has subsequently stated that it contracted with another company for approximately $11.3 million more than the Letter Agreement pricing.  See Memorandum Opinion and Order, Docket Entry No. 52, p. 12 n. 19 (citing WesternGeco's Amended Motion for Preliminary Injunction, Docket Entry No. 44, p. 9).

[40]Magseis FF LLC's Original Answer to WesternGeco, L.L.C.'s Original Petition, included in Exhibit B, to Notice of Removal, Docket Entry No. 1-2, pp. 19-20.  The reference to June 10, 2022, appears to be a typographical error, as the undisputed evidence shows that MSFF noticed WesternGeco on June 16, 2022.

[41]See Notice of Removal, Docket Entry No. 1.

## II.  **Standard of Review**

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment.  Fed. R. Civ. P. 56.  Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2511 (1986).  A "party moving for summary judgment must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (quoting Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986)).  "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."  Id.  If, however, the moving party meets this burden, Rule 56 requires the nonmovant to go beyond the pleadings and show by admissible evidence that specific facts exist over which there is a genuine issue for trial. Id.  "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 2110 (2000).  Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  Little, 37 F.3d at 1075.  Where,

-17-

as here, parties have filed cross-motions for summary judgment, each motion "must be considered separately, as each movant bears the burden of establishing that no genuine [dispute] of material fact exists and that it is entitled to judgment as a matter of law." National Federation of the Blind of Texas, Inc. v. City of Arlington, Texas, 109 F.4th 728, 733 (5th Cir. 2024), cert. denied, 145 S. Ct. 1311 (2025) (quoting National Press Photographers Association v. McCraw, 90 F.4th 770, 781 (5th Cir. 2024), and citing Fed. R. Civ. P. 56(a)).

### III. __Cross-Motions for Summary Judgment__

WesternGeco asserts a single claim for breach of contract pursuant to Texas law alleging:

23. The Letter Agreement is a valid and enforceable contract.

24. WesternGeco fully or substantially performed its contractual obligations under the Letter Agreement by paying [MSFF] four million dollars ($4 million USD) in unowed compensation.

25. Pursuant to the Letter Agreement, [MSFF] agreed to provide written notice of any potential engagement and to allow WesternGeco to exercise its contractual right of first refusal. As it pertains to Engagement 3, [MSFF] materially breached the Letter Agreement by failing to provide the required notice before accepting another contract of employment.

26. This constitutes a material breach, as WesternGeco was not provided the benefit of the bargain for which it paid [MSFF] four million dollars. . .

27.  [MSFF]'s breach injured WesterGeco, which resulted in Engagement 3 related damages, including but not limited to WesternGeco's additional costs in securing alternative seismic acquisition services, which will result in at least twelve million dollars ($12 million USD) to sixteen million dollars ($16 million USD) in additional costs and other business, operational and contractual related consequences to WesternGeco.[42]

The parties do not dispute that the Letter Agreement is a valid contract, and that WesternGeco performed by paying MSFF $4,000,000. At issue is whether MSFF breached the Letter Agreement by contracting the Z1 Crew to ExxonMobil without giving WesternGeco notice required to trigger the ROFR.

## A.   Applicable Law

Article 12 of the Letter Agreement states that "[t]his Agreement shall be governed, interpreted and enforced according to the laws of the state of Texas," that "[a]ny claim to interpret or enforce this Agreement . . . can only be tried by bench trial," and that "each party on a fully informed and knowing basis, waives all rights to a jury trial."[43]  "Texas has a strong public policy favoring freedom of contract," and "Texas courts regularly enforce unambiguous contract language agreed to by sophisticated parties in arms-length transactions." James Construction Group, LLC v.

_____

[42]Petition, included in Exhibit B to Notice of Removal, Docket Entry No. 1-2, p. 8 ¶¶ 23-27.

[43]Letter Agreement, p. 3 ¶ 12, included in Exhibit B to Notice of Removal, Docket Entry No. 1-2, p. 164.

-19-

Westlake Chemical Corp., 650 S.W.3d 392, 403 (Tex. 2022) (citing Chalker Energy Partners III, LLC v. Le Norman Operating LLC, 595 S.W.3d 668, 673 (Tex. 2020)). Under Texas law "[i]f the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). The parties do not dispute that Texas law governs the Letter Agreement, and neither party argues that any part of that agreement is ambiguous.[44] Therefore, interpretation of the Letter Agreement is a question of law. Texas courts "construe the language of an unambiguous contract according to its plain meaning, attempting to give effect to all provisions." James, 650 S.W.3d at 403 (citation omitted).

The elements of a breach-of-contract claim under Texas law are (1) the existence of valid contract between the parties, (2) performance or tendered performance by the plaintiff, (3) breach by the defendant, and (4) damages sustained by the plaintiff as a result of that breach. Pathfinder Oil & Gas, Inc. v. Great Western Drilling, Ltd., 574 S.W.3d 882, 890 (Tex. 2019). The first two elements of WesternGeco's breach of contract claim are not in dispute. "'Breach' of a contract occurs when a party fails to perform an act it has contractually promised to perform."

---

[44]WesternGeco's MPSJ, Docket Entry No. 72, p. 4. See also MSFF's MSJ, Docket Entry No. 63, pp. 4 and 21 (citing Texas law).

Greene v. Farmers Insurance Exchange, 446 S.W.3d 761, 765 (Tex.
2014).  "Contested fact issues . . . are for the [fact finder] to
resolve, and the burden of proof is on the party seeking a remedy."
Pathfinder, 574 S.W.3d at 890.  But "[w]hether a party has breached
a contract is a question of law for the court, not a question of
fact for the jury, when the facts of the parties' conduct are
undisputed or conclusively established."  Grohman v. Kahlig, 318
S.W.3d 882, 887 (Tex. 2010) (per curiam).  See also Elmen Holdings,
L.L.C. v. Martin Marietta Materials, Inc., 86 F.4th 667, 678 (5th
Cir. 2023)("Where the evidence is undisputed regarding a person's
conduct under a contract, the court alone must determine whether
such  conduct  shows  performance  or  breach  of  a  contractual
obligation.").

**B.    Application of the Law to the Undisputed Facts**

    1.    WesternGeco's Motion for Partial Summary Judgment

WesternGeco argues that it is entitled to partial summary
judgment because undisputed evidence shows that MSFF breached the
Letter Agreement by providing the Z1 Crew to ExxonMobil instead of
WesternGeco,[45] without providing WesternGeco the notice required by
Article 7 of the Letter Agreement.[46]  WesternGeco argues that

---

[45]WesternGeco's MPSJ, Docket Entry No. 72, p. 4.

[46]Id. at 6.

under the Letter Agreement, [MSFF] agreed to provide two levels of notice to WesternGeco concerning the availability of the Z1 Crew during its term. *First*, in the first sentence of Article 7, "[MSFF] will notify WesternGeco within twenty-four (24) hours of [MSFF]'s receipt and/or submission of any new and/or subsequent tenders/expressions of interest/LOI's/LOA's/agreements/ etc. that might [i]mpact [MSFF GOM] crew availability." *Second*, in the second sentence of Article 7, "Without providing customer and/or project names (to protect client confidentiality), *[MSFF] shall provide WesternGeco with timelines and other relevant Information, including, but not limited to, estimated contract award date, scheduling and any changes thereto.*" . . .

Because it is undisputed that [MSFF] did not provide the Z1 Crew to WesternGeco, the second sentence of Article 7 of the Letter Agreement is at the crux of the parties' dispute.  [MSFF] contends that it did not breach the Letter Agreement because it gave notice under "Article 7" . . . to WesternGeco via a single sentence in a June 16, 2022 email that triggered WesternGeco's ten business day right of first refusal, running to June 30, 2022 (the "June 16 Email").  It is undisputed that WesternGeco did not enter an agreement to secure the Z1 Crew by June 30, 2022.  [MSFF] thus contends that WesternGeco's right of first refusal had expired.  WesternGeco no longer had a right to the Z1 Crew and that it was free to give the crew and vessel package to ExxonMobil after June 30, 2022.[47]

WesternGeco argues that

[e]ven if the June 16 Email may have complied with the first sentence of Article 7, it is undisputed that the June 16 Email contains none of the detailed information required by the second sentence of Article 7 in order to constitute the notice required by Article 8 to trigger WesternGeco's right of first refusal.[48]

Asserting that its "motion presents a straightforward question of contract interpretation on undisputed facts," WesternGeco argues

---

[47]Id. at 4-6.

[48]Id. at 7.

that because the June 16th Email did not "contain information required by the Letter Agreement to trigger the right of first refusal — most critically, an estimated contract award date, timelines, and scheduling," MSFF "never provided compliant notice, the right of first refusal was never triggered, and [MSFF] breached when it committed the Z1 Crew to ExxonMobil."[49]

MSFF responds that the court should deny WesternGeco's motion because the applicable standard of performance is substantial — not actual or strict — performance,[50] and because a reasonable fact finder could conclude that MSFF substantially complied with Article 7.[51]  For the reasons stated below the court agrees.

> (a)  The Applicable Standard of Performance is Substantial Compliance

Asserting that its

> position is that the June 16th [Email] complied with the first sentence of Article 7 and at least substantially complied with the second sentence, and [that] any other 'relevant information' was supplied during ensuing communications, including primarily the follow-on calls on June 17th and June 29th,"[52]

---

[49]Id. at 8.

[50]MSFF's Opposition to WesternGeco's MPSJ, Docket Entry No. 74, p. 4.

[51]Id. at 5.

[52]Id. at 7 n. 9.

-23-

MSFF argues that "[i]n diametrical opposition to the applicable standard under Texas law, WesternGeco's sponsored construction would impose a strict compliance standard upon [MSFF]'s performance under Article 7."[53]  Although in response to MSFF's MSJ, WesternGeco acknowledges that "substantial compliance can be an appropriate standard to evaluate whether a party complied with many contractual notice conditions under Texas law,"[54] WesternGeco's MPSJ and reply in support thereof argue that WesternGeco is entitled to summary judgment on breach because "the June 16th Email plainly fails to meet the explicit demands of Article 7."[55]

"Whether a contract provision requires strict or substantial compliance with its terms is governed by state law."  Elmen, 86 F.4th at 677-78.  Under Texas law, "substantial compliance is the appropriate standard when evaluating whether a party complied with a contractual notice condition."  Id. at 678 (quoting James, 650 S.W.3d at 405).  "The doctrine of substantial compliance excuses a party's deviations from a contractual requirement . . . if those deviations do not severely impair the purpose of the requirement."  Id. (quoting South Texas Electric Cooperative v. Dresser-Rand Co., Inc., 575 F.3d 504, 508 (5th Cir. 2009) (applying Texas law)).  The

---

[53]Id. at 9.

[54]WesternGeco's Opposition to MSFF's MSJ, Docket Entry No. 73, p. 25.

[55]WesternGeco's Reply, Docket Entry No. 78, pp. 6, 17-18.  See also WesternGeco's MPSJ, Docket Entry No. 72, pp. 22-27.

doctrine of substantial compliance "serves the important purpose of preventing parties from engaging in bad-faith 'gotcha' tactics to avoid their own contractual obligations based on a technicality." James, 650 S.W.3d at 406. "A party substantially complies with a notice provision when it 'communicate[s] sufficient information to enable [the other party] to reasonably conclude that the [notice provision] was in play and that the . . . clock was ticking.'" Elmen, 86 F.4th at 678 (quoting James, 650 S.W.3d at 410). "[W]here state substantive law requires substantial compliance, 'whether a party has substantially complied with the terms of a contract presents a pure question of fact that the trier of fact alone may decide.'" Id. (quoting Turrill v. Life Insurance Company of North America, 753 F.2d 1322, 1326 (5th Cir. 1985)).

> (b)    WesternGeco Fails to Argue or Cite Evidence Establishing as a Matter of Law that MSFF Did Not Substantially Comply with Article 7's Requirements

Citing the June 16th email exchange between Poole and Hayter, Poole's summary of the June 17th call that he had with Hayter, and the subsequent emails that Poole exchanged with his superiors at WesternGeco, MSFF argues that a reasonable fact finder could conclude that it substantially complied with the requirements of Article 7's second sentence because the summary judgment evidence shows that

after the June 17th call, WesternGeco knew that the operator wanting Z1 was Exxon, Exxon's competing project was in Guyana, Exxon's timeslot interfered with Z1's availability to conduct Engagement 3 in "August/September," and that the nature of the "formal correspondence" received by [MSFF] from Exxon was a "conditional letter of intent."[56]

The undisputed summary judgment evidence establishes that on June 16, 2022, MSFF and an Exxon subsidiary executed an MOU obligating them to negotiate a work order for use of the Z1 crew on a project anticipated to commence in the September 2022 timeframe.[57] The same day, MSFF's Hayter emailed WesternGeco's Poole on the subject "Z1 Availability etc." stating:

> This afternoon (16th June 2022) we received formal correspondence from an operator to use the Z1 XPLR crew for a campaign immediately after the current survey.
> . . .
> We look forward to meeting at your convenience to discuss further.[58]

Poole responded by asking "is the Z1 XPLR crew you mention here the "Appomattox" or the "Mad Dog" crew," to which Hayter replied, "It's the 'Mad Dog' crew."[59]

---

[56]MSFF's Opposition to WesternGeco's MPSJ, Docket Entry No. 74, p. 11.

[57]MSFF's MSJ, Docket Entry No. 63, p. 10 & n. 17 (explaining that "Z1 is designated here by reference to the vessels REM Saltire and Sanco Spirit."). See also MOU, Exhibit A-5 of MSFF Appendix, pp. 154-59, Docket Entry No. 64-1, pp. 6-11.

[58]June 16, 2022, email, Exhibit G to MSFF Appendix, p. 326, Docket Entry No. 65, p. 27.

[59]Id.

-26-

Following his receipt of Hayter's email, Poole forwarded it to
Gowans, and working together he and Gowans drafted the following
email that Poole sent to Moussa and Allen:

> See below notification of crew utilization from MSFF
> relative to the crew that is intended for our Engagement
> 3 project.   Hayter indicates that an operator has
> provided MSFF with "formal correspondence" to use that
> crew on completion of their current BP work on the
> Atlantis and Mad Dog proprietary surveys, due to finish
> end of August. . .
>
> Referencing our Agreement with MSFF, they have to notify
> us within 24 hours of MSFF's receipt of LOI/LOA.   It
> would appear that is what Hayter is doing in his email.
>
> We now have first right to that crew and up to 10
> business days to execute an agreement with MSFF to use
> that crew, unless the terms of the LOI/LOA they received
> give them less than 10 days to respond, in which case we
> have the same time frame to work within.   MSFF are
> required to tell us what that timeframe is.
>
> I can have a call with Hayter tomorrow morning to
> understand the relevant timelines and request written
> confirmation of those.[60]

WesternGeco does not dispute that the June 16th Email provided
the notice required by Article 7's first sentence, but argues that
it is nevertheless entitled to summary judgment because that email
did not satisfy Article 7's second sentence, which required MSFF to

---

[60]June 16, 2022, email, Exhibit G of MSFF Appendix, p. 325,
Docket Entry No. 65, p. 26.  WesternGeco alleges that "[p]ursuant
to the Letter Agreement, [MSFF] agreed to provide written notice of
any potential engagement and to allow WesternGeco to exercise its
contractual right of first refusal."   Petition, included in
Exhibit B to Notice of Removal, Docket Entry No. 1-2, p. 8 ¶ 25.
MSFF argues that the Letter Agreement does not require any of the
information mentioned in Article 7 to be provided in writing. See
MSFF's MSJ, Docket Entry No. 63, p. 21.  WesternGeco has not cited
— and the court has not found — any provision of the Letter
Agreement that requires any of the information mentioned in Article
7 to be provided in writing.

-27-

"provide WesternGeco with timelines and other relevant information, including, but not limited to, estimated contract award dates, scheduling and any changes thereto."[61]   Although substantial compliance is the appropriate standard for evaluating MSFF's compliance with the Letter Agreement's notice provision, WesternGeco neither argues nor cites evidence that it contends establishes as a matter of law that MSFF failed to substantially comply with Article 7's second sentence.   Instead, WesternGeco argues in both its MPSJ and in its reply that it is entitled to summary judgment on the issue of breach because the June 16th Email did not provide timelines, an estimated contract award date, or scheduling in strict compliance with Article 7's second sentence.[62]

When Poole forwarded the June 16th Email to Moussa and Allen, he explained that "Hayter indicates that an operator has provided MSFF with 'formal correspondence' to use that crew on completion of their current BP work on the Atlantis and Mad Dog proprietary surveys, due to finish end of August."[63]   A reasonable fact finder could conclude both that MSFF provided WesternGeco with a timeline and estimated contract award date as required by Article 7's second sentence.   Moreover, Poole also stated that "[r]eferencing our

---

[61]Letter Agreement, p. 2, included in Exhibit B to the Notice of Removal, Docket Entry No. 1-2, p. 163.

[62]See WesternGeco's MPSJ, Docket Entry No. 72, pp. 22-27; WesternGeco's Reply, Docket Entry No. 78, pp. 6, 17-18.

[63]June 16, 2022, email, Exhibit G of MSFF Appendix, p. 325, Docket Entry No. 65, p. 26.

-28-

Agreement with MSFF, they have to notify us within 24 hours of MSFF's receipt of LOI/LOA. It would appear that is what Hayter is doing in his email."[64] A reasonable fact finder could therefore conclude that WesternGeco understood that the June 16th Email triggered the Letter Agreement's ROFR.

　　　　　(c)　Conclusions

Because under Texas law substantial performance is the appropriate standard of performance for a contractual notice provision, and because a reasonable fact finder could conclude from the June 16th email exchanges between MSFF and WesternGeco and between Poole and his WesternGeco superiors that MSFF substantially complied with both sentences of the Letter Agreement's Article 7, and that the June 16th Email communicated sufficient information to enable WesternGeco to reasonably conclude that the ROFR provision was in play and the clock was ticking. See Elmen, 86 F.4th at 678 (quoting James, 650 S.W.3d at 410) ("A party substantially complies with a notice provision when it 'communicate[s] sufficient information to enable [the other party] to reasonably conclude that the [notice provision] was in play and that the . . . clock was ticking.'"). The court therefore concludes that WesternGeco has failed to establish entitlement to summary judgment on the issue of breach. WesternGeco's MPSJ will be denied.

---

[64]Id.

2.   MSFF's Motion for Summary Judgment

MSFF argues that it is entitled to summary judgment because WesternGeco is unable to establish either that MSFF breached the Letter Agreement or that WesternGeco suffered damages caused by any such breach.[65]  MSFF argues that it is entitled to summary judgment on the issue of breach because the notification it provided to WesternGeco on June 16, 2022, "substantially complied with the notice provision by conveying sufficient information to alert WesternGeco that the [ROFR] provision was in play and that the ten-business-day period had commenced."[66]  MSFF argues that it is entitled to summary judgment on the issue of causation because "[t]he summary judgment evidence conclusively demonstrates that any increased costs to WesternGeco were not the result of some technical flaw in [MSFF]'s notice but, instead, stem from WesternGeco's lack of readiness during the option period."[67]

WesternGeco responds that the court should deny MSFF's MSJ because "WesternGeco should prevail on its contemporaneously filed [MPSJ],"[68] and because MSFF's arguments all "depend on facts outside the Letter Agreement."[69]

---

[65]MSFF's MSJ, Docket Entry No. 63, pp. 6 and 21.

[66]Id. at 24.

[67]Id. at 26.

[68]WesternGeco's Opposition to MSFF's MSJ, Docket Entry No. 73, p. 5.  See also id. at 16-17.  For the reasons stated in § III.B.1, the court has already decided to deny WesternGeco's MPSJ.

[69]Id. at 5.  See also id. at 17-26.

>        (a)    The    Undisputed    Summary    Judgment    Evidence
>               Establishes that MSFF Substantially Complied with
>               the Letter Agreement's Notice Provision

Citing the June 16th email exchange between Poole and Hayter, and the emails that Poole shared with his superiors at WesternGeco on June 16th and 17th, MSFF argues that "[t]he [c]ourt should grant summary judgment because [it] substantially complied with its notice obligation under the Letter Agreement."[70]  MSFF argues that this evidence establishes that it substantially complied with its notice obligation because it shows that "[o]n June 16, 2022, [MSFF] disclosed by email the competing interest in Z1 immediately after its current project and suggested a call to discuss,"[71] "WesternGeco understood the notification was provided under Article 7 of the Letter Agreement and that receipt started the ten-business-day clock,"[72] and that "[d]uring the June 17th follow-up call, WesternGeco learned — at a minimum — that [MSFF] had a 'conditional letter of intent' for Exxon's Guyana Project for the same August/September time slot as Engagement 3."[73]  MSFF also cites evidence showing that

> [w]ithin the ten-business-day period, [MSFF] informed
> WesternGeco that: (i) [MSFF] had received signed
> documentation requesting Z1 immediately following its

---

[70]MSFF's MSJ, Docket Entry No. 63, p. 23.

[71]Id. at 22.

[72]Id.

[73]Id. at 22-23.

-31-

current project; (ii) that Exxon was progressing the contract; and (iii) that [MSFF] expected that WesternGeco would not secure Z1 because the ten business days were almost up.[74]

WesternGeco responds that the court should deny MSFF's MSJ because MSFF's "[m]otion asks the court to look past the June 16 Email and rely on extra-contractual facts and post hoc arguments."[75] Asserting that the extra-contractual evidence is irrelevant and disputed, WesternGeco argues that even if the court chooses to consider WesternGeco's internal emails from June 16th, "they are actually consistent with the fact that MSFF's June 16 Email is not adequate notice under the Letter Agreement,"[76] because WesternGeco's "witnesses testified that they were confused by the June 16 Email, not that its employees understood the ten-day clock had started."[77]

The undisputed evidence establishes that on June 16, 2022, MSFF and an Exxon subsidiary executed an MOU obligating them to negotiate a work order for use of the Z1 crew on a project anticipated to commence in the September 2022 timeframe.[78] That

---

[74]Id. at 23.

[75]WesternGeco's Opposition to MSFF's MSJ, Docket Entry No. 73, p. 6. See also id. at 17-26.

[76]Id. at 18.

[77]Id. at 20.

[78]MSFF's MSJ, Docket Entry No. 63, p. 10 & n. 17 (explaining that "Z1 is designated here by reference to the vessels REM Saltire and Sanco Spirit."). See also MOU, Exhibit A-5 of MSFF Appendix, pp. 154-59, Docket Entry No. 64-1, pp. 6-11.

same day, MSFF's Hayter emailed WesternGeco's Poole regarding "Z1 Availability etc." stating:

> This afternoon (16th June 2022) we received formal correspondence from an operator to use the Z1 XPLR crew for a campaign immediately after the current survey.
>
> . . .
>
> We look forward to meeting at your convenience to discuss further.[79]

Poole responded by asking "is the Z1 XPLR crew you mention here the 'Appomattox' or the 'Mad Dog' crew," to which Hayter replied, "It's the 'Mad Dog' crew."[80]

Poole forwarded the June 16th Email to Gowans, and together they drafted the following email that Poole sent to Moussa and Allen:

> See below notification of crew utilization from MSFF relative to the crew that is intended for our Engagement 3 project.  Hayter indicates that an operator has provided MSFF with "formal correspondence" to use that crew on completion of their current BP work on the Atlantis and Mad Dog proprietary surveys, due to finish end of August . . .
>
> Referencing our Agreement with MSFF, they have to notify us within 24 hours of MSFF's receipt of LOI/LOA.  It would appear that is what Hayter is doing in his email.
>
> We now have first right to that crew and up to 10 business days to execute an agreement with MSFF to use that crew, unless the terms of the LOI/LOA they received give them less than 10 days to respond, in which case we

---

[79]June 16, 2022, email, Exhibit G to MSFF Appendix, p. 326, Docket Entry No. 65, p. 27.

[80]Id.

have the same time frame to work within.  MSFF are required to tell us what that timeframe is.

I can have a call with Hayter tomorrow morning to understand the relevant timelines and request written confirmation of those.[81]

Although not included in the above quoted email that was sent to Moussa and Allen, the following references to the Letter Agreement were made in a color-coded draft of the email created by Poole and Gowans:

Referencing our Letter Agreement with MSFF, the below points are relevant .....

Article 7: "MSFF will notify WG within 24 hours of MSFF's receipt of LOI/LOA etc".  I assume Simon's notification is in accordance with this.

Article 7: "MSFF will provide WG with timelines and other relevant info including estimated contract award date relative to any such LOI/LOA's received".  We should ask MSFF for the LOI/LOA timelines and expected contract award date and timelines.

Article 8: "Upon receipt of notification from MSFF (as per Article 7), WG shall have 10 business days to execute a written agreement with MSFF".  WG should have 10 business days to secure the crew unless ......

"Should MSFF not be able to grant WG 10 business days due to terms agreed prior to execution date of the WesternGeco Letter Agreement and/or future tenders, then MSFF shall provide WG with the acceptance timeline and WG can execute a written agreement within the same timeline".  If the operator talking to [MSFF] is Equinor, Shell or BP there may be existing terms from before our agreement that mean [MSFF] don't have to give us a[s] much as 10 days to execute a contract with them. However, if it's new work, e.g. XOM Guyana, they should

---

[81]June 16, 2022, email, Exhibit G of MSFF Appendix, p. 325, Docket Entry No. 65, p. 26.

have to give us the full 10 business days.  But they do have to tell us what that timeline is.[82]

On June 17, 2022, Poole spoke with Hayter and summarized their discussion in the following email to Allen and Gowans:

> It appears it is Exxon who are trying to secure this crew from MSFF for a campaign in Guyana.  MSFF have some sort of conditional letter of intent in their hands.  They are unsure whether Exxon will realistically be in a position to commence work in the Aug/Sep timeframe, so there is possibly a window for us to start Engagement 3 acquisition at that time if Exxon are not ready.  MSFF are expecting to discuss with Exxon on Monday about what "it" is and when.[83]

On June 21, 2022, Hayter emailed Poole stating:

> Things have progressed since we spoke on Friday.  The company I referred to below has now provided signed documentation requesting the Z1 XPLR crew immediately following Mad Dog.[84]

On June 23, 2022, Hayter sent another email to Poole writing in pertinent part, "[a]s stated in my recent emails, paperwork has been received for the crew immediately following Mad Dog. . ."[85] Poole responded: "Thanks for the update.  We're still focused on the ZXPLR crew and would like to get the Engagement 3 Work Order

---

[82]June 16, 2022, email, Exhibit H of MSFF Appendix, p. 329, Docket Entry No. 65, p. 30.

[83]June 17, 2022, email (RE: [Ext] Z1 Availability etc.), Exhibit J of MSFF Appendix, p. 397, Docket Entry No. 65, p. 98.

[84]June 21, 2022, email (RE: Z1 Availability etc.), Exhibit A-6 of MSFF Appendix, p. 161, Docket Entry No. 64-1, p. 13.

[85]June 23, 2022, email (RE Engagement 3 price estimate), Exhibit P of MSFF Appendix, p. 525, Docket Entry No. 66, p. 26.

prepared (to include a mutually agreed termination clause, so we can secure the crew unconditionally). . ."[86]

On June 29, 2022, Poole met with Hayter and other MSFF personnel.  In pertinent part, Poole summarized the meeting in an email to Gowans and Allen that was copied to Moussa:

- Hayter said they are progressing towards a contract with Company X.  He said he is assuming they will not have a contract with us as it is nearly 10 business days since he let us know that they had paperwork from company X. . . I see little in the way of intention to giving us any priority.

- I told Hayter that our intention was to be in a position to finalize a contract, which is why we were getting their cost estimates.

- Company X are saying they are ready to start acquisition in September, MSFF are a bit less sure of X's readiness, but continuing to take them at their word.

- At the end, Hayter asked whether we could send them a draft Service Order.

Can discuss tomorrow.[87]

Allen responded almost immediately stating in pertinent part: "As expected, [Hayter] now stating 10 days is triggered and backdated to his first notification of receiving 'paperwork.'"[88]

---

[86]Id.

[87]June 30, 2022, email (Magseis meeting today), Exhibit R of MSFF Appendix, p. 534, Docket Entry No. 66, p. 35.  The date of the email is June 30th instead of June 29th because it was sent just after midnight.

[88]Id.

-36-

On June 30, 2022, WesternGeco debated internally whether to ask MSFF for a "formal clock" on the 10-business day ROFR period. Poole exchanged text messages with Allen agreeing that they should ask MSFF for a "formal clock," but deferred the decision to Gowans.[89]  That evening Poole emailed Allen the following:

> Sat down with [Gowans] and we decided that there's no point in [Moussa] talking to [Hooijkaas].  I will continue to push [Hayter] for cost numbers in the meantime.

> If we ask him for a formal clock I imagine they will say it started 10 days ago.  If we don't ask, then there's still an argument to say we never had a formal notification.  There's no great option.[90]

Allen responded, "Ok thanks Gary.  Don't they need to provide evidence?  Or they can just verbally say clock started?  Surely we put something in [t]he agreement?"[91]

The June 16th email that Poole and Gowan drafted for Moussa and Allen, and the email that Poole actually sent to Moussa and Allen, demonstrate that WesternGeco understood the June 16th Email from Hayter to Poole as notice sent pursuant to Article 7 of the Letter Agreement that a competitor sought to secure the Z1 Crew at the end of August, that MSFF's June 16th Email triggered Article

---

[89]Poole-Allen June 30, 2022, text messages, Exhibit EE of MSFF Appendix, pp. 689-90, Docket Entry No. 67, pp. 90-91.

[90]June 30, 2022, email (MSFF end of day), Exhibit S of MSFF Appendix, p. 537, Docket Entry No. 66, p. 38.

[91]July 1, 2022, email (Re: MSFF end of day), Exhibit S of MSFF Appendix, p. 537, Docket Entry No. 66, p. 38.

8's ROFR period, and that WesternGeco had up to ten business days to execute a written agreement to secure the Z1 Crew.  These emails also establish that WesternGeco's only confusion was whether the competitor was an operator that had an existing agreement with MSFF, such as Equinor, Shell, or BP, in which case WesternGeco could have less than ten business days to secure the Z1 Crew; or whether the competitor represented new work, e.g., ExxonMobil, in which case WesternGeco would have the full ten business days. Poole's email summarizing his June 17th call with Hayter confirmed that the competitor was Exxon, that Exxon's time slot would interfere with Z1's availability to conduct Engagement 3 in August/September, and that the nature of the formal correspondence received by MSFF from Exxon was a conditional letter of intent.[92] The subsequent emails from June 21st, June 23rd, June 29th, and June 30th demonstrate that throughout the ten-business-day ROFR period that followed MSFF's June 16th Email, MSFF continued to provide WesternGeco "other relevant information" as required by Article 7. The details disclosed by MSFF to WesternGeco on June 16th and that WesternGeco understood to trigger the Letter Agreement's ten-business-days ROFR period, establish that MSFF substantially complied with the Letter Agreement's notice provision on June 16, 2022.  See Elmen, 86 F.4th at 678 (quoting James, 650

---

[92]June 17, 2022, email (RE: [Ext] Z1 Availability etc.), Exhibit J of MSFF Appendix, p. 397, Docket Entry No. 65, p. 98.

S.W.3d at 410)("A party substantially complies with a notice provision when it 'communicate[s] sufficient information to enable [the other party] to reasonably conclude that the [provision] was in play and that the . . . clock was ticking.'")).

> (b)   WesternGeco Fails to Cite Evidence that Raises a Genuine Issue of Material Fact for Trial

Although whether a party has substantially complied with the terms of the contract is a question of fact, id., and factual controversies are resolved in favor of the nonmovant, these principles only apply when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. Little, 37 F.3d at 1075. WesternGeco's opposition to MSFF's MSJ lists a number of factual disputes that it argues present genuine issues of material fact for trial,[93] but the court is not persuaded that any of the disputes listed in WesternGeco's opposition are disputes that if resolved in WesternGeco's favor would allow a reasonable fact finder to conclude that MSFF did not substantially comply with the Letter Agreement's notice provision. For example, citing deposition testimony of WesternGeco and MSFF employees, WesternGeco argues that a genuine issue of material fact exists as to whether MSFF ever told WesternGeco that the ten-day ROFR period had started. This issue does not present a genuine issue of

---

[93]WesternGeco's Opposition to MSFF's MSJ, Docket Entry No. 73, pp. 8-14.

material fact for trial because the Letter Agreement obligated MSFF to notify WesternGeco of new and/or subsequent offers from other customers; it did not obligate MSFF to notify WesternGeco that the ROFR period had started.  Therefore a dispute about whether MSFF told WesternGeco that "the clock was ticking" is not a genuine issue of material fact for trial.

Citing <u>James</u>, 650 S.W.3d at 405, for stating that "a party has not substantially complied if their deviations from the express contract terms 'severely impair the purpose of the requirement,"[94] WesternGeco argues that "[w]hether the purpose [of the Letter Agreement's notice provision] was 'severely impaired' is a fact question for the [c]ourt to resolve at trial."[95]  WesternGeco argues that it "has presented substantial evidence that [MSFF's] omissions deprived it of the information it needed to evaluate and act on its rights."[96]  But instead of citing evidence in support of this argument, WesternGeco merely argues that MSFF's

> omissions were not technical, inconsequential defects to its notice — they were wholesale. . . [MSFF] provided no estimated contract award date, no timelines, and no scheduling information. Omitting the entire substance of Article 7's second sentence is not a minor deviation because it eliminates the mechanism by which WesternGeco could evaluate whether and how to exercise its [ROFR].[97]

---

[94]<u>Id.</u> at 25.

[95]<u>Id.</u>

[96]<u>Id.</u>

[97]<u>Id.</u>

WesternGeco does not cite any evidence that would allow a reasonable fact finder to conclude that the notice it received on June 16th that a competitor sought to engage the Z1 Crew in the August/September timeframe, which was the timeframe that WesternGeco planned to engage the Z1 Crew for Engagement 3, was not sufficient for it to evaluate whether and how to exercise its ROFR.

Contrary to WesternGeco's argument that substantial compliance is inapplicable to the facts of this case, the Texas Supreme Court has held that the doctrine of substantial compliance is a "general principle of Texas law," James, 650 S.W.3d at 406, and the Fifth Circuit has held that "[t]he doctrine of substantial compliance excuses a party's deviations from a contractual requirement . . . if those deviations do not severely impair the purpose of the requirement." Elmen, 86 F.4th at 678 (quoting South Texas Electric, 575 F.3d at 508 (applying Texas law)). In Elmen the Fifth Circuit also held that "[a] party substantially complies with a notice provision when it 'communicate[s] sufficient information to enable [the other party] to reasonably conclude that the [provision] was in play and that the . . . clock was ticking,'" Id. (quoting James, 650 S.W.3d at 410). The Elmen court also held that "[w]here the evidence is undisputed regarding a person's conduct under a contract, the court alone must determine whether such conduct shows performance or breach of a contractual obligation." Id. at 677-78.

-41-

(c) Conclusions

Because under Texas law substantial performance is the appropriate standard of performance for a contractual notice provision, because MSFF has cited evidence demonstrating that on June 16th MSFF "'communicate[d] sufficient information to enable [WesternGeco] to reasonably conclude that the [ROFR provision] was in play and that the . . . clock was ticking,'" Elmen, 86 F.4th at 678 (quoting James, 650 S.W.3d at 410), and because WesternGeco has failed to cite evidence from which a reasonable fact finder could conclude that the deviations from the express contract terms of which WesternGeco complains, i.e., the failure to disclose specific timelines and an estimated contract award date, severely impaired the purpose of the Letter Agreement's notice provision, the court concludes that MSFF is entitled to summary judgment because it has established as a matter of law that it substantially complied with the Letter Agreement's notice provision. Therefore, MSFF's MSJ will be granted.

## IV. Conclusions and Order

For the reasons stated in § III.B.1, above, the court concludes that WesternGeco has failed to establish entitlement to summary judgment on the issue of breach. Therefore, Plaintiff WesternGeco, LLC's Motion for Partial Summary Judgment, Docket Entry No. 72, is **DENIED.**

For the reasons stated in § III.B.2, above, the court concludes that MSFF has established entitlement to summary judgment on the issue of breach.  Therefore, Defendant Magseis FF L.L.C.'s Motion for Summary Judgment, Docket Entry No. 63, is **GRANTED**.

**SIGNED** at Houston, Texas, on this 20th day of July, 2026.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE